KRIS MAYES
Attorney General

Deborah Garner (026161)
Assistant Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004-1592
Phone: (602) 542-8050
Fax: (602) 542-3393
DefensePhx@azag.gov
Deborah.Garner@azag.gov
*Attorney for DCS Defendants*

**UNITED STATES DISTRICT COURT**

**IN AND FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Jessica Ploof,<br><br>            Plaintiff,<br><br>v.<br><br>State of Arizona, et al.,<br><br>            Defendants. | Case No: 2:21-cv-00853-JJT<br><br>**DCS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>(Hon. John J. Tuchi) |

Department of Child Safety ("DCS") Defendants Tafoya, Greenway, Szymkowski, Hoff, and Breeding ("DCS Defendants"), respectfully move for summary judgment under Federal Rule of Civil Procedure 56. This Motion is supported by DCS Defendants' Statement of Facts ("DSOF") and the following Memorandum of Points and Authorities.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    SUMMARY OF REMAINING CLAIMS**

The First Amended Complaint ("FAC") was filed on June 7, 2024.[1] (Doc. 54.) The remaining claims include: **Four**—judicial deception by Szymkowski (*Id.* ¶¶ 243-250); **Five**—conspiracy to commit judicial deception by Szymkowski, Hoff, and Thal (*Id.* ¶¶ 251-258); **Six**—due process violations by all DCS Defendants for their failure to make reasonable efforts to preserve the family. (*Id.* ¶¶ 259-279).

---

[1] On January 15, 2026, the parties stipulated to and the Court granted the dismissal with prejudice on Claims 7-9. (Docs. 103-104.)

1

## II. SUMMARY OF ARGUMENT

- The doctrine of claim preclusion bars Count Six because (1) the same issues were raised in the dependency and termination proceedings; (2) there was a final judgment on the merits, and (3) an identity or privity between parties.
- No reasonable juror could find judicial deception; Plaintiff cannot identify any material misrepresentations or omissions to the State Court, nor any evidence of malice or reckless disregard by Szymkowski.
- The conspiracy claim fails; conspiracy is a derivative claim, and Ploof cannot establish the underlying judicial deception claim.
- The doctrine of issue preclusion independently bars the judicial deception and familial association claims; the issues were previously litigated, Plaintiff had a full and fair opportunity to litigate them, and the findings were necessary to the State Court's rulings.
- Qualified immunity shields them from liability, as no clearly established law was violated.

## III. PROCEDURAL BACKGROUND

This action arises from a 2016 DCS investigation and subsequent dependency proceedings involving Plaintiff and her minor child H.P., whose parental rights were terminated by the State Court in 2019.[2] For purposes of this Motion, it is relevant that this Court dismissed Count **One**—the ADA Count[3] as barred by the doctrine of claim preclusion (Doc. 14); and Count **Two**—the unlawful seizure of H.P. as time-barred. All state claims were dismissed after remand back to the State Court. (DSOF ¶ 54.)

## IV. FACTUAL BACKGROUND

### A. Hotline Reports and Investigation.

Ploof is the mother of H.P., a minor child born April 29, 2014. (Doc. 54 ¶ 17.) On December 20, 2016, DCS received an anonymous hotline report that Ploof was neglecting

---

[2] The termination was appealed resulting in three decisions: *Jessica P. v. Dep't of Child Safety*, 249 Ariz. 461 (App. 2020) ("*Jessica P. I*"); *Jessica P. v. Dep't of Child Safety*, 2020 WL 8766053 (Ariz. Dec. 15, 2020) ("*Jessica P. II*"); and *Jessica P. v. Dep't of Child Safety,* 251 Ariz. 34 (App. 2021) ("*Jessica P. III*"). Ultimately, the termination was affirmed. A court may take judicial notice of proceedings "in other courts" on its own volition when those proceedings "have a direct relation to matters at issue." Fed. R. Evid. 201(c)(1); *see also United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007).

[3] The two Acts referenced in the FAC will be jointly referred to as the ADA: Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213 and the Rehabilitation Act, 29 U.S.C. § 794.

