1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KRIS MAYES
Attorney General

Deborah Garner (026161)
Assistant Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004-1592
Phone:  (602) 542-8050
Fax:  (602) 542-3393
DefensePhx@azag.gov
Deborah.Garner@azag.gov
*Attorney for DCS Defendants*

## UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF ARIZONA

Jessica Ploof,

                          Plaintiff,

v.

State of Arizona, et al.,

                          Defendants.

Case No: 2:21-cv-00853-JJT

**DCS DEFENDANTS' STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

(Hon. John J. Tuchi)

Department of Child Safety (DCS) Defendants Tafoya, Greenway, Szymkowski, Hoff, and Breeding (DCS Defendants) pursuant to Federal Rules of Civil Procedure 56, submit their Statement of Facts (DSOF) in support of their Motion for Summary Judgment filed contemporaneously herein.

1.      On December 20, 2016, DCS received an anonymous hotline report that Ploof was neglecting H.P. and that her home was unsafe. (**Exhibit 1**, Child Safety Risk Assessment at ST-PLOOF-001144-46, 001148.)

2.      Ploof, H.P., and maternal grandmother, Brendi Ploof (Brendi), lived in the same residence.  Defendant Tafoya visited the home on December 21, 2016, at 10:15 a.m. and interviewed Ploof who admitted consuming alcohol that morning while home alone with H.P. Tafoya also detected the odor of alcohol on Ploof. Tafoya asked Ploof to complete a urinalysis drug screen and a hair follicle drug test. Tafoya reported that Ploof had difficulty comprehending what was happening and made threats of self-harm during

1

the DCS interaction.  (**Ex. 1** at ST-PLOOF-001145-001146, 001149-001152; **Exhibit 2**, Court Report 1/18/17 at ST-PLOOF-000814.).

3.       On December 21, 2016, DCS received a second hotline report that Ploof was providing alcohol to H.P. and that she had ongoing substance abuse, domestic violence, and possible mental health issues affecting her parenting. It was also reported that a known drug dealer supplied Ploof with marijuana. (**Ex. 1** at ST-PLOOF-001148; **Ex. 2** at ST-PLOOF-000815.)

4.       At 3:20 p.m., Tafoya made a second visit to the residence. Brendi reported that H.P. had previously received DDD (Division of Developmental Disabilities) services but she discontinued them because he was doing well. The Mesa Police Department Mental Health Unit accompanied DCS due to Ploof's self-harm comments and hostility towards DCS. (**Ex. 1** at ST-PLOOF-001149-001150; **Ex. 2** at ST-PLOOF-000815.)

5.       Tafoya allowed H.P. to remain in the home because a safety plan was already in place. (**Ex. 1** at ST-PLOOF-001152; **Exhibit 3,** Deposition of Jessica Ploof 10/30/24 at 64:21-25, 65:1-8.)

6.       On December 21, 2016, Ploof submitted samples for urinalysis and hair follicle drug testing. (**Ex. 1** at ST-PLOOF-001149-001150; **Exhibit 4,** TASC Toxicology Laboratory report, ST-PLOOF-002607.)

7.       Tafoya received the drug test result sometime before January 11, 2017. The urinalysis was positive for marijuana and alcohol, and the hair follicle was positive for methamphetamines and marijuana. All results were concerning to DCS and the positive alcohol test was unusual given that the sample was taken at 12:21 p.m. shortly after Ploof had been supervising H.P. alone at 10:15 a.m. (**Ex. 1** at ST-PLOOF-001149-001150; **Ex. 4; Exhibit 5**, Deposition Testimony of Tafoya 05/30/2025 at 105:22-25, 106:1-3; 159:7-18.)

8.       The hair follicle test showed methamphetamine levels 9 times the cut-off level and marijuana levels 88 times the cut off, both inconsistent with one-time use. Based on her training, Tafoya understood these results reflected repeated use and very high levels

of both substances in Ploof's system. (**Ex. 4**; **Ex. 5** at 102:1-12; 157:14-25, 158:1-14; **Exhibit 6**, Report of Dr. David Englehart 6/19/2025 at ST-PLOOF-018281-018282.)

9.    Ploof initially denied using methamphetamines and claimed "something may have been put in her drink," but this was inconsistent with the test results. On December 21, 2016, Tafoya spoke with Mesa Police Department officer who reported prior concerns about Ploof's substance abuse. During her deposition, Ploof admitted having interactions with the Mesa Police involving suspected alcohol/substance abuse in September 2016, November 2016, and in the days prior to removal of H.P. (**Ex. 1** at ST-PLOOF-001151 **Ex. 3** at 58:4-25, 59-64:1-19; **Ex. 5** at 155:6-25, 156:1-6; 158:16-25, 159:1-6; **Exhibit 7,** Deposition of Brendi Ploof 10/31/2024 at 94:13-25, 95-96, 97:1-13.)

10.    On January 11, 2017, a Team Decision Making (TDM) meeting was held to discuss the positive drug test results and determine next steps. Brendi attended with Ploof and agreed to drug test because Tafoya wanted to ensure that Brendi was not also using substances. Ploof agreed to cooperate with DCS and participate in services including parenting classes, Terros Families First, urinalysis testing, and family preservation services. (**Exhibit 8**, TDM Notes 1/11/2017 ST-PLOOF 000241-000245; **Ex. 7** at 83:10-25; **Ex. 5** at 112:22-25, 113:13-17.)

11.    The next day, Tafoya met with Ploof and served a Temporary Custody Notice (TCN) because Brendi failed to complete the agreed-upon two urinalysis tests and Ploof refused to participate in family preservation services. DCS remained concerned about Ploof's substance abuse, her refusal to participate in services, and her dependence on Brendi due to her mild mental retardation. (**Ex. 1** at ST-PLOOF-001151-001152; **Ex. 2** at ST-PLOOF-000819; **Ex. 5** at 131:12-19, 160:4-25, 161:1-6; **Exhibit 9**, Trial Transcript of Brendi Ploof 5/24/2019 at 130:23-25, 131:1-10.)

12.    The TCN identified the circumstances for removal as "the physical or mental condition of a child's caregiver endangers the child's health or safety" and "substance abuse." (**Exhibit 10**, TCN 1/12/2017 at ST-PLOOF 003679.)

13. Tafoya identified the risks in leaving H.P. in Ploof's care and noted several diminished caregiver protective capacities: (1) Ploof was abusing methamphetamines, marijuana and alcohol; (2) she did not understand what was occurring, functioning below her age level, and had a diagnosis of mild mental retardation; (3) Brendi was asked twice to drug test but failed to do so; and (4) although family preservation services were offered to keep H.P. in the home, Ploof stated she would not participate. (**Ex. 1** at ST-PLOOF-001153; **Ex. 2** at ST-PLOOF-00817-00818; **Ex. 5** at 142:17-23.)

14. On January 17, 2017, a Dependency Petition was filed in State Court alleging Ploof was unable to parent due to substance abuse and mental health concerns. The condition of the home and H.P.'s developmental delays were not allegations in the petition. (**Exhibit 11**, Dependency Petition 1/17/2017 at ST-PLOOF-003667-003668.)

15. The State Court signed the corresponding orders making H.P. a temporary ward of the Court and appointing an attorney for Ploof. (**Exhibit 12**, Dependency Petition Order 1/17/2017 at ST-PLOOF-003687.)

16. Before the first hearing, the State Court received a court report summarizing the reasons for DCS's involvement and investigation, consistent with DCS policy to requiring a summary of hotline reports. The court report explicitly stated there were no prior reports for the family. (**Ex. 2** at ST-PLOOF-000814-000817; **Ex. 5** at 127:3-25, 128:1-5.)

17. Ploof appeared at the first court hearing on January 20, 2017, and was appointed counsel. The hearing was continued so she could also be appointed a guardian-ad-litem. (**Exhibit 13**, Minute Entry Order 1/20/2017 at ST-PLOOF-003715.)

18. At the January 31, 2017, hearing, Ploof appeared with her attorney, guardian-ad-litem, and Brendi. She denied the allegations in the Dependency Petition, but knowingly, intelligently, and voluntarily waived her right to a contested trial. She did not request a hearing and agreed to H.P. being found dependent. The State Court made its dependency findings after considering the petition and admitting the January 18, 2017,

4

court report.  (**Ex. 2**; **Exhibit 14**, Minute Entry Order 1/31/2017 at ST-PLOOF-003720-3721; **Exhibit 15**, Response to Request for Admissions No. 4.)

19.    After his removal on January 12, 2017, H.P. was immediately placed with maternal relative, Heather Walker (Walker). (**Ex. 12**. at ST-PLOOF-003690.)

20.    On January 15, 2017, H.P. participated in a Rapid Response Assessment to determine his functioning. Walker reported that H.P. required one-on-one attention to remain calm, could not follow directions, did not respond to his name, and was frequently upset. He did not talk and used only vowel sounds and when upset, he banged his head hard enough to make his mouth bleed. It was also reported that H.P. was awaiting a neurology evaluation for possible seizures as he frequently "stare[s] off". H.P. could not complete the developmental screening due to distress. These developmental concerns were included in the court report provided to the State Court.  (**Exhibit 16**, Rapid Response Assessment at 2-4; **Ex. 2** at ST-PLOOF-000821-000822; **Ex. 5** at 137:19-25, 138:1.)

21.    The Court found that DCS made reasonable efforts to place H.P. with extended family and ordered the child to remain with the identified relative placement, consistent with the Preliminary Protective Order prohibiting any change in placement without a court order. (**Ex. 12** at ST-PLOOF-003691-003692; **Exhibit 17**, Preliminary Protective Conference Order 1/20/2017 at ST-PLOOF-003700-003701.)

22.    The State Court ordered Ploof to receive at least two visits per week, each lasting two hours, supervised by DCS or its designee. (**Ex. 17** at ST-PLOOF-003701.)

23.    Within days, Walker requested H.P. be removed from her care because she was unable to manage his developmental needs while parenting her two young children. Ploof was aware of this impending placement change. (**Exhibit 18,** Motion for Change in Physical Custody 1/25/17 at ST-PLOOF-003712; **Ex. 3** at 66:20-25, 67:1-7.)

24.    DCS filed a motion with the State Court seeking permission to place H.P. in foster care. (**Ex. 18** at ST-PLOOF-003710-003712.)

25.    The maternal aunt, Sherry Walford (Walford), was ruled out as a relative placement because substance abuse was a concern in the Ploof residence, and she admitted to Tafoya that she had a recent DUI. (**Ex. 18** at ST-PLOOF-003712.)

26.    On August 26, 2015, 17 months prior to H.P.'s removal, the City of Mesa filed a Complaint against Walford for DUI, Alcohol, Drugs, Toxic Vapor, and she pled guilty on December 8, 2015. (**Exhibit 19**, Public Access at ST-PLOOF-018278). (**Ex. 7** at 114:2-14.)

27.    During the hearing on January 31, 2017, the State Court ordered the change of physical custody removing H.P. from Walker and placing him in foster care. Ploof attended this hearing with her attorney, guardian-ad-litem, and Brendi. (**Ex. 14** at ST-PLOOF-003720-003722.)

28.    In August and November 2018, Brendi filed motions seeking placement of H.P. in her care but the State Court never approved the placement, and H.P. remained in foster care until the termination of Ploof's rights. (**Ex. 7** at 116:3-15, 18-21.)

