**EXHIBIT A**

Clerk of the Superior Court
*** Electronically Filed ***
J. Nelson, Deputy
12/23/2020 10:53:36 AM
Filing ID 12362202

Thomas A. Connelly (AZ Bar #019430)
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
**MILLS + WOODS LAW PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
Kristina Reeves (AZ Bar #031171)
GILLESPIE, SHIELDS, GOLDFARB, & TAYLOR
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com

*Attorneys for Plaintiff*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| JESSICA PLOOF, an individual, | Case No.: **CV2020-017046** |
| Plaintiff, | |
| v. | **COMPLAINT** |
| STATE OF ARIZONA, a government entity; ARIZONA DEPARTMENT OF CHILD SAFETY, a governmental entity; MEAGAN TAFOYA, individually and as an employee with the State of Arizona Department of Child Safety and JOHN DOE TAFOYA, her spouse; SARAH GREENWAY, individually and as an employee with the State of Arizona Department of Child Safety and JOHN DOE GREENWAY, her | **JURY TRIAL REQUESTED** |

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014-2555
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

1    spouse; PAIGE SZYMKOWSKI, individually and as an employee with the State of Arizona Department of Child Safety, and JOHN DOE SZYMKOWSKI, her spouse; CLAUDIA HOFF, individually and as an employee with the State of Arizona Department of Child Safety, and JOHN DOE HOFF, her spouse; NICK BREEDING, individually and as an employee with the State of Arizona Department of Child Safety, and JANE DOE BREEDING, his spouse; GREGORY MCKAY, as former Director, Arizona Department of Child Safety; MICHAEL FAUST, as Director, Arizona Department of Child Safety; JAMES THAL, individually and as a services provider for the State of Arizona Department of Child Safety and JANE DOE THAL, his spouse; JOHN and JANE DOES 1-5; and BLACK ENTITIES 1-5,

Defendants.

Plaintiff Jessica Ploof, by and through her counsel, files this Complaint against the State of Arizona, Arizona Department of Child Safety, Meagan Tafoya and her spouse; Sarah Greenway and her spouse, Paige Szymkowski and her spouse, Claudia Hoff and her spouse, Nick Breeding and his spouse, Gregory Mckay, Michael Faust, James Thal and his spouse, John and Jane Does 1-5, and Black Entities 1-5. Plaintiff states and alleges as follows:

## JURISDICTION AND VENUE

1.    Plaintiff bring this civil rights lawsuit pursuant to the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, the Civil Rights Act of 1871, 42 U.S.C. § 1983, the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213, the

2

Rehabilitation Act ("Rehabilitation Act"), 29 U.S.C. § 794, A.R.S. § 12-641, and Arizona common law.

2.      The amount in controversy exceeds the minimal jurisdictional limits of this Court.

3.      This Court has original subject matter jurisdiction over the claims made in this Complaint pursuant to Article 6, Section 14 of the Arizona Constitution.

4.      The acts and events giving rise to the causes of action alleged herein occurred in Maricopa County, Arizona, and all Defendants are subject to the personal jurisdiction of this Court in accordance with A.R.S. § 12-123 and as otherwise provided under Arizona law and the Arizona Rules of Civil Procedure.

5.      Venue lies in this Court pursuant to A.R.S. § 12-401 in that, among other reasons, the specific acts giving rise to the causes of action alleged herein occurred with primary effect in Maricopa County, Arizona.

## THE PARTIES

6.      Plaintiff Jessica Ploof ("Jessica") is an individual, a citizen of the United States, and a resident of Maricopa County, Arizona. At all times relevant to the present Complaint, Jessica resided in Maricopa County, Arizona.

7.      Defendant State of Arizona is a government entity that acts by and through its officials, employees, and agents, including, without limitation, each of the other Defendants in this action.

8.      Defendant the Arizona Department of Child Safety ("DCS") is a governmental entity that acts by and through its officials, employees, and agents, including without limitation, each of the other non-governmental entity Defendants in this action.

9.      Defendant Meagan Tafoya ("Tafoya") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. Tafoya was, at all times relevant to the present Complaint, an employee of the State of Arizona through DCS. At all times relevant to this Complaint, Tafoya was acting under the color of law as

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

3

an employee of DCS. She is named herein in her individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

10.     Defendant Sarah Greenway ("Greenway") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. Greenway was, at all times relevant to the present Complaint, an employee of the State of Arizona through the DCS. At all times relevant to this Complaint, Greenway was acting under the color of law as an employee of DCS. She is named herein in her individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

11.     Defendant Paige Szymkowski ("Szymkowski") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. Szymkowski was, at all times relevant to the present Complaint, an employee of the State of Arizona through the DCS. At all times relevant to this Complaint, Szymkowski was acting under the color of law as an employee of DCS. She is named herein in her individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

12.     Defendant Claudia Hoff ("Hoff") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. Hoff was, at all times relevant to the present Complaint, an employee of the State of Arizona through the DCS. At all times relevant to this Complaint, Hoff was acting under the color of law as an employee of DCS. She is named herein in her individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

13.     Defendant Nick Breeding ("Breeding") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. Breeding was, at all times relevant to the present Complaint, an employee of the State of Arizona through the DCS. At all times relevant to this Complaint, Breeding was acting under the color of law as an employee of DCS. He is named herein in his individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

4

14.     Defendant Gregory McKay ("McKay") is an individual who resided in Maricopa County, Arizona, at times relevant to the present Complaint. McKay was, at all times relevant to this Complaint, the Director of the DCS. At all times relevant to this complaint, McKay was the official policymaker for the DCS. He is named herein in his official capacity.

15.     Defendant Michael Faust ("Faust") is an individual who resided in Maricopa County, Arizona, at times relevant to the present Complaint. Faust was, at all times relevant to this Complaint, the Director of the DCS. At all times relevant to this complaint, Faust was the official policymaker for the DCS. He is named herein in his official capacity.

16.     Defendant Dr. James Thal ("Thal") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. At all times relevant to this Complaint, Thal provided contract services for the State of Arizona through the DCS. At all times relevant to this Complaint, Thal was acting under the color of law as a DCS service provider. He is named herein in his individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

17.     John and Janes Does 1-5 and Black Entities 1-5 are persons, agents, services, employees, business entities, partnerships, corporations, and/or unincorporated associations subject to suit in a common name whose true names are unknown to Plaintiff and who are, therefore, designated by fictitious names. Plaintiff will ask leave of the Court to substitute the true names of the said parties prior to the entry of Judgement herein.

18.     Whenever in this Complaint reference is made to any act of "Defendants" such allegations shall be deemed to mean all named Defendants, John and Jane Does 1-5, and Black Entities 1-5, or their officers, agents, managers, members, representatives, employees, heirs, assignees, customers, tenants, and that they did or authorized such acts while actively engaged in the operation, management, direction, or control of the affairs

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

of Defendants and while acting within the course and scope of their duties, except as specifically alleged otherwise.

19.    At all times herein mentioned and with respect to the specific matters alleged in this Complaint, Plaintiff alleges, upon information and belief, that each Defendant was and is the agent, employee, principal, employer, co-conspirator, or any combination thereof of each of the remaining defendants, vice versa, or both. In addition, Plaintiff alleges, upon information and belief, that the Defendants named herein, and each of them, are responsible in some manner for the occurrences herein alleged, and that each of the above Defendants conspired with, directed, ratified, approved, aided, abetted, jointly collaborated, or any combination thereof, each of the remaining Defendants in committing the acts herein alleged or failed to prevent such acts when having the power, duty, or authority to do so with full knowledge of said acts.

## FACTUAL ALLEGATIONS[1]

### I.    BACKGROUND

20.    Jessica is the Mother of H.P. (DOB 4/29/14).

21.    Although she graduated high school, since she was a child, Jessica has struggled with an intellectual disability.

22.    Jessica has an IQ of 65 and has been diagnosed as mentally disabled.

23.    Jessica was twenty-years old when H.P. was born.

24.    H.P.'s father has never been involved in H.P.'s life and so Jessica has raised him as a single mother.

25.    Although Jessica is a single mother, she has not been alone in raising H.P. Jessica has an extended family network that has always loved and supported her and H.P.

---

[1] Plaintiff makes the allegations in this Complaint based upon personal knowledge as to those matters in which she had personal involvement and upon information and belief as to all other matters.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

26.     As with millions of families in America, Jessica and H.P. are lucky enough to have the support and affection of an extended family.

27.     Brendi Ploof ("Brendi") is Jessica's mother.

28.     In 2016, Brendi worked as a Certified Nursing Assistant with the company "Visiting Angels".

29.     Brendi has also been right by Jessica's side in helping Jessica to raise H.P.

30.     Despite Jessica's unique challenges in raising a child, she, like any loving parent, always put H.P. first. Jessica recognized when she needed help and asked for it.

31.     Thal—an expert contracted by DCS during the parental-rights proceeding that followed Tafoya's unlawful seizure of H.P.—testified that Jessica "recognize[d] that she needs help in order to ensure that H.P.'s needs are met."

32.     Thal testified: "[F]rom the very beginning, when [H.P.] came home from the hospital, [Brendi] was involved."

33.     Since he was born, Jessica has made sure that H.P. was always well-cared for, and well-loved.

34.     When he was just five months old, Jessica recognized that H.P. was experiencing challenges and sought help for him.

35.     H.P. was diagnosed with low muscle tone.

36.     Division of Developmental Disabilities (DDD) is a division of the Arizona Department of Economic Security which provides support and services to individuals with certain developmental disabilities.

37.     Once Jessica recognized that H.P. needed help, she sought and received DDD services for him.

38.     Jessica also recognized that she needed help getting the right medical care for H.P. Fortunately, Brendi is uniquely qualified to assist Jessica in caring for H.P.'s special needs. Brendi had worked with DDD Developmental Disability Resources to care for special needs children for 13 years.

39.     When Jessica realized she needed help, she turned to her mother.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

7

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

40.     Brendi assisted Jessica in making sure that H.P. got the medical care he needed, she attended all of H.P.'s medical appointments with Jessica, and assisted Jessica in making medical decisions for H.P.

41.     Jessica, as any loving parent would do, ensured that H.P. was provided services from the time he was an infant, including physical therapy, DDD services, speech therapy, and attendance at a Head Start preschool.

42.     H.P. had been receiving speech therapy in Jessica's home, through DDD, in the months prior to DCS's interference with this family.

43.     Jessica had also been working with H.P., doing various exercises with him that his doctors recommended to increase his muscle development.

44.     H.P.'s speech therapist never notified DCS of any concern about H.P.'s health or well-being.

45.     H.P.'s preschool teachers never notified DCS of any concern about H.P.'s health or well-being.

46.     Jessica regularly took H.P. for medical checks with his pediatrician.

47.     In June 2016, Jessica took H.P. for a well-child check with his pediatrician. At that appointment, H.P.'s pediatrician reported that Jessica responded positively to H.P., that Jessica and H.P. were appropriately bonded, and that H.P. exhibited appropriate behavior, communication, language skills, and sense of humor for his age. The pediatrician did not record any concerns with H.P.'s growth or development.

48.     H.P.'s pediatrician, nor any physician which had ever seen H.P., ever notified DCS of any concern with H.P.'s health or well-being.

49.     Jessica's aunt (and Brendi's twin sister), Sherri Walford, was one of the family members who frequently saw Jessica and H.P. together.

50.     Prior to Tafoya unlawfully seizing H.P. from his mother, Ms. Walford would see Jessica and H.P. about 20 days out of every month.

51.     Ms. Walford is the mother of two children and also has grandchildren.

8

52.     One of Ms. Walford's granddaughters attended preschool with H.P. at Whitman School.

53.     Ms. Walford trusts Jessica to watch after her own grandchildren.

54.     Ms. Walford worked for Sojourner, a domestic violence shelter for women and children.

55.     One of Ms. Walford's duties at the shelter was to evaluate whether infants had the appropriate skills for their age, and work with them on their skill development.

