**EXHIBIT B**

🅰 Neutral
As of: January 23, 2026 11:49 PM Z

## *Jessica P. v. Dep't of Child Safety*

Court of Appeals of Arizona, Division One

March 18, 2021, Filed

No. 1 CA-JV 19-0253

**Reporter**
251 Ariz. 34 *; 484 P.3d 148 **; 2021 Ariz. App. LEXIS 50 ***; 2021 WL 1034952

JESSICA P., Appellant, v. DEPARTMENT OF CHILD SAFETY, H.P., Appellees.

**Prior History:** [***1] Appeal from the Superior Court in Maricopa County. No. JD 530589. The Honorable Jeffrey A. Reuter, Judge.

*Jessica P. v. Dep't of Child Safety, 2020 Ariz. LEXIS 318, 2020 WL 8766053 (Ariz., Dec. 15, 2020)*

**Disposition:** AFFIRMED.

## Core Terms

disability, reunification services, parental rights, terminate, hunter, juvenile court, reasonable accommodation, fundamental error, reasonable effort, reunification, modify, disabled parent, grandmother, impairment, juvenile

## Case Summary

### Overview
HOLDINGS: [1]-Although the reunification services offered to an intellectually disabled mother by the Arizona Department of Child Safety (DCS) had to comply with the Americans with Disabilities Act (ADA), the mother failed to show that fundamental error occurred when the juvenile court found that DCS provided her with appropriate reunification services before severing her parental rights. The mother identified no specific ADA-required services that DCS failed to provide, nor did she offer anything beyond speculation for the proposition that, had DCS provided those additional services, the severance trial outcome would have been different.

### Outcome
Judgment affirmed.

## LexisNexis® Headnotes

Family Law > ... > Termination of Rights > Involuntary Termination > Reunification Plans

Family Law > Family Protection & Welfare > Children > Services

Family Law > Delinquency & Dependency > Dependency Proceedings

Family Law > Family Protection & Welfare > Dependent & Disabled Adults > Services

*HN1* The Arizona Department of Child Safety (DCS) must comply with the Americans with Disabilities Act (ADA), *42 U.S.C.S. §§ 12101-12213*, when providing reunification services to a disabled parent in a dependency.

Civil Rights Law > ... > Protection of Disabled Persons > Americans With Disabilities Act > Scope

Family Law > Family Protection & Welfare > Dependent & Disabled Adults > Services

*HN2* The Americans with Disabilities Act (ADA) prohibits public entities from discriminating against disabled persons by excluding them from participation in or denying them the benefits of public services and programs. *42 U.S.C.S. § 12132*. The ADA imposes an affirmative duty on public entities to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the modifications would fundamentally alter the nature of the service provided. *28 C.F.R. § 35.130(b)(7)(i)*. A mental impairment that substantially limits one or more major life activities of an

Melinda Arakelov

251 Ariz. 34, *34; 484 P.3d 148, **148; 2021 Ariz. App. LEXIS 50, ***1

individual is a disability. *42 U.S.C.S. § 12102(1)(A)*. A mental impairment includes intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disability. *28 C.F.R. § 35.108(b)(1)(ii)*.

Family Law > ... > Termination of Rights > Involuntary Termination > Reunification Plans

Family Law > Family Protection & Welfare > Children > Services

Family Law > Delinquency & Dependency > Dependency Proceedings

Family Law > Family Protection & Welfare > Dependent & Disabled Adults > Services

*HN3* As a public child welfare agency, the Arizona Department of Child Safety must provide a disabled parent in a dependency with reunification services that comply with the Americans with Disabilities Act (ADA), *42 U.S.C.S. §§ 12101-12213*. The ADA requires family reunification services to be provided in a manner that takes a parent's disability into account. The ADA does not restrict a juvenile court's authority to terminate parental rights when the parent, even after reasonable accommodation of a disability, is unable to meet his or her child's needs, and while the ADA is not a defense to termination of parental rights, it applies to the provision of assessments, treatment, and other services that the Department makes available to parents before termination. The ADA's requirement of reasonable accommodation is entirely consistent with, and perhaps subsumed within, a child welfare agency's general statutory obligation to expend reasonable efforts to make reunification possible. Reunification services must comply with the ADA. The ADA encompasses/applies to the state's plan for reunification services, and a parent has the right to raise the ADA while the reunification plan is being implemented, not just after the fact in a claim for money damages.

