**EXHIBIT M**

🛑 Warning
As of: January 24, 2026 12:52 AM Z

## *Jessica P. v. Dep't of Child Safety*

Court of Appeals of Arizona, Division One

July 28, 2020, Filed

No. 1 CA-JV 19-0253

**Reporter**
249 Ariz. 461 *; 471 P.3d 672 **; 2020 Ariz. App. LEXIS 700 ***

JESSICA P., Appellant, v. DEPARTMENT OF CHILD SAFETY, H.P., Appellees.

**Subsequent History:** Review granted by, in part, Vacated by, in part, Review denied by, in part, Remanded by *Jessica P. v. Dep't of Child Safety, 2020 Ariz. LEXIS 318, 2020 WL 8766053 (Ariz., Dec. 15, 2020)*

Related proceeding at *Ploof v. Arizona, 2021 U.S. Dist. LEXIS 236047, 2021 WL 5850878 (D. Ariz., Dec. 9, 2021)*

Related proceeding at *Ploof v. State, 2023 Ariz. App. Unpub. LEXIS 320, 2023 WL 2663348 (Ariz. Ct. App., Mar. 28, 2023)*

**Prior History:** [***1] Appeal from the Superior Court in Maricopa County. No. JD 530589. The Honorable Jeffrey A. Reuter, Judge.

**Disposition:** AFFIRMED.

## Core Terms

disability, hunter, grandmother, terminate, juvenile court, parental rights, reunification services, placement, juvenile, reunification, out-of-home, best interest, accommodate, recommend, mental deficiency, special needs, unfitness, neglect, best interests of the child, reasonable evidence, strict scrutiny, state interest, modify, diligent effort, substance abuse, fifteen months, urinalysis, foster, safe, methamphetamine

## Case Summary

### Overview

HOLDINGS: [1]-Since the mother did not raise a claim that the Department of Child Safety violated her right to reasonable accommodations under the ADA in the juvenile court, the appellate court did not consider it; [2]-The mother's claim that the juvenile court violated her due process rights lacked merit because the juvenile court acted within its official capacity within the scope of its authority under *Ariz. Rev. Stat. § 8-533*, when it made an individualized determination that the mother was unfit at the time of termination and that severance was in child's best interests; [3]-Despite the bond between the mother and the child, termination of the mother's parental rights was in the child's best interest because the child was bonded with the foster parents, who wished to adopt him, and the mother was unable to parent due to both substance abuse and her intellectual disability.

### Outcome
Judgment affirmed.

## LexisNexis® Headnotes

Public Health & Welfare Law > ... > Advocacy & Protection > Discrimination > Americans With Disabilities Act

*HN1* The ADA, 42 U.S.C.S. § 12101-12213, prohibits public entities from discriminating against disabled persons by excluding them from participation in or denying them the benefits of public services and programs. *42 U.S.C.S. § 12132*. The ADA imposes an affirmative duty on public entities to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the modifications would fundamentally alter the nature of the service provided. *28 C.F.R. § 35.130(b)(7)(i)*. A mental impairment that substantially limits one or more major life activities of an individual is a disability. *42 U.S.C.S. § 12102(1)(A)*. A

Melinda Arakelov

249 Ariz. 461, \*461; 471 P.3d 672, \*\*672; 2020 Ariz. App. LEXIS 700, \*\*\*1

mental impairment includes intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disability. 28 C.F.R. § 35.108(b)(1)(ii).

Public Health & Welfare Law > ... > Advocacy & Protection > Discrimination > Americans With Disabilities Act

Family Law > ... > Termination of Rights > Involuntary Termination > Reunification Plans

**HN2** Child welfare agencies such as the Department of Child Safety (DCS), as public entities, must provide reunification services that comply with the ADA, 42 U.S.C.S. § 12101-12213, to disabled parents. The ADA requires family reunification services to be provided in a manner that takes a parent's disability into account. The ADA does not restrict a juvenile court's authority to terminate parental rights when the parent, even after reasonable accommodation of a disability, is unable to meet his or her child's needs, but while the ADA is not a defense to termination of parental rights, it applies to the provision of assessments, treatment, and other services that the Department makes available to parents before termination. The ADA's requirement of reasonable accommodation is entirely consistent with and perhaps subsumed within, child welfare agency's general statutory obligation to expend reasonable efforts to make reunification possible. Arizona's statutory requirement that DCS make reasonable efforts to provide reunification services is consistent with the ADA's requirement that disabled parents be reasonably accommodated.

Family Law > ... > Termination of Rights > Involuntary Termination > Reunification Plans

Public Health & Welfare Law > ... > Advocacy & Protection > Discrimination > Americans With Disabilities Act

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

**HN3** In general, any claim that the Department of Child Safety is failing to provide appropriate reunification services must be raised in the juvenile court or the issue is waived. Similarly, any claim that the appropriate state agency is violating the ADA, 42 U.S.C.S. § 12101-12213, in a dependency or severance matter must be timely raised or the issue is waived.

Civil Procedure > Appeals > Standards of Review

**HN4** Alleged constitutional violations raised for the first time on appeal are reviewed for fundamental error.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Constitutional Law > The Judiciary > Case or Controversy > Constitutionality of Legislation

**HN5** An appellate court reviews the constitutionality of a statute de novo. Under strict scrutiny analysis there is no presumption that a statute is constitutional.

Family Law > Parental Duties & Rights

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

Constitutional Law > Substantive Due Process > Scope

**HN6** Parents have a fundamental right in the care, custody, and management of their children and that interest is protected by the Due Process Clause. The maintenance of the parent-child relationship is a fundamental right, and the rationality of statutes which abridge it is subject to strict scrutiny. Under strict scrutiny analysis, proponents of a law bear the burden of showing that it furthers a compelling state interest, that it is narrowly drawn to serve that interest, and that the state's interests outweigh the fundamental liberty interests at stake.

Constitutional Law > Substantive Due Process > Scope

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

Family Law > Parental Duties & Rights > Termination of Rights

**HN7** Arizona's severance statute, Ariz. Rev. Stat. § 8-533, satisfies due process because the statutory grounds are synonymous with parental unfitness.

