Thomas A. Connelly (AZ Bar #019430)
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
**MILLS + WOODS LAW PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
Jenny D. Jansch (AZ Bar #024431)
**GILLESPIE, SHIELDS & TAYLOR**
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Jesscia Ploof, an individual,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>State of Arizona, *et al.*,<br><br>　　　　　Defendants. | Case No.: 2:21-cv-00853-JJT-PHX<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>(Hon. John J. Tuchi) |

Plaintiff, by and through undersigned counsel, moves for summary judgment on her judicial deception claim (Claim Four) against Defendant Szymkowski; conspiracy claim (Claim Five) against Defendants Szymkowski, Hoff, and Dr. Thal; and reasonable efforts claim (Claim Six) against Defendants Tafoya, Greenway, Szymkowski, Breeding, and Hoff. This motion is supported by the following Memorandum of Points and Authorities and Plaintiff's Statement of Facts in Support of Her Motion for Summary Judgment (PSOF).

**MEMORANDUM OF POINTS AND AUTHORITIES**

MILLS + WOODS LAW PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014-2555
480.999.4556

## I.   **INTRODUCTION**

This case is an unnecessary tragedy—a loving and caring mother's two-and-a-half-year-old son was initially taken and ultimately forever separated from his family because of his Mother's intellectual disability. Plaintiff Jessica Ploof brings her civil right claims against various employees of the Arizona Department of Child Safety (DCS) after her parental rights to her son were terminated because of the unconstitutional actions of certain DCS employees and a DCS contract provider, Dr. James Thal. Defendants moved to dismiss on statute of limitations grounds. This Court dismissed the claims arising under federal law (Claims One through Nine and Fourteen) and remanded the state law claims (Claims Ten through Thirteen). Plaintiff appealed the dismissal of her federal claims. On 13 April 2023, the 9th Circuit reversed the dismissal of Claims Four, Five, Six, Seven, Eight, and Nine and remanded back to this Court.  The claims remaining before this Court are judicial deception (Claim Four); conspiracy (Claim Five); and reasonable efforts (Claim Six).[1]

Remaining "State Defendants" refers collectively to the following individuals: Paige Szymkowski (now known as Paige Wooldridge), Megan Tafoya, Sarah Greenway, Claudia Hoff, and Nick Breeding.

## II.   **BACKGROUND**

Jessica is the mother of H.P., born in April of 2014. She has struggled with an intellectual disability her entire life. **PSOF ¶ 1**. Because of her intellectual disability, Jessica lived with her mother, Brendi Ploof, a certified nursing assistant, who co-parented with Jessica to ensure that all H.P.'s special and medical needs were appropriately met. *Id*. Because H.P. was a medically challenged child, Jessica arranged services for H.P. through the Arizona Department of Developmental Disabilities (DDD), including physical therapy, speech therapy, and attendance at a Head Start preschool.  **PSOF ¶ 2**.  For the first four years of H.P.'s life, Jessica dutifully cared for him. **PSOF ¶ 3**. None of the DDD service

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

---

[1] The Parties voluntarily dismissed Claims Seven (Medical Decisions), Eight (Medical Treatment), and Nine (Educational Decisions) (Docs. 103, 104).

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

providers—all mandated reporters—and other professionals who regularly interacted with either or both H.P. and Jessica, including other mandated reporters such as doctors and teachers, as well as family members, saw anything amiss with H.P., Jessica, or the way Jessica cared for H.P. *Id.* None of those mandated reporters ever saw neglect or abuse by Jessica that warranted a report to DCS or the police.

In December of 2016, Jessica ended a toxic relationship with her boyfriend. **PSOF ¶ 4**. Angry at the breakup, the boyfriend threatened to call the Department of Child Safety ("DCS") and make allegations against Jessica. *Id.* Soon, thereafter, DCS received two anonymous tips regarding Jessica and H.P. **PSOF ¶ 5**. The first anonymous tip was received on 20 December 2016, alleging that Jessica was neglecting H.P. and that her home was unsafe. *Id.* The second anonymous tip was received on 21 December 2016 for neglect, substance abuse, domestic violence, and that the home was "dirty" and there was "food, dirty clothes, tampons [unused] and spiders all over the floor." *Id.*

In response to the two anonymous tips, DCS Investigators Defendant Megan Tafoya and Ms. Baggen visited Jessica's home unannounced twice. **PSOF ¶ 6**. The first unannounced visit was in response to the first anonymous hotline call alleging that Jessica was neglecting H.P. and occurred on 21 December 2016 at 10:15 a.m. **PSOF ¶ 6**. Tafoya investigated those allegations and reported "[H.P.] was free from any visible injuries, he was dressed appropriately and the home was free from any safety hazards." *Id.* When the investigators interviewed Jessica, she admitted that she might test positive for marijuana. *Id.* Tafoya and Baggen went back to Jessica's home again unannounced on 21 December 2016 at 3:20 p.m. to investigate the second anonymous tip received on 21 December 2016. **PSOF ¶ 7**. The substandard conditions reported in both hotline calls were not observed either time and were then reported as "unsubstantiated." *Id.* If there were any concerns about the condition of the home, that would have been noted and reported during their investigation. **PSOF ¶ 8**. At that time, Tafoya determined that it was safe for H.P. to remain in the home in Jessica's care with Brendi as a "safety monitor." **PSOF ¶ 9**.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