2

H.P. and that her home was unsafe. (DSOF ¶ 1.) Ploof, H.P., and maternal grandmother, Brendi Ploof ("Brendi"), lived in the same residence. (DSOF ¶ 2.) Defendant Tafoya visited the home on December 21, 2016, at 10:15 a.m., and interviewed Ploof who admitted consuming alcohol that morning while home alone with H.P. (*Id.*) Tafoya also detected the odor of alcohol on Ploof. (*Id.*) Tafoya asked Ploof to complete a urinalysis drug screen and a hair follicle drug test. (*Id.*) Tafoya reported that Ploof had difficultly comprehending what was happening and made threats of self-harm during the DCS interaction. (*Id.*) Later that same day, DCS received a second hotline report. (DSOF ¶ 3.) Tafoya returned to the home with the assistance of law enforcement and a crisis response team. Brendi was interviewed and reported that H.P. previously received services from the Department of Developmental Disabilities ("DDD"), but those services were discontinued because HP was "doing well." (DSOF ¶ 4.) DCS identified Brendi as the safety monitor and allowed HP to remain in the home with Ploof while the investigation continued. (DSOF ¶ 5.)

Between December 21, 2016, and January 11, 2017, Ploof underwent drug testing, which indicated a positive urinalysis test for marijuana and alcohol, and a positive hair follicle screen for high levels of marijuana and methamphetamines. (Doc. 54 ¶¶ 90-92; DSOF ¶¶ 6-8.) A Team Decision Making ("TDM") meeting was scheduled on January 11, 2017, to address the positive drug screens. (Doc. 54 ¶ 92; DSOF ¶ 10.) At the conclusion of the TDM, it was decided that an in-home dependency petition would be filed and the safety plan would remain in place assuming Ploof cooperated with services including family preservation, random urinalysis testing, parenting classes, and Terros drug treatment. (DSOF ¶ 10.) Brendi also agreed to complete a urinalysis screen by January 12, 2017. Brendi did not complete that test and then reported to Tafoya that Ploof did not want to participate in services. (Doc. 54 ¶¶ 101-102; DSOF ¶¶ 10-11.) Because of Ploof's failure to cooperate with services, and Brendi's failure to complete two drug tests as requested, the safety plan was no longer viable, and H.P. was taken into the temporary physical custody of DCS. (DSOF ¶¶ 11-13.) The temporary custody notice (TCN)

identified the circumstances for removal as "the physical or mental condition of a child's caregiver endangers the child's health or safety" and "substance abuse." (DSOF ¶ 12.) On January 17, 2017, a dependency petition was filed alleging Ploof was unable to parent due to "substance abuse and mental health issues," and the State Court issued the corresponding orders making H.P. a temporary ward of the Court. (DSOF ¶¶ 14-16.)

B.   Post-Removal.

Ploof attended the preliminary protective conference and hearing on January 20, 2017. (DSOF ¶17.) At that hearing, she was appointed both an attorney, who appeared with her, and a guardian-ad-litem. (*Id.*) The hearing was continued to a later date. (*Id.*) The State Court placed H.P. with a relative, Heather Walker (Walker), and made findings that "DCS attempted to identify and assess placement of H.P. with a member of the child's extended family." (Doc. 54 ¶ 129; DSOF ¶¶ 19, 21.) The State Court ordered that H.P. remain in the physical custody of Walker until otherwise ordered by the Court and that DCS was not to move the child to a different placement without prior court approval except in case of emergency. (DSOF ¶ 21.) The State Court then ordered supervised visitation. (DSOF ¶ 22.) H.P. was provided a Rapid Response Assessment, which identified considerable developmental delays. (DSOF ¶ 20.) During the assessment, Walker reported a number of concerns and questioned whether she had the ability to continue caring for H.P. (*Id.*) A few days later, Walker reported that due to H.P.'s needs, she was unable to continue caring for him, so DCS filed a motion with the State Court to change physical custody to DCS. (DSOF ¶¶ 23-24.) A maternal aunt, Sherry Walford (Walford), was identified by Ploof as a potential placement, but Walford disclosed to Tafoya a recent DUI conviction.[4] (DSOF ¶ 25.) Because of the concerns for substance abuse in the home, she was denied as placement. (*Id.*) At the hearing on January 31, the Court addressed H.P.'s placement; Ploof appeared with counsel and her guardian-ad-

---

[4] On August 26, 2015, the City of Mesa filed a Complaint against Walford for DUI, Alcohol, Drugs, Toxic Vapor, and she pled guilty on December 8, 2015. (DSOF ¶ 26.) The DUI occurred 17 months prior to HP being removed from the home. (DSOF ¶ 26.)

4

litem. She did not object when H.P.'s physical custody was changed to foster care. (DSOF ¶ 27.)

At that same hearing, Ploof denied the allegations in the Dependency Petition but submitted the issue of dependency for the State Court's determination. A dependency finding was made based on allegations of substance abuse and mental health concerns set forth in the Dependency Petition and the January 18, 2017, court report. (DSOF ¶ 18.)