29.    H.P. was not enrolled in kindergarten until the Fall of 2019. (**Ex. 7** at 123:1-7.)

30.    Throughout the dependency, DCS investigated possible reunification options, including a co-parenting arrangement between Ploof and Brendi. After 18 months, the State Court changed the case plan from family reunification to severance and adoption on August 3, 2018. Brendi was asked to complete a psychological evaluation to assess co-parenting, and DCS discussed this option with both her and Ploof. (**Ex. 7** at 124:21-25, 125-126, 127:1-23; **Exhibit 20,** Minute Entry 8/3/2018 at ST-PLOOF-003831.)

31.    A seven-day severance trial was held between January 14 and June 3, 2019, and resulted in the termination of Plaintiff's parental rights to H.P. At that time, H.P. had been in DCS custody for more than 30 months. This matter was heard concurrently with Brendi's Motion for Appointment of a Permanent Guardian. (**Exhibit 21**, Severance Order, 7/30/19 at ST-PLOOF-004244-004258.)

32.     Ploof testified that she understood the services required for unification and could ask her case specialist, Claudia Hoff (Hoff), if she was confused. The court reports submitted to the State Court and the parties outlined the behavioral changes necessary for family reunification, and these requirements were discussed during the court hearings. Ploof also received a letter when the case opened outlining the services she needed to complete. (**Ex. 3** at 53:15-25, 54:1-21; **Exhibit 22**, Court Report 5/30/17 at PLOOF_EXHIBIT 000118-000119, 000121, 000123; **Exhibit 23**, Court Report 9/5/2017 at ST-PLOOF-000828-000829, 000832; **Exhibit 24**, Court Report 11/24/17 at ST-PLOOF-000837-000838, 000841-000842.)

33.     Ploof appealed the termination of her rights. The Court found "[s]ufficient evidence supported the court's finding that DCS made diligent efforts to provide reunification services." (**Exhibit 25**, *Jessica P. v. Department of Child Safety*, 249 Ariz. 461, 473 ¶ 46 (App. 2020)[1] (reversed and remanded) (*Jessica P. I.*))

34.     After remand, the second termination order was appealed. The Court of Appeals found that the trial court did not commit fundamental error and affirmed termination of Ploof's rights to H.P. (**Exhibit 26**, *Jessica P. v. Department of Child Safety*, 251 Ariz. 34, ¶ 2, ¶ 18 (App. 2021) (*Jessica P. III.*))

35.     The appeals court held: "We find no error, fundamental or otherwise, nor do we find that Mother's due process rights were violated." (**Ex. 25** at ¶ 37.)

36.     The State Court retained jurisdiction from January 17, 2017, until H.P.'s adoption on August 2, 2022. H.P. remained in foster care from January 31, 2017, until his adoption. (**Exhibit 27**, Dismissal Order 8/2/2022, ST-PLOOF-004419-004420.)

37.     On seven occasions, the State Court made findings consistent with the Adoption and Safe Families Act, 45 C.F.R. § 1356.21(b)(2). (**Exhibit 28**, Court Orders

---

[1] The Arizona Supreme Court granted review as to issue #4 only and vacated ¶¶ 23-27, and remanded the matter to the Court of Appeals to determine whether or not the trial court committed fundamental error. *Jessica P. v. Department of Child Safety*, 251 Ariz. 34, 36-37, ¶ 2 (App. 2021). The Supreme Court found the trial court did not commit fundamental error.

1  ST-PLOOF-003767-003768, 003780-003781, 003798-003799, 003816-003817, 003828-
2  003829, 004090-004091, 003805-003808.)

3       38.    There is no record of H.P. attending any medical appointments or any
4  medical or educational decisions being made for him between January 12-31, 2017. (**Ex.**
5  **16** at 3; **Exhibit 29**, Response to Non-Uniform Interrogatories, Response Nos. 8-11.)

6       39.    In the Response to the Non-Uniform Interrogatories, Plaintiff alleged
7  multiple falsehoods, misrepresentations, and omissions. (**Ex. 29**, Response No. 1.)

8       40.    Szymkowski authored and submitted three court reports to the State Court
9  which are the only documents Ploof identifies as containing alleged misrepresentations.
10 These court reports (1) outlined the services Ploof was offered and updated the Court
11 regarding her participation; (2) described the behavioral expected for reunification with
12 H.P.; and (3) detailed efforts to assess co-parenting. The reports do not state that Ploof
13 refused services, rather, they document the services that she was completing. The initial
14 court report explicitly stated there were no prior DCS reports involving the family. (**Ex. 2**
15 at ST-PLOOF-000817; **Ex. 22** at PLOOF_EXHIBIT 000118-000119; **Ex. 23** at ST-
16 PLOOF-000828-000829; **Ex. 24** at ST-PLOOF-000837-000838, 000841-000842; **Ex. 29**,
17 Response No. 2.)

18      41.    The three court reports authored by Szymkowski and submitted to the State
19 Court never stated that Ploof refused to get H.P. services prior to his removal. (**Ex. 22;**
20 **Ex. 23; Ex. 24.**)

21      42.    The three court reports authored by Szymkowski and submitted to the State
22 Court never discussed the device used by Brendi to thwart her drug test. (**Ex. 22; Ex. 23;**
23 **Ex. 24**.)

24      43.    The three court reports authored by Szymkowski and submitted to the State
25 Court never stated that the condition of the home was "substandard" when H.P. was
26 removed in January, 2017, nor did they report that H.P. was in poor overall condition or
27 grossly neglected at the time of his removal. (**Ex. 22; Ex. 23; Ex. 24.**)

28

44.     The condition of the home was not a safety concern causing DCS to remove H.P. The need for temporary custody was based on concerns for substance abuse and mental health. (**Ex. 2** at ST-PLOOF-000817; **Ex. 5** at 149:1-7; **Ex. 11** at ST-PLOOF-003667-003668.)

45.     While Szymkowski was assigned to the Ploof family, the case plan remained family reunification. The State Court changed the case plan to severance and adoption on August 3, 2018, while the case was assigned to Hoff. (**Ex. 20**; **Ex. 22; Ex. 23** at ST-PLOOF-000829; **Ex. 24** at ST-PLOOF-000838.)

46.     Szymkowski called Dr. Thal after she reviewed Brendi's original psychological evaluation dated January 14, 2018, to voice her concerns to him and to make sure that Dr. Thal had complete information. (**Exhibit 30**, Trial Testimony of Paige Szymkowski 1/14/19 at 46:14-25, 47:1-24.)

47.     Dr. Thal testified during the severance trial about the two versions of Brendi's January 4, 2018, psychological evaluation. He explained his phone conversation with Szymkowski, his decision to conduct a further review of the file, the resulting revisions to the final report, and his decision to write a letter explaining the incident. (**Exhibit 31**, Trial Testimony of Dr. Thal 2/21/19 at 74:14-25, 75-79, 80:1-7.)

48.     Dr. Thal testified that Szymkowski never asked him to change his report; rather, he agreed only to review the records and make revisions if needed to ensure factual accuracy, and all revised language was drafted solely by him. He further testified that he would have disregarded any request from her to alter his report. In his deposition, Dr. Thal testified that he paraphrased the hotline report when he used the word "substandard" to describe the condition of the home. He also testified that Szymkowski used the term "delayed developmental need" not the terms "grossly neglected" or "very poor overall condition." (**Ex. 31** at 76:18-24; **Exhibit 32**, Deposition Testimony of Dr. Thal 4/2/2025 at 226:3-23; 227:20-25; 228:1-2; 228:10-21; 237:1-7).

49.     Szymkowski was not involved in any decision by Dr. Thal and/or Hoff to submit an amended psychological evaluation on Brendi. She had no role in the decision to

1    shred the original report or in the decision to provide the revised version to the State Court.

2    (**Ex. 29**, Response No. 6.; **Exhibit 33,** Deposition Testimony of Dr. Thal 5/8/2025 at

3    347:16-24, deposition exhibit 34; **Exhibit 34**, State Court Exhibit List at 3.)

4         50.    In the three court reports, Szymkowski never reported that H.P. was born

5    with Fetal Alcohol Syndrome, nor did she provide that information to Dr. Thal. (**Ex. 22;**

6    **Ex. 23; Ex. 24; Exhibit 35,** Trial Testimony of Dr. Thal 6/3/2019 at 31:3-24.)

7         51.    The May 30, 2017, court report included the TASC drug test results for Ploof

8    and noted that she "continues to provide consistent, clean urinalysis tests." The September

9    5, 2017 and November, 24, 2017 court reports contained similar positive comments along

10   with the actual test results and counseling notes from the providers, referenced as

11   attachments. (**Ex. 22** at PLOOF_EXHIBIT 000119; **Ex. 23** at ST-PLOOF-000828-

12   000829; **Ex. 24** at ST-PLOOF-000837-000838.)

13        52.    Hoff reviewed H.P.'s DDD records and testified at trial that they did not

14   show Ploof or Brendi followed up with the recommended speech and physical therapy

15   services. Instead, the records indicated that speech and physical therapy did not begin until

16   October 12, 2017, after H.P. had been removed from Ploof's custody. (**Exhibit 36**, Trial

17   Testimony of Claudia Hoff 01/16/2019 at 9:10-24; 10:1-24; 13:6-9; 13:24-25; 14:1-3;

18   15:19-25, 16-18; 19:1-12.)

19        53.    Hoff testified that Brendi had a negative hair follicle and urinalysis test

20   during the dependency. (**Ex. 36** at 47:13-16.)

21        54.    All state claims were dismissed after remand back to the State Court.

22   (Exhibit 37, *Ploof v. State*, CV2020-017046, Order 9/30/2024.)

23        DATED this 23rd day of January, 2026.

24                                  Kristin K. Mayes
                                    Attorney General
25

26

27                                  */s/ Deborah Garner*
                                    Deborah Garner
28                                  Assistant Attorney General
                                    *Attorney for DCS Defendants*

1   ORIGINAL/COPY of the foregoing emailed
2   this 23rd day of January, 2026, to:

3   Thomas A. Connelly, Esq.                 DeeAn Gillespie Strub, Esq.
    Robert T. Mills, Esq.                    Jenny D. Jansch, Esq.
4   Sean A. Woods, Esq.                      GILLESPIE, SHIELDS & TAYLOR
    MILLS + WOODS LAW, PLLC                  dgillespie@gillaw.com
5   tconnelly@millsandwoods.com              jjansch@gillaw.com
6   rmills@millsandwoods.com                 *Attorneys for Ploof*
    swoods@millsandwoods.com
7   *Attorneys for Ploof*

8
    Jeffrey S. Hunter, Esq.
9   WEINBERG, WHEELER, HUDGINS,
    GUNN & DIAL, LLC
10  jhunter@wwhgd.com
    *Attorneys for Defendant Thal*
11

12

13  /s/ Sarah Wolfe
    LMS20-0389
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11

# EXHIBIT 1

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 2

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 3

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 4

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 5

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 6

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 7

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 8

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 9

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 10

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 11

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 12

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 13

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 14

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 15

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 16

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 17

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 18

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 19

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 20

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 21

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 22

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 23

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 24

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 25

🚩 KeyCite Red Flag

Opinion Vacated in Part by   Jessica P. v. DCS/H.P.,   Ariz.,   December 15, 2020

249 Ariz. 461

Court of Appeals of Arizona, Division 1.

JESSICA P., Appellant,

v.

DEPARTMENT OF CHILD SAFETY, H.P., Appellees.