56.     In all the times that she saw H.P., Ms. Walford never saw anything that caused her to be concerned that H.P. was being abused or neglected.

57.     Ms. Walford was also at Jessica's home numerous times in the months before Tafoya unlawfully seized H.P., and in her opinion, Jessica "kept her house clean."

58.     Ms. Walford attempted to share the information she had about H.P. and Jessica with various DCS employees throughout the time period that DCS was involved with this family, but no DCS employee would speak with her.

59.     In the months prior to DCS's interference with this family, H.P.'s doctors had recommended a variety of specialized tests for H.P.

60.     Like any loving parent, Jessica attempted to act on the recommendations of H.P.'s doctors.

61.     Due to her intellectual disability, Jessica cannot drive, but with Brendi's help, Jessica had been attempting to schedule H.P. for all the tests his doctors recommended.

62.     Scheduling the appointments was difficult, however, because of the limited availability of the appointments, and Brendi's need to work in order to provide for her family.

63.     Both Jessica and Brendi, however, were doing everything they could to care for H.P. and get him the medical care his doctors recommended.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

9

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

64.     Jessica was ensuring that all of H.P.'s physical, medical, and emotional needs were being met. They were a happy and loving family. Then DCS "stepped in," and this happy and loving family was tragically and unlawfully destroyed.

## II.     THE UNCONSTITUTIONAL SEIZURE OF H.P.

65.     In December 2016, Jessica and H.P. were living with Brendi.

66.     Prior to December 2016, Jessica became involved with a man named Derek Phillips.

67.     At one point during Jessica and Mr. Phillip's relationship, Brendi walked in on Mr. Phillips pouring an unknown substance into a drink he was preparing for Jessica.

68.     Brendi became upset and demanded that he leave the house. Mr. Phillips complied, but he became angry at Brendi and Jessica.

69.     In December 2016, Jessica realized that Mr. Phillips was not a person she should have in her life and ended their relationship.

70.     Mr. Phillips responded to Jessica ending the relationship by threatening to call DCS and make false allegations against her.

71.     According to the "SAFE AZ Child Safety Risk Assessment (CSRA) Documentation Guide," published by DCS, it is DCS policy and procedure that: "The documentation for the Family Functioning Assessment – Investigation shall be completed in the Child Safety and Risk Assessment (CSRA) tool in CHILDS. Documentation of interviews, observations, and other information learned about the family must be captured in the CSRA."

72.     A CSRA was completed regarding Jessica and H.P.

73.     Soon after Mr. Phillips made his threat, according to the CSRA, DCS received two reports in two days to their hotline. According to the CSRA, both reports were made by an anonymous caller. According to the CSRA, the anonymous caller made several outrageous allegations, which all amounted to a report that Jessica was neglecting H.P. and that her home was unsafe.

10

74. According to the CSRA, the first report was received on December 20, 2016 and the second on December 21, 2016.

75. As documented in the CSRA, prior to these reports, Jessica had never had any involvement with DCS.

76. As documented in the CSRA, in response to the anonymous reports, Tafoya and DCS agent FNU Baggen visited Jessica's home on December 21, 2016 at 10:15 am.

77. As documented in the CSRA, Jessica immediately and adamantly denied all of the allegations in the anonymous reports.

78. As documented in the CSRA, during Tafoya's initial visit, it was clear to Tafoya that Jessica had a mental disability.

79. According to the CSRA, Tafoya asked Jessica if she had any Native American heritage and Jessica responded that she did not understand what that meant.

80. According to the CSRA, Tafoya asked Jessica if she was with a tribe and Jessica responded that she did not understand what that meant.

81. As documented in the CSRA, Jessica told Tafoya that she has a learning disability.

82. As documented in the CSRA, Brendi, who arrived while Tafoya was at the home, also told DCS agent Baggen that Jessica has a "cognitive learning disability."

83. According to the CSRA, Tafoya asked Jessica if she would be willing "to do a UA" and Jessica responded that she did not understand what that meant.

84. As documented in the CSRA, once Tafoya explained to Jessica that a "UA" was a test to determine if Jessica had been using any illegal drugs, Jessica told Tafoya that she would be willing to do that.

85. As documented in the CSRA, in response to Tafoya's question of whether Jessica would test positive for anything, Jessica readily admitted that she would be positive for "weed."

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

11

86.     As documented in the CSRA, Jessica told Tafoya that when she used "weed," H.P. was not in her care, but was with Brendi.

87.     As documented in the CSRA, after Tafoya told Jessica that "weed" is marijuana, Jessica freely admitted to Tafoya that she would test positive for marijuana.

88.     As documented in the CSRA, Tafoya told Jessica that "if she drug test negative this will be documented that the allegations are false."

89.     As documented in the CSRA, Jessica also freely admitted that she may test positive for something else because she had recently been at a party and she believed that "something may have been put in her drink."

90.     As documented in the CSRA, after visiting Jessica's home, and speaking with Jessica and Brendi, and seeing H.P., Tafoya made the determination that H.P. should stay in his home with his mother.

91.     As documented in the CSRA, Tafoya reported that "[H.P.] was free from any visible injuries. He was dressed appropriately. The home was free from any safety hazards."

92.     Arizona law, specifically A.R.S. § 8-456(C)(1) requires that "after receiving a DCS report from the centralized intake hotline," a DCS investigator, "shall:"

> Make a prompt and thorough investigation. An investigation must evaluate and determine the nature, extent and cause of any condition created by the parents, guardian or custodian or an adult member of the victim's household that would tend to support or refute the allegation that the child is a victim of abuse or neglect and determine the name, age and condition of other children in the home.

93.     As documented in the CSRA, on December 21, 2017, Jessica submitted a hair and urine sample for substance abuse testing.

94.     As documented in the CSRA, the urine sample was positive for alcohol and marijuana, while the hair sample was positive for methamphetamine and marijuana.

95.     As documented in the CSRA, Tafoya responded to the drug test results by scheduling a Team Decision Meeting (TDM)—a meeting to discuss the safety plan for H.P.—for January 11, 2017.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

96.     As documented in the CSRA, during the intervening 22 days, Tafoya left H.P. in Jessica's care.

97.     At a TDM, a summary of what occurred in the meeting is prepared by an employee of DCS.

98.     According to the TDM summary, DCS agents recorded that H.P. was "healthy" with "stable housing."

99.     According to the TDM summary, DCS agents recorded that Jessica had family support, and noted Jessica's obvious love for her child.

100.    According to the TDM summary, due to Jessica's positive drug test results, Tafoya appointed Brendi as a "safety monitor for an in-home dependency," although DCS had not at that point filed a dependency petition, nor had a court determine that H.P. was a dependent; thus, no dependency actually existed.

101.    According to the TDM summary, at the TDM, Tafoya provided Jessica with five steps that Tafoya wanted her to take within the next seven to ten days in order for Jessica to keep her son with her, including Jessica participating in Terros and parenting classes.

102.    Jessica agreed to take all the steps required by Tafoya.

103.    The TDM Summary did not indicate that Brendi was required to take a substance abuse screening test in order for Jessica to keep her son with her.

104.    Although it was not noted on the TDM report, at the TDM, Brendi agreed that she would take a drug screening test, the next day, on January 12, 2017.

105.    On January 12, 2017, Brendi was unexpectedly called into work. Brendi immediately notified Tafoya that she had been called into work and would not be able to complete the drug screening test that day due to being called into work but made clear that she still intended to complete one at the first available opportunity.

106.    On January 12, 2017, despite there being no significant change in circumstances, Tafoya suddenly determined that the same circumstances that had existed

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

13

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

1  for the previous 22 days during which H.P. was not in imminent danger now suddenly
2  placed H.P. in imminent danger.

3      107.   At 3:30 p.m. on January 12, 2017, Tafoya seized H.P. from the custody of
4  Jessica.

5      108.   Tafoya, with the approval and participation of her supervisor, Defendant
6  Sarah Greenway ("Greenway"), seized H.P. using a Temporary Custody Notice (TCN).

7      109.   A DCS-issued "temporary custody notice" involves "no advanced court
8  review or approval." *Dep't of Child Safety v. Stocking-Tate in & for Cty. of Yuma*, 247 Ariz.
9  108, 112, (App. 2019) (citing *Kimu P. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 39, 41, ¶ 5 (App.
10 2008); *Michael J., Jr. v. Michael J., Sr.*, 198 Ariz. 154, 155, ¶ 4, (App. 2000).).

11     110.   According to a DCS press release in 2018, removal decisions do not and
12 never have "rested solely with the child welfare investigator." "All child removals have
13 always, and still require, a thorough case review and approval by the investigator's
14 supervisor   prior   to   DCS   making   a   removal   decision."   DCS   website,
15 https://dcs.az.gov/news/november-29-2018-statement-dcs-regarding-removal-
16 children (last visited October 31, 2019).

17     111.   The TCN Tafoya used to seize H.P. was signed by Greenway as the
18 approving supervisor.

19     112.   On the TCN, Tafoya indicated that, although, according to the DCS' own
20 TDM report, the day before, H.P. was "healthy" in "stable housing, with a loving parent
21 who had extensive family support", the next day, with no change in circumstances, H.P.
22 was now at "imminent risk of harm" due to Jessica's "substance abuse," and immediate
23 removal was required.

24     113.   At the time Tafoya seized H.P., "Arizona law recognize[d] that juvenile
25 courts can issue same-day 'motions for pickup.'" *Demaree v. Pederson*, 880 F. 3d 1066, 1076
26 (9th Cir. 2018) (citing *Ariz. Dep't of Econ. Sec. v. Lee ex rel. Cty. of Maricopa*, 228 Ariz. 150,
27 151 (App. 2011) (noting that the department filed a dependency petition and, "[o]n the
28 same day, the juvenile court granted a motion for pickup of the Child based on [the

department's] assertion that the 'child is at imminent risk of abuse and/or neglect due to Mother's substance abuse'"); *Tyren T. v. Dep't of Child Safety*, No. 1 CA-JC 16-0091, 2016 WL 4474154, at *1 (Ariz. Ct. App. Aug. 25, 2016); *Michael C. v. Ariz. Dep't of Econ. Sec.*, No. 1 CA-JV 12-0005, 2012 WL 1964581, at *1 (Ariz. Ct. App. May 31, 2012); *Magdaline L. v. Ariz. Dept. of Econ. Sec.*, No. 1 CA-JV 08-0076, 2008 WL 5403657, at *1 (Ariz. Ct. App. Dec. 30, 2008).

114.    At the time Tafoya seized H.P., Tafoya did not have a warrant, or any court authorization, to seize H.P.

115.    Prior to seizing H.P., neither Tafoya, nor any other agent of DCS, ever attempted to obtain court approval for them to seize H.P.

116.    Prior to seizing H.P., neither Tafoya nor any other DCS agent ever inquired of Brendi or Jessica as to the services they had obtained for H.P.

117.    Prior to seizing H.P., neither Tafoya nor any other DCS agent ever sought or obtained H.P.'s medical records, covering the period from his birth to his seizure by Tafoya and Greenway.

118.    Prior to seizing H.P., neither Tafoya nor any other DCS agent ever sought or obtained DDD, medical, and Head Start records for H.P., even though it was recommended in the Rapid Response Report, a report prepared by DCS personnel, that those records be obtained.

119.    Prior to seizing H.P., neither Tafoya nor any other DCS agent ever spoke with Michael Ploof, Jessica's father, although he had regularly assisted in H.P.'s care while Brendi worked.