Family Law > ... > Termination of Rights > Involuntary Termination > Reunification Plans

Civil Rights Law > ... > Protection of Disabled Persons > Americans With Disabilities Act > Accommodations

Family Law > Family Protection & Welfare > Dependent & Disabled Adults > Services

*HN4* Arizona's statutory requirement that the Department of Child Safety make reasonable efforts to provide reunification services satisfies the Americans with Disabilities Act's, *42 U.S.C.S. §§ 12101-12213*, reasonable accommodation requirement. Reasonable efforts under *Ariz. Rev. Stat. § 8-533* includes seeking to reasonably accommodate disabilities from which a parent may suffer. In other words, reasonable accommodations is a component of making reasonable efforts.

Evidence > Burdens of Proof > Allocation

Civil Procedure > Appeals > Standards of Review > Prejudicial Errors

*HN5* Under fundamental error review, an appellant bears the burden to establish that (1) error exists, (2) the error is fundamental, and (3) the error caused her prejudice. An error is fundamental only if it goes to the very foundation of a case. Moreover, to prove prejudice, the appellant must show that a reasonable fact-finder could have reached a different result.

Family Law > Family Protection & Welfare > Children > Services

Family Law > ... > Termination of Rights > Involuntary Termination > Reunification Plans

*HN6* Under *Ariz. Rev. Stat. § 8-533(B)(8)(c)*, the juvenile court may terminate parental rights only if it finds the Arizona Department of Child Safety (DCS) provided the parent with appropriate reunification services. DCS need not undertake rehabilitative measures that are futile, but it is obligated to undertake measures with a reasonable probability of success. DCS need not provide every conceivable service, but it must provide a parent with the time and opportunity to participate in programs designed to improve the parent's ability to care for the child.

**Counsel:** Gillespie Shields Goldfarb & Taylor, Phoenix, By Kristina B. Reeves, Counsel for Appellant.

Arizona Attorney General's Office, Mesa, By Lauren J. Lowe, Counsel for Appellee, Department of Child Safety.

Arizona Center for Disability Law, Tucson, By Christian Carlsen, Rose A. Daly-Rooney, Counsel for Amicus Curiae, Arizona Center for Disability Law.

Arizona Center for Law in the Public Interest, Phoenix,

1/23/26, 4:49 PM    Case 2:21-cv-00853-JJT    Document 119-1    Filed 01/27/26    Page 4 of 7

Page 3 of 6
251 Ariz. 34, *34; 484 P.3d 148, **148; 2021 Ariz. App. LEXIS 50, ***1

By Anne Ronan, Daniel Adelman, Counsel for Amicus Curiae, Arizona Center for Law in the Public Interest.

ACLU Foundation of Arizona, Phoenix, By Victoria Lopez, Counsel for Amicus Curiae, American Civil Liberties Union of Arizona.

Mills & Woods Law PLLC, Phoenix, By Thomas A. Connelly, Counsel for Amicus Curiae, the ARC, et al.

NYU School of Law Family Defense Clinic, New York, NY, By Amy Mulzer, Christine Gottlieb, Martin Guggenheim, Counsel for Amicus Curiae, the ARC, et al.

Disability & Civil Rights Clinic, Brooklyn Law School, Brooklyn, NY, By Sarah Lorr, Counsel for Amicus Curiae, the ARC, et al.

**Judges:** Judge Jennifer B. Campbell delivered the opinion of the Court, in which Presiding [***2] Judge Paul J. McMurdie and Judge Kent E. Cattani joined.

**Opinion by:** Jennifer B. Campbell

## Opinion

[*36] [**150] **CAMPBELL**, Judge:

*HN1* P1 In a prior opinion in this appeal by Jessica P. ("Mother"), we held that the Department of Child Safety ("DCS") must comply with the *Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213*, when providing reunification services to a disabled parent in a dependency.[1] We concluded, however, that Mother waived her claim that DCS failed to comply with the ADA because she failed to raise the issue in the juvenile court. After considering several other arguments made on appeal, we affirmed the juvenile court's order severing Mother's parental rights.