Family Law > ... > Termination of Rights > Involuntary Termination > Unfit Parents

Family Law > ... > Termination of Rights > Involuntary

1/23/26, 5:52 PM  Case 2:21-cv-00853-JJT   Document 119-2   Printed 01/27/26   Page 4 of 14

Page 3 of 13

249 Ariz. 461, *461; 471 P.3d 672, **672; 2020 Ariz. App. LEXIS 700, ***1

Termination > Disability

***HN8*** Both *Ariz. Rev. Stat. § 8-533(B)(3)* and *(B)(8)* require a finding of parental unfitness at the time of termination. To terminate parental rights based on mental deficiency under *§ 8-533(B)(3)*, the court must find, by clear and convincing evidence, that a parent is unable to discharge parental responsibilities because of mental deficiency at the time of severance and that the condition will continue for a prolonged indeterminate period. *Section 8-533(B)(8)(c)* requires a finding that a parent will not be capable of exercising proper and effective parental care and control in the future.

Family Law > Parental Duties & Rights

***HN9*** The State has an urgent parens patriae interest in preserving and promoting the welfare of the child and its goal is to provide the child with a permanent home, preferably with a fit parent.

Family Law > ... > Termination of Rights > Involuntary Termination > Reunification Plans

***HN10*** The Department of Child Safety (DCS) must make reasonable rehabilitative efforts before seeking severance of parental rights under *Ariz. Rev. Stat. § 8-533(B)(3)*. And *§ 8-533(B)(8)* requires DCS to make a diligent effort to provide appropriate reunification services. If reunification with a parent is not possible, however, due process does not require DCS to pursue alternative means such as guardianship in every instance before seeking to change the case plan to severance and adoption.

Family Law > Parental Duties & Rights

***HN11*** *Ariz. Rev. Stat. § 1-601(A)* states that parents have a fundamental right to direct the upbringing, education, health care and mental health of their children. *Section 1-601(B)* says that the State shall not infringe on those rights without demonstrating that the compelling governmental interest as applied to the child involved is of the highest order, is narrowly tailored and is not otherwise served by a less restrictive means.

Family Law > ... > Termination of Rights > Involuntary Termination > Reunification Plans

Family Law > Parental Duties & Rights > Termination of Rights > Involuntary Termination

***HN12*** Under *Ariz. Rev. Stat. § 8-533(B)(8)(c)*, a court may terminate parental rights if the Department of Child Safety made diligent reunification efforts, the parent was unable to remedy the circumstances causing the parent's child to be in an out-of-home placement for fifteen months or longer, and there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future. *Ariz. Rev. Stat. § 8-533(B)(8)(c)*. An appellate court views the evidence and the reasonable inferences to be drawn from it in the light most favorable to affirming the juvenile court's order. The appellate court will not reverse the juvenile court's order unless reasonable evidence does not support the juvenile court's factual findings. In assessing a parent's ability to provide proper parental care and control, the juvenile court must consider the discrete and special needs of the particular child.

Family Law > Parental Duties & Rights > Termination of Rights > Involuntary Termination

***HN13*** In making a determination that a parent has been unable to remedy the circumstances causing the child to be in an out-of-home placement, an appellate court construes those circumstances to mean the circumstances existing at the time of the severance that prevented a parent from appropriately providing for the parent's child.

Family Law > Parental Duties & Rights > Termination of Rights > Involuntary Termination

Family Law > ... > Termination of Rights > Involuntary Termination > Reunification Plans

***HN14*** Before seeking to terminate a parent's parental rights on grounds of out-of-home placement, the Department of Child Safety (DCS) must make a diligent effort to provide appropriate reunification services. *Ariz. Rev. Stat. § 8-533(B)(8)*. Termination of the parent-child relationship should not be considered a panacea but should be resorted to only when a concerted effort to preserve the relationship fails. DCS need not undertake rehabilitative measures that are futile, but it is obligated to undertake measures with a reasonable probability of success. DCS need not provide every conceivable service, but it must provide a parent with the time and

249 Ariz. 461, *461; 471 P.3d 672, **672; 2020 Ariz. App. LEXIS 700, ***1

opportunity to participate in programs designed to improve the parent's ability to care for the child. DCS does not make reasonable reunification efforts if it neglects to offer the very services that its consulting expert recommends.

Family Law > ... > Termination of Rights > Involuntary Termination > Burdens of Proof

Family Law > Parental Duties & Rights > Termination of Rights > Involuntary Termination

Civil Procedure > Appeals > Standards of Review

*HN15* An appellate court does not reweigh the evidence and will affirm the juvenile court's factual findings if supported by reasonable evidence. Although fundamental, parental rights are not inviolate; a court may still sever those rights if it finds clear and convincing evidence of one of the statutory grounds for severance, and also finds by a preponderance of the evidence that severance is in the best interests of the child. Severance is in a child's best interests if the child would derive an affirmative benefit from termination or incur a detriment by continuing in the relationship. A current adoptive plan is a well-established affirmative benefit to a child.

Family Law > ... > Termination of Rights > Involuntary Termination > Best Interest of Child

*HN16* Although the existence of a bond between a parent and child is a factor in assessing best interests, it is not dispositive. Even in the face of such a bond, the juvenile court is required to evaluate the totality of circumstances and determine whether severance is in the best interests of the children.

**Counsel:** Gillespie Shields Goldfarb & Taylor, Phoenix, By Kristina B. Reeves, April Maxwell, Counsel for Appellant.

Arizona Attorney General's Office, Mesa, By Lauren J. Lowe, Counsel for Appellee, Department of Child Safety.

Arizona Center for Disability Law, Tucson, By Christian Carlsen, Rose A. Daly-Rooney, Counsel for Amicus Curiae, Arizona Center for Disability Law.

Arizona Center for Law in the Public Interest, Phoenix, By Anne Ronan, Daniel Adelman, Counsel for Amicus Curiae, Arizona Center for Law in the Public Interest.

ACLU Foundation of Arizona, Phoenix, By Victoria Lopez, Counsel for Amicus Curiae, American Civil Liberties Union of Arizona.

Mills & Woods Law PLLC, Phoenix, By Thomas A. Connelly, Counsel for Amicus Curiae, the ARC, et al.

NYU School of Law Family Defense Clinic, New York, NY, By Amy Mulzer, Christine Gottlieb, Martin Guggenheim, Counsel for Amicus Curiae, the ARC, et al.

Disability & Civil Rights Clinic, Brooklyn NY, Brooklyn Law School, By Sarah Lorr, Counsel for Amicus Curiae, the ARC, et al.

**Judges:** Judge Jennifer B. Campbell delivered the opinion of the Court, in [***2] which Presiding Judge Paul J. McMurdie and Judge Kent E. Cattani joined.