At Tafoya's request, Jessica voluntarily submitted to drug testing. **PSOF ¶ 10**. She tested positive for alcohol, marijuana, and methamphetamine. *Id*. In response to the positive drug test, Tafoya scheduled a Team Decision Meeting (TDM)—a meeting between DCS and the family to discuss the safety plan—on 11 January 2017. **PSOF ¶ 1**. It was reported during the TDM that H.P. was healthy with stable housing. **PSOF ¶ 12**. Jessica had family support and obvious love for H.P. *Id*. Tafoya appointed Brendi as a "safety monitor for an in-home dependency." *Id*. Jessica was required to participate in TERROS and parenting classes.[2] *Id*. Brendi agreed that she would submit to drug testing, as well. *Id*.

Unfortunately, on 12 January 2017, Brendi was unexpectedly called into work and could not undergo the drug and alcohol screening that day. **PSOF ¶ 13**. Brendi offered to complete the screening on another day when she was not working. *Id*. That same day, despite there being no significant change in circumstances and no imminent danger to H.P., Tafoya removed H.P. from Jessica's care using a Temporary Custody Notice (TCN). **PSOF ¶ 14**. Neither Tafoya nor her supervisor, Defendant Sarah Greenway, sought to obtain prior court authorization for the seizure. *Id*.

On 17 January 2017, DCS caused a Dependency Petition and Petition for Paternity and/or Child Support to be filed. **PSOF ¶ 16**. The Petition was verified by Tafoya under penalty of perjury. *Id*. The Petition alleged that Jessica was unable to parent due to substance abuse, mental health issues, being unable to make sound decisions, and was in constant need of instruction from the maternal grandparent. *Id*. On 10 February 2017, an [Amended] Petition and Petition for Paternity and/or Child Support was filed but the only change was to add John Doe as H.P.'s Father. *Id*. There were no allegations within the

---

[2] TERROS is a leading Arizona-based nonprofit organization specializing in whole person integrated care offering various services tailored to families, adults, adolescents, youth, and children, including physical healthcare, wellness, prevention, behavioral and mental health counseling, and substance use treatment. *See* Terros Health | Our Organization - Terros Health

Petition that the home was in substandard condition or that it was dirty or otherwise in an unsafe condition. *Id*.

Tafoya authored and submitted a Report to the Juvenile Court for Preliminary Protective Hearing and/or Initial Dependency Hearing on 18 January 2017. **PSOF ¶ 17.** In the Report, she recommended that Jessica demonstrate sobriety, participate in visitation, complete a psychological evaluation to determine her ability to parent, develop and maintain social/community connections and support, and participate in random urinalysis. *Id*. On 26 January 2017, Tafoya, the primary DCS investigator, transitioned the case to Paige Szymkowski as the DCS ongoing case manager. **PSOF ¶ 15.**

Jessica faithfully participated in the services provided to her by the department. **PSOF ¶ 16.** During the two years that the trial court process lasted, Jessica never again tested positive for any substances, legal or illegal. *Id*. After Szymkowski took over the case, she submitted a referral for the psychological evaluation of Jessica with her first preference as Dr. James Thal, a long-time contracted provider for DCS. **PSOF ¶¶ 20-21.** Significantly, ninety to ninety-five percent (90-95%) of Dr. Thal's practice are referrals from DCS. **PSOF ¶ 21.** Almost all of Dr. Thal's practice revenue is derived from DCS. *Id*.

In Szymkowski's Assessment and Plan dated 2 October 2017, she falsely alleged that "[t]here are no known protective behaviors present with Jessica. **PSOF ¶ 22.** There is also a lack of ability to recognize safety threats, as the home was observed to be dirty, with food, dirty clothing, unused tampons as well as spiders all over the ground." *Id*. At the end of December 2017, Szymkowski was removed as the case manager and Defendant Claudia Hoff was assigned as the new DCS case manager. **PSOF ¶ 23**. Hoff took over the case on 3 January 2018. *Id*. After the case was reassigned, Szymkowski's involvement should have ended since she was no longer actively working on this matter. *Id*.