### C.     On-Going Dependency.

During the dependency proceedings, Brendi filed two motions with the State Court to obtain custody of H.P., both denied by the Court. (DSOF ¶ 28.) Brendi then filed a guardianship motion, which was heard concurrently with the severance trial and denied. (DSOF ¶ 31.) After the dependency was granted, DCS offered a variety of services to Ploof, Brendi, and H.P. including two psychological evaluations for Ploof, two psychological evaluations for Brendi, and a bonding assessment for H.P., Brendi, and the foster placement. (DSOF ¶¶ 30, 32-34.) DCS explored a co-parenting arrangement for H.P. with Ploof and Brendi. (DSOF ¶¶ 30, 40.) Ploof followed DCS's directions and participated in DCS services to the best of her ability. (DSOF ¶¶ 32-33, 40.) She attended court hearings and understood what was required for her to obtain custody of H.P. (DSOF ¶ 32.) The court reports provided to the parties and Court outlined the services offered by DCS, the exploration into a co-parenting solution, as well as the behavioral changes necessary to safely return H.P. to Ploof. (DSOF ¶¶ 32, 40.) Despite all the efforts to reunify Ploof with H.P., due to the passage of time and the statutory mandate to obtain permanency for H.P., DCS requested the Court change the case plan to severance and adoption, and the Court agreed. (DSOF ¶ 30.)

### D.     Severance Trial.

A seven-day severance trial resulted in the termination of Ploof's parental rights to H.P. (Doc. 54 ¶ 239; DSOF ¶¶ 31.) The Court of Appeals affirmed termination. *See Jessica P. I, Jessica P. II,* and *Jessica P. III*. (DSOF ¶¶ 33-34.) The State Court maintained continuous jurisdiction from January 17, 2017, until H.P.'s adoption on August 2, 2022.

(DSOF ¶ 36.) During that time, the State Court made findings consistent with the Adoption and Safe Families Act on seven occasions. (DSOF ¶ 37.) The Court of Appeals found that Ploof's due process rights were not violated. (DSOF ¶¶ 33-35.)

## V.    STANDARD OF PROOF

### A.    There are No Genuine Issues of Material Fact and No Due Process Violations.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Likewise, substantive due process applies only to egregious arbitrary government conduct. *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974); *Collins v. Harker Heights,* 503 U.S. 115, 129 (1992). "Unwarranted interference includes governmental actions that are vexatious and unnecessary, harassing, unfounded or unreasonable, and arbitrary, discriminatory, or demonstrably irrelevant." *Daurio v. Arizona Dep't of Child Safety*, 2020 WL 6940812, *5 (D. Ariz. 2020) (citation omitted). To state a familial association claim, Ploof must allege that the Defendants' interference with the familial relationship was unwarranted. *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 441 n.23 (9th Cir. 2010) (citation omitted.) The record shows that DCS acted pursuant to court orders and documented safety concerns; therefore, no reasonable juror could find arbitrary or unwarranted interference and the substantive due process claims fail.

To prove procedural due process violations, Plaintiff must show:(1) deprivation of a constitutionally protected liberty or property interest; and (2) denial of adequate procedural protections. *United States v. 101 Houseco, LLC*, 22 F.4th 843, 851 (9th Cir. 2022). Plaintiff was appointed counsel, had hearings, and an opportunity to contest DCS actions. Because Plaintiff received full procedural protections, Plaintiff's procedural due process claims fail as a matter of law.

## VI. CLAIM PRECLUSION BARS COUNT SIX

The original Complaint alleged ADA violations and interference in the familial relationship based on DCS's failure to provide appropriate reunification services. (Doc. 1 ¶¶ 256-280, 323-343.) This Court dismissed the ADA claim under claim preclusion and the *Rooker-Feldman* doctrine after finding that the adequacy of the ADA accommodations and reunification services had already been litigated and affirmed on appeal.[5] (Doc. 14 at 10-12.) Count Six of the Amended Complaint (Doc. 54 ¶¶ 259-279) restates the same allegations. Because this Court has already found all four elements of claim preclusion satisfied, the same analysis applies and Count Six should be dismissed.