No. 1 CA-JV 19-0253
|
FILED 7/28/2020
|
Review Granted in Part, Denied in Part 12/15/2020 [*]

**Synopsis**

**Background:** Department of Child Safety initiated proceedings to terminate mother's parental rights to her son. The Superior Court, Maricopa County, No. JD 530589, Jeffrey A. Reuter, J., ordered termination of mother's parental rights and denied mother's motion to appoint grandmother as permanent guardian. Mother appealed.

**Holdings:** The Court of Appeals, Campbell, J., held that:

[1] termination of mother's parental rights pursuant to termination statute did not violate mother's due process rights;

[2] sufficient evidence supported finding that there was substantial likelihood that mother would not be capable of exercising effective parental care and control in near future;

[3] sufficient evidence supported finding that Department offered mother reasonable reunification efforts prior to termination of mother's parental rights; and

[4] sufficient evidence supported finding that termination of mother's parental rights was in son's best interests.

Affirmed.

**Procedural Posture(s):** On Appeal; Petition to Terminate Parental Rights.

**West Headnotes (27)**

[1]   **Civil Rights**   🔑   Child custody, support, and protection;  parental rights

Child welfare agencies such as the Department of Child Safety, as public entities, must provide reunification services that comply with the ADA to disabled parents. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

1 Case that cites this headnote

[2]   **Infants**   🔑   Objections and motions and rulings thereon

Any claim that the Department of Child Safety is failing to provide appropriate reunification services must be raised in the juvenile court or the issue is waived.

[3]   **Infants**   🔑   Objections and motions and rulings thereon

Any claim that a state agency, such as the Department of Child Safety, is violating the ADA in a dependency or severance matter must be timely raised or the issue is waived. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

1 Case that cites this headnote

[4]   **Infants**   🔑   Objections and motions and rulings thereon

Mother waived for appellate review her claim that Department of Child Safety violated her right to reasonable accommodations under ADA, where she failed to raise claim in juvenile court before or during proceedings on termination of her parental rights to her son. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

1 Case that cites this headnote

Jessica P. v. Department of Child Safety, H.P., 249 Ariz. 461 (2020)

23 Arizona Cases Digest 20, 471 P.3d 672

**[5]**    **Appeal and Error** 🔑 **Constitutional questions**

Alleged constitutional violations raised for the first time on appeal are reviewed for fundamental error.

**[6]**    **Appeal and Error** 🔑 **Statutory or legislative law**

Appellate courts review the constitutionality of a statute de novo.

**[7]**    **Constitutional Law** 🔑 **Due process**

Under strict scrutiny due process analysis, applied on review of statutes that abridge a fundamental right, there is no presumption that a statute is constitutional. U.S. Const. Amend. 14.

**[8]**    **Constitutional Law** 🔑 **Parent and Child Relationship**

Parents have a fundamental right in the care, custody, and management of their children and that interest is protected by the Due Process Clause. U.S. Const. Amend. 14.

1 Case that cites this headnote

**[9]**    **Constitutional Law** 🔑 **Parent and Child Relationship**

The maintenance of the parent-child relationship is a fundamental right, and the rationality of statutes which abridge it is subject to strict scrutiny due process analysis. U.S. Const. Amend. 14.

**[10]**    **Constitutional Law** 🔑 **Levels of scrutiny; strict or heightened scrutiny**

Under strict scrutiny due process analysis applied to statutes that abridge a fundamental right, proponents of a law bear the burden of showing that it furthers a compelling state interest, that it is narrowly drawn to serve that interest, and that the state's interests outweigh

the fundamental liberty interests at stake. U.S. Const. Amend. 14.

**[11]**    **Constitutional Law** 🔑 **Removal or termination of parental rights**

**Infants** 🔑 **Dependent children**

Statute permitting termination of parental rights on grounds of parental inability to care for child due to mental illness and on grounds of child being in out-of-home placement for extended period of time was narrowly drawn to serve compelling state interest of promoting and protecting child welfare, and thus termination of mother's parental rights to her son pursuant to statute did not violate mother's due process rights; on both grounds, statute required finding of parental unfitness at actual time of termination and required Department of Child Safety to make efforts at reunification prior to terminating parental rights. U.S. Const. Amend. 14; Ariz. Rev. Stat. Ann. §§ 8-533(B)(3), 8-533(B)(8).

2 Cases that cite this headnote

**[12]**    **Infants** 🔑 **Mental or emotional condition or incapacity**

**Infants** 🔑 **Efforts and compliance by government or agency**

The Department of Child Safety must make reasonable rehabilitative efforts before seeking termination of parental rights on grounds of parental inability to care for child due to mental illness. Ariz. Rev. Stat. Ann. § 8-533(B)(3).

**[13]**    **Infants** 🔑 **Presumptions, inferences, and burden of proof**

Appellate courts reviewing a juvenile court's decision on whether to terminate parental rights view the evidence and the reasonable inferences to be drawn from it in the light most favorable to affirming the juvenile court's order.

**[14]**    **Infants** 🔑 **Dependency, Permanency, and Rights Termination**

Appellate courts will not reverse a juvenile court's order on whether to terminate parental rights unless reasonable evidence does not support the juvenile court's factual findings.

3 Cases that cite this headnote

[15]    Infants ⚖ Leaving child in agency or third party custody;  length

In context of determining whether to terminate parental rights on grounds of a child's cumulative 15 months of out-of-home placement, in assessing a parent's ability to provide proper parental care and control, the juvenile court must consider the discrete and special needs of the particular child. Ariz. Rev. Stat. Ann. § 8-533(B)(8)(c).

[16]    Infants ⚖ Persistence of conditions

In making a determination that a parent has been unable to remedy the circumstances causing a child to be in an out-of-home placement, for purposes of statute governing termination of parental rights on grounds of a child's cumulative 15 months of out-of-home placement, appellate courts construe those circumstances to mean the circumstances existing at the time of the severance that prevented a parent from appropriately providing for the parent's child. Ariz. Rev. Stat. Ann. § 8-533(B)(8)(c).

[17]    Infants ⚖ Parental unfitness or incompetence

Sufficient evidence supported finding that there was substantial likelihood that mother would not be capable of exercising effective parental care and control in near future following her child's out-of-home placement for over two years, as would support termination of mother's parental rights; doctor who psychologically evaluated mother concluded that mother's prognosis for demonstrating minimally adequate parenting skills was poor, given nature of her intellectual disability, noted that her decision-making abilities were significantly limited, and opined that her intellectual disability made her

unable to meet child's special needs. Ariz. Rev. Stat. Ann. § 8-533(B)(8)(c).

[18]    Infants ⚖ Leaving child in agency or third party custody;  length

Infants ⚖ Efforts and compliance by government or agency

Termination of a parent-child relationship on grounds of the child being in out-of-home placement for extended period of time should not be considered a panacea but should be resorted to only when a concerted effort to preserve the relationship fails. Ariz. Rev. Stat. Ann. § 8-533(B)(8).

[19]    Infants ⚖ Leaving child in agency or third party custody;  length

Infants ⚖ Efforts and compliance by government or agency

Prior to terminating a parent-child relationship on grounds of the child being in out-of-home placement for extended period of time, the Department of Child Safety need not undertake rehabilitative measures that are futile, but it is obligated to undertake measures with a reasonable probability of success. Ariz. Rev. Stat. Ann. § 8-533(B)(8).

[20]    Infants ⚖ Leaving child in agency or third party custody;  length

Infants ⚖ Efforts and compliance by government or agency

Prior to terminating a parent-child relationship on grounds of the child being in out-of-home placement for extended period of time, the Department of Child Safety need not provide every conceivable service, but it must provide a parent with the time and opportunity to participate in programs designed to improve the parent's ability to care for the child. Ariz. Rev. Stat. Ann. § 8-533(B)(8).

1 Case that cites this headnote

[21]    **Infants** 🔑 Leaving child in agency or third party custody; length

**Infants** 🔑 Efforts and compliance by government or agency

In context of termination of a parent-child relationship on grounds of the child being in out-of-home placement for extended period of time, the Department of Child Safety does not make requisite reasonable reunification efforts if it neglects to offer the very services that its consulting expert recommends. Ariz. Rev. Stat. Ann. § 8-533(B)(8).

[22]    **Infants** 🔑 Efforts and compliance by government or agency

Sufficient evidence supported finding that Department of Child Safety offered mother reasonable reunification efforts prior to termination of mother's parental rights to her son, as necessary to warrant termination; Department offered mother numerous reunification services, including random urinalysis testing, substance abuse treatment, individual counseling sessions, psychological evaluations, bonding assessment, visitation, parent aide, and transportation, as mother did not drive. Ariz. Rev. Stat. Ann. § 8-533(B)(8).

[23]    **Infants** 🔑 Dependency, Permanency, and Rights Termination

In reviewing a determination of whether termination of parental rights was in the child's best interests, appellate courts do not reweigh the evidence and will affirm the juvenile court's factual findings if supported by reasonable evidence. Ariz. Rev. Stat. Ann. § 8-533(B).

[24]    **Infants** 🔑 Dependency, Permanency, and Termination Factors; Children in Need of Aid

**Infants** 🔑 Needs, interest, and welfare of child

**Infants** 🔑 Dependency, permanency, and rights termination in general

Although fundamental, parental rights are not inviolate; a court may still sever those rights if it finds clear and convincing evidence of one of the statutory grounds for severance, and also finds by a preponderance of the evidence that severance is in the best interests of the child. Ariz. Rev. Stat. Ann. § 8-533(B).

[25]    **Infants** 🔑 Needs, interest, and welfare of child

Termination of parental rights is in a child's best interests if the child would derive an affirmative benefit from termination or incur a detriment by continuing in the relationship. Ariz. Rev. Stat. Ann. § 8-533(B).

1 Case that cites this headnote

[26]    **Infants** 🔑 Adoptability and exceptions to adoption

In context of determining whether termination of parental rights is in the child's best interests, a current adoptive plan is an affirmative benefit to a child. Ariz. Rev. Stat. Ann. § 8-533(B).

[27]    **Infants** 🔑 Needs, interest, and welfare of child

Sufficient evidence supported finding that termination of mother's parental rights to her son was in son's best interests, as necessary to warrant termination; son was adoptable and thriving in his current placement, which was willing to adopt him, and doctor who conducted bonding and best interests assessment found that mother had little understanding of son's medical needs and was not responsive to his cues regarding his needs, and further explained that son would be at risk of neglect in mother's care, even for short periods of time. Ariz. Rev. Stat. Ann. § 8-533(B).

**\*\*675** Appeal from the Superior Court in Maricopa County, No. JD 530589, The Honorable Jeffrey A. Reuter, Judge.

AFFIRMED

**Attorneys and Law Firms**

Gillespie Shields Goldfarb & Taylor, Phoenix, By Kristina B. Reeves, April Maxwell, Counsel for Appellant

Arizona Attorney General's Office, Mesa, By Lauren J. Lowe, Counsel for Appellee, Department of Child Safety

Arizona Center for Disability Law, Tucson, By Christian Carlsen, Rose A. Daly-Rooney, Counsel for Amicus Curiae, Arizona Center for Disability Law

Arizona Center for Law in the Public Interest, Phoenix, By Anne Ronan, Daniel Adelman, Counsel for Amicus Curiae, Arizona Center for Law in the Public Interest

ACLU Foundation of Arizona, Phoenix, By Victoria Lopez, Counsel for Amicus Curiae, American Civil Liberties Union of Arizona

Mills & Woods Law PLLC, Phoenix, By Thomas A. Connelly, Counsel for Amicus Curiae, the ARC, et al.