120.    Prior to seizing H.P., neither Tafoya nor any other DCS agent ever spoke with Jessica's aunts, Michelle Van Berstraten or Ms. Walford, who had also assisted in H.P.'s care.

121.    Prior to seizing H.P., the only investigation that any employee of DCS completed was for Tafoya to visit the home and then require Jessica to test for drugs.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

15

122.    Prior to taking the dramatic step of removing three-year-old H.P. from his mother, neither Tafoya nor any other DCS agent made any attempt to pursue any less restrictive options, such as finding a safety monitor other than Brendi who could stay in the home with Jessica and H.P.

123.    After H.P. was unlawfully seized, from January 2017 until December 2017, Szymkowski was the DCS case manager and Breeding was her supervisor.

124.    As Szymkowski's supervisor, Breeding was aware of and approved of each action taken by Szymkowski. Without Breeding's knowledge and approval, Szymkowski would not have taken any action regarding Jessica and H.P. Breeding substantially participated in each and every action taken by Szymkowski.

125.    At a hearing that followed Tafoya's seizure of H.P., Szymkowski provided testimony regarding the necessity for the seizure, which she knew to be false and/or which demonstrated a reckless disregard for the truth.

126.    Szymkowski testified, under oath, that the circumstances that necessitated removal were:

> There were concerns due to maternal grandmother not complying with drug testing and, you know, when she did go to try to test, she used a device to try to test. So that was concerning to the Department. And I believe mother was also refusing services at the time.

127.    This testimony was false, and Szymkowski knew, or reasonably should have known it to be false when she offered it under oath.

128.    Although Brendi did, at one point, attempt to use a device during testing, this did not occur until well *after* Tafoya seized H.P. and so could not possible have provided a basis for the seizure.[2]

---

[2] *After* H.P. was removed, Brendi did not know which day she would be called into test. The night before she was called to test, Brendi consumed a glass of wine. Brendi was terrified that the wine would cause DCS to take H.P. and that H.P. would be "lost in the foster care system." Overcome by this fear, Brendi made the poor decision to attempt to use a device to produce a false urine sample. Brendi readily acknowledged that she made

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

1    129.    Furthermore, Jessica *never* refused any of the services offered by any agent

2    of DCS.

3    130.    Szymkowski's creation of false justifications, while under oath, for the

4    seizure further demonstrates that Tafoya had no basis for seizing H.P.

5    **III.    AGENTS OF DCS CONTINUE TO VIOLATE THE LAW.**

6    131.    After removing H.P. from his loving family, Tafoya, Greenway, Breeding,

7    and/or Szymkowski briefly placed H.P. with a family member.

8    132.    Tafoya and Greenway placed H.P. with Jessica's cousin, Ms. Walford's

9    daughter, Heather Walker.

10    133.    Ms. Walker had a small child and had just given birth. She asked

11    Szymkowski for DCS to provide assistance to allow her to care for H.P.

12    134.    When Ms. Walford learned that her daughter was having difficulty caring

13    for H.P., she contacted Szymkowski and offered to care for H.P.

14    135.    Szymkowski, however, refused to place H.P. with his great aunt because,

15    as Ms. Walford had freely disclosed, *four years* prior, she had a single DUI.

16    136.    Although Arizona law, specifically A.R.S. § 8-514 requires that DCS

17    prioritize placing a child with a family member, Tafoya never told Ms. Walford that she

18    had the option of pursuing a provisional license and a waiver so that she could care for

19    H.P.

20    137.    Neither did Szymkowski tell Ms. Walford that she had the right to appeal

21    their decision to deny her request to serve as placement for H.P.

22    138.    If Ms. Walford had known of these options, she would have pursued them.

23    139.    Instead of continuing to keep H.P. with his family and providing Ms.

24    Walker the help she had requested, Szymkowski simply removed H.P. and placed him

25    with an unrelated foster family.

26

27

28    a "stupid decision." Soon after that bad decision, Brendi did have both a urine and hair
follicle test done. Both tests were negative.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

140.     Unsurprisingly, placing H.P. with strangers forced him to undergo significant trauma.

141.     He was described as being very upset, "clingy and [crying]."

142.     H.P. was unable to be calmed and manifested his distress by hitting his head until he bled.

143.     He was so distraught over his removal that the initial foster family in which Tafoya and/or Szymkowski placed him could not continue to care for him.

144.     By the time H.P. was placed with his second foster family, his traumatic experience had caused him to digress into a state described as having "no interests" and not showing emotion.

145.     Knowing that her son was so distressed and anguished caused Jessica to feel significant emotional distress and anguish.

146.     Tafoya's response to H.P.'s distress at being away from his mother was to unreasonably deny Jessica "visitation due to the... fear[] [H.P.] would act out more with vesting [sic] with his mother."

147.     From the beginning, Tafoya and/or Szymkowski knew that Jessica did not understand why DCS was involved, what DCS' allegations against her were, and what Tafoya and/or Szymkowski wanted from her.

148.     Due to Jessica's intellectual disability, it is difficult for her to understand and make sense of things.

149.     Tafoya documented in the CSRA that she understood and believed that Jessica did "not have an understanding of what is going on."

150.     Dr. Thal testified that throughout the underlying proceedings, Jessica was "fundamentally confused about why her child was taken from her."

151.     Despite not understanding what was happening or what DCS required of her, Jessica loved her son, and so she desperately tried.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

18

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

152.    At the trial proceedings that resulted in Mother's parental rights being forever terminated, Szymkowski testified: "[Jessica] participated in the services to the best of her abilities."

153.    Unfortunately, DCS employees did not try to the best of their abilities or mandate. Despite being aware of Jessica's disability, no DCS employee ever made any effort whatsoever to offer Jessica services that were in any way accommodated to her disability, even though such services exist and were required by federal law.

154.    The Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213 (2018) is a federal law that requires public entities to make reasonable accommodations for qualified individuals with disabilities.

155.    The ADA prohibits a public entity from discriminating against a qualified individual with disabilities in the provision or operation of public services, programs, or activities. *Tennessee v. Lane*, 541 U.S. 509, 517 (2004).

156.    Section 504 of the Rehabilitation Act applies the same requirement to entities that receive federal financial assistance. *See In re H.C.*, 187 A.3d 1254, 1265 (D.C. 2018).

157.    Under the ADA, a qualified person with a disability shall not, "solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

158.    The ADA imposes an affirmative duty on public entities to make reasonable accommodations for qualified individuals with disabilities. 28 C.F.R. § 35.130(b)(7) (2018).

159.    DCS is a public entity.

160.    Jessica is a qualified individual with a disability, as that term is used in 42 U.S.C. §§ 12101-12213.

161.    The services that DCS offers to parents is a public service.

162.    The services that DCS offers to parents are programs and/or activities that receive federal financial assistance.

19

163.    Despite being well aware of Jessica's disability and that requirement of federal law that DCS offer her services that were reasonably accommodated to her disability, no agent of DCS complied with federal law by offering Jessica services that were reasonably accommodated to her disability.

164.    Neither Tafoya, nor Szymkowski, nor any other agent from DCS, made any effort to ensure that Jessica understood what was happening and what services she was required to complete in order to keep her son.

165.    Despite the failure of every DCS employee involved in this case to comply with federal law, once Tafoya took her son from her, Jessica did everything she understood DCS wanted her to do because she was determined to get her beloved son back.

166.    As Szymkowski testified, Jessica "produced clean UAs after her initial positives."

167.    Jessica's consistent negative drug tests demonstrated that she was resolved to do whatever it took to get her son back.

168.    As Szymkowski testified, Jessica "went to TERROS and completed her intake and engaged in those services, engaged in regular visitation and therapeutic visitation and the individual counseling as well as a psychological evaluation."

169.    In July 2017, Jessica completed a psychological evaluation with Dr. Thal.

170.    Dr. Thal diagnosed Jessica with a mild mental deficiency.

171.    Dr. Thal opined that due to her mental deficiency, it was difficult for Jessica to understand things and to retain things in memory.

172.    In his opinion, Jessica would not be successful in learning in the same environment in which a person of average intelligence could learn.

173.    Despite Dr. Thal making it clear the difficulties Jessica would encounter with regular services, after receiving Dr. Thal's report, DCS did not make any alteration to the services they offered her in order to accommodate her disability.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

20

1    174.    In his July 2017 report, Dr. Thal recommended that Jessica co-parent with a
2    "capable and fully functioning parental figure."

3    175.    Dr. Thal testified: "In my mind, the most obvious person in that role would
4    have been maternal Grandmother."

5    176.    In his July 2017 report, Dr. Thal stated: "the best-case scenario for Jessica
6    would be for her to serve in the capacity of co-parent or, more accurately, for her to act
7    as an 'assistant' caregiver to a fully qualified caregiver."

8    177.    Despite Dr. Thal's recommendation, Szymkowski did nothing to follow it.
9    She took no action at all to implement Dr. Thal's recommended course of action.

10    178.    At trial Dr. Thal testified that after his initial evaluation of Jessica, he
11    determined that, due to her intellectual disability, a normal psychological evaluation of
12    her would not be possible.

13    179.    Despite Dr. Thal's conclusion that Jesscia's intellectual disability would
14    make a normal psychological evaluation impossible, Szymkowski still ordered and
15    Jessica completed another two psychological evaluations.

16    180.    In October 2018, Jessica completed a second psychological evaluation, again
17    with Dr. Thal.

18    181.    Dr. Thal testified that at the time of the second evaluation, none of the
19    services that DCS had offered Jessica had produced any noticeable effect increasing her
20    parenting skills.

21    182.    In his report, Dr. Thal opined that Jessica had not been successful at
22    acquiring these skills because "the kind of services and activities" that DCS had offered
23    her had been ineffective due to her intellectual disability.

24    183.    In his report, Dr. Thal opined that, due to Jessica's intellectual disability, it
25    was "just challenging for her to retain that set of facts and principles, and ideas, and
26    concepts that most parents in a normal range master successfully."

27    184.    Dr. Thal did not opine Jessica was incapable of learning altogether, or that
28    she was not trying. Dr. Thal's evaluation clearly signaled DCS that the services it was

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

1  providing Jessica were not appropriate and reasonable due to Jessica's intellectual

2  disability. Yet, even after receiving Dr. Thal's October 2018 report, DCS made no effort to

3  offer Jessica services that would accommodate her disability.

4       185.    As he had concluded before, Dr. Thal's conclusion again was: "As was the

5  case during her previous evaluation, Jessica appears to be best suited to assist a fully

6  capable and competent caregiver."

7       186.    In the latter part of 2017, Szymkowski commissioned Dr. Thal to conduct a

8  psychological evaluation of Brendi.

9       187.    Dr. Thal conducted many of these evaluations because his practice revolves

10  almost exclusively around DCS referrals

11       188.    Dr. Thal testified that, "well in excess of 90 percent," "probably 95 percent,"

12  of his livelihood is dependent on DCS.

13       189.    On January 18, 2018, Dr. Thal issued his evaluation of Brendi where he

14  again offered his professional opinion in favor of appointing Brendi as guardian and

15  allow her and Jessica to co-parent H.P.

16       190.    Dr. Thal released a positive evaluation of Brendi, noting that Brendi was

17  "well-oriented," "neatly groomed," had an "appropriate" "thought process," and "her

18  judgment seems to be good."

19       191.    Dr. Thal recommended Brendi be appointed as guardian for H.P., stating,

20  "[Brendi] would appear to be a particularly suitable long-term placement for H.P.," and

21  "[a] child in the sole care and custody of this grandparent would not appear to be at risk

22  in any identifiable way provided she sets clear boundaries and reasonable expectations

23  with the mother, Jessica Ploof."

24       192.    By the time Dr. Thal had issued his report, Defendant Claudi Hoff had

25  taken over as DCS case manager for Jessica's case. Szymkowski no longer had any

26  professional connection to the case.