P2 Mother filed a petition for review with the Arizona Supreme Court, which granted review, vacated the portion of our opinion concerning Mother's waiver of her ADA claim, and directed us on remand to consider whether the juvenile court committed fundamental error, citing *Brenda D. v. Department of Child Safety, 243 Ariz. 437, 447, ¶ 37, 410 P.3d 419 (2018)*. Consistent with *Brenda D.* and with our previous opinion, we reiterate that DCS must comply with the ADA in a dependency involving a disabled parent. We conclude, however, that Mother has not sustained her burden to show that [**151] [*37] fundamental error occurred when the juvenile court found [***3] that DCS provided her with appropriate reunification services before severing her parental rights.

## BACKGROUND

P3 Mother has an intellectual disability. She is the parent of a son, Hunter, who was born in 2014. In late December 2016, DCS received two calls reporting that Mother was neglecting the child. At the time, Mother and son were living with her mother, "Grandmother." The callers alleged that Mother used marijuana and methamphetamine around the child, left him home alone on multiple occasions, and that Mother had given the child drinks of beer and hard liquor. The callers further alleged that Mother spanked Hunter, bit her own grandmother, and physically fought with Grandmother and Mother's significant other in front of the child.

P4 DCS removed Hunter from Mother's custody. When he came into foster care, he was globally delayed, could barely speak, and was "very unsteady on his feet." The juvenile court found Hunter dependent and offered Mother services aimed at reunification, including a drug abuse assessment and treatment, random urinalysis testing, case aide services, parent aide services, therapeutic visits, individual counseling, and psychological evaluations. DCS also provided [***4] Mother and Grandmother with joint counseling sessions and provided Mother transportation to and from services and visits.

P5 Mother diligently participated in services "to the best of her abilities." She consistently tested negative for illegal substances after some initial positive tests, completed substance abuse services, engaged in regular and therapeutic visitation, completed parent aide services, and participated in psychological evaluations and individual counseling. At the time of the severance trial, Mother lived in an apartment and had a job as a caretaker for a teenager with special needs. Nevertheless, DCS remained concerned that Mother did not understand Hunter's medical and behavioral needs.

---

[1] In the prior opinion, we addressed Mother's constitutional challenge, state statutory claim, and contention that insufficient evidence supported the juvenile court's bests interests finding. *Jessica P. v. Dep't of Child Safety, 249 Ariz. 461, 471 P.3d 672 (App. 2020)*, vacated in part, *No. CV-20-0241-PR, 2020 Ariz. LEXIS 318 (Ariz. Dec. 15, 2020)* (granting review in part and vacating ¶¶ 23-27 of the Court of Appeals opinion).

1/23/26, 4:49 PM  Case 2:21-cv-00853-JJT   Document 119-1   Filed 01/27/26   Page 5 of 7

Page 4 of 6

251 Ariz. 34, *37; 484 P.3d 148, **151; 2021 Ariz. App. LEXIS 50, ***4

P6 Mother underwent two psychological evaluations with Dr. James Thal, who determined Mother's IQ is 65 - placing her in the intellectually disabled range. Dr. Thal diagnosed Mother with mild intellectual disability, alcohol use disorder in early remission, methamphetamine use disorder in early remission, and a rule-out diagnosis of bipolar I disorder. Given Mother's intellectual disability, Dr. Thal opined that it is "exceedingly difficult for [her] to acquire, understand, retain, [***5] and implement basic parenting knowledge and skills." He believed that even with services, Mother would be unlikely to achieve a minimally adequate parenting level. Dr. Thal further opined that Hunter could not be safely returned to Mother's sole custody, then or in the foreseeable future, because he would be at risk in her care. Dr. Thal concluded that Mother's prognosis for demonstrating minimally adequate parenting skills in the foreseeable future was poor.