**Opinion by:** Jennifer B. Campbell

## Opinion

[*464] [**675] **CAMPBELL**, Judge:

P1 Jessica P. ("Mother") appeals from the juvenile court's order terminating her parental rights to her son, Hunter. On appeal, Mother raises an *Americans with Disabilities Act ("ADA")* claim, a facial constitutional challenge, and a state statutory claim. She also challenges the sufficiency of the evidence supporting the court's order terminating her parental rights on mental deficiency and fifteen months out-of-home placement grounds. For the following reasons, we affirm.

### BACKGROUND

P2 Mother was 20 and living with her mother ("Grandmother") when Hunter was born in April 2014. Mother has an intellectual disability. Grandmother helped take care of Hunter, including taking him to medical appointments. Grandmother also helped Mother, who received Social Security disability benefits, with her finances.

P3 In September 2016, Mesa Police were called to Banner Desert Hospital where Mother was being treated for a possible sexual assault. Mother tested positive for THC, opiates, and methamphetamine. She told police she sometimes spent time with a 61 year-old man and

1/23/26, 5:52 PM Case 2:21-cv-00853-JJT   Document 119-2   Print Filed 01/27/26   Page 6 of 14

Page 5 of 13

249 Ariz. 461, *464; 471 P.3d 672, **675; 2020 Ariz. App. LEXIS 700, ***2

smoked methamphetamine [***3] with him. Hospital staff observed that Mother was "extremely altered" and displaying "twitching type behavior." Grandmother reported that the man had been "grooming" Mother for the past month after meeting him at an extended stay motel where they were residing.

P4 In November 2016, Mother's grandparents feared for Mother's safety and called Mesa Police to report that Mother was acting out, being combative, and "acting crazy." Police observed that Mother appeared to be under the influence of drugs. They transported her to the hospital for evaluation.

[*465] [**676] P5 In late December 2016, DCS received two reports that Mother was neglecting Hunter. Mother and Hunter were still living with Grandmother. The callers alleged that Mother used marijuana and methamphetamine around the child, she had left him home alone on multiple occasions, the home was dirty, and she had been observed giving Hunter drinks of beer and hard liquor. The reports further alleged that Mother spanked the child, physically fought with Grandmother and Mother's significant other in front of the child, and she bit her own grandmother.

P6 A DCS investigator went to Mother and Grandmother's home and observed that other than a scratch [***4] on his cheek, the child was injury-free, and he was dressed appropriately. Aside from summarizing the two reports to DCS discussed *supra* ¶¶ 4-5, the investigator reported that the home was "free from any safety hazards." The investigator noted that Grandmother reported the child had previously received services from the Department of Developmental Disabilities ("DDD") for an intellectual disability, but that she had discontinued his DDD services "because he was doing well."

P7 The investigator spoke with Mother, who reported she had consumed alcohol that morning. Mother told the investigator she believed the neglect reports had been made by a former boyfriend because she had refused to have sex with him. Mother told the investigator that she previously had taken medication for depression and anxiety but was not on medication currently. Mother agreed to drug testing and told the investigator she would test positive for "weed." Mother also told the investigator that she had considered self-harm. After Grandmother agreed to be a safety monitor, the investigator left Hunter in the home pending Mother's urinalysis testing. DCS offered Mother family-preservation services, drug testing, and [***5] substance-abuse treatment.

P8 Mother's urinalysis was positive for alcohol and marijuana. Her hair follicle test was positive for marijuana and "a high level [of] . . . methamphetamines." DCS held a Team Decision Meeting in January 2017. At that meeting Mother admitted to having used methamphetamine but said she had only done so one time. She told DCS that Hunter's father was unknown. DCS expressed "concern that Hunter did not currently have DDD services and concern about Mother's lack of understanding about DCS's involvement."

P9 The next day, DCS removed Hunter from the home because 1) Grandmother, his safety monitor, refused to provide a urinalysis test[1]; 2) Mother's substance abuse; 3) Mother refused to participate in services; and 4) "[t]he physical or mental condition of [Mother] endangers [the] child's health or safety." DCS placed Hunter in an unlicensed relative placement (a maternal cousin) and filed a dependency petition. DCS alleged Mother was unable to parent Hunter because of both substance abuse and her intellectual disability. The case plan was family reunification. Several days after Hunter was removed, Grandmother went in for urinalysis and was caught using a device [***6] to submit a false urine sample.

P10 A behavioral health agency conducted a rapid-response assessment of the child. The cousin described Hunter as difficult to comfort when upset and told the agency therapist that Hunter would bang his head against walls to the point of injuring himself. The therapist observed that he became very upset when the cousin attempted to engage him in activities. The cousin said that she could not keep Hunter in her home because of his special needs. Two weeks later, DCS placed Hunter in a licensed DDD foster home.

P11 When Hunter came into care, he was globally delayed, could barely speak, and was "very unsteady on his feet."[2] He had not had [**677] [*466] any

---

[1] Grandmother claimed she could not test the first time DCS asked her to do so because of work responsibilities. About eight months later, in September 2017, Grandmother tested negative for substances.

[2] Hunter was nearly three years old when he came into care. His delays were apparent much earlier, however. When he was five months old, his pediatrician referred him to the Arizona Early Intervention Program ("AZEIP"), where he was determined to have a moderate delay in motor skills, a

249 Ariz. 461, *466; 471 P.3d 672, **677; 2020 Ariz. App. LEXIS 700, ***6

immunizations, was underweight and his eating behaviors raised concerns about whether he had been getting enough nourishment. In addition, he had trouble feeding himself, shook when he was eating, and drooled excessively. Initially, he had frequent tantrums and violent outbursts towards other children in daycare. He displayed obsessive compulsive behaviors and appeared to be autistic. Hunter's foster mother took him to a neurologist who diagnosed him with a seizure disorder and put him on medication. Hunter's neurologist [***7] and pediatrician referred him to a developmental pediatrician because he was delayed in three or more areas. At the time of trial, Hunter had an Individualized Education Plan ("IEP") and was attending a developmental preschool where he received speech, occupational, and physical therapies. He remained "significantly behind" his peers in preschool.

P12 The juvenile court found Hunter dependent in late January 2017. DCS asked Mother to complete services, including a substance abuse assessment and treatment at TERROS, random urinalysis testing, case aide services, parent aide services, therapeutic visits,[3] individual counseling, and psychological evaluations. In 2018, DCS also provided Mother with several joint counseling sessions with Grandmother when considering the possibility of Mother and Grandmother co-parenting the child. DCS provided Mother with transportation to services and visits.