On 18 July 2017, Dr. Thal conducted his first psychological evaluation of Jessica. In his report, he opined that Jessica could be an effective co-parent to H.P. and suggested that the maternal grandmother, Brendi, take the role as the primary parent. **PSOF ¶ 24.** Dr. Thal's first psychological evaluation of Brendi took place on 4 January 2018. **PSOF ¶ 25.**

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

In his report issued on 18 January 2018, Dr. Thal opined that Brendi was an appropriate caregiver for H.P., could meet his special needs, could provide at least minimally adequate care, and that H.P. would not be in danger if placed in her care. *Id*. He recommended that Brendi seek permanent guardianship of H.P. *Id*. That same day, Dr. Thal emailed Brendi's evaluation to Szymkowski, who had been rotated off the case by that time. *Id*.; PSOF ¶ **23**. After Szymkowski reviewed Dr. Thal's favorable report, on 24 January 2018, she emailed Dr. Thal's assistant to schedule a call with Dr. Thal to discuss Brendi's report, as she, Hoff, and Breeding agreed should be done. **PSOF ¶ 26.**

By January 2018, after one year of DCS involvement, Jessica had successfully completed required services and was on track for H.P.'s return until Szymkowski and Dr. Thal had their fateful conversation that changed the trajectory of the case. **PSOF ¶¶ 27, 50.** On 29 January 2018, Dr. Thal sent a letter to Hoff explaining that "[i]n discussing this case with your predecessor, Paige Szymkowski, I would recommend further assessment regarding what is the best placement for H.P....Therefore, I would recommend that you seek a bonding/best interest evaluation of the child and the parties involved." **PSOF ¶ 27.** Although Szymkowski was no longer the case manager and her involvement on the case concluded at the end of December 2017, she had an ex parte telephone call with Dr. Thal on 30 January 2018. **PSOF ¶ 28.** During this call she expressed her personal, lay opinion that H.P. was bonded with his foster parents and that Dr. Thal should take that into consideration. *Id*. Szymkowski also stressed the allegedly substandard condition of the home, knowing that these issues did not exist and were unsubstantiated. *Id*.

After his phone call with Szymkowski, Dr. Thal profoundly altered his previous professional findings and recommendations. **PSOF ¶ 29.** Dr. Thal now opined that Brendi would not be able to provide minimally adequate parenting and added the recommendation, at Szymkowski's request for a bonding assessment. *Id*. Dr. Thal's improperly altered report changed the trajectory of the case and led to what is essentially the death penalty for a parent in regard to their relationship with their child, i.e., a change of case plan from reunification to severance and adoption. However, neither Szymkowski nor Hoff provided

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

6

any new or additional factual information to Dr. Thal; all he received were the personal false opinions of Szymkowski which were contradicted by documentation he had already reviewed as part of his initial assessment. **PSOF ¶ 30**. Dr Thal's claims that his conversation with Szymkowski made him view the information differently, led him to profoundly chang his conclusions and recommendations. ***Id***.

On 1 February 2018, Hoff emailed Thal and "suggested in lieu of a follow-up letter, that [Thal] could simply make [his] changes to [Brendi's] evaluation report because [Hoff] had not yet disclosed the report." **PSOF ¶ 31**. The very next day, on 2 February 2018, Hoff emailed Dr. Thal and expressed her personal, lay opinion on Jessica's ability to parent. **PSOF ¶ 32**. Hoff stated "[w]hile Jessica has completed most of the services, she is so low functioning, I don't know that she could parent a child with special needs. Her mother...something was off there. I couldn't exactly put my finger on it." ***Id***. She further stated that the home was clean and safe. ***Id***. She told Dr. Thal that she would shred his original report. ***Id***. In his response email, Dr. Thal stated that "I didn't realize that the report had not been distributed as yet. That being the case, I will re-work the recommendations to include the bonding assessment." **PSOF ¶ 33**. Then, on 7 February 2018, Dr. Thal's office, contrary to the applicable professional standards, instructed Hoff to "shred the other report." **PSOF ¶¶ 34, 50**.

Jessica dutifully and successfully continued with recommended services and on 28 February 2018, she also successfully completed parent-aide services. **PSOF ¶ 35**. The provider working closely with Jessica specifically found that Jessica "has demonstrated that she is able to meet his [H.P.'s] basic needs" and recommended that a family reunification team be provided to reunify H.P. with his mother. ***Id***. But as a family reunification team was contrary to DCS's preferred plan of termination of parental rights Hoff, Breeding, and others at DCS did not arrange for or set up reunification services. Instead, they requested a bonding assessment using the substantively altered conclusions and recommendations of Dr. Thal's orchestrated revised Brendi report as justification. **PSOF ¶36.**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