Under Arizona law, claim preclusion bars re-litigation of issues where a final judgment on the merits involves the same parties, subject matter, and cause of action. *Hall v Lalli,* 194 Ariz. 54, 57 (App. 1999) (citing *Hall v. Lalli*, 191 Ariz. 104, 106 (App. 1997). Here, the Arizona Court of Appeals expressly held that DCS made diligent and reasonable efforts to reunify the family, rejecting Ploof's argument that DCS failed to accommodate her disability. The Court of Appeals made the following finding:

> As the juvenile court found, DCS offered Mother numerous reunification services, including random urinalysis testing, substance abuse treatment, more than 30 individual counseling sessions (exceeding the 20 sessions recommended by Dr. Thal), two psychological evaluations, a bonding assessment, therapeutic visitation and supervised visitation, a parent aide, and transportation because she did not drive. DCS invited her to attend the child's medical appointments so that she could understand his special needs…Sufficient evidence supported the court's finding that DCS made diligent efforts to provide reunification services.

(DSOF ¶ 33.) Moreover, this Court determined that: (1) the Court of Appeals decision was a final judgment on the merits, (2) the parties are identical, (3) there was a common identity of subject matter, and (4) the same cause of action. (Doc. 14 at 10-12.) Ploof

---

[5] In the Motion to Dismiss, DCS Defendants moved to dismiss all 42 U.S.C. § 1983 Counts, including Count Six, as time barred. At that time, they did not move to dismiss Count Six under preclusion doctrine. (Doc. 8.)

7

never appealed that ruling, making dismissal of the ADA claim final.[6] Because the adequacy of DCS's reunification efforts has been fully adjudicated, Count Six—which merely repackages the same allegations—is barred by claim preclusion and the law of the case doctrine. *U.S. v. Alexander*, 106 F.3d 874 (9th Cir. 1997) ("A court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case.")

## VII. NO FACTS SUPPORT A JUDICIAL DECEPTION CLAIM AGAINST SZYMKOWSKI—COUNT FOUR

"A person commits judicial deception when they make "(1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision." *Benavidez v. County of San Diego,* 993 F.3d 1134, 1147 (9th Cir. 2021). Ploof alleges that Szymkowski committed judicial deception through her testimony under oath. (Doc. 54 ¶ 247.) This claim fails as a matter of law because any statements made during testimony are categorically protected by absolute immunity. *Briscoe v. LaHue*, 460 U.S. 325, 330–31 (1983) (Absolute immunity protections apply for any testimony or evidence offered during the juvenile court proceedings.) This includes government witnesses in dependency proceedings. *Nation v. Cholla*, 173 Ariz. 245, 251-52 (App. 1991). Even absent immunity, the claim fails because there is: (1) no evidence any alleged misrepresentations were communicated to the Court; (2) no evidence the statements were misrepresentations; and (3) no evidence they were material to the

---

[6] The State Court also monitors DCS efforts throughout the proceedings and made reasonable efforts findings at reoccurring intervals on seven occasions. (DSOF ¶ 37.) Likewise, findings of reasonable efforts were made in the original Order terminating parental rights (DSOF ¶ 31) twice at the Court of Appeals, (*Jessica P. I* and *III*), and a fourth time by this Court. (Doc. 14.) In addition, this argument was adopted in the Maricopa County Superior Court case, CV 2020-017046, addressing the remanded state counts for gross negligence. Judge Michael Herrod found claim preclusion mandated dismissal of Counts 11-13. "Now in this matter, Ploof wishes for the Court to litigate whether State Defendants were grossly negligent in performing the very services that were upheld by the Court of Appeals in the two *Jessica P.* cases. Those issues arise out of the same transaction as the Juvenile Court proceedings and are precluded." (DSOF ¶ 54.)

termination of Ploof's rights. Judicial deception requires a false statement or omission actually communicated to the court; absent that, the claim fails as a matter of law.

### A. Jessica's Refusal of Services.

The FAC alleges Szymkowski falsely stated Ploof refused services. "Furthermore, Jessica *never* refused any of the services offered by any agent of DCS." (Doc. 54 ¶ 126.) This claim fails for multiple reasons. First, Ploof identifies no record or evidence showing when or where this statement was made. If it was made during testimony, it is protected by immunity. *Nation*, 173 Ariz. at 25-251. Second, Szymkowski's court reports submitted to the State Court contain no such statement or variation of it. (DSOF ¶ 40.) Third, the FAC contradicts itself, alleging elsewhere that Szymkowski testified "Jessica participated in services to the best of her abilities" (Doc. 54 ¶ 149), and, described the specific services completed by Jessica. (*Id.* ¶ 156.) Therefore, Ploof offers no evidence that this alleged statement was ever communicated to the court, was false, or was material to any judicial decision. Moreover, the Court of Appeals found Ploof completed services consistent with Szymkowski's testimony, eliminating any possible prejudice. (DSOF ¶¶ 33-35.)