NYU School of Law Family Defense Clinic, New York, NY, By Amy Mulzer, Christine Gottlieb, Martin Guggenheim, Counsel for Amicus Curiae, the ARC, et al.

Disability & Civil Rights Clinic, Brooklyn NY, Brooklyn Law School, By Sarah Lorr, Counsel for Amicus Curiae, the ARC, et al.

Judge Jennifer B. Campbell delivered the opinion of the Court, in which Presiding Judge Paul J. McMurdie and Judge Kent E. Cattani joined.

## OPINION

CAMPBELL, Judge:

**\*464** ¶1 Jessica P. ("Mother") appeals from the juvenile court's order terminating her parental rights to her son, Hunter. On appeal, Mother raises an Americans with Disabilities Act ("ADA") claim, a facial constitutional challenge, and a state statutory claim. She also challenges the sufficiency of the evidence supporting the court's order terminating her parental rights on mental deficiency and fifteen months out-of-home placement grounds. For the following reasons, we affirm.

## BACKGROUND

¶2 Mother was 20 and living with her mother ("Grandmother") when Hunter was born in April 2014. Mother has an intellectual disability. Grandmother helped take care of Hunter, including taking him to medical appointments. Grandmother also helped Mother, who received Social Security disability benefits, with her finances.

¶3 In September 2016, Mesa Police were called to Banner Desert Hospital where Mother was being treated for a possible sexual assault. Mother tested positive for THC, opiates, and methamphetamine. She told police she sometimes spent time with a 61 year-old man and smoked methamphetamine with him. Hospital staff observed that Mother was "extremely altered" and displaying "twitching type behavior." Grandmother reported that the man had been "grooming" Mother for the past month after meeting him at an extended stay motel where they were residing.

¶4 In November 2016, Mother's grandparents feared for Mother's safety and called Mesa Police to report that Mother was acting out, being combative, and "acting crazy." Police observed that Mother appeared to be under the influence of drugs. They transported her to the hospital for evaluation.

**\*\*676 \*465** ¶5 In late December 2016, DCS received two reports that Mother was neglecting Hunter. Mother and Hunter were still living with Grandmother. The callers alleged that Mother used marijuana and methamphetamine around the child, she had left him home alone on multiple occasions, the home was dirty, and she had been observed giving Hunter drinks of beer and hard liquor. The reports further alleged that Mother spanked the child, physically fought with Grandmother and Mother's significant other in front of the child, and she bit her own grandmother.

¶6 A DCS investigator went to Mother and Grandmother's home and observed that other than a scratch on his cheek, the child was injury-free, and he was dressed appropriately. Aside from summarizing the two reports to DCS discussed *supra* ¶¶ 4-5, the investigator reported that the home was "free from any safety hazards." The investigator noted that Grandmother reported the child had previously received services from the Department of Developmental Disabilities ("DDD") for an intellectual disability, but that she had discontinued his DDD services "because he was doing well."

¶7 The investigator spoke with Mother, who reported she had consumed alcohol that morning. Mother told the investigator she believed the neglect reports had been made by a former boyfriend because she had refused to have sex with him. Mother told the investigator that she previously had taken medication for depression and anxiety but was not on medication currently. Mother agreed to drug testing and told the investigator she would test positive for "weed." Mother also told the investigator that she had considered self-harm. After Grandmother agreed to be a safety monitor, the investigator left Hunter in the home pending Mother's urinalysis testing. DCS offered Mother family-preservation services, drug testing, and substance-abuse treatment.

¶8 Mother's urinalysis was positive for alcohol and marijuana. Her hair follicle test was positive for marijuana and "a high level [of] ... methamphetamines." DCS held a Team Decision Meeting in January 2017. At that meeting Mother admitted to having used methamphetamine but said she had only done so one time. She told DCS that Hunter's father was unknown. DCS expressed "concern that Hunter did not currently have DDD services and concern about Mother's lack of understanding about DCS's involvement."

¶9 The next day, DCS removed Hunter from the home because 1) Grandmother, his safety monitor, refused to provide a urinalysis test[1]; 2) Mother's substance abuse; 3) Mother refused to participate in services; and 4) "[t]he physical or mental condition of [Mother] endangers [the] child's health or safety." DCS placed Hunter in an unlicensed relative placement (a maternal cousin) and filed a dependency petition. DCS alleged Mother was unable to parent Hunter because of both substance abuse and her intellectual disability. The case plan was family reunification. Several days after Hunter was removed, Grandmother went in for urinalysis and was caught using a device to submit a false urine sample.

¶10 A behavioral health agency conducted a rapid-response assessment of the child. The cousin described Hunter as difficult to comfort when upset and told the agency therapist that Hunter would bang his head against walls to the point of injuring himself. The therapist observed that he became very upset when the cousin attempted to engage him in activities. The cousin said that she could not keep Hunter in her home because of his special needs. Two weeks later, DCS placed Hunter in a licensed DDD foster home.

¶11 When Hunter came into care, he was globally delayed, could barely speak, and was "very unsteady on his feet."[2] He had not had **677 *466 any immunizations, was underweight and his eating behaviors raised concerns about whether he had been getting enough nourishment. In addition, he had trouble feeding himself, shook when he was eating, and drooled excessively. Initially, he had frequent tantrums and violent outbursts towards other children in daycare. He displayed obsessive compulsive behaviors and appeared to be autistic. Hunter's foster mother took him to a neurologist who diagnosed him with a seizure disorder and put him on medication. Hunter's neurologist and pediatrician referred him to a developmental pediatrician because he was delayed in three or more areas. At the time of trial, Hunter had an Individualized Education Plan ("IEP") and was attending a developmental preschool where he received speech, occupational, and physical therapies. He remained "significantly behind" his peers in preschool.

¶12 The juvenile court found Hunter dependent in late January 2017. DCS asked Mother to complete services, including a substance abuse assessment and treatment at TERROS, random urinalysis testing, case aide services, parent aide services, therapeutic visits,[3] individual counseling, and psychological evaluations. In 2018, DCS also provided Mother with several joint counseling sessions with Grandmother when considering the possibility of Mother and Grandmother co-parenting the child. DCS provided Mother with transportation to services and visits.

¶13 Mother was diligent and participated in services "to the best of her abilities." She consistently tested negative for substances after the initial positive tests, successfully completed substance abuse services at TERROS, engaged consistently in both regular visitation and therapeutic visitation, completed parent aide services, and participated in psychological evaluations and individual counseling. At the time of trial, Mother was living in her own apartment and had a job as a caretaker for an 18 year-old with special needs.[4] Although the DCS case manager agreed that Mother had made behavioral changes and "was doing really well with maintaining her sobriety," the case manager was still concerned that Mother did not understand Hunter's medical and behavioral needs.

¶14 The case aide who supervised visits with Hunter, Mother, and Grandmother starting in June 2018, testified that Mother was consistent, prepared, nurturing, and loving. However, Mother and Grandmother bickered with one another during

almost every visit, which upset the child. Hunter would cover his ears, ask why Mother and Grandmother were arguing, and tell them to be nice. The case aide testified that Grandmother acted in a controlling manner towards both Mother and the child.

¶15 In December 2018, the case aide received a phone call inadvertently originating from Grandmother's phone that went to voicemail. The voicemail message was a recording of Grandmother "ranting and raving ... [at Mother] with swear words." The case aide heard Grandmother mention a lawyer and tell Mother "you haven't tried." She heard someone who sounded like Mother yelling back and crying. The case aide believed Grandmother was berating Mother about the dependency case. She reported the incident to Adult Protective Services. Subsequently, in part because of this incident, Grandmother and Mother's visits with Hunter were separated. **678 *467 Mother continued to have weekly supervised visits in her home (visits Hunter appeared to enjoy), and Grandmother's visits were reduced to once a month at a DCS office. An additional incident occurred at a meeting at DCS when Grandmother "scream[ed] at [Mother] about what a failure she was and how bad she had done to not get her son back." The case manager warned Grandmother that if she spoke that way to Mother again, she would not be invited to any more meetings.

¶16 Mother underwent two psychological evaluations with Dr. James Thal. The first evaluation took place in July 2017. Mother's IQ was determined to be 65, which placed her in the first percentile or in the intellectually disabled range. Dr. Thal diagnosed Mother with mild intellectual disability, alcohol use disorder in early remission, methamphetamine use disorder in early remission, and gave her a rule-out diagnosis of bipolar I disorder. Dr. Thal opined that Mother's memory was "not intact and it was very difficult for [her] to recall basic information." Further, Mother's "insight [was] quite limited but consistent with her intellectual level." He observed that Mother "seemed to take little responsibility for her own actions or her reported lack of adequate care of her son." Dr. Thal opined that Mother's intellectual disability would make it "exceedingly difficult for her to acquire, understand, retain, and implement basic parenting knowledge and skills." He concluded that Mother's prognosis for being able to demonstrate minimally adequate parenting skills in the foreseeable future was poor. Dr. Thal also concluded that the child could not be safely returned to Mother's sole custody now or in the foreseeable future, and that he would be at risk in her care. Dr. Thal explained that "[Mother]

would require ongoing supervision with a child" and that she could not "be relied upon to independently learn, retain, and implement safe and effective parenting practices." He found that Mother was at risk for exploitation by predatory males and recommended individual therapy to assist her in decision making. Although mental health services "could improve [Mother's] functioning," they would be unlikely to raise her to a minimally adequate parenting level.

¶17 Dr. Thal re-assessed Mother in October 2018 to determine if Mother's participation in services had improved her parenting abilities to a minimally adequate level. Mother continued to deny neglecting the child. Mother denied that Hunter had emotional or behavioral problems and stated that she believed he was developmentally on track. When discussing her completed drug treatment at TERROS, Mother stated "I honestly didn't need those classes." Dr. Thal again concluded that the prognosis that Mother would be able to demonstrate minimally adequate parenting skills was poor. He wrote:

> [Mother] has participated in a wide range of services but, not surprising given the nature of her mental deficiency, there are not significant changes in her parenting profile. This is an intellectually disabled young woman who has substantial difficulty with concepts, timeframes, and retaining factual information. She is more than willing to follow directives and she clearly loves [the child]. However, placing Hunter in [Mother]'s sole and independent care would likely place the child at risk for inadvertent neglect, impaired decision-making, and significant under-stimulation of the child's already reportedly compromised learning abilities.

¶18 Dr. Thal recommended a bonding and best interests assessment for Hunter, Mother, Grandmother, and the child's foster family. Dr. S. Bryce Bennett conducted the assessment in April and May 2018. Dr. Bennett noted that Mother "seemingly had no understanding of [Hunter's] medical needs," and that Grandmother lacked understanding of his

medical needs beyond his developmental delays and did not seem to recognize how much support Mother would require if Hunter were returned to her. Both Mother and Grandmother had difficulty responding to the child's cues. Grandmother's failure to recognize his cues was of particular concern because Hunter required a "caregiver who is very responsive to his cues." Dr. Bennett concluded that Hunter's foster parents provided him with a safe and stable home and had the ability to meet his special needs. Dr. Bennett conducted an updated bonding assessment **679 *468 regarding Grandmother in October 2018. Dr. Bennett continued to have concerns about Grandmother's ability to meet Hunter's needs and concluded that it was not in his best interests to be placed with her. [5]

¶19 DCS filed a motion to terminate Mother's parental rights in August 2018 pursuant to A.R.S. §§ 8-533(B)(3) (mental deficiency) and (B)(8)(c) (fifteen months out-of-home placement). At that time, Mother requested that Hunter be placed with Grandmother. The juvenile court denied the request.