27       193.    When Dr. Thal issued his report, Hoff had no issues or concerns with it or

28  Dr. Thal's recommendations.

194.    Despite having no professional connection to the case, when Szymkowski saw Dr. Thal's report, she took it upon herself to call Dr. Thal.

195.    According to Dr. Thal, in a letter dated March 18, 2018, when Szymkowski contacted him, she "expressed" to him "her concerns" over the alleged "substandard condition of grandmother's residence" as well as her "concern" about H.P.'s alleged "very poor overall condition when he came into care."

196.    In addition to the lack of professionalism, Szymkowski's action in calling Dr. Thal was also inappropriate because she had *no* factual evidence to support her alleged "concerns."

197.    Szymkowski did not conduct the initial investigation and had no first-hand knowledge of the condition of Brendi's home when H.P. came into care.

198.    Tafoya was the DCS agent who actually observed the condition of Jessica's and Brendi's home when DCS became involved in the family.

199.    As noted above, DCS agents are required to document information they obtain during their investigation in the CSRA.

200.    The CSRA did not contain any evidence to support Szymkowski's allegation of "substandard" conditions of Brendi's home.

201.    Indeed, Tafoya's only record about the condition of the home implies quite the opposite. It notes: "[the] home is free from of any safety hazards."

202.    Additionally, H.P. was regularly receiving speech therapy, in Brendi's and Jessica's home, from state providers, who are mandatory reporters.

203.    H.P.'s speech therapist never reported any substandard condition in the home.

204.    Because Szymkowski's concerns about the allegedly "substandard" condition of the home had no factual basis, she could not and did not provide Dr. Thal with any evidence to support her allegations.

205.    Likewise, there was no factual basis for Szymkowski's concern that H.P. was in "very poor overall condition when he came into care."

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

23

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

206.    Again, Szymkowski did not conduct the initial investigation. Tafoya did.

207.    When Tafoya visited the home in December 2016, her observations were not that H.P. was in "very poor overall condition." Quite the opposite. Her report stated that H.P. was "appropriately dressed" and showed no indications of injury or concerns about H.P.'s condition.

208.    It is highly unlikely that Tafoya would have left H.P. in Jessica's care, twice, if he was in "very poor overall condition."

209.    Additionally, on January 11, 2017, at the TDM, the TDM summary, prepared by an employee of DCS, noted that H.P. was "healthy" with "stable housing."

210.    There is nothing in the TDM summary that indicates in any way that H.P. was in "very poor overall condition."

211.    Additionally, H.P. regularly attended preschool and was regularly seen by doctors.

212.    Both preschool teachers and doctors are mandatory reporters under A.R.S. § 13-3620.

213.    None of these mandatory reporters ever reported H.P.'s alleged "very poor overall condition."

214.    On the contrary, at H.P.'s well-child check six months before DCS removed H.P., H.P.'s pediatrician reported that Jessica responded positively to H.P., that Jessica and H.P. were appropriately bonded, and that H.P. exhibited appropriate behavior, communication, language skills, and sense of humor.

215.    Because Szymkowski's concerns about H.P.'s alleged "very poor condition" had no factual basis, she could not and did not provide Dr. Thal with any evidence to support her allegations.

216.    During his testimony in the juvenile court case, Dr. Thal made clear that Szymkowski's allegations of "gross-neglect" and "under-development," were just "according to Szymkowski" and not based on any actual evidence.

24

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

217.    Szymkowski likewise did not present any evidence at trial to back up her allegations that H.P. was removed because Jessica and Brendi had a "substandard" home, H.P. was in "very poor overall condition," or that he was "grossly neglected."

218.    At trial, when asked about the circumstances of H.P.'s removal, Szymkowski provided the false testimony discussed in paragraph 126 above.

219.    As discussed in his March 18, 2018 letter, when Szymkowski called Dr. Thal, she additionally raised "a second major point."

220.    This "second major point" was regarding H.P.'s relationship with his foster family. Szymkowski stated that in her opinion, H.P. was "bonded" with his foster family.

221.    According to Szymkowski, H.P.'s bond with his foster family was "critically important" to Dr. Thal's determination of whether Brendi could serve as a guardian and co-parent to her grandchild, and whether DCS should be making the effort, as they are legally required to do, to return H.P. to his birth family.

222.    Despite the fact that Szymkowski was not the assigned case agent and had provided absolutely no evidence to support her allegations, as a result of Szymkowski's telephone call, Dr. Thal changed his report.

223.    Dr. Thal did not state that he reviewed any additional reports that were not previously considered in his amended report and cited no reason for the change other than his telephone call with Szymkowski.

224.    After changing his report, in a letter to Hoff dated March 14, 2018, Dr. Thal asked Hoff "to shred the original report" he had provided.

225.    At the time of his March 14, 2018 letter, Dr. Thal had believed that his original report had not yet been disclosed to Jessica.

226.    Prior to March 14, 2018, however, Dr. Thal's unaltered report had been disclosed to Jessica.

227.    Despite Dr. Thal's decision to change his report based solely on Szymkowski's unsupported allegations, at trial Dr. Thal testified that proper protocol would be to prevent the kind of *ex parte* communication that he had with Szymkowski.

228.   This is, Dr. Thal testified, so that the evaluator will not be improperly influenced by unsubstantiated "facts", or to use Dr. Thal's words, to protect against "some set of facts that are not borne out."

229.   Although Dr. Thal apparently knew of his ethical obligations, Dr. Thal ignored them.

230.   During the telephone call with Szymkowski, Dr. Thal assured her that he would "review" his findings and "consider drafting a follow-up letter suggesting ways to address her concerns."

231.   Within two days after receiving Szymkowski's call, and without obtaining any further information or records or documentation at all, Dr. Thal drafted such a letter.

232.   After being informed by Hoff that his unaltered report had not been disclosed to Jessica, Dr. Thal then issued his altered report.

233.   Had the unaltered report not already been disclosed, Jessica would never have learned that Dr. Thal altered his report due to an unethical *ex parte* communication with Szymkowski, as DCS showed no intention to disclose this information.

234.   Dr. Thal made many significant changes in his altered report, as the following chart demonstrates:

| Original, Unaltered Report | Altered Report |
|---|---|
| Dr. Thal recommended that H.P. be placed with his family, with Jessica and Brendi acting as co-parents. | Dr. Thal had "alarming" concerns with H.P. being in Brendi's care. |
| No health concerns for H.P. noted. | Noted that H.P. was in "poor condition" and "grossly underdeveloped" when he came into care. |
| H.P.'s living conditions while in the home of Brendi are described in positive terms. | H.P.'s living conditions while in the home of Brendi are described as "deplorable living conditions." |
| No diagnosis for Brendi. | Brendi diagnosed with "[n]eglect by history." |

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

| | |
|---|---|
| No concern about Brendi's response to H.P.'s challenges expressed. | Expressed that Dr. Thal was "alarm[ed]" about Brendi's alleged lack of response to H.P.'s challenges. |
| Reached the expert conclusion that there "would not appear to be any risk" to H.P. under Brendi's care. | Reached the expert conclusion that "H.P. would be at risk for neglect and regression in his development if Brendi is not adequately attentive to her grandson's health and well-being." |

235.    Over three days in 2018, Jessica completed a bonding/best interest assessment with Dr. Bennett.

236.    In his report of June 18, 2018, Dr. Bennett also concluded that Jessica has an intellectual disability.

237.    In his report, Dr. Bennett noted that H.P. was "relaxed," and "comfortable," with his mother and grandmother, and that it was obvious that the family was "enjoy[ing] each other's company."

238.    Dr. Bennett also noted how Jessica and Brendi worked as a team, stating that "records suggest that during the visits Brendi does some of the parenting... but there are also visits where Jessica does these same things."

239.    Dr. Bennett noted that appropriate verbal and physical affection came from both Jessica and Brendi, and that H.P. would seek out Brendi for comfort.

240.    In his report, Dr. Bennett opined that Brendi "likely has the ability to parent H.P."

241.    He observed that Jessica was implementing "some of what she learned through services," but expressed concern that "given Jessica's intellectual issues," it was unknown what parenting skills she could learn through the non-accommodating services DCS was offering.

242.    After Dr. Bennett's evaluation, DCS was even more aware that, due to Jessica's intellectual disability, the services they were offering to her were unlikely to help

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

27

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

1  her. Yet, DCS did nothing to offer services that were in any way accommodated to

2  Jessica's disability.

3      243.   Despite DCS's failure to offer Jessica services that offered her any

4  reasonable prospect of success because they were not reasonably accommodated to her

5  disability, Jessica still tried to do everything in her power to get her child back to her.

6      244.   In addition to the services noted above that Jessica completed, Jessica also

7  completed parent aide services and case aide services, both with generally positive

8  reports.

9      245.   Ms. Walford testified that after Tafoya took H.P., she had observed Jessica

10  do everything she could to get her child back. Ms. Walford testified:

> Jessica has gotten a job. She is working on trying to obtain her
> driver's license. She has grown, and she's been responsible for
> watching my own grandchildren on occasion. And she has taken
> extra classes and courses to help herself be a better person.

14      246.   Szymkowski and/or Hoff told Jessica that she needed to get a job, so she

15  got a job. At the time of the irrevocable termination of her parental rights, Jessica worked

16  full-time caring for a teenager with special needs. She helped her with meals, provides

17  her with activities, and helps her with basic daily needs.

18      247.   Szymkowski and/or Hoff DCS told Jessica that she needed to get her own

19  home. At the time of the irrevocable termination of her parental rights, Jessica had her

20  own apartment.

21      248.   The juvenile court found that Jessica "loves her child and intently wishes to

22  parent the child."

23      249.   The juvenile court acknowledged that Jessica had "completed all services

24  that have been asked of her to the best of her ability."

25      250.   The juvenile court, however, found that services DCS had offered Jessica

26  had not been successful, and permanently and irrevocably terminated her parental rights.

27      251.   The juvenile court terminated Jessica's parental rights under A.R.S. § 8-

28  533(B)(8) because it determined that, due to Jessica's mental deficiency, she was unable

to discharge her parental responsibilities, and under A.R.S. § 8-533(B)(8)(c), because it determined that, due to her mental deficiency, Jessica had been unable to remedy the circumstances that caused H.P. to be placed outside of her care for more than fifteen months.

252.    The Arizona Court of Appeals held that DCS, as a public entity "must provide reunification services that comply with the ADA to disabled parents." *Jessica P. v. Dep't of Child Safety, H.P.*, 249 Ariz. 461, 469, ¶ 25 (App. 2020).

253.    The Arizona Court of Appeals determined that it would not consider whether DCS had complied with the ADA when it offered services to Jessica.

254.    The Court of Appeals affirmed the severance of Jessica's parental rights under A.R.S. § 8-533(B)(8)(c).

255.    Due to the actions and discrimination of Defendants, as stated herein, Jessica has lost her son forever. She will never see or hold her young child again.

## CLAIMS

## CLAIM ONE

**(The State of Arizona is liable for violating Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213 (ADA), and § 504 of the Rehabilitation Act (Rehabilitation Act), 29 U.S.C. § 794.)**

256.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the paragraphs above.

257.    The Arizona Department of Child Safety (DCS) is a public entity and a government agency of the State of Arizona.

258.    Employees of the DCS are employees of the State of Arizona.

259.    The State of Arizona is vicariously liable for the acts of its employees which violate the ADA and the Rehabilitation Act.

260.    Jessica is a qualified individual with a disability under the ADA and the Rehabilitation Act because she has a mental impairment that substantially limits one or more major life activities.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

261.    Jessica was excluded from participation in and/or denied the benefits of the services, programs, and/or activities of DCS, and/or otherwise discriminated against by DCS, and this exclusion, denial of benefits, and/or discrimination was by reason of her disability.