P7 Over a year later, Dr. Thal reassessed Mother to determine if her participation in services had improved her parenting abilities to a minimally adequate level. Mother continued to deny that Hunter had emotional or behavioral problems, and she asserted that Hunter was doing well for his age. Mother also continued to minimize her substance abuse issues. After the evaluation, Dr. Thal again determined that Mother's prognosis for demonstrating minimally adequate parenting skills was poor:

> [Mother] has participated in a wide range of services but, not surprising given the nature of her mental deficiency, there are not significant changes in her parenting profile. This is an intellectually disabled young woman who has substantial difficulty [***6] with concepts, timeframes, and retaining factual information. She is more than willing to follow directives and she clearly loves [the child]. However, placing Hunter in [Mother]'s sole and independent care would likely place the child at risk for inadvertent neglect, impaired decision-making, and significant under-stimulation of the child's already reportedly compromised learning abilities.

P8 Hunter, Mother, Grandmother, and the child's foster family participated in a bonding [**152] [*38] assessment with Dr. S. Bryce Bennett. Dr. Bennett noted that Mother "seemingly had no understanding of [Hunter's] medical needs" and had difficulty responding to his cues. Dr. Bennett continued to have concerns about Grandmother's ability to meet Hunter's needs and concluded that it was not in his best interests to be placed in her care. Dr. Bennett concluded that Hunter's foster parents provided him with a safe and stable home and could meet his special needs.[2]

P9 DCS filed a motion to terminate Mother's parental rights in August 2018 pursuant to A.R.S. § 8-533(B)(3) (mental deficiency) and (B)(8)(c) (fifteen months out-of-home placement).

P10 A third psychological evaluation of Mother was conducted by Dr. Lee Underwood midway through [***7] the severance trial. Dr. Underwood's diagnosis of mild intellectual disability was consistent with Dr. Thal's diagnosis. Dr. Underwood did not recommend that Hunter be returned to Mother's sole care. Instead, he concluded that she could parent only in a co-parenting model.

P11 After a seven-day trial, the juvenile court terminated Mother's parental rights to Hunter based on fifteen months out-of-home placement and mental deficiency.[3] The court found that severance was in Hunter's best interests, even though Mother loved him and was bonded with him, and that DCS had made reasonable efforts to provide reunification services. Mother timely appealed.

## DISCUSSION

### I. Americans With Disabilities Act

P12 Mother argues that the juvenile court erred by not considering whether DCS's reunification efforts complied with the ADA, and that DCS failed to prove it provided her with services that reasonably accommodated her mental disability. Because Mother failed to raise this claim in the juvenile court, we review only for fundamental error. Brenda D., 243 Ariz. at 447, ¶ 37.

HN2 P13 The ADA prohibits public entities from discriminating against disabled persons by excluding

---

[2] After Dr. Thal conducted a psychological evaluation of Grandmother, he too did not recommend placing Hunter with her. At trial, Dr. Thal expressed concern that Grandmother believed Mother could safely parent the child and did not recognize Mother had significant intellectual limitations.

[3] The court also terminated the parental rights of an alleged Father on abandonment grounds. He is not party to this appeal.

251 Ariz. 34, *38; 484 P.3d 148, **152; 2021 Ariz. App. LEXIS 50, ***7

them from participation in or denying them the benefits of public [***8] services and programs. *42 U.S.C. § 12132*. The ADA imposes an affirmative duty on public entities to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless . . . the modifications would fundamentally alter the nature of the service" provided. *28 C.F.R. § 35.130(b)(7)(i)*. A mental impairment that substantially limits one or more major life activities of an individual is a disability. *42 U.S.C. § 12102(1)(A)*. A mental impairment includes "intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disability." *28 C.F.R. § 35.108(b)(1)(ii)*.