---

significant delay in cognitive skills, a moderate delay in physical development and communication ability, and a mild delay in adaptive and self-help skills. AZEIP provided him with physical therapy. By February 2016, it was apparent that Hunter was speech delayed, and at a visit to his pediatrician that month, Mother and Grandmother said Hunter would start speech therapy "soon." He did not begin speech therapy until June 2016, however. Also in February 2016, Hunter's pediatrician referred him to a neurologist to address his shaking and staring episodes. Hunter did not see the neurologist until June 2016. The neurologist suspected complex partial seizures and referred Hunter for an electroencephalogram ("EEG") and a magnetic-resonance imaging scan ("MRI"). Neither Mother nor Grandmother took him for an EEG or MRI, leaving him untreated until he came into care.

[3] Therapeutic visitation was put into place because Hunter was exhibiting stress before and after visits, and because Mother was having difficulty responding to his cues and managing his tantrums during the visits. The therapeutic visit supervisor modeled appropriate parenting behaviors for Mother, provided her with parenting information and strategies, and gave her verbal feedback.

P13 Mother was diligent and participated in services "to the best of her abilities." She consistently tested negative for substances after the initial positive tests, successfully completed substance abuse services at TERROS, engaged consistently in both regular visitation and therapeutic visitation, [***8] completed parent aide services, and participated in psychological evaluations and individual counseling. At the time of trial, Mother was living in her own apartment and had a job as a caretaker for an 18 year-old with special needs.[4] Although the DCS case manager agreed that Mother had made behavioral changes and "was doing really well with maintaining her sobriety," the case manager was still concerned that Mother did not understand Hunter's medical and behavioral needs.

P14 The case aide who supervised visits with Hunter, Mother, and Grandmother starting in June 2018, testified that Mother was consistent, prepared, nurturing, and loving. However, Mother and Grandmother bickered with one another during almost every visit, which upset the child. Hunter would cover his ears, ask why Mother and Grandmother were arguing, and tell them to be nice. The case aide testified that Grandmother acted in a controlling manner towards both Mother and the child.

P15 In December 2018, the case aide received a phone call inadvertently originating from Grandmother's phone that went to voicemail. The voicemail message was a recording of Grandmother "ranting and raving . . . [at Mother] with swear words." [***9] The case aide heard Grandmother mention a lawyer and tell Mother "you haven't tried." She heard someone who sounded like Mother yelling back and crying. The case aide believed Grandmother was berating Mother about the dependency case. She reported the incident to Adult Protective Services. Subsequently, in part because of this incident, Grandmother and Mother's visits with Hunter were separated. [*467] [**678] Mother continued to have weekly supervised visits in her home (visits Hunter appeared to enjoy), and Grandmother's visits were reduced to once a month at a DCS office. An additional incident occurred at a meeting at DCS when Grandmother "scream[ed] at [Mother] about what a failure she was and how bad she had done to not get her son back." The case manager warned Grandmother that if she spoke that way to Mother again, she would not be invited to any more meetings.

P16 Mother underwent two psychological evaluations with Dr. James Thal. The first evaluation took place in

---

[4] Mother earned $150.00 per week at her job.

249 Ariz. 461, *467; 471 P.3d 672, **678; 2020 Ariz. App. LEXIS 700, ***9

July 2017. Mother's IQ was determined to be 65, which placed her in the first percentile or in the intellectually disabled range. Dr. Thal diagnosed Mother with mild intellectual disability, alcohol use disorder in early remission, [***10] methamphetamine use disorder in early remission, and gave her a rule-out diagnosis of bipolar I disorder. Dr. Thal opined that Mother's memory was "not intact and it was very difficult for [her] to recall basic information." Further, Mother's "insight [was] quite limited but consistent with her intellectual level." He observed that Mother "seemed to take little responsibility for her own actions or her reported lack of adequate care of her son." Dr. Thal opined that Mother's intellectual disability would make it "exceedingly difficult for her to acquire, understand, retain, and implement basic parenting knowledge and skills." He concluded that Mother's prognosis for being able to demonstrate minimally adequate parenting skills in the foreseeable future was poor. Dr. Thal also concluded that the child could not be safely returned to Mother's sole custody now or in the foreseeable future, and that he would be at risk in her care. Dr. Thal explained that "[Mother] would require ongoing supervision with a child" and that she could not "be relied upon to independently learn, retain, and implement safe and effective parenting practices." He found that Mother was at risk for exploitation [***11] by predatory males and recommended individual therapy to assist her in decision making. Although mental health services "could improve [Mother's] functioning," they would be unlikely to raise her to a minimally adequate parenting level.

P17 Dr. Thal re-assessed Mother in October 2018 to determine if Mother's participation in services had improved her parenting abilities to a minimally adequate level. Mother continued to deny neglecting the child. Mother denied that Hunter had emotional or behavioral problems and stated that she believed he was developmentally on track. When discussing her completed drug treatment at TERROS, Mother stated "I honestly didn't need those classes." Dr. Thal again concluded that the prognosis that Mother would be able to demonstrate minimally adequate parenting skills was poor. He wrote:

> [Mother] has participated in a wide range of services but, not surprising given the nature of her mental deficiency, there are not significant changes in her parenting profile. This is an intellectually disabled young woman who has substantial difficulty with concepts, timeframes, and retaining factual information. She is more than willing to follow directives and she clearly [***12] loves [the child]. However, placing Hunter in [Mother]'s sole and independent care would likely place the child at risk for inadvertent neglect, impaired decision-making, and significant under-stimulation of the child's already reportedly compromised learning abilities.

P18 Dr. Thal recommended a bonding and best interests assessment for Hunter, Mother, Grandmother, and the child's foster family. Dr. S. Bryce Bennett conducted the assessment in April and May 2018. Dr. Bennett noted that Mother "seemingly had no understanding of [Hunter's] medical needs," and that Grandmother lacked understanding of his medical needs beyond his developmental delays and did not seem to recognize how much support Mother would require if Hunter were returned to her. Both Mother and Grandmother had difficulty responding to the child's cues. Grandmother's failure to recognize his cues was of particular concern because Hunter required a "caregiver who is very responsive to his cues." Dr. Bennett concluded that Hunter's foster parents provided him with a safe and stable home and had the ability to meet his special needs. Dr. Bennett conducted an updated bonding assessment [*468] [**679] regarding Grandmother in October 2018. [***13] Dr. Bennett continued to have concerns about Grandmother's ability to meet Hunter's needs and concluded that it was not in his best interests to be placed with her.[5]

P19 DCS filed a motion to terminate Mother's parental rights in August 2018 pursuant to A.R.S. §§ 8-533(B)(3) (mental deficiency) and (B)(8)(c) (fifteen months out-of-home placement). At that time, Mother requested that Hunter be placed with Grandmother. The juvenile court denied the request.