7

On 6 March 2018, Hoff called Dr. Thal's office to inform him that, unfortunately, his original Brendi report, the unaltered version, in fact was disclosed to all parties. **PSOF ¶ 37.** Hoff explained that "Paige [Szymkowski] asked you [Thal] to consider additional information and that you revised your report." *Id*. She also expressed that the Court wanted to know why Dr. Thal recommended a bonding/best interest evaluation in the altered version of his report. *Id*. In response to this surprising phone call, Dr. Thal sent a letter dated 14 March 2018, explaining to Hoff that he issued an altered report for his 4 January 2018 evaluation of Bendi based on his 30 January 2018 phone call with Szymkowski. **PSOF ¶ 38.** Dr. Thal explained that during the fateful call, Szymkowski "expressed her concerns" over the alleged "substandard condition of grandmother's residence," and about H.P.'s alleged "very poor overall condition when he came into care." **PSOF ¶ 39**. He further explained that Szymkowski also expressed her personal view that H.P. was "bonded" with his foster family and that this bond was a "critically important relationship." **PSOF ¶ 40.** Dr. Thal reported that Szymkowski was "clearly concerned about the traumatic impact of removing [H.P.] from foster care." *Id*. No mention was made of the inevitable trauma H.P. experienced being removed from the loving care of his mother and grandmother at age two and a half on January 12, 2017. Clearly, Szymkowski's personal views had no factual basis and were contrary to the written reports of the initial DCS investigators. **PSOF ¶41.** Injecting her personal opinions into the case this way was a violation of the DCS Oath of Loyalty to not inject personal opinions into her work and to remain unbiased. *Id*.

As a result of this improper conduct, Dr. Thal altered his "CONCLUSIONS" and "RECOMMENDATIONS" for Grandmother Brendi drastically in her disfavor, based solely on the unsolicited, misleading, false information provided by Szymkowski. **PSOF ¶ 42.** Dr. Thal made the following changes to his report:

| Original, Unaltered Report | Altered Report |
|---|---|

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

8

| Dr. Thal recommended that H.P. be placed with this family, with Jessica and Brendi acting as co-parents | Dr. Thal had "alarming" concerns with H.P. being in Brendi's care |
| --- | --- |
| No health concerns noted for H.P. | Noted that H.P. was in "poor condition" and "grossly underdeveloped" when he came into care. |
| H.P.'s living conditions while in the home of Brendi are described in positive terms. | H.P.'s living conditions while in the home of Brendi are described as "deplorable living conditions." |
| No diagnosis for Brendi. | Brendi diagnosed with "[n]eglect by history. |
| No concern about Brendi's response to H.P.'s challenges expressed. | Expressed that Dr. Thal was "alarm[ed]" about Brendi's alleged lack of response to H.P.'s challenges. |
| Reached the expert conclusion that there "would not appear to be any risk" to H.P. under Brendi's care. | Reached the expert conclusion that "H.P. would be at risk for neglect and regression in his development if Brendi is not adequately attentive to her grandson's health and well-being." |

**PSOF ¶¶ 25, 27, 28, 29.**

Importantly, the records reviewed by Dr. Thal are identical in both reports; that is, Dr. Thal did not receive any new, objective, factual information to justify the changes he made. **PSOF ¶¶ 43, 50.** Notably, the Comprehensive Child and Safety Risk Assessment (CSRA) was among the list of records that Dr. Thal reviewed, which documented that the home was free of any safety risks and H.P. was safe with Brendi and Jessica in their home. *Id*. Dr. Thal also changed the "Referral Agent" from Szymkowski to Hoff, which was not technically correct. *Id*.

In reliance on Dr. Thal's recommendation, on 7 March 2018, Hoff referred H.P. and his foster parents to S. Bryce Bennett, PsyD. for the bonding/best interest assessment. **PSOF ¶ 44.** Hoff made sure Dr. Thal's altered report was included in the collateral information provided to Dr. Bennett. *Id*. Dr. Bennett's 18 June 2018 report did not recommend returning H.P. to Brendi and Jessica's care. *Id*. Dr. Thal's altered report improperly influenced Dr. Bennett into believing that Brendi was not a viable co-parent. *Id*. This position was a 180-degree shift from Dr. Thal's original report that was supportive

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

of H.P. being in the care of his mother with grandmother's assistance, as had been the case for the first two and half years of his life.

Hoff unilaterally communicated, ex parte, with Dr. Bennett through email on 12 June 2018, 21 June 2018, and again on 20 September 2018. **PSOF ¶45.** During these communications she expressed her personal opinion that Jessica and Brendi were barely minimal parents, and that he may be called to testify as she forecasted the intent to terminate Jessica's parental rights, and needed the evaluation back quickly as Dr. Thal did not want to see Brendi for a second psychological evaluation before reviewing Dr. Bennett's evaluation. *Id*. Hoff informed Dr. Bennett of her intent to terminate Jessica's rights with her son. *Id*.

Based on Dr. Thal's altered report, on 14 August 2018, Hoff facilitated DCS's Motion for Termination of Parent-Child Relationship on time-in-care grounds coupled with the claim that Jessica was unable to cure her intellectual disability and was unable to parent as a result. **PSOF ¶ 46.** In their Motion, DCS anchored its claim on Dr. Thal's improperly altered report and assessment, "as Dr. Thal stated in his report, the mother is unable 'to be relied upon to independently learn, retain, and implement safe and effective parenting practices." *Id*. DCS also alleged that foster care is the least-restrictive placement, falsely claiming "[t]he child is not placed with a grandparent…*because DCS is unaware of any such person who is willing, able and appropriate to care for the child*." (emphases added). *Id*.