### B. Representing Jessica Failed to Get HP Services Prior to Removal.

The same flaws noted above destroys this alleged deceptive statement as well. Ploof has not identified where in the record this statement was supplied to the State Court by Szymkowski. (DSOF ¶¶ 40-41.) Further, the State Court found Ploof did *fail* to seek proper treatment for H.P. prior to removal, so by definition, it is not a misrepresentation. (DSOF ¶¶ 31, 33-34.)

### C. Timing of Brendi's Use of Device to Alter Drug Test.

Plaintiff also claims that Szymkowski made a false statement regarding the timing of when Brendi used a device to alter her drug test results. This allegation fails for several reasons. First, the alleged statement occurred during Szymkowski's trial testimony and is therefore protected by immunity. (*Id.* ¶ 123.) But even if Szymkowski had erroneously testified about the timing, the statement is immaterial because the Court of Appeals found that any tampering occurred *post-removal*. (DSOF ¶ 33, at ¶ 9.) Finally, none of

1  Szymkowski's three court reports reference the tampering of the drug test or link it to
2  H.P.'s removal. (DSOF ¶ 42.)

### D. Statements to Dr. Thal.

4  Ploof's claim that Szymkowski lied to Dr. Thal to influence his report by stating
5  that Ploof had a "substandard" home and that H.P. was in "very poor overall condition"
6  or "grossly neglected" at removal is unsupported by any admissible evidence. (Doc. 54 ¶
7  183.) Ploof identifies no facts showing Szymkowski used these words. The record
8  establishes only that this language reflected Dr. Thal's own characterization of the
9  conversation. (DSOF ¶¶ 46-48.) Second, contemporaneous hotline reports independently
10 described the home as substandard, even if not observed by Tafoya when she visited the
11 residence on December 21, 2016. (DSOF ¶¶ 1-2.) Further, H.P.'s developmental delays
12 were documented within days of his removal by the relative placement and in the Rapid
13 Response Assessment and the State Court found he was delayed in its severance ruling,
14 which was later affirmed on appeal. (DSOF ¶¶ 20, 31, 33-35.)

15 Next, no evidence shows that Szymkowski submitted these alleged statements to
16 the State Court as required to establish judicial deception. Plaintiff alleges that Dr. Thal
17 changed his report after speaking to Szymkowski; however, she also alleges that the report
18 was submitted to the State Court after Szymkowski was removed from the case. (Doc. 54.
19 ¶ 120; DSOF ¶¶ 47-49.) No reasonable juror could conclude Szymkowski committed
20 judicial deception if she did not submit Dr. Thal's amended report to the State Court.
21 Finally, Plaintiff failed to establish that either the State Court or the Court of Appeals
22 found these alleged misrepresentations material to their decision to terminate Ploof's
23 rights to H.P. (DSOF ¶¶ 33-35.)

24 Even assuming minor errors occurred, simple mistakes are insufficient to establish
25 judicial deception. *Benavidez*, 993 F.3d at 1147. "This exacting standard gives government
26 officials breathing room to make reasonable but mistaken judgments by protect[ing] all
27 but the plainly incompetent or those who knowingly violate the law." *Hardwick v. County*
28 *of Orange*, 844 F.3d 1112, 1117 (9th Cir. 2017). Even if Szymkowski was mistaken about

the home's condition at the time of removal or the timing of Brendi's drug test tampering, there are no facts linking her behavior to malice intent. Moreover, Dr. Thal—not Szymkowski—made the changes to his report, and those revisions concerned Brendi's evaluation, not Ploof's. Further, both the original and amended reports were completed in January, 2018—twelve months before the severance trial began in January 2019, making any claim of materiality highly speculative at best. (DSOF ¶¶ 31, 47-48.) Szymkowski was not even the assigned case specialist when the State Court requested permission to change the case plan from family reunification to severance and adoption in August, 2018. (DSOF ¶ 45.) In sum, Ploof identifies no evidence that Szymkowski misrepresented or omitted any material facts to the State Court, and without such evidence, her claim fails as a matter of law.