¶20 A week before trial, Mother filed a motion to appoint Grandmother as a permanent guardian. In her petition, Mother stated, "[DCS] has made reasonable efforts to reunite Mother with the minor child. Reunification of the minor child and Mother is not in [his] best interest. Mother is unable to properly care for [him] without the assistance of [Grandmother]." DCS opposed the guardianship motion.

¶21 A third psychological evaluation of Mother was conducted by Dr. Lee Underwood in March and April 2019, midway through trial. Dr. Underwood's diagnosis of mild intellectual disability was consistent with Dr. Thal's diagnosis. Dr. Underwood did not recommend that the child be returned to Mother's sole care. Instead he concluded that she could parent in a co-parent model.

¶22 After a seven-day trial on both the guardianship and severance motions, the juvenile court denied Mother's guardianship motion. The court granted DCS's severance motion, terminating Mother's parental rights to Hunter based on fifteen months out-of-home placement and mental deficiency. [6] The court found that severance was in Hunter's best interests even though Mother loved him and was clearly bonded with him, and that DCS made reasonable efforts to provide reunification services. The court denied the motion to appoint Grandmother as a permanent guardian, noting, among

other things, that he had been neglected by Mother while they both resided with Grandmother. Mother timely appealed.

## DISCUSSION

### I. Americans With Disabilities Act

¶23 Mother argues that the juvenile court erred by not considering whether DCS's reunification efforts complied with ADA, 42 U.S.C. §§ 12101-12213, and that DCS failed to prove that it provided her with services that reasonably accommodated her mental disability. [7]

¶24 The ADA prohibits public entities from discriminating against disabled persons by excluding them from participation in or denying them the benefits of public services and programs. 42 U.S.C. § 12132. The ADA imposes an affirmative duty on public entities to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless ... the modifications would fundamentally alter the nature of the service" provided. 28 C.F.R. § 35.130(b)(7)(i). A mental impairment that substantially limits one or more major life activities of an individual is a disability. 42 U.S.C. § 12102(1)(A). A mental impairment includes "intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disability." 28 C.F.R. § 35.108(b)(1)(ii).

**[1]** ¶25 We agree with courts in other jurisdictions–child welfare agencies such as **680 *469 DCS, as public entities, must provide reunification services that comply with the ADA to disabled parents. See Lucy J. v. Dep't of Health & Soc. Servs., 244 P.3d 1099, 1115-16 (Alaska 2010) (ADA requires family reunification services to be provided in a manner that takes a parent's disability into account); In re S.K., 440 P.3d 1240, 1248, ¶ 25 (Colo. App. 2019) ("ADA does not restrict a juvenile court's authority to terminate parental rights when the parent, even after reasonable accommodation of a disability, is unable to meet his or her child's needs," but while the ADA "is not a defense to termination of parental rights, it applies to the provision of assessments, treatment, and other services that the Department makes available to parents ... before termination."); In re H.C., 187 A.3d 1254, 1265 (D.C. 2018) (ADA's requirement of reasonable accommodation is "entirely consistent with and perhaps subsumed within, [child welfare agency's] general statutory obligation to expend reasonable efforts to make reunification possible"); In re Adoption of Gregory, 434 Mass.

117, 747 N.E.2d 120, 126 (2001) (reunification services must comply with the ADA); *In re Terry*, 240 Mich.App. 14, 610 N.W.2d 563, 570 (2000) (same); *In re K.C.*, 362 P.3d 1248, 1252, ¶¶ 19, 21 (Utah 2015) (ADA encompasses a plan for reunification services and a parent has the right to raise the ADA "while the reunification plan is being implemented ... not just after the fact in a claim for money damages."); *In re A.J.R.*, 78 Wash.App. 222, 896 P.2d 1298, 1302 (1995) (severance statute's requirement that State provide reasonable services resulted in reasonable accommodation of parents' disabilities). Arizona's statutory requirement that DCS make reasonable efforts to provide reunification services is consistent with the ADA's requirement that disabled parents be reasonably accommodated.

**[2]** **[3]** ¶26 In general, any claim that DCS is failing to provide appropriate reunification services must be raised in the juvenile court or the issue is waived. *Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 175, ¶ 1, 319 P.3d 236, 237 (App. 2014). Similarly, we agree with other courts concluding that any claim that the appropriate state agency (here, DCS) is violating the ADA in a dependency or severance matter must be timely raised or the issue is waived. *See Gregory*, 747 N.E.2d at 124-25 (parent may not raise noncompliance with the ADA with regard to reunification services for the first time at a termination proceeding). *Accord Terry*, 610 N.W.2d at 570 (disabled parent should claim a violation of the ADA before the termination hearing "either when a service plan is adopted or soon afterward" so that juvenile court can address the claim.). *Accord In re Hicks/Brown*, 500 Mich. 79, 893 N.W.2d 637, 642 (2017) (raising claim that services did not accommodate a parent's intellectual disability in court eleven months prior to termination hearing was sufficient). *Cf. In re K.C.*, 362 P.3d at 1252, ¶ 27 (parent may raise ADA violation at termination hearing, but "[a] parent who waits until the eleventh hour to request a modification under the ADA may thoroughly undermine her ability to establish that such a modification is reasonable").

**[4]** ¶27 Here, Mother did not raise her claim that DCS violated her right to reasonable accommodations under the ADA in the juvenile court before or during the severance proceedings. Mother never asked the juvenile court to determine whether the services DCS provided Mother, which the court found were reasonable under A.R.S. § 8-533, also satisfied the ADA. Mother was represented by counsel throughout the case and could have timely raised the issue. Raising an ADA claim for the first time on appeal is untimely and we do not consider it.

## II. Due Process and A.R.S. § 1-601

**[5]** **[6]** **[7]** ¶28 Mother argues that the juvenile court violated her due process rights. Alleged constitutional violations raised for the first time on appeal are reviewed for fundamental error. *Brenda D. v. Ariz. Dep't of Child Safety*, 243 Ariz. 437, 447, ¶ 37, 410 P.3d 419, 429 (2018). Mother first argues that A.R.S. §§ 8-533(B)(3) and (B)(8) are facially unconstitutional under the federal constitution. We review the constitutionality of a statute de novo. *State v. Maestas*, 244 Ariz. 9, 11, ¶ 6, 417 P.3d 774, 776 (2018). Under strict scrutiny analysis there is no presumption that a statute is constitutional. **\*\*681 \*470** *Martin v. Reinstein*, 195 Ariz. 293, 309, ¶ 51, 987 P.2d 779, 795 (App. 1999).

**[8]** **[9]** **[10]** ¶29 Parents have a fundamental right in the care, custody, and management of their children and that interest is protected by the Due Process Clause. *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). "The maintenance of the parent-child relationship is a fundamental right, and the rationality of statutes which abridge it is subject to strict scrutiny." *Maricopa Cty. Juv. Action No. JS-7359*, 159 Ariz. 232, 236, 766 P.2d 105, 109 (App. 1988) (citing *Santosky*, 455 U.S. 745, 102 S.Ct. 1388). Under strict scrutiny analysis, "proponents of a law bear the burden of showing that it furthers a compelling state interest, that it is narrowly drawn to serve that interest, and that the state's interests outweigh" the fundamental liberty interests at stake. *Martin*, 195 Ariz. at 309, ¶ 51, 987 P.2d at 795.

¶30 Mother agrees that A.R.S. §§ 8-533(B)(3) and (B)(8) serve a compelling state interest. Nevertheless, she argues that Arizona's severance statute fails strict scrutiny analysis because the compelling state interest is preventing harm to the child and the statute does not require DCS to prove, by clear and convincing evidence, that termination is necessary to prevent harm to the child.

¶31 The Arizona Supreme Court has held that Arizona's severance statute satisfies due process because the statutory grounds are "synonymous with parental unfitness." *Alma S. v. Ariz. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 9, 425 P.3d 1089, 1093 (2018) ("If a statutory ground were not synonymous with unfitness, a contested severance based on such a ground would be constitutionally infirm."); *see also JS-7359*, 159 Ariz. at 236, 766 P.2d at 109 (prior version of Arizona's severance statute satisfied strict scrutiny because it incorporated a concept of parental unfitness).

¶32 Both A.R.S. §§ 8-533(B)(3) and (B)(8) require a finding of parental unfitness at the time of termination. To terminate parental rights based on mental deficiency under A.R.S. § 8-533(B)(3), the court must find, by clear and convincing evidence, that a parent is "unable to discharge parental responsibilities because of ... mental deficiency" at the time of severance and that "the condition will continue for a prolonged indeterminate period." Section 8-533(B)(8)(c) requires a finding that a parent "will not be capable of exercising proper and effective parental care and control in the future."

¶33 Mother misidentifies the compelling state interest in termination proceedings, which is to promote and protect child welfare. *See Santosky*, 455 U.S. at 766, 102 S.Ct. 1388 (the State has an urgent "*parens patriae* interest in preserving and promoting the welfare of the child" and its "goal is to provide the child with a permanent home," preferably with a fit parent); *JS-7359*, 159 Ariz. at 236, 766 P.2d at 109 (quoting *Santosky*, 455 U.S. at 767, 102 S.Ct. 1388); *Ariz. Dep't of Child Safety v. Beene*, 235 Ariz. 300, 306, ¶ 13, 332 P.3d 47, 53 (App. 2014) ("DCS has a compelling interest in protecting child welfare.") (internal quotation omitted).

**[11]    [12]** ¶34 Mother argues that A.R.S. §§ 8-533(B)(3) and (B)(8) are both unconstitutional because they do not require DCS to prove that termination is the least-restrictive means available for protecting the child. She argues that the State may not choose a single means of avoiding severance, such as family reunification, and then declare that severance is the least-restrictive means because reunification is not available. We disagree. DCS must make reasonable rehabilitative efforts before seeking severance under A.R.S. § 8-533(B)(3). *Vanessa H. v. Ariz. Dep't of Econ. Sec.*, 215 Ariz. 252, 255-56, ¶ 18, 159 P.3d 562, 565–66 (App. 2007). And A.R.S. § 8-533(B)(8) requires DCS to make a diligent effort to provide appropriate reunification services. If reunification with a parent is not possible, however, due process does not require DCS to pursue "alternative means" such as guardianship in every instance before seeking to change the case plan to severance and adoption. [8]

**682    *471** ¶35 Mother also argues that A.R.S. §§ 8-533(B)(3) and (B)(8) are overly inclusive because they "allow for the possibility that a fit parent may have their parental rights ... terminated simply because, at some point, they were unfit." As discussed *supra* ¶¶ 31-32, §§ 8-533(B)

(3) and (B)(8) require the juvenile court to make an individualized finding of unfitness at the time of termination.

¶36 Mother next argues that the juvenile court had a statutory duty to apply A.R.S. § 1-601(B), and "find that DCS has met every burden that Arizona's legislature has mandated, including those mandated under A.R.S. § 1-601(B)," and that its failure to do so violated her due process rights under the federal and state constitutions. Mother did not raise her statutory claim until her written closing argument.