262.    Jessica was excluded from participation in and/or denied the benefits of the services, programs, and/or activities of the DCS, and/or otherwise discriminated against by DCS when employees of DCS failed to offer her services that were reasonably accommodated to her disability.

263.    Jessica was entitled to receive the benefit of services provided by DCS.

264.    Jessica was denied these benefits solely by reason of her disability.

265.    DCS is a program that receives federal financial assistance.

266.    DCS employees intentionally and/or with deliberate indifference failed to provide Jessica with meaningful access to services and/or make reasonable accommodations in its provision of services.

267.    DCS employees were aware from the initial interaction between Tafoya and Jessica that Jessica had a mental disability.

268.    As documented in the CSRA, Jessica also told Tafoya that she has a learning disability.

269.    As documented in the CSRA, Brendi also told DCS agent Baggen that Jessica has a "cognitive learning disability."

270.    Tafoya documented in the CSRA that she understood and believed that Jessica did "not have an understanding of what is going on."

271.    Additionally, DCS employees were repeatedly informed in the reports of its experts, that Jessica has a cognitive disability that made learning parenting skills especially difficult.

272.    DCS employees were on notice after Dr. Thal diagnosed Jessica and recommended accommodations, noting that standard methods for modelling and speed of teaching would not work for her.

30

273.    DCS employees were also made aware of Jessica's disability when Dr. Underwood diagnosed her as mentally disabled and similarly recommended accommodations.

274.    Once DCS employees became aware of Jessica's disability, they had a duty to investigate options for providing a reasonable accommodation by gathering "information from [both the disabled individual and] qualified experts as needed to determine what accommodations are necessary to enable" the individual to meet relevant standards. *Mantolete v. Bolger*, 767 F.2d 1416, 1423 (9th Cir. 1985). No DCS employee did so.

275.    Despite her cognitive disability, and the applicable federal guidance, DCS employees repeatedly failed to provide Jessica with services that reasonably accommodated her disability.

276.    The failure of DCS employees to offer Jessica meaningful access to services that offered her a reasonable prospect of success at being reunified with her child, or at the very least, not having her parental rights severed, was due solely to her disability.

277.    If not for her disability, DCS would have provided Jessica with services that offered her a reasonable prospect of success at being reunified with her child, or at the very least, not having her parental rights severed.

278.    The termination of Jessica's parental rights was based on her mental impairment.

279.    If not for the discriminatory acts of DCS employees and their repeated failure to offer Jessica services that were reasonably accommodated to her disability, there is a reasonable probability that her rights to her child would not have been severed.

280.    As a direct and proximate result of the violation of the ADA and Rehabilitation Act by DCS employees, Jessica suffered irreparable harm, and will continue to suffer general and special damages, in an amount not yet ascertained but which shall be shown according to proof at trial.

///

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

31

## CLAIM TWO

**(Under 42 U.S.C. § 1983, Tafoya and Greenway are liable for violating Jessica's Right to Freedom of Association under the First Amendment and Due Process under the Fourteenth Amendment to the U.S. Constitution for unlawfully seizing H.P.)**

281.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the paragraphs above.

282.    On or about January 12, 2017, Tafoya unconstitutionally seized H.P.

283.    Tafoya seized H.P. on the advice and consent of her supervisor Greenway.

284.    Both Tafoya and Greenway substantially participated in the seizure of H.P.

285.    At the time Tafoya and Greenway seized H.P., it was well established that the Fourteenth Amendment protects the rights of parents and children to live together without government interference. *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000).

286.    At the time Tafoya and Greenway seized H.P., it was well established that the First Amendment also protects "family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'" *Lee v. City of Los Angeles*, 250 F. 3d 668, 685 (9th Cir. 2001).

287.    At the time Tafoya and Greenway seized H.P., it was well established that state officials may not remove children from their parents without a court order unless they have "information at the time of the seizure that establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury." *Rogers v. County of San Joaquin*, 487 F. 3d 1288, 1294 (9th Cir. 2007).

288.    At the time Tafoya and Greenway seized H.P., it was well established that a state official "cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued," the "scope of the intrusion" must be "reasonably necessary to avert" a specific injury, and the intrusion cannot be longer than necessary to avert the injury. *Wallis*, 202 F.3d at 1138-1141.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

32

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

289.    At the time Tafoya and Greenway seized H.P., they did not have information that established reasonable cause to believe that H.P. was in imminent danger of serious bodily injury.

290.    Prior to seizing H.P., Tafoya and/or Greenway did not first pursue reasonable avenues of investigation.

291.    When Tafoya and Greenway seized H.P., the scope of the intrusion was not reasonably necessary to avert any specific injury, and, even if it were, the intrusion was longer than necessary to avert the injury.

292.    At the time Tafoya and Greenway seized H.P., there were no exigent circumstances that justified the seizure.

293.    At the time Tafoya and Greenway seized H.P., no reasonable person in their position would have believed that H.P. would be harmed in the time it would take for Tafoya and/or Greenway to obtain a warrant authorizing the seizure of H.P.

294.    Tafoya and Greenway, and each of them, acted under the color of law when they seized H.P.

295.    Tafoya's and Greenway's seizure of H.P. violated Jessica's constitutional rights.

296.    As a direct and proximate result of the violation of her constitutional rights, Jessica suffered irreparable harm and will continue to suffer general and special damages, in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM THREE
**(Under 42 U.S.C. § 1983, Defendant Arizona Department of Child Safety is liable for the unconstitutional seizure of H.P. by Defendants Tafoya and Greenway.)**

297.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the paragraphs above.

298.    It is well-established that a government entity is liable for the constitutional violations of its employees when its employees commit a constitutional violation and, at the time of the constitutional violation, the government entity had a policy which

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

amounted to a deliberate indifference of the relevant constitutional right and the policy was the moving force behind the constitutional violation. *Lee v. Cty. of Los Angeles*, 250 F. 3d 668, 685 (9th Cir. 2001).

299.    The Arizona Court of Appeals has found that until July 1, 2018, "DCS assumed temporary custody over a child using a DCS-issued "temporary custody notice" that involved no advanced court review or approval." *Dep't of Child Safety v. Stocking-Tate in & for Cty. of Yuma*, 247 Ariz. 108, 112, (App. 2019) (citing *Kimu P. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 39, 41, ¶ 5 (App. 2008); *Michael J., Jr. v. Michael J., Sr.*, 198 Ariz. 154, 155, ¶ 4, (App. 2000).)

300.    "In 2017 and 2018, in response to litigation in federal court concerning the constitutionality of removing a child from a parent's care without judicial authorization, *see Rogers v. Cty. of San Joaquin*, 487 F.3d 1288, 1294-96 (9th Cir. 2007) (collecting cases), the legislature amended A.R.S. § 8-821(A) to abolish this practice, *see* 2018 Ariz. Sess. Laws, ch. 191, § 1 (2d Reg. Sess.); 2017 Ariz. Sess. Laws, ch. 282, § 3 (1st Reg. Sess.)." *Dep't of Child Safety v. Stocking-Tate in & for Cty. of Yuma*, 247 Ariz. 108, 112, (App. 2019). The Arizona Supreme Court "adopted Rule 47.3, effective July 1, 2018, to implement those amendments." *Id.*

301.    At the time that Tafoya and Greenway violated Jessica's and H.P.'s constitutional rights by unlawfully seizing H.P., DCS had a policy which allowed its employees to seize children from their parents through the use of a TCN and did not require its employees to seek prior judicial approval before seizing children, even in the absence of exigent circumstances.

302.    DCS's aforementioned policy amounted to a deliberate indifference to the constitutional rights of Jessica.

303.    DCS's aforementioned policy was the moving force behind the constitutional rights violations perpetuated by Defendants Tafoya and Greenway.

304.    DCS either did not create clear and constitutionally permissible policies and procedures for DCS employees to follow when those employees removed a child from

1   the custody of the child's parents, and/or it failed to train DCS employees on clear and

2   constitutionally permissible policies and procedures for DCS employees to follow when

3   those employees removed a child from the custody of the child's parents.

4        305.   It was obvious that the policy instituted and/or maintained by DCS would

5   lead to a constitutional violation like the violation suffered by Jessica, and DCS was

6   deliberately indifferent to the consequent constitutional violations that would inevitably

7   occur as a direct result of the policy.

8        306.   As a direct and proximate result of the violations of her constitutional rights

9   resulting from the aforementioned DCS policy, Jessica suffered irreparable harm and will

10  continue to suffer, general and special damages in an amount not yet ascertained but

11  which shall be shown according to proof at trial.

## CLAIM FOUR

**(Under 42 U.S.C. § 1983, Defendant Szymkowski is liable for violating Jessica's right to Due Process under the Fourth and Fourteenth Amendments for making misrepresentations and/or omissions to the court which were deliberate falsehoods and/or which demonstrated a reckless disregard for the truth.)**

17       307.   Plaintiff re-alleges and incorporates by reference each and every allegation

18  set forth in the paragraphs above.

19       308.   It is well established that liability for a § 1983 claim will lie for judicial

20  deception. *Liston v. County of Riverside*, 120 F.3d 965, 972 (9th Cir. 1997).

21       309.   Although, the Ninth Circuit has "recognized absolute immunity for social

22  workers ... for the discretionary, quasi-prosecutorial decisions to institute court

23  dependency proceedings to take custody away from parents," the "scope of absolute

24  immunity for social workers is extremely narrow." *Miller v. Gammie*, 335 F.3d 889, 989

25  (9th Cir. 2003). Absolute immunity does not extend to the fabrication of false evidence or

26  perjury. *Hardwick v. County of Orange*, 844 F. 3d 1112 (9th Cir. 2017).

27       310.   At all relevant times, "the constitutional right to be free from the knowing

28  presentation of false or perjured evidence" was clearly established. *Hardwick v. County of*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

35

*Orange*, 844 F. 3d 1112 (9th Cir. 2017); *see also Devereaux v. Perez*, 218 F.3d 1045 (9th Cir.2000); *Whitaker v. Garcetti*, 486 F.3d 572, 582 (2007) (concluding that "the contours of the Fourth Amendment right against judicial deception" were clearly established by 1996).

311.    During her testimony under oath, Szymkowski made numerous statements which were false and/or demonstrated a reckless disregard for the truth, including, but not limited to the false testimony discussed in paragraph 126 above.

312.    Throughout the case, Szymkowski falsely represented that Jessica had failed to get services for H.P. prior to Tafoya's seizure of him.

313.    When committing her acts of judicial deception, Symkowksi was acting under color of law.

314.    As a direct and proximate result of the violations of her constitutional rights, Jessica suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM FIVE

**(Under 42 U.S.C. § 1983, Szymkowski, Hoff, and Thal are liable for conspiring to violate Jessica's right to Due Process under the Fourth and Fourteenth Amendments to be free from misrepresentations and/or omissions to the court which were deliberate falsehoods and/or which demonstrated a reckless disregard for the truth.)**

315.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the paragraphs above.

316.    At all relevant times, it was well established that liability for a conspiracy in a § 1983 case will lie when there exists an "agreement or meeting of the minds" to violate constitutional rights. *Crowe v. Cty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010). Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." Id.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

36

317.    At all relevant times, it was also well established that "A private individual may be liable under § 1983 if she conspired or entered joint action with a state actor." *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir.2002).

318.    Szymkowski, Hoff, and Dr. Thal conspired to deceive the court by fabricating a report of Dr. Thal's evaluation of Brendi which was based on false, biased, and/or misleading information and which did not contain a true and accurate report of Dr. Thal's evaluation of Brendi.

319.    Szymkowski, Hoff, and Dr. Thal conspired to deceive the court by conspiring to shred or otherwise dispose of the unaltered report of Dr. Thal's evaluation of Brendi and/or conspiring to conceal the report from Jessica.