*HN3* P14 As a public child welfare agency, DCS must provide a disabled parent in a dependency with reunification services that comply with the ADA. See *Lucy J. v. Dep't of Health & Soc. Servs., 244 P.3d 1099, 1115-16 (Alaska 2010)* (ADA requires family reunification services to be provided in a manner that takes a parent's disability into account); *People ex. rel. S.K., 2019 COA 36, 440 P.3d 1240, 1248, ¶ 25 (Colo. App. 2019)* ("ADA does not restrict a juvenile court's authority to terminate parental rights when the parent, even after reasonable accommodation of a disability, is unable to meet his or her child's needs," and while the ADA "is not a defense to termination of parental rights, it applies to the provision of assessments, treatment, and other services [***9] that the Department makes available to parents . . . before termination."); *In re H.C., 187 A.3d 1254, 1265 (D.C. 2018)* (ADA's requirement of reasonable accommodation is "entirely consistent with, and perhaps subsumed within, [child welfare agency's] general [**153] [*39] statutory obligation to expend reasonable efforts to make reunification possible"); *In re Adoption of Gregory, 434 Mass. 117, 747 N.E.2d 120, 126 (Mass. 2001)* (reunification services must comply with the ADA); *In re Terry, 240 Mich. App. 14, 610 N.W.2d 563, 570 (Mich. Ct. App. 2000)* (same); *In re K.C., 2015 UT 92, 362 P.3d 1248, 1252, ¶¶ 19, 21 (2015)* (ADA encompasses/applies to state's plan for reunification services, and a parent has the right to raise the ADA "while the reunification plan is being implemented . . . not just after the fact in a claim for money damages"); *In re A.J.R., 78 Wn. App. 222, 896 P.2d 1298, 1302 (Wash. Ct. App. 1995)* (severance statute's requirement that state provide reasonable services resulted in reasonable accommodation of parents' disabilities).

*HN4* P15 This court has already recognized that Arizona's statutory requirement that DCS make reasonable efforts to provide reunification services satisfies the ADA's reasonable accommodation requirement. *Vanessa H. v. Ariz. Dep't of Econ. Sec., 215 Ariz. 252, 256, ¶ 20, 159 P.3d 562 (App. 2007)* (explaining "reasonable efforts" under *A.R.S. § 8-533* "includes seeking to reasonably accommodate disabilities from which a parent may suffer"). In other words, "reasonable accommodations" is a "component of making 'reasonable efforts.'" *Id.*

## II. Fundamental Error Analysis

P16 Because Mother [***10] failed to raise her ADA argument in the juvenile court, we will reverse the severance order only if she can show that fundamental error occurred. See *Brenda D., 243 Ariz. at 447, ¶ 37*. *HN5* Under fundamental error review, Mother "bears the burden to establish that (1) error exists, (2) the error is fundamental, and (3) the error caused [her] prejudice." *Id. at 447-48, ¶ 38*. An error is fundamental only if it "goes to the very foundation of a case." *Id. at 448, ¶ 38* (quoting *Monica C. v. Ariz. Dep't of Econ. Sec., 211 Ariz. 89, 94, ¶ 24, 118 P.3d 37 (App. 2005))*. "Moreover, to prove prejudice, [Mother] must show that a reasonable [fact-finder] could have reached a different result." *Brenda D., 243 Ariz. at 448, ¶ 38* (second alteration in original).

*HN6* P17 Under *A.R.S. § 8-533(B)(8)(c)*, the juvenile court may terminate parental rights only if it finds DCS provided the parent with appropriate reunification services. DCS need not undertake rehabilitative measures that are futile, but it is obligated to undertake measures with a reasonable probability of success. *Mary Ellen C. v. Ariz. Dep't of Econ. Sec., 193 Ariz. 185, 192, ¶ 34, 971 P.2d 1046 (App. 1999)*. DCS need not provide every conceivable service, but it "must provide a parent with the time and opportunity to participate in programs designed to improve the parent's ability to care for the child." *Id. at ¶ 37*.

P18 In our initial opinion, we reviewed at length the services DCS provided Mother and concluded the record [***11] amply supported the juvenile court's finding that DCS had fulfilled its obligation to offer her appropriate reunification services. Mother argues that because of her intellectual disability, the reunification services DCS offered her needed to comply with the ADA. While we agree with that general legal proposition, Mother has failed to show that a fundamental error occurred or that she suffered prejudice as a result.

251 Ariz. 34, *39; 484 P.3d 148, **153; 2021 Ariz. App. LEXIS 50, ***11

While Mother contends that DCS should have provided her with "enhanced," "supplemental," and more frequent training (presumably parenting training), she identifies no specific ADA-required services that DCS failed to provide. Nor does Mother offer anything beyond speculation for the proposition that, had DCS provided those additional services, the severance trial outcome would have been different. For that reason, Mother "has not met her burden under fundamental error review." *Brenda D., 243 Ariz. at 448, ¶ 39*.

## CONCLUSION

P19 For the reasons set forth above and in our initial opinion in this matter, we affirm the juvenile court's order terminating Mother's parental rights.

End of Document