P20 A week before trial, Mother filed a motion to appoint Grandmother as a permanent guardian. In her petition, Mother stated, "[DCS] has made reasonable efforts to reunite Mother with the minor child. Reunification of the minor child and Mother is not in [his] best interest. Mother is unable to properly care for [him] without the assistance of [Grandmother]." DCS opposed the guardianship motion.

---

[5] Dr. Thal conducted a psychological evaluation of Grandmother in January 2018 and another evaluation in January 2019. He likewise did not recommend placing Hunter with Grandmother. At trial, Dr. Thal testified that it was concerning that Grandmother believed that Mother could safely parent the child and failed to recognize she had "some very significant intellectual limitations."

249 Ariz. 461, *468; 471 P.3d 672, **679; 2020 Ariz. App. LEXIS 700, ***13

P21 A third psychological evaluation of Mother was conducted by Dr. Lee Underwood in March and April 2019, midway through trial. Dr. Underwood's diagnosis of mild intellectual disability was consistent with Dr. Thal's diagnosis. Dr. Underwood did not recommend that the child be returned to Mother's sole care. Instead he concluded that she could parent in a co-parent [***14] model.

P22 After a seven-day trial on both the guardianship and severance motions, the juvenile court denied Mother's guardianship motion. The court granted DCS's severance motion, terminating Mother's parental rights to Hunter based on fifteen months out-of-home placement and mental deficiency.[6] The court found that severance was in Hunter's best interests even though Mother loved him and was clearly bonded with him, and that DCS made reasonable efforts to provide reunification services. The court denied the motion to appoint Grandmother as a permanent guardian, noting, among other things, that he had been neglected by Mother while they both resided with Grandmother. Mother timely appealed.

## DISCUSSION

### I. Americans With Disabilities Act

P23 Mother argues that the juvenile court erred by not considering whether DCS's reunification efforts complied with ADA, 42 U.S.C. §§ 12101-12213, and that DCS failed to prove that it provided her with services that reasonably accommodated her mental disability.[7]

*HN1* P24 The ADA prohibits public entities from discriminating against disabled persons by excluding them from participation in or denying them the benefits of public services and programs. 42 U.S.C. § 12132. The ADA imposes an affirmative duty [***15] on public entities to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless . . . the modifications would fundamentally alter the nature of the service" provided. 28 C.F.R. § 35.130(b)(7)(i). A mental impairment that substantially limits one or more major life activities of an individual is a disability. 42 U.S.C. § 12102(1)(A). A mental impairment includes "intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disability." 28 C.F.R. § 35.108(b)(1)(ii).

*HN2* P25 We agree with courts in other jurisdictions—child welfare agencies such as [**680] [*469] DCS, as public entities, must provide reunification services that comply with the ADA to disabled parents. *See Lucy J. v. Dep't of Health & Soc. Servs., 244 P.3d 1099, 1115-16 (Alaska 2010)* (ADA requires family reunification services to be provided in a manner that takes a parent's disability into account); *In re S.K., 440 P.3d 1240, 1248, ¶ 25, 2019 COA 36 (Colo. App. 2019)* ("ADA does not restrict a juvenile court's authority to terminate parental rights when the parent, even after reasonable accommodation of a disability, is unable to meet his or her child's needs," but while the ADA "is not a defense to termination of parental rights, it applies to the provision of assessments, treatment, and other services that the Department [***16] makes available to parents . . . before termination."); *In re H.C., 187 A.3d 1254, 1265 (D.C. 2018)* (ADA's requirement of reasonable accommodation is "entirely consistent with and perhaps subsumed within, [child welfare agency's] general statutory obligation to expend reasonable efforts to make reunification possible"); *In re Adoption of Gregory, 434 Mass. 117, 747 N.E.2d 120, 126 (Mass. 2001)* (reunification services must comply with the ADA); *In re Terry, 240 Mich. App. 14, 610 N.W.2d 563, 570 (Mich. Ct. App. 2000)* (same); *In re K.C., 2015 UT 92, 362 P.3d 1248, 1252, ¶¶ 19, 21 (Utah 2015)* (ADA encompasses a plan for reunification services and a parent has the right to raise the ADA "while the reunification plan is being implemented . . . not just after the fact in a claim for money damages."); *In re A.J.R., 78 Wn. App. 222, 896 P.2d 1298, 1302 (Wash. Ct. App. 1995)* (severance statute's requirement that State provide reasonable services resulted in reasonable accommodation of parents' disabilities). Arizona's statutory requirement that DCS make reasonable efforts to provide reunification services is consistent with the ADA's requirement that disabled parents be reasonably accommodated.

*HN3* P26 In general, any claim that DCS is failing to

---

[6] The court also terminated the parental rights of an alleged Father on abandonment grounds. He is not party to this appeal.

[7] Mother argues for the first time on appeal that DCS should have provided her with "enhanced," "supplemental," and more frequent training (presumably parenting training), either in her home or in another environment "more conducive to learning," and that it should have provided "visual modeling or individualized techniques."

1/23/26, 5:52 PM Case 2:21-cv-00853-JJT Document 119-2 Filed 01/27/26 Page 10 of 14

Page 9 of 13

249 Ariz. 461, *469; 471 P.3d 672, **680; 2020 Ariz. App. LEXIS 700, ***16

provide appropriate reunification services must be raised in the juvenile court or the issue is waived. *Shawanee S. v. Ariz. Dep't of Econ. Sec., 234 Ariz. 174, 175, ¶ 1, 319 P.3d 236 (App. 2014)*. Similarly, we agree with other courts concluding that any claim that the appropriate state agency (here, DCS) is violating the ADA in a dependency or severance matter must **[\*\*\*17]** be timely raised or the issue is waived. *See Gregory, 747 N.E.2d at 124-25* (parent may not raise noncompliance with the ADA with regard to reunification services for the first time at a termination proceeding). *Accord Terry, 610 N.W.2d at 570* (disabled parent should claim a violation of the ADA before the termination hearing "either when a service plan is adopted or soon afterward" so that juvenile court can address the claim.). *Accord In re Hicks/Brown, 500 Mich. 79, 893 N.W.2d 637, 642 (Mich. 2017)* (raising claim that services did not accommodate a parent's intellectual disability in court eleven months prior to termination hearing was sufficient). *Cf. In re K.C., 362 P.3d at 1252*, ¶ 27 (parent may raise ADA violation at termination hearing, but "[a] parent who waits until the eleventh hour to request a modification under the ADA may thoroughly undermine her ability to establish that such a modification is reasonable").