Hoff then ensured that Dr. Thal conducted a second psychological evaluation of Jessica on 18 October 2018 using the compounded error of Dr. Bennet's assessment, which itself was improperly influenced by Dr. Thal's altered report on Brendi. **PSOF ¶ 47.** In this second report on Jessica, Dr. Thal now opined, "[p]lacing [H.P.] in Ms. Ploof's sole and independent care would likely place the child at risk for inadvertent neglect, impaired decision-making, and significant under-stimulation of the child's already reportedly compromised learning abilities." *Id*. Dr. Thal went even further stating that the prognosis is poor that Jessica is able to demonstrate minimally adequate parenting in the future. *Id*.

Mɪʟʟs + Wᴏᴏᴅs Lᴀᴡ, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

10

Dr. Thal also changed his recommendation from reunification to adoption by the foster parents. *Id*.

Because of DCS's reliance on Dr. Thal's faulty reports, Dr. Underwood was retained by Jessica to conduct a psychological evaluation of Jessica. **PSOF ¶ 48.** Dr. Underwood opined that DCS should reinitiate the plan for Jessica to be the physical guardian of her son with a co-parenting model; H.P. should continue to receive individual behavioral health counseling to deal with the issues of being displaced by DCS removal; DCS should revive the Safety Plan; individual counseling should be provided for Jessica to help her work through the multiple emotions related to displacement of her son; her behavioral health counseling to assist in addressing concerns around substance use; family interventions, vocation training for Jessica; and random alcohol and drug screening to ensure compliance in this area. *Id*.

## III.    <u>STANDARD OF REVIEW</u>

Rule 56 provides that a moving party is entitled to summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "[T]he court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor." *Puentes v. City of San Mateo*, No. C 11-02511 SI, 2011 WL 4005383, at *2 (N.D. Cal. Sept 8, 2011), *aff'd*, 481 F. App'x 348 (9th Cir. 2012) (internal citations omitted). "Summary judgment will not lie if the dispute about a fact is 'genuine,'" *i.e.*, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The trial court must inquire if "the evidence…is so one-sided that one party must prevail as a matter of law" and "should not act other than with caution in granting summary judgment." *Id.* at 242-43, 106 S.Ct. at 2507, 91 L.Ed. 2d 202.

In addition, the "[p]arty seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

portions of the pleadings, depositions, answers to interrogatories, and admission on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrette*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1986); Fed.R.Civ.P. 56(a).

IV.    **ARGUMENT**

   A.    **There is No Genuine Dispute of Material Facts Showing that State Defendants Conspired with Defendant Dr. Thal to Achieve Termination of Jessica's Parental Rights**

   Liability for conspiracy in a §1983 case exists when there is an agreement to achieve the goal of violating Plaintiff's constitutional rights. *Crowe v. Cty. Of San Diego*, 608 F.3d 406, 4440 (9th Cir. 2010). Evidence of an agreement to conspire can be inferred by the defendants' actions when their acts would have been unlikely to occur without the agreement. *Id.*; *Kunik v. Racine Cty*, 946 F.2d 1574, 1580-81 (7th Cir. 1991). Thus, circumstantial evidence, including the actions of the Defendants, can support the requisite meeting of the minds for conspiracy in a § 1983 matter. *Crowe*, 608 F.3d at 440. Defendants' activity must be "inextricably intertwined" with each other. *Burnette v. Human Society of Ventura Cnty*, 294 F. 3d 1205, 1211 (9th Cir. 2020). "[S]ubstantial cooperation" between the private actor[s] and the State must be shown. *Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498, 503 (9th Cir. 1996). Defendant Thal becomes a state actor "by conspiring with a state office or by engaging in a joint activity with state officials" and "by becoming so closely related to the State that the person's actions can be said to be those of the State itself." *Price v. State of Hawaii*, 939 F.2d 702, 708-09 (9th Cir. 1991) *cert denied* 503 U.S. 938 (1992).

   Here, DCS, particularly Szymkowski, a case manager no longer assigned to the case, improperly influenced Dr. Thal through ex parte communications to profoundly alter his original report on Brendi as it was initially favorable to Jessica and recommended H.P. be returned to his mother in a co-parenting arrangement with Brendi, the maternal grandmother. Contrary to the case plan of family reunification, DCS conspired with the aid of Dr Thal so they could pursue termination of Jessica's parental rights with H.P. Dr. Thal

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

and DCS shared a common objective to keep H.P. from Jessica and his grandmother. Significantly, Dr. Thal's livelihood and revenue depends on the cases that DCS refers to him. Moreover, it is unlikely that Dr. Thal would violate the applicable standards of care in his profession without a conspiratorial motive.