### E. Additional Misrepresentations/Omissions Identified by Ploof in Her Response to Non-Uniform Interrogatories.

Ploof identified five additional statements in her Response to Non-Uniform Interrogatories, which she claims constitute misrepresentations and omissions. (DSOF ¶ 39.) First, the alleged failure to inform the State Court that H.P. *was not born* with Fetal Alcohol Syndrome (FAS) is immaterial. Nothing in the Dependency Petition or Szymkowski's court reports states that H.P. *was born* with FAS, therefore, there was no record to correct and no omission to disclose. (DSOF ¶¶ 14, 50.) Dr. Thal further confirmed that he did not receive this information from Szymkowski. Rather the concern regarding FAS originated from statements made by Ploof and/or Brendi during their evaluations. (DSOF ¶ 50.)

Second, the alleged failure to inform the State Court about Ploof's negative drug tests and completion of counseling services is directly contradicted by Szymkowski's court reports themselves, which outline the negative drug test results and Ploof's completion of Terros drug treatment classes. (DSOF ¶ 51.) Third, at the time of Brendi's negative drug test, Szymkowski was not the assigned case specialist, and Hoff testified at

trial that Brendi completed a negative urinalysis and hair follicle test, so the information was provided to the State Court. (DSOF ¶ 53.)

Plaintiff also alleges that DCS Defendants[7] failed to report that H.P. was receiving in-home DDD services before his removal. However, Hoff testified at trial that she reviewed the DDD records, which did not show any physical or speech therapy occurring. Accordingly, this cannot constitute a misrepresentation. (DSOF ¶ 52.)

Finally, Ploof claims DCS failed to inform the State Court that H.P. remained in Ploof's home following the initial hotline call without any adverse effects. (DSOF ¶ 39.) This is also not supported by the record—Tafoya clearly conveyed in her initial court report that the December 20, 2016, hotline report was the first report that DCS received on Ploof and also that HP was left in the care of Ploof under a safety plan between December 21, 2016 and January 12, 2017. (DSOF ¶¶ 2, 5, 14, 19, 40.) Accordingly, there is no evidence of intentional or material misrepresentation, and this allegation fails as a matter of law.

## VIII. CONSPIRACY IS A DERIVATIVE CLAIM WHICH FAILS BECAUSE JUDICIAL DECEPTION FAILS

The FAC identifies only Szymkowski as having engaged in judicial deception, yet alleges conspiracy to commit judicial deception against Szymkowski, Hoff, and Dr. Thal. (Doc. 54 ¶¶ 243-258.) Because conspiracy is a derivative claim, Count Five must be dismissed as to Hoff and Dr. Thal; there are no underlying allegations that either engaged in judicial deception.

Existing law does not recognize conspiracy as an independent § 1983 claim. *Fidler v. Arizona,* 2022 WL 16649520 (D. Ariz. 2022) (citing *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012)). Conspiracy may only extend liability where there is an underlying constitutional violation, but it cannot stand alone. *Id. at* *15. Thus, without

---

[7] This vague wording is problematic because judicial deception is only plead against Szymkowski and not any other DCS Defendant. Setting aside this discrepancy, however, it is still clear the State Court received all relevant information.

12

allegations that Hoff or Dr. Thal themselves engaged in judicial deception, the conspiracy claim fails as a matter of law. Because Szymkowski cannot commit "conspiracy" with herself, the claim also fails against her. *Lacey*, 693 F.3d 896, 935 (A civil conspiracy is a combination of two or more persons…) Moreover, conspiracy requires more than a mere agreement, it demands a wrongful act in furtherance of that agreement. *SinglePoint Direct Solar LLC. v. Curiel*, 2022 WL331157, *28 (D. Ariz. 2022) (citing *Wells Fargo Bank v. Ariz. Laborers*, 201 Ariz. 474, 498-99 (2002). Plaintiff identifies no wrongful act by Szymkowski or Hoff as they did not revise the report, and no wrongful act by Dr. Thal as he did not commit judicial deception as he did not submit the report to the court.

## IX. ALTERNATIVELY, ISSUE PRECLUSION BARS ALL CLAIMS

Even if Plaintiff could state a constitutional violation, which they cannot, issue preclusion independently bars these claims. When reviewing state-court judgments, federal courts apply the preclusion law of the state that entered the judgment. *Pike v. Hester*, 891 F.3d 1131, 1138 (9th Cir. 2018). In Arizona, issue preclusion applies when a fact "was actually litigated in a previous suit, a final judgment was entered, and the party against whom the doctrine is to be invoked had a full opportunity to litigate the matter and actually did litigate it" and the fact "was essential to the prior judgment." *Crosby Garbotz v. Fell*, 434 P.3d 143, 146 (Ariz. 2019) (internal quotation marks omitted). This Court has routinely held that issue preclusion bars relitigation of juvenile court findings through section 1983 claims of familial interference. *See Smith v. Banner Health Sys.*, 621 F. App'x 876, 880-81 (9th Cir. 2015) (memorandum decision); *cf. Kasdan v. County of Los Angeles,* 2014 WL 6669354, at *4-6 (C.D. Cal. Nov. 24, 2014) (holding that issue preclusion barred the plaintiff from relitigating issues decided in a dependency proceeding through a civil-rights lawsuit); *Grimes v. Ayerdis*, 2018 WL 3730314, at *5-7 (N.D. Cal. Aug. 6, 2018) (same).