¶37 The Parents' Bill of Rights is codified at A.R.S. §§ 1-601 and -602. Section 1-601 (A) states that parents have a fundamental right "to direct the upbringing, education, health care and mental health of their children." Section 1-601(B) says that the State shall not infringe on those rights "without demonstrating that the compelling governmental interest as applied to the child involved is of the highest order, is narrowly tailored and is not otherwise served by a less restrictive means." Section 1-602 defines a parent's rights, and provides, in part:

> This section does not authorize or allow a parent to engage in conduct that is unlawful or to abuse or neglect a child in violation of the laws of this state. This section does not prohibit courts, law enforcement officers or employees of a government agency responsible for child welfare from acting in their official capacity within the scope of their authority. This section does not prohibit a court from issuing an order that is otherwise permitted by law.

Here, the juvenile court acted within its "official capacity within the scope of [its] authority" under Arizona's severance statute, A.R.S. § 8-533, and that statute satisfies due process. The juvenile court made an individualized determination that Mother was unfit at the time of termination, and that severance was in child's best interests. The court's severance order was permitted by A.R.S. § 8-533. We find no error, fundamental or otherwise, nor do we find that Mother's due process rights were violated.

### III. Fifteen Months Out-of-Home Placement

 **[13]**    **[14]**    **[15]** ¶38 Mother argues that insufficient evidence supported the juvenile court's finding that severance was warranted pursuant to A.R.S. § 8-533(B)(8)(c). Under this statute, the court may terminate parental rights if DCS made diligent reunification efforts, the parent was unable to remedy the circumstances causing the parent's child to be in an out-of-home placement for fifteen months or longer, and "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S.§ 8-533(B)(8)(c). We view the evidence and the reasonable inferences to be drawn from it in the light most favorable to affirming the juvenile court's order. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18, 219 P.3d 296, 303 (App. 2009). We will not reverse the juvenile court's order unless reasonable evidence does not support the juvenile court's factual findings. *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7, 225 P.3d 604, 606 (App. 2010). In assessing a parent's ability to provide proper parental care and control, the juvenile court must "consider the discrete and special needs of the particular child." *Joelle M. v. Ariz. Dep't of Child Safety*, 245 Ariz. 525, 527, ¶ 12, 431 P.3d 595, 597 (App. 2018).

 **[16]** ¶39 Hunter was in an out-of-home placement for more than two years at the start of the severance trial and for two and one-half years when the juvenile court granted the severance. Mother argues that she remedied her substance abuse problem, which was the circumstance causing Hunter's removal. However, in making a determination that a parent has been unable to remedy the circumstances causing the child to be in an out-of-home placement, we construe those circumstances to mean the circumstances existing at the time of the severance that prevented a parent from appropriately providing for the parent's child. **\*\*683  \*472** *Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 330, ¶ 22, 152 P.3d 1209, 1213 (App. 2007). Moreover, Mother's substance abuse was not the only circumstance leading to Hunter's removal. *See Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 17, ¶ 26, 444 P.3d 258, 266 (App. 2019) (court must consider "*both the origin and any cause arising during the dependency*"). DCS took Hunter into custody because of Mother's substance abuse, because she initially refused to participate in services, and because "[t]he physical or mental condition of [Mother] endanger[ed] child's health or safety." In addition, Grandmother declined to take a urinalysis test when she was designated safety monitor for the child. The dependency petition alleged that Mother was unable to parent due to both substance abuse and her intellectual disability. At the time of the severance trial, although Mother's substance abuse was no longer a concern, her intellectual disability was the circumstance causing Hunter's continued out-of-home placement.

¶40 Here, the juvenile court found that "Mother has completed all services that have been asked of her to the best of her ability." [9]   The court found that even so, Mother had been unable to remedy the circumstances leading to the child's out-of-home placement because "[e]very professional who evaluated Mother has concluded that Mother, due to her limitations, cannot independently parent the child. Mother's deficiencies are exacerbated by the special needs of the child. The professionals have concluded that the child cannot be safely returned to Mother's care." Citing Dr. Thal's opinion, the court found that there was a substantial likelihood that Mother would not be capable of exercising proper and effective parental care and control in the near future.

 **[17]** ¶41 Reasonable evidence supports the juvenile court's findings. Dr. Thal evaluated Mother twice, and even after she had completed "a wide range of services," Dr. Thal concluded that Mother's prognosis for demonstrating minimally adequate parenting skills was poor, given the nature of her intellectual ability. Dr. Thal noted that Mother's medical decision-making abilities were "significantly limited," and opined that Mother's intellectual disability "and the accompanying impact on her judgment and decision making" made her unable to meet Hunter's special needs. No evaluator or therapist concluded that Mother could safely parent child independently.

¶42 Mother argues that Dr. Thal recommended the child be returned to her in July 2017, and that DCS's failure to do so extended his out-of-home placement past fifteen months. This misstates the record. After his first evaluation of Mother in July 2017, Dr. Thal made the following recommendations concerning placement:

> It is not recommended a child be placed in this [Mother]'s sole and independent care. ... The best-case scenario for [Mother] would be for her to act as an assistant caregiver to a fully qualified caregiver. [Mother] would require ongoing supervision with a child and cannot be relied upon to independently learn, retain, and

implement safe and effective parenting practices. ... Alternative long-term placement planning is necessary to insure the welfare of [Hunter].

¶43 Mother also asserts that Dr. Thal testified that she could effectively co-parent, and that with assistance, she would be able to exercise proper and effective parental care and control. This misstates Dr. Thal's testimony. Dr. Thal specifically testified that the child would be in Mother's sole and independent care, but that a goal might be for her to "function in an assisted capacity. Not to [be] the co-parent but to assist a capable and fully functioning parental figure."

¶44 Mother argues that the juvenile court erred by finding that DCS made diligent **684 *473 efforts to reunify the family because DCS failed to "undertake even the minimum of the diligent efforts [it was] legally required to take." Mother argues that DCS failed to obtain Hunter's medical, DDD, and Head Start records, did not ask Mother or Grandmother about services they had obtained for the child, and did not speak with child's grandfather or Mother's aunts. She also argues that Dr. Thal recommended that the child "be returned to Mother, with Grandmother as guardian," but "DCS did nothing for six months." [10]

 [18]   [19]   [20]   [21]   ¶45 Before seeking to terminate a parent's parental rights on grounds of out-of-home placement, DCS must make a diligent effort to provide appropriate reunification services. A.R.S. § 8-533(B)(8). "Termination of the parent-child relationship should not be considered a panacea but should be resorted to only when [a] concerted effort to preserve the relationship fails." *Ariz. Dep't of Econ. Sec. v. Mahoney*, 24 Ariz. App. 534, 537, 540 P.2d 153, 156 (1975). DCS need not undertake rehabilitative measures that are futile, but it is obligated to undertake measures with a reasonable probability of success. *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34, 971 P.2d 1046, 1053 (App. 1999). DCS need not provide every conceivable service, but it "must provide a parent with the time and opportunity to participate in programs designed to improve the parent's ability to care for the child." *Id.* at ¶ 37. DCS does not make reasonable reunification efforts if "it neglects to offer the very services that its consulting expert recommends." *Id.*

 [22]   ¶46 As the juvenile court found, DCS offered Mother numerous reunification services, including random urinalysis testing, substance abuse treatment, more than 30 individual counseling sessions (exceeding the 20 sessions recommended by Dr. Thal), two psychological evaluations, a bonding assessment, therapeutic visitation and supervised visitation, a parent aide, and transportation because she did not drive. DCS invited her to attend the child's medical appointments so that she could understand his special needs. These services were offered to help Mother become sober, enhance her parenting skills, and assist her with "decision-making, employing sound judgment, staying safe, and coping with her disabilities." Sufficient evidence supported the court's finding that DCS made diligent efforts to provide reunification services.

¶47 DCS case manager Claudia Hoff testified that obtaining the child's DDD and medical records at the outset of the case would not have changed the services offered to Mother. And whether or not DCS interviewed certain family members during its investigation is not relevant to the question of whether it made diligent efforts to provide appropriate reunification services.

¶48 Because sufficient evidence supported the juvenile court's finding that severance was warranted pursuant to A.R.S. § 8-533(B)(8)(c), we need not consider Mother's challenge to the alternate ground of mental deficiency. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3, 53 P.3d 203, 205 (App. 2002).

## IV. Best Interests

 [23]   [24]   [25]   [26]   ¶49 Finally, Mother argues that the juvenile court erred by finding that termination of her parental rights was in Hunter's best interests. We do not reweigh the evidence and will affirm the juvenile court's factual findings if supported by reasonable evidence. *Dominique M. v. Ariz. Dep't of Child Safety*, 240 Ariz. 96, 97, ¶ 6, 376 P.3d 699, 700 (App. 2016). "Although fundamental, parental rights are not inviolate; a court may still sever those rights if it finds clear and convincing evidence of one of the statutory grounds for severance, and also finds by a preponderance of the evidence that severance is in the best interests of the child[ ]." *Id.* at 98, ¶7, 376 P.3d at 701 (citations omitted). Severance is in a child's best interests if the child would "derive an affirmative benefit from termination or incur a detriment by continuing in the relationship." **685 *474 *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 6, 100 P.3d 943, 945 (App. 2004). A current adoptive plan is a well-established affirmative benefit to a child. *Id.*

¶50 The juvenile court found that the child was adoptable and that his foster parents were meeting all his special needs. Hunter's foster parents wished to adopt him. He had lived with his foster parents for nearly two and one-half years and he was bonded to them. He was also bonded with Mother. The court also found that maintaining Mother's parental rights would be detrimental to Hunter because Mother was "not equipped to provide the level of care that child needs." The court concluded that "the facts dictate that it is in the child's best interests that Mother's parental rights be terminated despite her love for, and bond with, the child."

 **[27]**   ¶51 Reasonable evidence supported the juvenile court's best interests finding. Dr. Bennett concluded his bonding and best interests assessment by opining that returning Hunter to Mother was not in his best interests because he seemed to have little understanding of his medical needs and was not responsive to his cues regarding his needs. [11]  Dr. Bennett explained that the child would be at risk of neglect in her care, even for short periods of time. Hunter was adoptable and his current placement was willing to adopt him. Hunter was thriving in their care.

¶52 Mother argues that she was a "fit and loving" parent and that Hunter was bonded to her. As discussed above, reasonable evidence supported the severance ground of out-of-home placement and the court's conclusion that Mother would not be a fit parent in the near future. And although the existence of a bond between a parent and child is a factor in assessing best interests, it is not dispositive. *Dominique M.,* 240 Ariz. at 98, ¶ 12, 376 P.3d at 701. "Even in the face of such a bond, the juvenile court is required to evaluate the totality of circumstances and determine whether severance is in the best interests of the children." *Id.* at 99, ¶12, 376 P.3d at 702. Here, the court considered the totality of the circumstances and found that severance was in Hunter's best interests. Reasonable evidence supports that finding.

### CONCLUSION

¶53 For the foregoing reasons, we affirm the juvenile court's order terminating Mother's parental rights.

**All Citations**

249 Ariz. 461, 23 Arizona Cases Digest 20, 471 P.3d 672

---

### Footnotes

\*      Justice Bolick voted to grant review of issues # 1-3.

1      Grandmother claimed she could not test the first time DCS asked her to do so because of work responsibilities. About eight months later, in September 2017, Grandmother tested negative for substances.