320.    Szymkowski, Hoff, and Thal conspired to violate Jessica's right to Due Process under the Fourth and Fourteenth Amendments to be free from misrepresentations and/or omissions to the court which were deliberate falsehoods and/or which demonstrated a reckless disregard for the truth by conspiring to fabricate a report of Dr. Thal's evaluation of Brendi which was based on false, biased, and/or misleading information and which did not contain a true and accurate report of Dr. Thal's evaluation of Brendi and conspiring to conceal the unaltered report from Jessica.

321.    When conspiring to violate Jessica's right to Due Process under the Fourth and Fourteenth Amendments to be free from misrepresentations and/or omissions to the court which were deliberate falsehoods and/or which demonstrated a reckless disregard for the truth, Szymkowski, Hoff, and Thal, and each of them, were acting under the color of law.

322.    As a direct and proximate result of the violations of her constitutional rights, Jessica suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM SIX

**(Under 42 U.S.C. § 1983, Defendants Tafoya, Greenway, Szymkowski, Reeding, and Hoff are liable for violating**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

37

**Jessica's right to Due Process under the Fourth and Fourteenth Amendments for failing to make reasonable efforts to preserve the family relationship.)**

323.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the paragraphs above.

324.    At all relevant times, it was "well established that the State...has an affirmative duty to make all reasonable efforts to preserve the family relationship." *Mary Ellen C. v. Arizona Dep't of Econ. Sec.*, 193 Ariz. 185, 186, ¶ 1 (App. 1999). This duty is "defined [] on constitutional grounds." *Id.* at 192, ¶32. A "reasonable effort" requires the State "to undertake measures with a reasonable prospect of success." *Id.*

325.    At all relevant times, it was well established that DCS agents are "obligated to undertake measures with a reasonable probability of success." *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999). DCS agents "must provide a parent with the time and opportunity to participate in programs designed to improve the parent's ability to care for the child." *Id.* at ¶ 37.

326.    At all relevant times, it was well established that "DCS has a constitutional obligation to attempt to unite" a parent with her children. *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 24 ¶ 46 (App. 2019). "DCS is obliged to work with the parent toward a shared goal of reunification throughout the statutory period." *Id.* at 23, ¶ 49. At the "very least," reasonable efforts require "DCS to identify the conditions causing the child's out-of-home placement, provide services that have a reasonable prospect of success to remedy the circumstances as they arise throughout the time-in-care period, maintain consistent contact with the parent, and make reasonable efforts to assist the parent in areas where compliance proves difficult." *Id.* at 20, ¶ 50.

327.    At all relevant times, it was well-established that in determining whether DCS has complied with the law and made reasonable efforts to reunite a parent with their children, a juvenile court must view the "totality of the circumstances" and review DCS' actions during the entirety of time the child has been in DCS' care. *Donald W.*, 247 Ariz.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

at 19, ¶ 49. "[A]bsent reasonable modifications to…rehabilitative services offered to a disabled parent, a department has failed to perform its duty under the ADA to reasonably accommodate a disability and, in turn, its obligation to make reasonable efforts to rehabilitate the parent." *People in Interest of S.K.*, 440 P. 3d 1240, 1249 (Co. App. 2019).

328.    By failing to make reasonable modifications to the services they offered to Jessica given their knowledge of her disability, Defendants Tafoya, Greenway, Szymkowski, Reeding, and Hoff failed to make reasonable efforts to rehabilitate Jessica.

329.    Defendants Tafoya, Greenway, Szymkowski, Reeding, and Hoff violated Jessica's right to the State's reasonable efforts to reunite them by failing to offer Jessica any services that offered any reasonable prospect of success because they, and each of them, never offered her any services that were reasonably accommodated to her disability.

330.    Defendants Tafoya, Greenway, Szymkowski, Reeding, and Hoff violated Jessica's right to the State's reasonable efforts to reunite her and H.P. by failing to complete a prompt and thorough investigation, as required by A.R.S. § 8-456(C)(1).

331.    Although during the initial investigation, Brendi indicated to Tafoya that H.P. was receiving DDD services, and although the Rapid Response report, a report prepared by DCS employees, recommended obtaining these records, during the year that Szymkowski was the DCS case manager, she never obtained H.P.'s DDD records and thus never confirmed what services H.P. had received while in Jessica's care.

332.    Despite this complete lack of investigation, Szymkowski continued to maintain throughout the case that, contrary to Jessica's and Brendi's statements and the medical records, Jessica had failed to get services for H.P.

333.    Szymkowski and Breeding violated Jessica's right to the State's reasonable efforts to reunite them by failing to appropriately obtain H.P.'s DDD records.

334.    Szymkowski violated Jessica's right to the State's reasonable efforts to reunite her with her child by repeatedly falsely claiming that Jessica had not obtained DDD services for H.P. prior to Tafoya's unlawful seizure of him.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

335.    Arizona law, specifically A.R.S. § 514(B), requires that DCS "place a child in the least restrictive type of placement available, consistent with the best interest of the child."

336.    Arizona law, specifically A.R.S. § 514(B), mandates that placement of a child in a kinship care with a member of the child's family is a less restrictive placement than placement with a foster family.

337.    Szymkowski and Breeding violated Jessica's right to the State's reasonable efforts to reunite her with her child by failing to keep H.P. with Ms. Walker, a member of his family and a less restrictive type of placement that was consistent with his best interest, and instead moving him to the more restrictive placement of placement with a foster family.

338.    Tafoya, Greenway, Szymkowski, Reeding, and Hoff violated Jessica's right to the State's reasonable efforts to reunite her with her child by failing to conduct a continuing and appropriate investigation into the circumstances justifying out of home care throughout the entire period of out of home care.

339.    Defendants Tafoya, Greenway, Szymkowski, Reeding, and Hoff violated Jessica's right to the State's reasonable efforts to reunite her and H.P. by failing to at any time appropriately identify to Jessica the conditions causing H.P.'s out-of-home placement.

340.    Defendants Tafoya, Greenway, Szymkowski, Reeding, and Hoff violated Jessica's right to the State's reasonable efforts to reunite them by failing to notify Ms. Walford of steps Ms. Walford could take so that she could serve as a family member placement for H.P.

341.    Defendants Szymkowski, Reeding, and Hoff violated Jessica's right to the State's reasonable efforts to reunite her and H.P. by failing to take appropriate, reasonable, and/or timely action to pursue a situation where Jessica could co-parent H.P. with Brendi, in response to the professional recommendation of Dr. Thal.

40

342.     When they violated Jessica's right to the State's reasonable efforts to reunite her and H.P., Defendants Tafoya, Greenway, Szymkowski, Reeding, and Hoff, and each of them, were acting under color of law.

343.     As a direct and proximate result of the violations of her constitutional rights, Jessica suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM SEVEN

**(Under 42 U.S.C. § 1983, Defendants Tafoya, Greenway, Szymkowski, Reeding, and Hoff are liable for violating Jessica's Due Process under the Fourteenth Amendment to the U.S. Constitution to make medical decisions for H.P.)**

344.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the paragraphs above.

345.     At all relevant times, it was well established that the constitutional due process "right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Wallis*, 202 F.3d at 1141 (citing *Parham v. J.R.*, 442 U.S. 584, 602 (1979) (holding that it is in the interest of both parents and children that parents have ultimate authority to make medical decisions for their children unless a "neutral fact finder" determines, through due process hearing, that parent is not acting in child's best interests)).

346.     At all relevant times, it was well established that, "All parental rights are reserved to a parent of a minor child without obstruction or interference from this state, any political subdivision of this state, any other governmental entity or any other institution, including: The right to make health care decisions for the minor child, including rights pursuant to §§ 15-873, 36-2271 and 36-2272, unless otherwise prohibited by law." A.R.S. § 1-602(A)(5).

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

41

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

347.    At all relevant times, it was well established that until there is a finding of dependency by a court, which legally entitles DCS "to temporarily invade" a parent's rights to "legal custody" of their child, that the state has no legal right to invade the constitutional and legal rights of a parent to make medical decisions for their child. *Diana H. v. Rubin*, 217 Ariz. 131, 134 ¶ 13 (2007).

348.    At all relevant times, it was well established that "the requirement that [the state child welfare organization] provide parental notice and obtain consent" before a child in its care and/or custody is provided medical treatment is not "inconsistent with [the state child welfare organization's] obligation to provide routine or emergency medical care to children in its custody." *Mann v. Cty. of San Diego*, 907 F.3d 1154, 1163 (9th Cir. 2018).

349.    Defendants Tafoya, Greenway, Szymkowski, and Breeding violated Jessica's right to make medical decisions for H.P. by, prior to any finding of dependency:

a. Scheduling medical appointments for H.P. without Jessica's knowledge and/or consent, and refusing to reschedule those appointments so that Jessica could attend;

b. Purporting to authorize H.P.'s foster family to schedule medical appointments for H.P. without Jessica's knowledge and/or consent;

c. Failing to take adequate steps to ensure that Jessica could attend all of H.P.'s medical appointments;

d. Taking steps to prohibit Jessica from receiving medical information regarding H.P. from medical providers; and/or

e. Taking steps to prohibit Jessica from providing medical information regarding H.P. to medical providers.

350.    When they violated Jessica's right to the State's reasonable efforts to reunite her and H.P., Defendants Tafoya, Greenway, Szymkowski, and Breeding, and each of them, were acting under color of law.

42

351.    As a direct and proximate result of the violations of her constitutional rights, Jessica suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM EIGHT

**(Under 42 U.S.C. § 1983, Defendants Tafoya, Greenway, Szymkowski, Reeding, and Hoff are liable for violating Jessica's Due Process Right under the Fourteenth Amendment to the U.S. Constitution to be with H.P. during medical treatment.)**

352.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the paragraphs above.

353.    At all relevant times, it was well established that the "Constitution assures parents that, in the absence of parental consent, [medical treatment] of their child may not be undertaken … at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an [treatment] exist and that the administration of the procedure is reasonable under all the circumstances." *Wallis*, 202 F.3d at 1141 (9th Cir. 2000). "Moreover, parents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention (or to be in a waiting room or other nearby area if there is a valid reason for excluding them while all or a part of the medical procedure is being conducted)." *Id.*

354.    Defendants Tafoya, Greenway, Szymkowski, and Breeding violated Jessica's right to be with H.P. during medical treatments by, prior to any finding of dependency:

a. Scheduling medical appointments for H.P. without Jessica's knowledge and/or consent, and refusing to reschedule those appointments so that Jessica could attend;

b. Purporting to authorize H.P.'s foster family to schedule medical appointments for H.P. without Jessica's knowledge and/or consent;

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

43

c. Failing to take adequate steps to ensure that Jessica could attend all of H.P.'s medical appointments;

d. Taking steps to prohibit Jessica from receiving medical information regarding H.P. from medical providers; and/or,

e. Taking steps to prohibit Jessica from providing medical information regarding H.P. to medical providers.

355.   When they violated Jessica's right to be with H.P. during medical treatments, Defendants Tafoya, Greenway, Szymkowski, and Breeding, and each of them, were acting under color of law.

356.   As a direct and proximate result of the violations of her constitutional rights, Jessica suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

### CLAIM NINE

**(Under 42 U.S.C. § 1983, Defendants Tafoya, Greenway, Szymkowski, and Breeding are liable for violating Jessica's Due Process Right under the Fourteenth Amendment to the U.S. Constitution to make educational decisions for H.P.)**

357.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the paragraphs above.