P27 Here, Mother did not raise her claim that DCS violated her right to reasonable accommodations under the ADA in the juvenile court before or during the severance proceedings. Mother never asked the juvenile court to determine whether the services DCS provided Mother, which the court found were reasonable under *A.R.S. § 8-533*, also satisfied the ADA. Mother was represented by counsel throughout the case and could have timely **[\*\*\*18]** raised the issue. Raising an ADA claim for the first time on appeal is untimely and we do not consider it.

## II. Due Process and *A.R.S. § 1-601*

P28 Mother argues that the juvenile court violated her due process rights. *HN4* Alleged constitutional violations raised for the first time on appeal are reviewed for fundamental error. *Brenda D. v. Ariz. Dep't of Child Safety, 243 Ariz. 437, 447, ¶ 37, 410 P.3d 419 (2018)*. Mother first argues that *A.R.S. §§ 8-533(B)(3)* and *(B)(8)* are facially unconstitutional under the federal constitution. *HN5* We review the constitutionality of a statute de novo. *State v. Maestas, 244 Ariz. 9, 11, ¶ 6, 417 P.3d 774 (2018)*. Under strict scrutiny analysis there is no presumption that a statute is constitutional. *Martin v. Reinstein,* **[\*470] [\*\*681]** *195 Ariz. 293, 309, ¶ 51, 987 P.2d 779 (App. 1999)*.

*HN6* P29 Parents have a fundamental right in the care, custody, and management of their children and that interest is protected by the *Due Process Clause*. *Santosky v. Kramer, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)*. "The maintenance of the parent-child relationship is a fundamental right, and the rationality of statutes which abridge it is subject to strict scrutiny." *Maricopa Cty. Juv. Action No. JS-7359, 159 Ariz. 232, 236, 766 P.2d 105 (App. 1988)* (citing *Santosky, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599*). Under strict scrutiny analysis, "proponents of a law bear the burden of showing that it furthers a compelling state interest, that it is narrowly drawn to serve that interest, and that the state's interests outweigh" the fundamental liberty interests at stake. *Martin, 195 Ariz. at 309*, ¶ 51.

P30 Mother agrees that *A.R.S. §§ 8-533(B)(3)* and *(B)(8)* serve a compelling **[\*\*\*19]** state interest. Nevertheless, she argues that Arizona's severance statute fails strict scrutiny analysis because the compelling state interest is preventing harm to the child and the statute does not require DCS to prove, by clear and convincing evidence, that termination is necessary to prevent harm to the child.

*HN7* P31 The Arizona Supreme Court has held that Arizona's severance statute satisfies due process because the statutory grounds are "synonymous with parental unfitness." *Alma S. v. Ariz. Dep't of Child Safety, 245 Ariz. 146, 150, ¶ 9, 425 P.3d 1089 (2018)* ("If a statutory ground were not synonymous with unfitness, a contested severance based on such a ground would be constitutionally infirm."); *see also JS-7359, 159 Ariz. at 236* (prior version of Arizona's severance statute satisfied strict scrutiny because it incorporated a concept of parental unfitness).

*HN8* P32 Both *A.R.S. §§ 8-533(B)(3)* and *(B)(8)* require a finding of parental unfitness at the time of termination. To terminate parental rights based on mental deficiency under *A.R.S. § 8-533(B)(3)*, the court must find, by clear and convincing evidence, that a parent is "unable to discharge parental responsibilities because of . . . mental deficiency" at the time of severance and that "the condition will continue for a prolonged indeterminate period." *Section 8-533(B)(8)(c)* requires a finding that **[\*\*\*20]** a parent "will not be capable of exercising proper and effective parental care and control in the future."

249 Ariz. 461, *470; 471 P.3d 672, **681; 2020 Ariz. App. LEXIS 700, ***20

*HN9* P33 Mother misidentifies the compelling state interest in termination proceedings, which is to promote and protect child welfare. *See Santosky, 455 U.S. at 766* (the State has an urgent "*parens patriae* interest in preserving and promoting the welfare of the child" and its "goal is to provide the child with a permanent home," preferably with a fit parent); *JS-7359, 159 Ariz. at 236* (quoting *Santosky, 455 U.S. at 767*); *Ariz. Dep't of Child Safety v. Beene, 235 Ariz. 300, 306, ¶ 13, 332 P.3d 47 (App. 2014)* ("DCS has a compelling interest in protecting child welfare.") (internal quotation omitted).

P34 Mother argues that *A.R.S. §§ 8-533(B)(3)* and *(B)(8)* are both unconstitutional because they do not require DCS to prove that termination is the least-restrictive means available for protecting the child. She argues that the State may not choose a single means of avoiding severance, such as family reunification, and then declare that severance is the least-restrictive means because reunification is not available. We disagree. *HN10* DCS must make reasonable rehabilitative efforts before seeking severance under *A.R.S. § 8-533(B)(3)*. *Vanessa H. v. Ariz. Dep't of Econ. Sec., 215 Ariz. 252, 255-56, ¶ 18, 159 P.3d 562 (App. 2007)*. And *A.R.S. § 8-533(B)(8)* requires DCS to make a diligent effort to provide appropriate reunification services. If reunification with a parent is not possible, however, due process [***21] does not require DCS to pursue "alternative means" such as guardianship in every instance before seeking to change the case plan to severance and adoption.[8]

[*471] [**682] P35 Mother also argues that *A.R.S. §§ 8-533(B)(3)* and *(B)(8)* are overly inclusive because they "allow for the possibility that a fit parent may have their parental rights . . . terminated simply because, at some point, they were unfit." As discussed *supra* ¶¶ 31-32, *§§ 8-533(B)(3)* and *(B)(8)* require the juvenile court to make an individualized finding of unfitness at the time of termination.

P36 Mother next argues that the juvenile court had a statutory duty to apply *A.R.S. § 1-601(B)*, and "find that DCS has met every burden that Arizona's legislature has mandated, including those mandated under *A.R.S. § 1-601(B)*," and that its failure to do so violated her due process rights under the federal and state constitutions. Mother did not raise her statutory claim until her written closing argument.

---

[8] Here, DCS did pursue permanent guardianship by Grandmother but determined she was not an appropriate guardian for the child.