Dr. Thal reviewed DCS materials and forensically evaluated Brendi Ploof and issued his original unbiased professional evaluation of Brendi on 18 January 2018. **PSOF ¶ 25**. Dr. Thal clearly offered his professional opinion in favor of appointing Brendi as guardian of H.P., Jessica to co-parent H.P., assuring that H.P. would not be in danger if placed in their care. ***Id***. Dr. Thal initially provided an unequivocally positive evaluation of Brendi. He then emailed his completed and signed report to Szymkowski. ***Id***. Ironically, when Dr. Thal issued his original report, the newly assigned case manager, Claudia Hoff, had no issues or concerns with it or his positive recommendations in support of the case plan of family reunification. However, Szymkowski, even though she was no longer the case manager, took it upon herself to interfere and call Dr. Thal ex parte. **PSOF ¶¶ 26-28**. When Szymkowski contacted Dr. Thal, she "expressed" to him "her concerns" over the alleged "substandard condition of grandmother's residence" as well as her "concern" about H.P.'s alleged "very poor overall condition when he came into care." **PSOF ¶ 26**. Szymkowski offered no new factual information to Dr. Thal and knew that these "concerning" conditions did not exist. **PSOF ¶¶ 5-9, 26**. The critical point that Szymkowski raised with Dr. Thal was her personal opinion that H.P. was "bonded" with his foster family, and that H.P.'s bond with his foster family was "critically important" to Dr. Thal's determination of whether Brendi could serve as a guardian and co-parent of H.P. **PSOF ¶¶ 27-29**.

Szymkowski improperly and overtly influenced Dr. Thal to dramatically change his report merely based on her biased opinions. This reality is supported by the fact that no new documented factual information was provided to Dr. Thal between his two diametrically opposite reports of Brendi Ploof's ability to again serve as a helping guardian for her daughter, Jessica, and H P. **PSOF ¶¶ 28, 50**. The only things that changed in his

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

13

report were his conclusions and recommendations. **PSOF ¶¶ 29, 50**. DCS's investigation and services were "inextricably intertwined" with Dr. Thal's actions in providing a biased, forensically tainted, report in the juvenile proceedings which was then used as the basis to terminate Jessica's parental rights.

Furthermore, in acting as he did, Dr. Thal stepped out of his limited role as an unbiased independent forensic evaluator to occupy the role of belonging to the DCS camp with its personnel who were on a quest to terminate Jessica's parental rights. Plaintiff's expert opined that Dr. Thal violated his professional ethics and the applicable standard of care as follows:

- Dr. Thal's revisions to his report of his 4 January 2018 evaluation of Brendi "changed the trajectory of the case," **PSOF ¶ 50;**

- DCS "unduly influenced" Dr. Thal to change his report, *id.*;

- "Dr. Thal's methodology was substantially below the standard of care" and "quite deficient" for one acting in the role of a forensic evaluator, as Dr. Thal was doing, *id.*;

- It was below the standard of care for a forensic evaluator to engage in ex parte communications with a DCS worker that resulted in substantial, unexplained modifications to his report, *id.*;

- It was below the standard of care to "attempt to engage in subterfuge around the initial report" and "agreeing with the DCS worker that the first report should be shredded is highly deficient," *id.*;

- The record he reviewed in preparation for writing his report contains indications that there was "collusion" between DCS and Dr. Thal regarding the changes that were made to his initial report on Brendi, *id.*;

- It was outside the standard of care for forensic evaluators for Dr. Thal to change his report in the ways that he did based solely on the unsolicited, ex parte lay opinions of Szymkowski, *id.*;

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

14

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

- It was inappropriate for Dr. Thal to consider the question of H.P.'s bonding with the foster parents when reporting on his evaluation of the fitness of Brendi to parent the child, which was another indication of collusion between DCS and Dr. Thal, ***id***.

Dr, Thal put his practice's profits and DCS first in front of his ethics and forensic professionalism to the detriment of Jessica and H. P., something a licensed professional is loath to do in the absence of an agreement, even if unspoken, to assist in achieving DCS's desired goal. To say it another way, Dr. Thal played a knowing, pivotal role with DCS and its personnel in ensuring there was a basis to have Jessica's parental rights terminated in the dependency action.

Discussed below are the actions DCS and Dr. Thal took in furtherance of their agreement, even if only tacit, to violate Jessica's constitutional right to due process by aiding DCS to not adequately initiate a recommended family reunification team to facilitate reunification of H.P. with Jessica. Instead, he willingly and knowingly abdicated his professional ethics and duties to aid DCS's agenda for H. P.'s adoption by his foster family. Initially Dr. Thal issued an unequivocally favorable report having Brendi be the guardian of H.P. with Jessica in a co-parenting role. He then emailed his favorable report to Szymkowski. Szymkowski could see this evaluation of Brendi would result in reunification for H.P. with his mother and family. She improperly interfered and influenced Dr. Thal by unilaterally plying him with her biased and unsolicited opinions during an ex parte telephone call.