Here, trial transcripts and state-court rulings outline the issues actually litigated. (DSOF ¶¶ 32, 34-35.) Judge Rueter included detailed findings outlining the specific facts he considered during the severance trial. (DSOF ¶ 31.) The Court of Appeals outlined

what testimony and evidence it relied on in affirming the termination order. (DSOF ¶¶ 33-35.) The Chart below directly compares the precise language of the alleged misrepresentations and omissions in the FAC to the actual findings by the State Court and the Court of Appeals. *See* Chart (contrasting and comparing FAC with court rulings.)

| FAC ALLEGATIONS | COURT FINDINGS |
|---|---|
| Szymkowski testimony: "There were concerns due to maternal grandmother not complying with drug testing, and you know, when she did go try to test, she used a device to try to test. So that was concerning to the Department. And I believe mother was also refusing services at the time. (Doc. 54 ¶ 123.) | "Several days after HP was removed, Grandmother went in for urinalysis and was caught using a device to submit a false urine sample" *See Jessica P. v. Department of Child Safety, H. P.*, 249 Ariz. 461, 465, ¶ 9; see also Ex. 25 and Ex. 26.)<br><br>"In addition, Grandmother declined to take a urinalysis test when she was designated safety monitor for the child….DCS took Hunter into custody because of Mother's substance abuse, because she initially refused to participate in services…" *Id.* at 472, ¶ 39. |
| "Jessica never refused any of the services offered by any agent of DCS." (*Id.* ¶ 126.) | "Mother was diligent and participated in services 'to the best of her abilities." *Id.* at 466, ¶ 13. |
| "Szymkowski falsely represented that Jessica had failed to get services for HP prior to Tafoya's seizure of him." (*Id.* ¶ 248.) | "Hunter was nearly three years old when he came into care. His delays were apparent much earlier, however…" (*Id.* at n. 2.) |
| "Prior to removing HP, neither Tafoya nor any other DCS agent ever sought or obtained DDD, medical, and Head Start records for HP…" (*Id.* ¶ 115.) | "DCS case manager Claudia Hoff testified that obtaining the child's DDD and medical records at the outset of the case would not have changed the services offered to Mother." *Id.* at 473, ¶ 47. |
| "Prior to removing HP, neither Tafoya nor any other DCS agent ever spoke to Michael Ploof … Michelle Van Berstraten or Ms. Walford." (*Id.* ¶¶ 116-117.) | "And whether or not DCS interviewed certain family members during its investigation is not relevant to the question of whether it made diligent efforts to provide appropriate reunification services." *Id.* |
| Szymkowski violated Jessica's rights … by failing to keep HP with Walker (*Id.* ¶ 273.) | "The cousin [Walker] said that she could not keep HP in her home because of his special needs." *Id.* at 466, ¶ 10. |
| "Instead of continuing to keep HP with family…Szymkowski simply | State Court ordered HP into foster care at a Court hearing attended by Ploof, her attorney and guardian-ad-litem. (DSOF ¶ 27.) |