2      Hunter was nearly three years old when he came into care. His delays were apparent much earlier, however. When he was five months old, his pediatrician referred him to the Arizona Early Intervention Program ("AZEIP"), where he was determined to have a moderate delay in motor skills, a significant delay in cognitive skills, a moderate delay in physical development and communication ability, and a mild delay in adaptive and self-help skills. AZEIP provided him with physical therapy. By February 2016, it was apparent that Hunter was speech delayed, and at a visit to his pediatrician that month, Mother and Grandmother said Hunter would start speech therapy "soon." He did not begin speech therapy until June 2016, however. Also in February 2016, Hunter's pediatrician referred him to a neurologist to address his shaking and staring episodes. Hunter did not see the neurologist until June 2016. The neurologist suspected complex partial seizures and referred Hunter for an electroencephalogram ("EEG") and a magnetic-resonance imaging scan ("MRI"). Neither Mother nor Grandmother took him for an EEG or MRI, leaving him untreated until he came into care.

3      Therapeutic visitation was put into place because Hunter was exhibiting stress before and after visits, and because Mother was having difficulty responding to his cues and managing his tantrums during the visits. The

therapeutic visit supervisor modeled appropriate parenting behaviors for Mother, provided her with parenting information and strategies, and gave her verbal feedback.

4    Mother earned $150.00 per week at her job.

5    Dr. Thal conducted a psychological evaluation of Grandmother in January 2018 and another evaluation in January 2019. He likewise did not recommend placing Hunter with Grandmother. At trial, Dr. Thal testified that it was concerning that Grandmother believed that Mother could safely parent the child and failed to recognize she had "some very significant intellectual limitations."

6    The court also terminated the parental rights of an alleged Father on abandonment grounds. He is not party to this appeal.

7    Mother argues for the first time on appeal that DCS should have provided her with "enhanced," "supplemental," and more frequent training (presumably parenting training), either in her home or in another environment "more conducive to learning," and that it should have provided "visual modeling or individualized techniques."

8    Here, DCS did pursue permanent guardianship by Grandmother but determined she was not an appropriate guardian for the child.

9    Mother complains that elsewhere in the court's minute entry the court stated, "[DCS] made diligent efforts by providing an array of reunification services and had those services been successfully completed, reunification likely would have occurred." This appears to be in conflict with other findings. The court specifically found that Mother completed all services to the best of her abilities and stated so twice in its minute entry order, which was consistent with the DCS case manager's testimony. Further, the court outlined in great detail all of the services offered to Mother and noted that she participated in and completed each of them.

10   As noted *supra* ¶¶ 42-43, Dr. Thal did not recommend returning Hunter to Mother with Grandmother as his guardian.

11   Mother claims that the juvenile court erred by finding severance was in Hunter's best interests because she was a single parent. The court did mistakenly refer to Mother instead of Grandmother when summarizing Dr. Bennett's bonding/best interests assessment, wherein Dr. Bennett stated that Grandmother was a single parent. However, the court did not refer to Mother's relationship status in its ultimate findings about best interests.

---

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 26

251 Ariz. 34
Court of Appeals of Arizona, Division 1.

JESSICA P., Appellant,

v.

DEPARTMENT OF CHILD SAFETY, H.P., Appellees.

No. 1 CA-JV 19-0253
|
FILED 3/18/2021

**Synopsis**

**Background:** Department of Child Safety (DCS) brought proceeding to terminate parental rights of mother, who had an intellectual disability, based on mental deficiency and 15 months out-of-home placement of child. The Superior Court, Maricopa County, No. JD 530589, Jeffrey A. Reuter, J., ordered termination of parental rights. Mother appealed. The Court of Appeals, 249 Ariz. 461, 471 P.3d 672, affirmed. Mother petitioned for review. The Supreme Court vacated in part and remanded.

**Holdings:** The Court of Appeals, Campbell, J., held that:

[1] lack of unspecified extra services, as part of DCS's obligation of reunification efforts complying with Americans with Disabilities Act (ADA), was not fundamental error, and

[2] any error with respect to reunification services did not result in prejudice.

Affirmed.

**Procedural Posture(s):** On Appeal; Petition to Terminate Parental Rights.

**West Headnotes (10)**

**[1]** **Infants** 🔑 Preservation of Grounds for Review

Issue concerning Department of Child Safety's (DCS) provision of reunification efforts that complied with ADA was subject to review for fundamental error on appeal of termination of parental rights of mother who had intellectual disability, where mother failed to raise issue in juvenile court. Americans with Disabilities Act of 1990 §§ 3, 202, 42 U.S.C.A. §§ 12102(1)(A), 12132; 28 C.F.R. §§ 35.108(b)(1)(ii), 35.130(b)(7)(i).

**[2]** **Infants** 🔑 Necessity and entitlement

**Infants** 🔑 Requisites and sufficiency

As a public child welfare agency, Department of Child Safety (DCS) must provide a parent with a disability in a dependency case with reunification services that comply with the ADA. Americans with Disabilities Act of 1990 §§ 3, 202, 42 U.S.C.A. §§ 12102(1)(A), 12132; Ariz. Rev. Stat. Ann. § 8-533; 28 C.F.R. §§ 35.108(b)(1)(ii), 35.130(b)(7)(i).

6 Cases that cite this headnote

**[3]** **Infants** 🔑 Requisites and sufficiency

ADA's reasonable accommodation requirement is a component of requirement that Department of Child Safety (DCS) provide appropriate reunification services as a prerequisite to terminating parental rights. Americans with Disabilities Act of 1990 §§ 3, 202, 42 U.S.C.A. §§ 12102(1)(A), 12132; Ariz. Rev. Stat. Ann. § 8-533; 28 C.F.R. §§ 35.108(b)(1)(ii), 35.130(b)(7)(i).

12 Cases that cite this headnote

**[4]** **Appeal and Error** 🔑 Burden of showing correctness or error

Under fundamental error review, appellant bears the burden to establish that (1) error exists, (2) the error is fundamental, and (3) the error caused them prejudice.

1 Case that cites this headnote

**[5]** **Appeal and Error** 🔑 Necessity of objections in general

An error is "fundamental" only if it goes to the very foundation of a case.

**[6]**  **Appeal and Error** 🔑 **Necessity of objections in general**

To prove that a trial court error was prejudicial for fundamental error review, appellant must show that a reasonable fact-finder could have reached a different result.

1 Case that cites this headnote

**[7]**  **Infants** 🔑 **Requisites and sufficiency**

Department of Child Safety (DCS) need not undertake rehabilitative measures that are futile as part of its obligation to provide appropriate reunification services as a prerequisite to terminating parental rights, but it is obligated to undertake measures with a reasonable probability of success. Ariz. Rev. Stat. Ann. § 8-533(B)(8)(c).

1 Case that cites this headnote

**[8]**  **Infants** 🔑 **Requisites and sufficiency**

Department of Child Safety (DCS) need not provide every conceivable service, but must provide a parent with the time and opportunity to participate in programs designed to improve the parent's ability to care for the child, as part of DCS's obligation to provide appropriate reunification services as a prerequisite to terminating parental rights. Ariz. Rev. Stat. Ann. § 8-533(B)(8)(c).

9 Cases that cite this headnote

**[9]**  **Infants** 🔑 **Efforts and compliance by government or agency**

**Infants** 🔑 **Preservation of Grounds for Review**

Department of Child Safety's (DCS) alleged failure to provide "enhanced" and "supplemental" services and more frequent parenting training, as part of its obligation to provide ADA-compliant reunification efforts to mother who had an intellectual disability, was not fundamental error, where mother identified no specific ADA-required services that DCS failed to provide prior to termination of her parental

rights based on mental deficiency and 15 months out-of-home placement of child. Americans with Disabilities Act of 1990 §§ 3, 202, 42 U.S.C.A. §§ 12102(1)(A), 12132; Ariz. Rev. Stat. Ann. §§ 8-533, 8-533(B)(3), 8-533(B)(8)(c); 28 C.F.R. §§ 35.108(b)(1)(ii), 35.130(b)(7)(i).

7 Cases that cite this headnote

**[10]**  **Infants** 🔑 **Preservation of Grounds for Review**

Any error in Department of Child Safety's (DCS) provision of ADA-compliant reunification services to mother who had an intellectual disability did not result in prejudice as a component of fundamental error review following termination of mother's parental rights based on mental deficiency and 15 months out-of-home placement of child, where mother did not offer anything beyond speculation for the proposition that, had DCS provided enhanced or supplemental services or more frequent parenting training that she did not specifically identify, the trial outcome would have been different. Americans with Disabilities Act of 1990 §§ 3, 202, 42 U.S.C.A. §§ 12102(1)(A), 12132; Ariz. Rev. Stat. Ann. §§ 8-533, 8-533(B)(3), 8-533(B)(8)(c); 28 C.F.R. §§ 35.108(b)(1)(ii), 35.130(b)(7)(i).

2 Cases that cite this headnote

**\*\*150**  Appeal from the Superior Court in Maricopa County, No. JD 530589, The Honorable Jeffrey A. Reuter, Judge. **AFFIRMED**

**Attorneys and Law Firms**

Gillespie Shields Goldfarb & Taylor, Phoenix, By Kristina B. Reeves, Counsel for Appellant

Arizona Attorney General's Office, Mesa, By Lauren J. Lowe, Counsel for Appellee, Department of Child Safety

Arizona Center for Disability Law, Tucson, By Christian Carlsen, Rose A. Daly-Rooney, Counsel for Amicus Curiae, Arizona Center for Disability Law

Arizona Center for Law in the Public Interest, Phoenix, By Anne Ronan, Daniel Adelman, Counsel for Amicus Curiae, Arizona Center for Law in the Public Interest

ACLU Foundation of Arizona, Phoenix, By Victoria Lopez, Counsel for Amicus Curiae, American Civil Liberties Union of Arizona

Mills & Woods Law PLLC, Phoenix, By Thomas A. Connelly, Counsel for Amicus Curiae, the ARC, et al.

NYU School of Law Family Defense Clinic, New York, NY, By Amy Mulzer, Christine Gottlieb, Martin Guggenheim, Counsel for Amicus Curiae, the ARC, et al.

Disability & Civil Rights Clinic, Brooklyn Law School, Brooklyn, NY, By Sarah Lorr, Counsel for Amicus Curiae, the ARC, et al.

Judge Jennifer B. Campbell delivered the opinion of the Court, in which Presiding Judge Paul J. McMurdie and Judge Kent E. Cattani joined.

## OPINION

CAMPBELL, Judge:

**\*36** ¶1 In a prior opinion in this appeal by Jessica P. ("Mother"), we held that the Department of Child Safety ("DCS") must comply with the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213, when providing reunification services to a disabled parent in a dependency.[1] We concluded, however, that Mother waived her claim that DCS failed to comply with the ADA because she failed to raise the issue in the juvenile court. After considering several other arguments made on appeal, we affirmed the juvenile court's order severing Mother's parental rights.

¶2 Mother filed a petition for review with the Arizona Supreme Court, which granted review, vacated the portion of our opinion concerning Mother's waiver of her ADA claim, and directed us on remand to consider whether the juvenile court committed fundamental error, citing *Brenda D. v. Department of Child Safety*, 243 Ariz. 437, 447, ¶ 37, 410 P.3d 419, 429 (2018). Consistent with *Brenda D.* and with our previous opinion, we reiterate that DCS must comply with the ADA in a dependency involving a disabled parent. We conclude, however, that Mother has not sustained her burden to show that **\*\*151** **\*37** fundamental error occurred when the juvenile court found that DCS provided her with appropriate reunification services before severing her parental rights.