358.   At all relevant times, it was well established that parents have the right to make educational decisions for their children. In *Troxel v. Granville*, 530 U.S. 57, 66 (2000), a plurality of the court held: "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." This interest also includes the right of parents to "direct the upbringing and education of [their] children." *Id.; see also Meyer v. Nebraska*, 262 U.S. 390 (1923) (upholding constitutional right of parents to make educational decisions for their children); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925) (same).

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

44

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

359.    At all relevant times, it was well established that "All parental rights are reserved to a parent of a minor child without obstruction or interference from this state, any political subdivision of this state, any other governmental entity or any other institution, including: The right direct the education of the minor child." A.R.S. § 1-602(A)(5).

360.    At all relevant times, it was well established that until there is a finding of dependency by a court, which legally entitles DCS "to temporarily invade" a parent's rights to "legal custody" of their child, that the state has no legal right to invade the constitutional and legal rights of a parent to make educational decisions for their child. *Diana H. v. Rubin*, 217 Ariz. 131, 134 ¶ 13 (2007).

361.    Defendants Tafoya, Greenway, Szymkowski, and Breeding violated Jessica's right to make educational decisions for H.P. by, prior to any finding of dependency:

a. Scheduling educational appointments for H.P. without Jessica's knowledge and/or consent, and refusing to reschedule those appointments so that Jessica could attend;

b. Making educational decisions for H.P. without Jessica's knowledge and/or consent;

c. Purporting to authorize H.P.'s foster family to make educational decisions for H.P. without Jessica's knowledge and/or consent;

d. Failing to take adequate steps to ensure that Jessica could attend all of H.P.'s educational appointments;

e. Taking steps to prohibit Jessica from receiving educational information regarding H.P. from education providers; and/or,

e. Taking steps to prohibit Jessica from providing educational information regarding H.P. to educational providers.

45

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

362.   When they violated Jessica's right to make educational decisions for H.P., Defendants Tafoya, Greenway, Szymkowski, and Breeding, and each of them, were acting under color of law.

363.   As a direct and proximate result of the violations of her constitutional rights, Jessica suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM TEN

**(Under established Arizona law, Thal is liable to Jessica for failing to provide the minimum accepted standard of care in his care of Jessica.)**

364.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the paragraphs above.

365.   Thal had a duty to provide the minimum accepted standard of care in his treatment of Jessica.

366.   As discussed above, Thal breached his duty and failed to provide the minimum accepted standard of care in his treatment of Jessica.

367.   As a direct and proximate result of Defendant Thal's failure to satisfy the minimum accepted standard of care, Jessica suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM ELEVEN

**(Under established Arizona law, Defendants Tafoya, Greenway, Szymkowski, Hoff, and Breeding are liable for exercising Gross Negligence in carrying out their duty to protect the legal rights of children and families.)**

368.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the paragraphs above.

46

369.   Under A.R.S. § 8-802 (D)(1), "[a]ll child safety workers shall be trained and demonstrate competency in [their] duty to protect the legal rights of children and families from the time of the initial contact through treatment."

370.   "A statute or regulation typically gives rise to a tort duty premised on public policy only if it is designed to protect the class of persons, in which the plaintiff is included, against the risk of the type of harm which has in fact occurred as a result of its violation." *Lorenz v. State*, 238 Ariz. 556, 558 (App. 2015).

371.   Defendants Tafoya and Greenway acted with gross negligence and breached their duty to protect the legal rights of Jessica when they failed to properly investigate whether DCS should remove H.P. from his parent's care before removing H.P. from his parent's care.

372.   Defendants Tafoya, Greenway, Szymkowski, Reeding, and Hoff, and each of them, acted with gross negligence and breached their duty to protect the legal rights of Jessica by failing to complete a prompt and thorough investigation, as required by A.R.S. § 8-456(C)(1).

373.   Defendants Tafoya, Greenway, Szymkowski, Reeding, and Hoff, and each of them, exercised Gross Negligence in carrying out their duty to protect the legal rights of Jessica by failing to comply with the ADA by failing to offer Jessica services that were reasonably accommodated to her disability.

374.   Symskowski and Breeding acted with gross negligence and breached their duty to protect the legal rights of Jessica by failing to keep H.P. with Ms. Walker, a member of his family and a less restrictive type of placement that was consistent with his best interest, and instead moving him to the more restrictive placement of placement with a foster family.

375.   Defendant Szymkowski acted with gross negligence and breached her duty to protect the legal rights of Jessica when she made representations to the court that were false and/or demonstrated a reckless disregard for the truth.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

47

376.   Defendants Tafoya and Greenway, and each of them, acted with gross negligence and breached their duty to protect the legal rights of Jessica when they refused to return H.P. to his mother even though there was no probable cause to believe Jessica had abused or neglected H.P.

377.   Defendants Tafoya, Greenway, Hoff, Szymkowski, and/or Breeding, and each of them, acted with gross negligence and breached their duty to protect the legal rights of Jessica when they took action to prevent Jessica from being represented by counsel at the CFT.

378.   Defendants Szymkowski, Breeding, and/or Hoff, and each of them, acted with gross negligence and breached their duty to protect the legal rights of Jessica when they took steps to influence Dr. Thal's report of Brendi by asserting false allegations against Jessica and to prevent Jessica from obtaining a copy of the unaltered report.

379.   As a direct and proximate result of Defendants' breach of their duty, Jessica suffered irreparable harm and will continue to suffer, general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM TWELVE

**(Under established Arizona law, Defendants Tafoya, Greenway, Szymkowski, Hoff, and Breeding and each of them, are liable for exercising Gross Negligence in carrying out their duty to make reasonable and/or diligent efforts to preserve the family relationship.)**

380.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the paragraphs above.

381.   At all relevant times, it was "well established that the State … has an affirmative duty to make all reasonable efforts to preserve the family relationship." *Mary Ellen C. v. Arizona Dep't of Econ. Sec.*, 193 Ariz. 185, 186, ¶ 1 (App. 1999). This duty is "defined [] on constitutional grounds." *Id.* at 192, ¶32. A "reasonable effort" requires the State "to undertake measures with a reasonable prospect of success." *Id.*

382.   At all relevant times, it was well established that DCS agents are "obligated to undertake measures with a reasonable probability of success." *Mary Ellen C. v. Ariz.*

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

*Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999). DCS agents "must provide a parent with the time and opportunity to participate in programs designed to improve the parent's ability to care for the child." *Id.* at ¶ 37.

383.    At all relevant times, it was well established that "DCS has a constitutional obligation to attempt to unite" a parent with her children. *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 24 ¶ 46 (App. 2019). "DCS is obliged to work with the parent toward a shared goal of reunification throughout the statutory period." *Id.* at 23, ¶ 49. At the "very least," reasonable efforts require "DCS to identify the conditions causing the child's out-of-home placement, provide services that have a reasonable prospect of success to remedy the circumstances as they arise throughout the time-in-care period, maintain consistent contact with the parent, and make reasonable efforts to assist the parent in areas where compliance proves difficult." *Id.* at 20, ¶ 50.

384.    A.R.S. § 8-533(B)(8) requires DCS agents to make a diligent effort to provide appropriate reunification services.

385.    At all relevant times, it was well-established that in determining whether DCS has complied with the law and made reasonable efforts to reunite a parent with their children, a juvenile court must view the "totality of the circumstances" and review DCS' actions during the entirety of time the child has been in DCS' care. *Donald W.*, 247 Ariz. at 19, ¶ 49. "[A]bsent reasonable modifications to…rehabilitative services offered to a disabled parent, a department has failed to perform its duty under the ADA to reasonably accommodate a disability and, in turn, its obligation to make reasonable efforts to rehabilitate the parent." *People in Interest of S.K.*, 440 P. 3d 1240, 1249 (Co. App. 2019).

386.    By failing to make reasonable modifications to the services they offered to Jessica given their knowledge of her disability, Defendants Tafoya, Greenway, Szymkowski, Reeding, and Hoff, and each of them, exercised gross negligence in carrying out their duty to make reasonable and/or diligent efforts to preserve the family relationship.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

49

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

387.    Defendants Tafoya, Greenway, Szymkowski, Reeding, and Hoff, and each of them, exercised gross negligence in carrying out their duty to make reasonable and/or diligent efforts to preserve the family relationship by failing offer Jessica any services that offered any reasonable prospect of success because they, and each of them, never offered her any services that were reasonably accommodated to her disability.

388.    Defendants Tafoya, Greenway, Szymkowski, Reeding, and Hoff, and each of them, acted with gross negligence and breached their duty to make reasonable and/or diligent efforts to preserve the family relationship by failing to complete a prompt and thorough investigation, as required by A.R.S. § 8-456(C)(1).

389.    Defendants Symskowski and Breeding exercised gross negligence in carrying out their duty to make reasonable and/or diligent efforts to preserve the family relationship by failing to appropriately obtain H.P.'s DDD records.

390.    Defendant Symskowski exercised gross negligence in carrying out her duty to make reasonable and/or diligent efforts to preserve the family relationship by repeatedly falsely claiming that Jessica had not obtained DDD services for H.P. prior to Tafoya's unlawful seizure of him.

391.    Defendants Tafoya, Greenway, Szymkowski, Reeding, and Hoff, and each of them, exercised gross negligence in carrying out their duty to make reasonable and/or diligent efforts to preserve the family relationship by failing to conduct a continuing, and appropriate investigation into the circumstances justifying out-of-home-care throughout the entire period of out-of-home-care.

392.    Defendants Tafoya, Greenway, Szymkowski, Reeding, and Hoff, and each of them, exercised gross negligence in carrying out their duty to make reasonable and/or diligent efforts to preserve the family relationship by failing to at any time appropriately identify to Jessica the conditions causing H.P.'s out-of-home placement.

393.    Defendants Tafoya, Greenway, Szymkowski, Reeding, and Hoff, and each of them, exercised gross negligence in carrying out their duty to make reasonable and/or diligent efforts to preserve the family relationship by failing to notify Ms. Walford of

50

1 steps Ms. Walford could take so that she could serve as a family member placement for

2 H.P.

3     394.    Defendants Szymkowski, Reeding, and Hoff, and each of them, exercised

4 gross negligence in carrying out their duty to make reasonable and/or diligent efforts to

5 preserve the family relationship by failing to take appropriate, reasonable, and/or timely

6 action to pursue a situation where Jessica could co-parent H.P. with Brendi, in response

7 to the professional recommendation of Dr. Thal.

8     395.    As a direct and proximate result of Defendants' gross negligence, Jessica

9 suffered irreparable harm, including but not limited to, the permanent loss of her parental

10 rights, and will continue to suffer general and special damages in an amount not yet

11 ascertained but which shall be shown according to proof at trial.

## CLAIM THIRTEEN

**(Under established Arizona law, Defendants McKay and/or**
**Faust are liable to Jessica for the Gross Negligence exercised**
**by Defendant employees of DCS in carrying out their duties.)**

15     396.    Plaintiff re-alleges and incorporates by reference each and every

16 allegation set forth in the paragraphs above.

17     397.    McKay and/or Faust owed a duty to Jessica to ensure that the

18 employees, officers, and agents of DCS were qualified to serve in their respective

19 roles before hiring and assigning employees to act as investigators and/or case

20 managers for DCS.

21     398.    Defendants McKay & Faust operated with gross negligence and

22 breached the duties described herein by failing to ensure that employees, officers,

23 and agents of DCS were properly qualified before hiring and assigning employees

24 to act as investigators and/or case managers for DCS.

25     399.    Defendants McKay and/or Faust also owed a duty to Jessica to ensure

26 that the employees, officers, and agents of DCS were properly trained and

27 possessed the skill and knowledge to perform their assigned job tasks in a

28 competent manner.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

400.   Defendants McKay and/or Faust operated with gross negligence and breached the duties described herein by failing to ensure that the employees, officers, and/or agents of DCS were properly trained and possessed the skill and knowledge to perform their assigned job tasks in a competent manner

401.   Under Arizona law, specifically A.R.S. § 8-456(A)(2), DCS is required to ensure that all DCS investigators were properly trained on their "duty to protect the legal and due process rights of children and families from the time of the initial contact through case closure."