P37 The *Parents' Bill of Rights* is codified at *A.R.S. §§ 1-601* and *- 602*. *HN11 Section 1-601 (A)* states that parents have a fundamental right "to direct the upbringing, education, health care and mental health of their children." *Section 1-601(B)* says that the State shall not infringe on those rights "without demonstrating that the compelling governmental interest as applied to the child [***22] involved is of the highest order, is narrowly tailored and is not otherwise served by a less restrictive means." *Section 1-602* defines a parent's rights, and provides, in part:

> This section does not authorize or allow a parent to engage in conduct that is unlawful or to abuse or neglect a child in violation of the laws of this state. This section does not prohibit courts, law enforcement officers or employees of a government agency responsible for child welfare from acting in their official capacity within the scope of their authority. This section does not prohibit a court from issuing an order that is otherwise permitted by law.

Here, the juvenile court acted within its "official capacity within the scope of [its] authority" under Arizona's severance statute, *A.R.S. § 8-533*, and that statute satisfies due process. The juvenile court made an individualized determination that Mother was unfit at the time of termination, and that severance was in child's best interests. The court's severance order was permitted by *A.R.S. § 8-533*. We find no error, fundamental or otherwise, nor do we find that Mother's due process rights were violated.

### III. Fifteen Months Out-of-Home Placement

P38 Mother argues that insufficient evidence supported [***23] the juvenile court's finding that severance was warranted pursuant to *A.R.S. § 8-533(B)(8)(c)*. *HN12* Under this statute, the court may terminate parental rights if DCS made diligent reunification efforts, the parent was unable to remedy the circumstances causing the parent's child to be in an out-of-home placement for fifteen months or longer, and "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." *A.R.S.§ 8-533(B)(8)(c)*. We view the evidence and the reasonable inferences to be drawn from it in the light most favorable to affirming the juvenile court's order. *Jordan C. v. Ariz. Dep't of Econ. Sec., 223 Ariz. 86, 93, ¶ 18, 219 P.3d 296 (App. 2009)*. We will not reverse the juvenile court's order unless reasonable evidence does not support the

249 Ariz. 461, *471; 471 P.3d 672, **682; 2020 Ariz. App. LEXIS 700, ***23

juvenile court's factual findings. *Ariz. Dep't of Econ. Sec. v. Matthew L., 223 Ariz. 547, 549, ¶ 7, 225 P.3d 604 (App. 2010)*. In assessing a parent's ability to provide proper parental care and control, the juvenile court must "consider the discrete and special needs of the particular child." *Joelle M. v. Ariz. Dep't of Child Safety, 245 Ariz. 525, 527, ¶ 12, 431 P.3d 595 (App. 2018)*.

P39 Hunter was in an out-of-home placement for more than two years at the start of the severance trial and for two and one-half years when the juvenile court granted the severance. Mother argues that she remedied her substance abuse problem, which was the circumstance causing Hunter's [***24] removal. *HN13* However, in making a determination that a parent has been unable to remedy the circumstances causing the child to be in an out-of-home placement, we construe those circumstances to mean the circumstances existing at the time of the severance that prevented a parent from appropriately providing for the parent's child. *Marina P. v. Ariz. Dep't of Econ. Sec., 214 Ariz. 326, 330, ¶ 22, [*472] [**683] 152 P.3d 1209 (App. 2007)*. Moreover, Mother's substance abuse was not the only circumstance leading to Hunter's removal. *See Donald W. v. Dep't of Child Safety, 247 Ariz. 9, 17, ¶ 26, 444 P.3d 258 (App. 2019)* (court must consider "*both the origin and any cause arising during the dependency*"). DCS took Hunter into custody because of Mother's substance abuse, because she initially refused to participate in services, and because "[t]he physical or mental condition of [Mother] endanger[ed] child's health or safety." In addition, Grandmother declined to take a urinalysis test when she was designated safety monitor for the child. The dependency petition alleged that Mother was unable to parent due to both substance abuse and her intellectual disability. At the time of the severance trial, although Mother's substance abuse was no longer a concern, her intellectual disability was the circumstance causing Hunter's continued out-of-home placement.

P40 Here, the juvenile court [***25] found that "Mother has completed all services that have been asked of her to the best of her ability."[9] The court found that even so, Mother had been unable to remedy the circumstances leading to the child's out-of-home placement because "[e]very professional who evaluated Mother has concluded that Mother, due to her limitations, cannot independently parent the child. Mother's deficiencies are exacerbated by the special needs of the child. The professionals have concluded that the child cannot be safely returned to Mother's care." Citing Dr. Thal's opinion, the court found that there was a substantial likelihood that Mother would not be capable of exercising proper and effective parental care and control in the near future.

P41 Reasonable evidence supports the juvenile court's findings. Dr. Thal evaluated Mother twice, and even after she had completed "a wide range of services," Dr. Thal concluded that Mother's prognosis for demonstrating minimally adequate parenting skills was poor, given the nature of her intellectual ability. Dr. Thal noted that Mother's medical decision-making abilities were "significantly limited," and opined that Mother's intellectual disability "and the accompanying [***26] impact on her judgment and decision making" made her unable to meet Hunter's special needs. No evaluator or therapist concluded that Mother could safely parent child independently.

P42 Mother argues that Dr. Thal recommended the child be returned to her in July 2017, and that DCS's failure to do so extended his out-of-home placement past fifteen months. This misstates the record. After his first evaluation of Mother in July 2017, Dr. Thal made the following recommendations concerning placement:

> It is not recommended a child be placed in this [Mother]'s sole and independent care. . . . The best-case scenario for [Mother] would be for her to act as an assistant caregiver to a fully qualified caregiver. [Mother] would require ongoing supervision with a child and cannot be relied upon to independently learn, retain, and implement safe and effective parenting practices. . . . Alternative long-term placement planning is necessary to insure the welfare of [Hunter].

P43 Mother also asserts that Dr. Thal testified that she could effectively co-parent, and that with assistance, she would be able to exercise proper and effective parental care and control. This misstates Dr. Thal's testimony. Dr. [***27] Thal specifically testified that the

---

[9] Mother complains that elsewhere in the court's minute entry the court stated, "[DCS] made diligent efforts by providing an array of reunification services and had those services been successfully completed, reunification likely would have occurred." This appears to be in conflict with other findings. The court specifically found that Mother completed all services to the best of her abilities and stated so twice in its minute entry order, which was consistent with the DCS case manager's testimony. Further, the court outlined in great detail all of the services offered to Mother and noted that she participated in and completed each of them.

1/23/26, 5:52 PM Case 2:21-cv-00853-JJT Document 119-2 Filed 01/27/26 Page 13 of 14

Page 12 of 13

249 Ariz. 461, *472; 471 P.3d 672, **683; 2020 Ariz. App. LEXIS 700, ***27

child should not be in Mother's sole and independent care, but that a goal might be for her to "function in an assisted capacity. Not to [be] the co-parent but to assist a capable and fully functioning parental figure."