Then, sensing the direction provided by Szymkowski, particularly picking up on her preference for adoption by the foster family, Dr. Thal authored a letter dated 29 January to Hoff letting her know that after his conversation with Szymkowski, he was changing his opinion and was now recommending Hoff seek a bonding/best interest evaluation of H.P., rather than pursue family reunification. Finally, after Dr. Thal's conversation with Szymkowski, he altered his findings and recommendations in a revised report with a 180-degree result now claiming that Brendi would not be able to provide minimally adequate

parenting and including the requested recommendation for bonding assessment. Dr, Thal did all of this with no new information, being only influenced by the false and irrelevant information provided by Szymkowski in the ex parte call.

Next, in email communications between Hoff and Dr. Thal, they conspired to hide the original report by shredding it so that the other parties would never know he changed his report at the sole and improper request of DCS.

Then, keeping in mind the irony that Dr. Thal was engaged to assess Jessica's and Brendi's abilities to safely parent H.P., Hoff expressed her personal opinion to Dr. Thal about Jessica's ability to parent and assured him she would shred his first forensic evaluation of Brendi.

Then, even though Jessica successfully completed the recommended parent-aide services with the hands-on provider noting that Jessica had exhibited all the protective parenting abilities desired by DCS and recommending a family reunification team be promptly assigned, Hoff chose not to share this critical information with Dr. Thal. The recommended reunification services were not provided by either Hoff or Breeding.

Then, after finding out that Dr. Thal's original report as to Brendi was inadvertently disclosed to all the parties, and that the court wanted to know why Dr, Thal suddenly recommended a bonding assessment, Dr. Thal authored and sent a letter that he changed his report simply because  Szymkowski "expressed her concerns" about things he already knew for the records he reviewed—except for one thing, he did not know Szynkowski's opinion that H.P. was better off being adopted by foster family than returned to Jessica and Brendi, which is what she really wanted to, and did, convey to him on 30 January 2018.

Error was compounded and due process violated when Dr. Thal's biased, altered report was shared with Dr. Bennett, misleading Dr. Bennett into believing that Brendi could not be a viable co-parent.

Ultimately, DCS relied heavily on Dr. Thal's altered report as its foundation to terminate Jessica's parental rights.

In summary, Dr. Thal, Szymkowski, Hoff, and Breeding conspired and played crucial, pivotal roles in the genesis and prosecution of the termination of Jesssica's parental rights with her son H. P.  Without Szymkowski's, Hoff's, and Dr. Thal's collusion, H.P. would have long since been reunited with her loving mother and grandmother and not forever gone -- adopted by his foster parents.

**B.**     **Defendants Failed to Make Reasonable Efforts to Preserve this Family**

Defendants Tafoya, Greenway, Szymkowski, Breeding, and Hoff violated Jessica's due process when they refused to make reasonable efforts to preserve the family relationship. Their actions willfully set her up so they could sever her parental rights based on her intellectual disability.

Federal and state laws require child welfare agencies to make "reasonable efforts" to preserve the family and prevent the child's removal. 42 U.S.C. § 671(a)(15); A.R.S. § 8-846 (2018); *Mary Ellen C. v. Arizona Dep't of Econ Sec.*, 193 Ariz. 185, 186, 971 P.2d 1046 (App. 1999); *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 444 P.3d 258 (App. 2019).  State Defendants had long-standing, clearly established statutory and constitutional obligations to quickly reunify this family.  *Marina P. v. Ariz. Dep't of Econ Sec.*, 214 Ariz. 326 ¶ 37, 152 P.3d 1209 (App. 2007).

Reasonable efforts require "DCS to identify the conditions causing the child's out-of-home placement, provide services that have a reasonable prospect of success to remedy the circumstances as they arise throughout the time-in-care period, maintain consistent contact with the parent, and make reasonable efforts to assist the parent in areas where compliance proves difficult." *Donald W*., Ariz. 247 Ariz at 20 ¶ 50.

Here, Tafoya failed to thoroughly investigate the hotline call allegations before she sought removal via a Temporary Custody Notice.  **PSOF ¶¶6-9, 12**. She was aware this family had no prior involvement with DCS.  **PSOF ¶ 3**.  After visiting the home twice, she allowed H.P. to remain in the home for 21 days with Brendi as the safety monitor, clearly indicating the lack of any emergency circumstances. **PSOF ¶ 9**. The only change before

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

17

DCS seized H.P., without a warrant or court order, was the fact that Brendi was unexpectedly called into work and unable to complete her drug testing that day. **PSOF ¶¶ 13-14**.

The services provided by DCS were supposed to facilitate family reunification. DCS did not intend to honor the case plan. That is evident based on Jessica's successful completion of the services provided by State Defendants and their termination of her parental rights anyway. PSOF ¶ 19. Jessica was faithfully working toward reunification when Szymkowski decidedly tipped the scales against her. Initially, there were two positive evaluations done by Dr. Thal of Jessica and Brendi that were favorable and in support of the case plan of family reunification. **PSOF ¶¶ 24-25**.