14

| | |
|---|---|
| removed HP and placed with a…foster family. (*Id.* ¶ 136.) | |
| "Tafoya's response to HP's distress … was to unreasonably deny Jessica visitation …" (*Id.* ¶ 143.) | "Therapeutic visitation was put into place because HP was exhibiting stress before and after visits, and because Mother was having difficulty responding to his cues and managing tantrums during visits." *Jessica P,* 249 Ariz. at n. 3; *see also* Ex. 25. |
| "…Tafoya and Szymkowski knew that Jessica did not understand why DCS was involved, what DCS' allegations against her were, and what Tafoya and/or Szymkowski wanted from her." (*Id.* ¶ 144.) | "Mother has completed all services asked of her to the best of her ability….Mother has been participating in services for approximately two and a half years." (DSOF ¶ 31 at ST.PLOOF-004246.) |
| Despite Dr. Thal's recommendations [to serve in the capacity of a co-parent] Szymkowski did nothing to follow it. (*Id.* ¶ 165.) | "In 2018, DCS also provided Mother with several joint counseling sessions with Grandmother when considering the possibility of Mother and Grandmother co-parenting the child." *Jessica P,* 249 Ariz. at 466, ¶ 12; *see also* Ex. 25. |
| "…when Szymkowski contacted [Dr.Thal], she expressed concerns over the alleged substandard condition of grandmother's residence as well as her concerns about HP's alleged very poor overall condition when he came into care." (*Id.* ¶ 183.) | "…the investigator reported that the home was 'free from any safety hazards'" (*Id.* at 465, ¶ 6.)<br><br>"When Hunter came into care, he was globally delayed, could barely speak, and was 'very unsteady on his feet." *Id*. at 466, ¶ 11.)<br><br>"The Court denied the motion to appoint Grandmother as a permanent guardian noting, among other things, that he had been neglected by Mother while they both resided with Grandmother." (*Id.* at 468, ¶ 22.) |

The record clearly demonstrates that Ploof fully litigated the alleged infractions and lost. Accordingly, because the State Court already considered these precise issues, issue preclusion bars her claims.

## X.     QUALIFIED IMMUNITY BARS ALL CLAIMS

Finally, qualified immunity protects DCS Defendants' alleged wrongful acts. "Qualified immunity protects government officials from liability under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their

conduct was clearly established at the time." *Cuevas v. City of Tulare*, 107 F.4th 894, 898 (9th Cir. 2024) (internal quotation marks omitted). "When this test is properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Hernandez v. City of San Jose,* 897 F.3d 1125, 1132-33 (9th Cir. 2018) (citation omitted). "[G]overnment officials performing discretionary functions [are entitled to] qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (citations omitted). For a right to be clearly established, the right must first 'be defined at the appropriate level of specificity.' *Dunn v. Castro*, 621 F.3d 1196, 1201 (9th Cir. 2010). To overcome qualified immunity "plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* [officials] *in this case* that *their particular conduct* was unlawful… [T]he prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Sharp v. Cty. Of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (citation omitted).

Here, Ploof failed to establish any constitutional violations. She does not explain how any identified act violated her constitutional rights, particularly where the vast majority of the conduct occurred after due process protections were triggered and the State Court assumed decision making authority. The State Court, not DCS, made the final determinations regarding (1) continuing H.P. in state care, (2) placement with Walker and then foster care, (3) visitation and services, and (4) termination of her parental rights. (DSOF ¶¶ 14-15, 17-19, 21-24, 27-28, 31, 37.) Procedures were in place to protect Ploof from any constitutional violations, and Ploof has not shown that any DCS Defendant acted egregiously or provided false or misleading information to the State Court. Nor has Ploof identified any clearly established law demonstrating that the conduct at issue violated a constitutional right. *Cuevas*, 107 4th at 898. As such, the law was not clearly established that DCS Defendants' management of an ongoing dependency case under the juvenile court's jurisdiction violated her constitutional rights. For instance, no authority supports

the notion that a parent in a dependency proceeding retains final placement authority once the State Court assumes jurisdiction. Without more, no reasonable juror could find that DCS Defendants violated any clearly established rights.

## XI. CONCLUSION

For the foregoing reasons, DCS Defendants respectfully request that this Court enter an Order (1) granting summary judgment, (2) entering final judgment in their favor, (3) awarding costs and attorney's fees as permitted under 42 U.S.C. § 1988, and (4) granting them such other and further relief as it deems just and proper.

DATED this 23rd day of January, 2026.

Kristin K. Mayes
Attorney General

/s/ Deborah Garner
Deborah Garner
Assistant Attorney General
*Attorney for DCS Defendants*

ORIGINAL/COPY of the foregoing emailed this 23rd day of January, 2026, to:

Thomas A. Connelly, Esq.
Robert T. Mills, Esq.
Sean A. Woods, Esq.
MILLS + WOODS LAW, PLLC
tconnelly@millsandwoods.com
rmills@millsandwoods.com
swoods@millsandwoods.com
*Attorneys for Ploof*

DeeAn Gillespie Strub, Esq.
Jenny D. Jansch, Esq.
GILLESPIE, SHIELDS & TAYLOR
dgillespie@gillaw.com
jjansch@gillaw.com
*Attorneys for Ploof*

Jeffrey S. Hunter, Esq.
WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
jhunter@wwhgd.com
*Attorneys for Defendant Thal*

/s/ Sarah Wolfe
LMS20-0389