## BACKGROUND

¶3 Mother has an intellectual disability. She is the parent of a son, Hunter, who was born in 2014. In late December 2016, DCS received two calls reporting that Mother was neglecting the child. At the time, Mother and son were living with her mother, "Grandmother." The callers alleged that Mother used marijuana and methamphetamine around the child, left him home alone on multiple occasions, and that Mother had given the child drinks of beer and hard liquor. The callers further alleged that Mother spanked Hunter, bit her own grandmother, and physically fought with Grandmother and Mother's significant other in front of the child.

¶4 DCS removed Hunter from Mother's custody. When he came into foster care, he was globally delayed, could barely speak, and was "very unsteady on his feet." The juvenile court found Hunter dependent and offered Mother services aimed at reunification, including a drug abuse assessment and treatment, random urinalysis testing, case aide services, parent aide services, therapeutic visits, individual counseling, and psychological evaluations. DCS also provided Mother and Grandmother with joint counseling sessions and provided Mother transportation to and from services and visits.

¶5 Mother diligently participated in services "to the best of her abilities." She consistently tested negative for illegal substances after some initial positive tests, completed substance abuse services, engaged in regular and therapeutic visitation, completed parent aide services, and participated in psychological evaluations and individual counseling. At the time of the severance trial, Mother lived in an apartment and had a job as a caretaker for a teenager with special needs. Nevertheless, DCS remained concerned that Mother did not understand Hunter's medical and behavioral needs.

¶6 Mother underwent two psychological evaluations with Dr. James Thal, who determined Mother's IQ is 65 - placing her in the intellectually disabled range. Dr. Thal diagnosed Mother with mild intellectual disability, alcohol use disorder in early remission, methamphetamine use disorder in early remission, and a rule-out diagnosis of bipolar I disorder. Given Mother's intellectual disability, Dr. Thal opined that it is "exceedingly difficult for [her] to acquire, understand,

retain, and implement basic parenting knowledge and skills." He believed that even with services, Mother would be unlikely to achieve a minimally adequate parenting level. Dr. Thal further opined that Hunter could not be safely returned to Mother's sole custody, then or in the foreseeable future, because he would be at risk in her care. Dr. Thal concluded that Mother's prognosis for demonstrating minimally adequate parenting skills in the foreseeable future was poor.

¶7 Over a year later, Dr. Thal reassessed Mother to determine if her participation in services had improved her parenting abilities to a minimally adequate level. Mother continued to deny that Hunter had emotional or behavioral problems, and she asserted that Hunter was doing well for his age. Mother also continued to minimize her substance abuse issues. After the evaluation, Dr. Thal again determined that Mother's prognosis for demonstrating minimally adequate parenting skills was poor:

> [Mother] has participated in a wide range of services but, not surprising given the nature of her mental deficiency, there are not significant changes in her parenting profile. This is an intellectually disabled young woman who has substantial difficulty with concepts, timeframes, and retaining factual information. She is more than willing to follow directives and she clearly loves [the child]. However, placing Hunter in [Mother]'s sole and independent care would likely place the child at risk for inadvertent neglect, impaired decision-making, and significant under-stimulation of the child's already reportedly compromised learning abilities.

¶8 Hunter, Mother, Grandmother, and the child's foster family participated in a bonding **152 *38 assessment with Dr. S. Bryce Bennett. Dr. Bennett noted that Mother "seemingly had no understanding of [Hunter's] medical needs" and had difficulty responding to his cues. Dr. Bennett continued to have concerns about Grandmother's ability to meet Hunter's needs and concluded that it was not in his best interests to be

placed in her care. Dr. Bennett concluded that Hunter's foster parents provided him with a safe and stable home and could meet his special needs. [2]

¶9 DCS filed a motion to terminate Mother's parental rights in August 2018 pursuant to A.R.S. § 8-533(B)(3) (mental deficiency) and (B)(8)(c) (fifteen months out-of-home placement).

¶10 A third psychological evaluation of Mother was conducted by Dr. Lee Underwood midway through the severance trial. Dr. Underwood's diagnosis of mild intellectual disability was consistent with Dr. Thal's diagnosis. Dr. Underwood did not recommend that Hunter be returned to Mother's sole care. Instead, he concluded that she could parent only in a co-parenting model.

¶11 After a seven-day trial, the juvenile court terminated Mother's parental rights to Hunter based on fifteen months out-of-home placement and mental deficiency. [3] The court found that severance was in Hunter's best interests, even though Mother loved him and was bonded with him, and that DCS had made reasonable efforts to provide reunification services. Mother timely appealed.

### DISCUSSION

### I. Americans With Disabilities Act

[1]  ¶12 Mother argues that the juvenile court erred by not considering whether DCS's reunification efforts complied with the ADA, and that DCS failed to prove it provided her with services that reasonably accommodated her mental disability. Because Mother failed to raise this claim in the juvenile court, we review only for fundamental error. *Brenda D.*, 243 Ariz. at 447, ¶ 37, 410 P.3d at 429.

¶13 The ADA prohibits public entities from discriminating against disabled persons by excluding them from participation in or denying them the benefits of public services and programs. 42 U.S.C. § 12132. The ADA imposes an affirmative duty on public entities to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless ... the modifications would fundamentally alter the nature of the service" provided. 28 C.F.R. § 35.130(b)(7)(i). A mental impairment that substantially limits one or more major life activities of an individual is a disability. 42 U.S.C. § 12102(1)(A). A mental

impairment includes "intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disability." 28 C.F.R. § 35.108(b)(1)(ii).

**[2]** ¶14 As a public child welfare agency, DCS must provide a disabled parent in a dependency with reunification services that comply with the ADA. *See Lucy J. v. Dep't of Health & Soc. Servs.*, 244 P.3d 1099, 1115–16 (Alaska 2010) (ADA requires family reunification services to be provided in a manner that takes a parent's disability into account); *In re S.K.*, 440 P.3d 1240, 1248, ¶ 25 (Colo. App. 2019) ("ADA does not restrict a juvenile court's authority to terminate parental rights when the parent, even after reasonable accommodation of a disability, is unable to meet his or her child's needs," and while the ADA "is not a defense to termination of parental rights, it applies to the provision of assessments, treatment, and other services that the Department makes available to parents ... before termination."); *In re H.C.*, 187 A.3d 1254, 1265 (D.C. 2018) (ADA's requirement of reasonable accommodation is "entirely consistent with, and perhaps subsumed within, [child welfare agency's] general **\*\*153 \*39** statutory obligation to expend reasonable efforts to make reunification possible"); *In re Adoption of Gregory*, 434 Mass. 117, 747 N.E.2d 120, 126 (2001) (reunification services must comply with the ADA); *In re Terry*, 240 Mich.App. 14, 610 N.W.2d 563, 570 (2000) (same); *In re K.C.*, 362 P.3d 1248, 1252, ¶¶ 19, 21 (Utah 2015) (ADA encompasses/applies to state's plan for reunification services, and a parent has the right to raise the ADA "while the reunification plan is being implemented ... not just after the fact in a claim for money damages"); *In re A.J.R.*, 78 Wash.App. 222, 896 P.2d 1298, 1302 (1995) (severance statute's requirement that state provide reasonable services resulted in reasonable accommodation of parents' disabilities).

**[3]** ¶15 This court has already recognized that Arizona's statutory requirement that DCS make reasonable efforts to provide reunification services satisfies the ADA's reasonable accommodation requirement. *Vanessa H. v. Ariz. Dep't of Econ. Sec.*, 215 Ariz. 252, 256, ¶ 20, 159 P.3d 562, 566 (App. 2007) (explaining "reasonable efforts" under A.R.S. § 8-533 "includes seeking to reasonably accommodate disabilities from which a parent may suffer"). In other words, "reasonable accommodations' " is a "component of making 'reasonable efforts.' " *Id.*

## II. Fundamental Error Analysis

**[4]** **[5]** **[6]** ¶16 Because Mother failed to raise her ADA argument in the juvenile court, we will reverse the severance

order only if she can show that fundamental error occurred. *See Brenda D.*, 243 Ariz. at 447, ¶ 37, 410 P.3d at 429. Under fundamental error review, Mother "bears the burden to establish that (1) error exists, (2) the error is fundamental, and (3) the error caused [her] prejudice." *Id.* at 447–48, ¶ 38, 410 P.3d at 429–30. An error is fundamental only if it "goes to the very foundation of a case." *Id.* at 448, ¶ 38, 410 P.3d at 429 (quoting *Monica C. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 89, 94, ¶ 24, 118 P.3d 37, 42 (App. 2005)). "Moreover, to prove prejudice, [Mother] must show that a reasonable [fact-finder] could have reached a different result." *Brenda D.*, 243 Ariz. at 448, ¶ 38, 410 P.3d at 430 (second alteration in original).

**[7]** **[8]** ¶17 Under A.R.S. § 8-533(B)(8)(c), the juvenile court may terminate parental rights only if it finds DCS provided the parent with appropriate reunification services. DCS need not undertake rehabilitative measures that are futile, but it is obligated to undertake measures with a reasonable probability of success. *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34, 971 P.2d 1046, 1053 (App. 1999). DCS need not provide every conceivable service, but it "must provide a parent with the time and opportunity to participate in programs designed to improve the parent's ability to care for the child." *Id.* at ¶ 37.

**[9]** **[10]** ¶18 In our initial opinion, we reviewed at length the services DCS provided Mother and concluded the record amply supported the juvenile court's finding that DCS had fulfilled its obligation to offer her appropriate reunification services. Mother argues that because of her intellectual disability, the reunification services DCS offered her needed to comply with the ADA. While we agree with that general legal proposition, Mother has failed to show that a fundamental error occurred or that she suffered prejudice as a result. While Mother contends that DCS should have provided her with "enhanced," "supplemental," and more frequent training (presumably parenting training), she identifies no specific ADA-required services that DCS failed to provide. Nor does Mother offer anything beyond speculation for the proposition that, had DCS provided those additional services, the severance trial outcome would have been different. For that reason, Mother "has not met her burden under fundamental error review." *Brenda D.*, 243 Ariz. at 448, ¶ 39, 410 P.3d at 430.

## CONCLUSION

¶19 For the reasons set forth above and in our initial opinion in this matter, we affirm the juvenile court's order terminating Mother's parental rights.

**All Citations**

251 Ariz. 34, 40 Arizona Cases Digest 36, 484 P.3d 148

---

### Footnotes

1      In the prior opinion, we addressed Mother's constitutional challenge, state statutory claim, and contention that insufficient evidence supported the juvenile court's bests interests finding. *Jessica P. v. Dep't of Child Safety,* 249 Ariz. 461, 471 P.3d 672 (App. 2020), *vacated in part,* No. CV-20-0241-PR, 2020 WL 8766053 (Ariz. Dec. 15, 2020) (granting review in part and vacating ¶¶ 23–27 of the Court of Appeals opinion).

2      After Dr. Thal conducted a psychological evaluation of Grandmother, he too did not recommend placing Hunter with her. At trial, Dr. Thal expressed concern that Grandmother believed Mother could safely parent the child and did not recognize Mother had significant intellectual limitations.

3      The court also terminated the parental rights of an alleged Father on abandonment grounds. He is not party to this appeal.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 27

# THIS EXHIBIT IS BEING FILED UNDER SEAL

**EXHIBIT 28**

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 29

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 30

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 31

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 32

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 33

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 34

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 35

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 36

# THIS EXHIBIT IS BEING FILED UNDER SEAL

# EXHIBIT 37

# THIS EXHIBIT IS BEING FILED UNDER SEAL