402.   Defendants McKay and/or Faust operated with gross negligence and breached the duties described herein by failing to ensure that all DCS investigators were properly trained on their duty to protect the legal and due process rights of children and families from the time of the initial contact through case closure.

403.   As a direct and proximate result of Defendants' breaches of these duties, Jessica was damaged in that she, among other things, was denied her constitutionally protected individual and familial rights thereby suffering damages from the loss of familial relationships forever, and Jessica will continue to suffer such damages into the future, all in an amount that will be demonstrated at trial.

## CLAIM FOURTEEN

**(Under 42 U.S.C. § 1983, Defendant Arizona Department of Child Safety is liable for the unconstitutional acts of its employees which were committed pursuant to a policy and/or practice of DCS.)**

404.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the paragraphs above.

405.   Defendant Arizona Department of Child Safety is a "person" within the meaning of 42 U.S.C. § 1983 and subject to *Monell* liability. *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978).

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

52

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

406.    DCS, and those individual defendants in their official capacity who had supervisory and/or policy making authority, had a duty to Jessica to establish, implement, and/or follow policies, procedures, customs and/or practices which confirm and provide the protections guaranteed Jessica under the United States Constitution, including under the First and Fourteenth Amendments. This includes, without limitation, the protection of the right to familial relations; the right to privacy; and the rights to substantive and procedural due process.

407.    DCS established and/or followed policies, procedures, customs, and/or practices (hereinafter collectively referred to as "policy" or "policies"), which policies were the moving force behind the violation of Jessica's constitutional rights, including those under the First and Fourteenth Amendment of the United States Constitution. These policies, included, but are not limited to:

   a. the policy of using trickery, duress, fabrications and/or false testimony and/or evidence, and in failing to disclose exculpatory evidence, in preparing and presenting reports and court documents to the juvenile court, causing an interference with parents' rights, including those as to familial relations;

   b. the policy of inadequate training and/or supervision, and/or by failing to train and/or supervise its officers, agent, employees, and state actors, in providing the constitutional protections guaranteed to individuals and families, including those under the Fourteenth Amendment, when performing actions related to child abuse and dependency-type proceedings;

   c. the policy of setting forth allegations in juvenile dependency petitions against parents claiming child abuse and/or neglect and/or other unsubstantiated allegations regardless of whether or not reasonable and articulable evidence exists at the time to support the claims set out in the petition under penalty of perjury;

53

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

d. the policy, practice, or custom of making knowingly false allegations of child abuse and/or neglect in juvenile dependency petitions signed under penalty of perjury, motions, or other documents filed with the juvenile court as a means of intimidating parents, whether or not true, or forcing a parent to adjudicate a matter knowing that the courts most often sustain allegations, whether justified by extant evidence or not;

e. the policy of fraudulently charging parents with child abuse and/or neglect where none exists;

f. the policy of unilaterally determining not to carry out judicial orders regarding visitation of children with their parents;

g. the policy of failing to take appropriate action to ensure that scheduled visitation occurs as ordered by a court;

h. the policy of failing to take appropriate action to ensure that appropriate and meaningful visitation occurs;

i. the policy of making medical decisions for children who have been removed by DCS, although there has been no judicial finding of dependency which would allow DCS agents to lawfully make medical decisions for children;

j. the policy of preventing parents of children who have been removed by DCS from being with their children when their children are receiving medical care, although there has been no judicial order which would allow DCS agents to lawfully prevent parents from being with their children while their children are receiving medical treatment; and/or

k. the policy of making educational decisions for children who have been removed by DCS, although there has been no judicial finding of dependency which would allow DCS agents to lawfully make educational decisions for children rather than their parent.

54

Case 2:21-cv-00853-JJT   Document 1-3   Filed 05/13/21   Page 59 of 130

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

408.    The customs, policies, and/or practices listed herein are not exhaustive due to the pending nature of discovery and the privileged and protected records of investigative and juvenile dependency type proceedings. Jessica reserves their right to amend this pleading as more information becomes available.

409.    It was obvious that the policies described herein that were instituted and/or maintained by DCS would lead to constitutional violations like the violations suffered by Jessica, and DCS was deliberately indifferent to the consequent constitutional violations that would inevitably occur as a direct result of its policies.

410.    DCS, breached its duties and obligations to Jessica including but not limited to, failing to establish, implement, and follow the correct and proper Constitutional policies, procedures, customs and practices; by failing to properly select, supervise, train, control, and review its agents and employees as to their compliance with Constitutional safeguards; and by permitting the DCS employees to engage in the unlawful and unconstitutional conduct alleged herein.

411.    DCS, knew, or should have known, that by breaching the above-mentioned duties and obligations that it was reasonably foreseeable that DCS employees would, and did, cause Jessica to be injured and damaged by DCS's wrongful policies, or deliberate lack thereof, or deliberate indifference to the need for such policies and/or training, and other acts as alleged herein, and that such breaches occurred in the contravention of public policy and their legal duties and obligations to Jessica; and that such policies subjected them to injunctive relief which Jessica asserts herein.

412.    These actions, and/or inactions, of DCS are the moving force behind, and direct and proximate cause of Jessica's injuries, as alleged herein; and as a result, Jessica has sustained general and specific damages to an extent and in an amount to be proven at trial. Jessica has incurred and will continue to incur,

attorneys' fees, costs, and expenses, including those authorized by 42 U.S.C. § 1983, to an extent and in an amount subject to proof at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief as follows:

A.    General damages and special damages according to proof, but in no event less than $50,000,000.00, including, but not limited to economic losses, medical costs, hedonic damages, psychological trauma, and emotional distress;

B.    For injunctive relief in the form of DCS agreeing to provide training to all DCS case workers regarding:

1. When exigent circumstances exist that justify the unwarranted seizure of a child;

2. The psychological trauma and harm suffered by children and family that occurs when DCS removes a child from the custody of his or her parent(s);

3.  That prior to removing a child from the custody of his or her parent(s), DCS has a legal and constitutional obligation to conduct a thorough investigation into any allegations justifying removal, including investigating facts, witnesses, and evidence that refutes the allegations;

4. That when a parent is disabled the services that DCS offers the parent must be reasonably accommodated to the parent's disability such that the parent is offered a reasonable prospect of success at reunifying with their child if they successfully complete all services offered;

5. That unless and until a court has specifically determined otherwise after a hearing and an opportunity for a parent to be heard, that the

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

56

parent retains the sole legal right to make all medical decisions for their child;

6. That unless and until a court has specifically determined otherwise after a hearing and an opportunity for a parent to be heard, that the parent retains the sole legal right to make all educational decisions for their child;

7. That it is a violation of the Constitutional rights of children and parents to make misrepresentations or omissions to the court which are false and/or which demonstrate a reckless disregard for the truth; and,

8. That facilitating regular contact between parent and child through visitation is perhaps the most basic and essential of the services provided by the State and thus all reasonable efforts must be expended to ensure that a visitation occurs regularly and as scheduled.

C.     The training described in (B) above must be provided, at a minimum, annually to all DCS case workers and must be included in the training provided to persons upon their becoming a DCS case worker;

D.     For taxable costs and pre- and post-judgment interest to the extent permitted by law;

E.     For punitive and/or exemplary damages to the extent permitted by law and in an amount appropriate to punish the wrongful conduct alleged herein and to deter such conduct in the future;

F.     For attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and state law, as applicable; and,

G.     For such other relief as the Court deems just and proper under the circumstances.

57

**RESPECTFULLY SUBMITTED** this 23rd day of December 2020.

MILLS + WOODS LAW PLLC

By  /s/ Thomas A. Connelly
　　　Thomas A. Connelly
　　　Robert T. Mills
　　　Sean A. Woods
　　　5055 North 12th Street, Suite 101
　　　Phoenix, AZ 85014

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
　　　DeeAn Gillespie Strub
　　　Kristina Reeves
　　　7319 North 16th Street
　　　Phoenix, AZ 85020

*Attorneys for Plaintiff*

**ORIGINAL** filed on this 23rd day
of December 2020, with the Clerk of
the Maricopa County Superior Court
via TurboCourt

　/s/ Elisabeth A. Small

EXHIBIT B

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBIT C

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBIT C

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBIT D

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBIT E

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBIT F

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBIT G

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBIT H

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBIT I

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBIT J

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBIT K

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBIT L

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBIT M

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBIT N

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBIT O

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBIT P

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBIT Q

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBIT R

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBITS

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBIT T

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBIT U

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBIT V

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

EXHIBIT W

# THIS EXHIBIT IS BEING

# FILED UNDER SEAL

**EXHIBIT X**

Clerk of the Superior Court
*** Electronically Filed ***
10/27/2022 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2020-017046                                                10/26/2022


                                         CLERK OF THE COURT
HONORABLE JOAN M. SINCLAIR                        K. Cabral
                                                   Deputy


JESSICA PLOOF                            THOMAS A CONNELLY

v.

STATE OF ARIZONA, et al.                 JULIE M RHODES


                                         JEFFREY S HUNTER
                                         JUDGE SINCLAIR


### UNDER ADVISEMENT RULING


        Defendant Dr. Thal ("Defendant Thal") filed a Motion for Summary Judgment along
with a Statement of Facts with supporting exhibits on April 18, 2022. Plaintiff filed a Response,
and Objection to Defendant's Statement of Facts/Controverting Statement of Facts with
supporting exhibits on June 30, 2022. Defendant filed a Reply, a Statement of Facts in Support
of the Reply with supporting exhibits, and a Response to Plaintiff's Controverting Statement of
Facts on August 10, 2022.  With the matter being fully briefed, oral argument was held on
October 4, 2022, and the matter was taken under advisement. The Court now rules.

        Defendant Thal argues that the single claim against him, namely that he did not provide
the minimum accepted standard of care to the Plaintiff, should be dismissed because the statute
of limitations had run and he owed no duty to the Plaintiff.  The Court agrees and dismisses
Count 10 of the Complaint.

        There is a two-year statute of limitations on negligence claims under A.R.S. § 12-542.
The Complaint was filed December 23, 2020.  The order of dismissal from the United States
District Court for the District of Arizona, filed in this Court on December 14, 2021, concluded
that the Plaintiff was not of unsound mind and that the two-year limitations period ended on June

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2020-017046                                    10/26/2022

18, 2020.  See Order filed December 14, 2021, in CV-21-00853-PHX-JJT ("Order"), p. 8.  This Court also previously found that the Plaintiff had not proven she had an unsound mind or that the complaint was filed within the statute of limitations.  See Minute Entry ruling filed on April 25, 2022.  Therefore, the negligence claim against Defendant Thal is time barred.

Furthermore, Defendant Thal had no duty toward the Plaintiff.  He was not an employee or investigator under A.R.S. § 8-456.  And where a psychologist "conducts an examination of an injured employee solely for the purpose of evaluating the employee's disability for the insurance carrier…and the doctor neither offers nor intends to treat, care for or otherwise benefit the employee and does not injure him during the course of the examination, the doctor is not liable for negligence in a suit for medical malpractice." *Hafner v. Beck*, 185 Ariz. 389, 392 (App. 1995).

In this case, Defendant Thal was brought in by DCS/CPS for the purposes of evaluating what was in the best interests of the child, and Jessica Ploof signed an informed consent form. Defendant's Statement of Facts ¶ 4, 6-8. Defendant Thal had no duty to the Plaintiff.

**IT IS THEREFORE ORDERED** granting Defendant Thal's Motion for Summary Judgment.  The Defendant shall file a proposed judgment with the Court by November 11, 2022.