P44 Mother argues that the juvenile court erred by finding that DCS made diligent [**684] [*473] efforts to reunify the family because DCS failed to "undertake even the minimum of the diligent efforts [it was] legally required to take." Mother argues that DCS failed to obtain Hunter's medical, DDD, and Head Start records, did not ask Mother or Grandmother about services they had obtained for the child, and did not speak with child's grandfather or Mother's aunts. She also argues that Dr. Thal recommended that the child "be returned to Mother, with Grandmother as guardian," but "DCS did nothing for six months."[10]

*HN14* P45 Before seeking to terminate a parent's parental rights on grounds of out-of-home placement, DCS must make a diligent effort to provide appropriate reunification services. *A.R.S. § 8-533(B)(8)*. "Termination of the parent-child relationship should not be considered a panacea but should be resorted to only when [a] concerted effort to preserve the relationship [***28] fails." *Ariz. Dep't of Econ. Sec. v. Mahoney, 24 Ariz. App. 534, 537, 540 P.2d 153 (1975)*. DCS need not undertake rehabilitative measures that are futile, but it is obligated to undertake measures with a reasonable probability of success. *Mary Ellen C. v. Ariz. Dep't of Econ. Sec., 193 Ariz. 185, 192, ¶ 34, 971 P.2d 1046 (App. 1999)*. DCS need not provide every conceivable service, but it "must provide a parent with the time and opportunity to participate in programs designed to improve the parent's ability to care for the child." *Id.* at ¶ 37. DCS does not make reasonable reunification efforts if "it neglects to offer the very services that its consulting expert recommends." *Id.*

P46 As the juvenile court found, DCS offered Mother numerous reunification services, including random urinalysis testing, substance abuse treatment, more than 30 individual counseling sessions (exceeding the 20 sessions recommended by Dr. Thal), two psychological evaluations, a bonding assessment, therapeutic visitation and supervised visitation, a parent aide, and transportation because she did not drive. DCS invited her to attend the child's medical appointments so that she could understand his special needs. These services were offered to help Mother become sober, enhance her parenting skills, and assist her with "decision-making, employing sound judgment, staying safe, and coping [***29] with her disabilities." Sufficient evidence supported the court's finding that DCS made diligent efforts to provide reunification services.

P47 DCS case manager Claudia Hoff testified that obtaining the child's DDD and medical records at the outset of the case would not have changed the services offered to Mother. And whether or not DCS interviewed certain family members during its investigation is not relevant to the question of whether it made diligent efforts to provide appropriate reunification services.

P48 Because sufficient evidence supported the juvenile court's finding that severance was warranted pursuant to *A.R.S. § 8-533(B)(8)(c)*, we need not consider Mother's challenge to the alternate ground of mental deficiency. See *Jesus M. v. Ariz. Dep't of Econ. Sec., 203 Ariz. 278, 280, ¶ 3, 53 P.3d 203 (App. 2002)*.

## IV. Best Interests

P49 Finally, Mother argues that the juvenile court erred by finding that termination of her parental rights was in Hunter's best interests. *HN15* We do not reweigh the evidence and will affirm the juvenile court's factual findings if supported by reasonable evidence. *Dominique M. v. Ariz. Dep't of Child Safety, 240 Ariz. 96, 97, ¶ 6, 376 P.3d 699 (App. 2016)*. "Although fundamental, parental rights are not inviolate; a court may still sever those rights if it finds clear and convincing evidence of one of the statutory grounds for severance, and also finds by [***30] a preponderance of the evidence that severance is in the best interests of the child[]." *Id. at 98*, ¶ 7 (citations omitted). Severance is in a child's best interests if the child would "derive an affirmative benefit from termination or incur a detriment by continuing in the relationship." *Ariz. Dep't of [*474] [**685] Econ. Sec. v. Oscar O., 209 Ariz. 332, 334, ¶ 6, 100 P.3d 943 (App. 2004)*. A current adoptive plan is a well-established affirmative benefit to a child. *Id.*

P50 The juvenile court found that the child was adoptable and that his foster parents were meeting all his special needs. Hunter's foster parents wished to adopt him. He had lived with his foster parents for nearly two and one-half years and he was bonded to them. He was also bonded with Mother. The court also found that maintaining Mother's parental rights would be detrimental to Hunter because Mother was "not equipped to provide the level of care that child needs."

---

[10] As noted *supra* ¶¶ 42-43, Dr. Thal did not recommend returning Hunter to Mother with Grandmother as his guardian.

249 Ariz. 461, *474; 471 P.3d 672, **685; 2020 Ariz. App. LEXIS 700, ***30

The court concluded that "the facts dictate that it is in the child's best interests that Mother's parental rights be terminated despite her love for, and bond with, the child."

P51 Reasonable evidence supported the juvenile court's best interests finding. Dr. Bennett concluded his bonding and best interests assessment by opining that returning Hunter to Mother was [***31] not in his best interests because she seemed to have little understanding of his medical needs and was not responsive to his cues regarding his needs.[11] Dr. Bennett explained that the child would be at risk of neglect in her care, even for short periods of time. Hunter was adoptable and his current placement was willing to adopt him. Hunter was thriving in their care.

P52 Mother argues that she was a "fit and loving" parent and that Hunter was bonded to her. As discussed above, reasonable evidence supported the severance ground of out-of-home placement and the court's conclusion that Mother would not be a fit parent in the near future. *HN16* And although the existence of a bond between a parent and child is a factor in assessing best interests, it is not dispositive. Dominique M., 240 Ariz. at 98, ¶ 12. "Even in the face of such a bond, the juvenile court is required to evaluate the totality of circumstances and determine whether severance is in the best interests of the children." Id. at 99, ¶ 12. Here, the court considered the totality of the circumstances and found that severance was in Hunter's best interests. Reasonable evidence supports that finding.

## CONCLUSION

P53 For the foregoing reasons, we affirm the juvenile court's order [***32] terminating Mother's parental rights.

---

**End of Document**

---

[11] Mother claims that the juvenile court erred by finding severance was in Hunter's best interests because she was a single parent. The court did mistakenly refer to Mother instead of Grandmother when summarizing Dr. Bennett's bonding/best interests assessment, wherein Dr. Bennett stated that Grandmother was a single parent. However, the court did not refer to Mother's relationship status in its ultimate findings about best interests.