Even though Szymkowski was no longer assigned to the case and her involvement was supposed to have ceased, she was determined not to allow H.P. to be reunified with Jessica and Grandmother Brendi. Szymkowski improperly and willfully interfered with the reunification process, with the knowledge and support of Hoff and Breeding. **PSOF ¶¶ 27-29**. She initiated an ex parte conversation with Dr. Thal, which she failed to document. She elected to express her unsolicited and biased opinions in hopes of altering his opinion, which it did. **PSOF ¶¶ 27-30**. After Szymkowski expressed her biased concerns to Dr. Thal, Hoff then interjected her own opinions to further tip the scales against reunification. **PSOF ¶ 32**. Hoff did the same with Dr. Bennett, offering her personal, unsolicited opinions of Jessica's and Brendi's parenting abilities. **PSOF ¶ 45**. Hoff has a high termination of parental rights rate and boasted about it. **PSOF ¶ 36**.

Hoff and Breeding did not assign the recommended family reunification team to support H.P.'s return to his mother when she successfully completed the parent aide services. Instead, a bonding assessment was requested using Dr. Thal's altered report as justification. Hoff emailed Dr. Bennett who was responsible for doing the bonding assessment and again expressed her biased opinion that both Jessica and Brendi were barely minimal and DCS was moving towards termination of parental rights. **PSOF ¶ 45**. With

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

18

Dr. Thal's profoundly altered report and Dr. Bennett's reliance on the same, DCS marched on to termination of Jessica's parental rights having cast the die. **PSOF ¶ 44, 46**.

### C.    There are No Genuine Issues of Material Fact that Exist as to Plaintiff's Abuse of Process Claim (Claim Four)

The elements of an abuse of process claim are: "(1) a willful act in the use of the judicial process; (2) for an ulterior purpose not proper in the regular conduct of the proceedings. *Liberti v. City of Scottsdale*, 258 Ariz. 496, 503, 560 P.3d 322 (App. 2024) (quoting *Crackel v. Allstate Ins. Co.*, 208 Ariz. 252, 257 ¶11, 92 P.3d 882, 889 (App 2004); *Neinstedt v. Wetzel*, 133 Ariz. 348, 651 P.2d 876, 881 (App. 1982). A party can demonstrate "ulterior purpose" by "showing that the process has been used primarily to accomplish a purpose for which the process was not designed. *Neinstedt,* 651 P.2d at 881; *see also Crackel*, 92 F.3d at 889 (explaining that to demonstrate an "improper" motive, "a claimant must establish that the defendant used a court process in a fashion inconsistent with the legitimate litigation goals"). Arizona interprets "process" as encompassing "the entire range of procedure incident to the litigation process." *Id*. at 880. A plaintiff must "present more than mere speculation to support the assertion that the defendant has used court process with an improper intent." *Crackel*, 92 F.3d at 889.

Here, the conduct of DCS, specifically Szymkowski and Hoff, included, (1) interfering with the recommendations of an (purported) independent third party evaluator, Dr. Thal, a forensic evaluator; (2) providing false information to sway his recommendations so that DCS could use the juvenile dependency action slated for reunification to terminate Jessica's parental rights, (3) including false information in DCS reports, (4) withholding information from the court; and (5) failing to provide the court with positive information in support of reunification.

After Szymkowski conspired with Dr. Thal to change his recommendations in his original report to recommend against Brendi Ploof, DCS then used the altered report to achieve its goal of termination of Jessica's parental rights with her son H. P. Szymkowski, Hoff, and Breeding chose not to implement services that were recommended by parent aide

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

providers or those tailored to Jessica's intellectual disability so DCS could ensure the agenda of termination of parental rights was achieved in violation of Jessica's due process and constitutional rights.

## V.    <u>CONCLUSION</u>

Summary judgment as requested herein should be granted in Plaintiff's favor as there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" on the issues and claims discussed herein.  Fed.R.Civ.P. 56.  For all the reasons stated above, the Court should enter summary judgment in Plaintiff's favor as requested herein.

**DATED** this 28th day of January 2026.

MILLS + WOODS LAW PLLC


By  /s/ Thomas A. Connelly
        Thomas A. Connelly
        Robert T. Mills
        Sean A. Woods
        5055 North 12th Street, Suite 101
        Phoenix, AZ 85014

GILLESPIE, SHIELDS & TAYLOR
        DeeAn Gillespie Strub
        Jenny D. Jansch
        7319 North 16th Street
        Phoenix, AZ 85020

        *Attorneys for Plaintiffs*

MILLS + WOODS LAW PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**CERTIFICATE OF SERVICE**

I hereby certify that on January 28, 2026, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel of record

_/s/ Thomas A. Connelly_

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556