Thomas A. Connelly (AZ Bar #019430)
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
**MILLS + WOODS LAW PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
Jenny D. Jansch (AZ Bar #024431)
**GILLESPIE, SHIELDS &TAYLOR**
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Jesscia Ploof, an individual, <br><br> Plaintiff, <br><br> v. <br><br> State of Arizona, *et al.*, <br><br> Defendants. | Case No.: 2:21-cv-00853-JJT-PHX <br><br> **PLAINTIFF'S STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** <br><br> (Hon. John J. Tuchi) |

1. Jessica Ploof, intellectually disabled, is the mother of H.P., born in April of 2014. **Ex. 1** at 14:20-22. Jessica lived with her mother, Brendi Ploof, a certified nursing assistant who co-parented with Jessica, ensuring that H.P.'s medical needs were appropriately met, among other things. **Ex. 1** at 19:19120:3; **Ex. 2**.

2. H.P. was a medically challenged child. Jessica arranged services for H.P. through the Arizona Department of Developmental Disabilities, including physical therapy, speech therapy, and attendance at a head start preschool. **Ex. 3** at 46:19-48:8; 142:2-143:12.

3. For the first four years of H.P.'s life, Jessica dutifully cared for H.P. None of the persons who regularly interacted with either or both of H.P. and Jessica, including doctors, teachers, and family members, saw anything amiss with H.P., Jessica, or the way Jessica cared for H.P. **Ex. 4** at 2.

4. In December of 2016, Jessica ended a toxic relationship with her boyfriend. **Ex. 4** at 5. The boyfriend threatened to call the Department of Child Safety ("DCS") and make allegations against Jessica. *Id*.

5. Soon, thereafter, DCS received two anonymous tips regarding Jessica and H.P. **Ex. 4** at 2. The first anonymous tip was on 20 December 2016, alleging that Jessica was neglecting H.P. and that her home was unsafe. *Id*. The second anonymous tip was on 21 December 2016 for neglect, substance abuse, domestic violence and the home was "dirty" and there is "food, dirty clothes, tampons [unused] and spiders all over the floor." *Id*.

6. Two DCS Investigators, Megan Tafoya and Ms. Baggen, visited Jessica's home two times on 21 December 2016 at 10:15 a.m. for the first anonymous call that Jesscia was neglecting H.P. **Ex**. **4** at 4; **Ex. 5** at 98:5-99:9. Tafoya reported that "[H.P.] was free from any visible injuries, he was dressed appropriately, and the home was free from any safety hazards. **Ex. 4** at 6. Jessica admitted that she might drug test positive for marijuana. *Id*. at 5.

7. The two DCS investigators went back to Jessica's home again unannounced on 21 December 2016 at 3:20 p.m. to investigate the second anonymous tip received on December 21, 2016. **Ex**. **4** at 4; Ex. 5 at 115:15-24.

8. The substandard conditions reported in both hotline calls were unsubstantiated and if there were concerns about condition of the home, it would have been reported during the DCS investigation. **Ex. 5** at 25:3-26:20; 81:9-83:20.

9. The two DCS investigators determined that H.P. was safe to remain in the home in Jessica's care with Brendi as a "safety monitor." **Ex. 4** at 6; **Ex. 5** at 89:9-25. Tafoya never spoke with any other collateral sources besides Brendi Ploof as part of her investigation. *Id*. at 95:4-25.

2

10.     Jessica submitted to drug testing. **Ex. 4** at 3. Her urine sample was positive for alcohol and marijuana; hair sample was positive for methamphetamine and marijuana. *Id*.

11.     Tafoya responded to the drug test results by scheduling a Team Decision Meeting (TDM)—a meeting to discuss the safety plan on 11 January 2017. *Id.*; **Ex. 6**.

12.     According to information received at the TDM, H.P. was healthy with stable housing. *Id*. Jessica had family support and obvious love for H.P. *Id*. at 2. Tafoya appointed Brendi as a "safety monitor for an in-home dependency." *Id*. The TDM did not indicate that Brendi had to submit to substance abuse screening for Jessica to keep her son. *Id*. It did require Jessica to participate in TERROS and parenting classes. *Id*. Brendi agreed that she would take a drug screening. *Id*.

13.     On 12 January 2017, Brendi, a nursing assistant, was unexpectedly called into work. **Ex. 4** at 7. Brendi notified Defendant Tafoya of this development and that she would not be able to complete the drug screening test that day but would complete one at a rescheduled time. *Id*.

14.     H.P. remained at home in the care of Jessica and Brendi for 22 days, until removal on 12 January 2017, when, despite there being no significant change in circumstances and H.P. not being in imminent danger, Tafoya decided to remove H.P. from his mother with a temporary custody notice (TCN) instead of a court order or warrant. **Ex. 7**. She did so with the approval of her supervisor Defendant Sarah Greenway. Neither Tafoya nor Greenway sought any prior court authorization for the seizure. **Ex. 5** at 112:16-113:5.

15.     After Tafoya seized H.P. and removed him from Jessica, on 26 January 2017, DCS assigned Defendant Paige Szymkowski as the ongoing case manager. **Ex. 8** at 4.

16.     On 17 January 2017, DCS filed the Dependency Petition verified by Tafoya. **Ex. 9**. The Petition alleged Jessica was unable to parent due to substance abuse, mental health issues, unable to make sound decisions, and she is in constant need of instruction from the Brendi. *Id*. DCS later filed an Amended Dependency Petition only to add John Doe as Father for H.P. **Ex. 10**. There was no allegation within either Petition that the home was in substandard condition or that it was unsafe or dirty in the ways described by the anonymous

3

hotline caller and as later emphasized to Dr. Thal by Szymkowski. **Ex. 9; Ex. 10;** see **PSOF ¶ 28.**

17. On 18 January 2017, Tafoya submitted a Report to the Juvenile Court for Preliminary Protective Hearing and/or Initial Dependency Hearing. **Ex. 11**. In her Report, Tafoya recommended that Jessica demonstrate sobriety, participate in recommended services, spend quality time with H.P. during visitation, complete a psychological evaluation to determine her ability to parent her child, develop and maintain social/community connections/support, and participate in random urinalysis. *Id.* at 5-6.

18. Szymkowski placed H.P. with an unrelated, unfamiliar foster family. **Ex. 12**.

19. Jessica faithfully participated in and successfully completed the services provided by DCS. **Ex. 13**; **Ex. 32** at 91:16-19. For the two years that the trial court process lasted, Jessica never again tested positive for any substances, legal or illegal. **Ex. 14**.

20. In May of 2017, Szymkowski submitted a referral for psychological evaluation of Jessica with Dr. Thal as her first preference of provider. **Ex. 17**.

21. Dr. Thal is, and was at the time, a contracted provider with DCS. **Ex. 18.** Ninety to ninety-five percent of Dr. Thal's practice, and his livelihood, depends on cases referred to him via his DCS contract. **Ex. 19** at 33:17-35:22. Nearly all of Dr. Thal's practice's annual revenue is derived from DCS referrals. *Id.* at 35:20-22.

22. On 2 October 2017, Szymkowski completed an Assessment and Plan and alleged that "[t]here are no known protective behaviors present with Jessica. There is also a lack of ability to recognize safety threats, as the home was observed to be dirty, with food, dirty clothing unused tampons as well as spiders all over the ground." **Ex. 20**. Szymkowski knew that the allegations about the home were unsubstantiated. **Ex. 21 at** 135:25-138:4**.**

23. At the end of December 2017, Szymkowski was removed as the ongoing case manager. *See* **Ex. 8** at 4. Claudia Hoff was assigned in her place and took over the case on 3 January 2018. *Id*. Once Szymkowski was removed as the case manager, she was no longer required to work on the matter. **Ex. 21** at 148:12-17.

4

24. Dr. Thal conducted a psychological evaluation of Jessica on 18 July 2017. In his report, he opined that Jessica could be an effective co-parent and suggested that Brendi take the role as primary parent. **Ex. 22** at 11; **Ex. 19** at 169:10-19.

25. Dr. Thal also conducted a psychological evaluation of Brendi on 4 January 2018. In his report, Dr. Thal opined that Brendi was an appropriate caregiver for H.P., could meet his special needs, could provide at least minimally adequate care, and that H.P. would not be in danger if placed in her care. **Ex. 23** at 8. He recommended that Brendi file for permanent guardianship of H.P. *Id*. at 9. Dr. Thal sent his signed report to Szymkowski on 18 January 2018. **Ex. 24**.

26. On 24 January 2018, Szymkowski arranged an ex parte telephone call with Dr. Thal to discuss that report. *Id*. Some time before that, Szymkowski, Hoff, and Breeding discussed Dr. Thal's report and agreed that Szymkowski should be the one to call him with her concerns. **Ex. 15** at 79:1-23.

27. On 29 January 2018, Dr. Thal authored a letter to Hoff explaining that "[i]n discussing this case further with your predecessor, Paige Szymkowski, I would recommend further assessment regarding what is the best placement for H.P.….Therefore, I would recommend that you seek a bonding/best interest evaluation of the child and the parties involved." **Ex. 25**. This letter is not signed, and it is unclear if it was sent to Hoff.

28. Although Szymkowski was no longer assigned as the case manager and her involvement on the case ended at the end of December 2017, she spoke with Dr. Thal on 30 January 2018, providing him with her unsolicited opinions and alleged concerns with his report. **Ex. 26**. She expressed her lay opinion that H.P. was now bonded with his foster parents and that Dr. Thal should take that into consideration. **Ex. 27**. Szymkowski also stressed concerns of the substandard condition of the home, knowing that these issues did not exist and were unsubstantiated. *Id*. No new factual information was given to Dr. Thal. Ex. 19 at 283:4-11, 343:18-344:10.

29. After this ex parte phone call with Szymkowski, Dr. Thal changed the findings and recommendations in his 18 January 2018 report regarding Brendi. *Compare* **Ex. 23** at

7-9 *with* **Ex. 28** at 7-10; *see also* First Am. Compl. ¶¶ 177-222; Ex. 19 at 226:6-13, 234:18-238:20, 240:20-241:4**.** He now opined that Brendi would not be able to provide minimally adequate parenting and added a new recommendation for bonding assessments. **Ex. 28** at 7-10; **Ex.** 19 at 322:21-331:22.

30. Dr. Thal stated that neither Szymowski nor Hoff or anyone else at DCS provided any new or additional information during the 30 January 2018 ex parte telephone call or at any time between issuing his original and then the revised report of his 4 January 2018 evaluation of Brendi. **Ex. 19** at 283:4-8. Instead, he stated that speaking with Szymkowski made him view the information differently and he changed his conclusions and recommendations as a result. **Ex. 19** at 227:21-228:21, 322:21-331:22, 283:4-11, 340: 17: 341:2, 343:18-344:10; **Ex. 27** at 1.

31. On 1 February 2018, Hoff emailed Dr. Thal and "suggested in lieu of a follow-up letter, that [Thal] could simply make [his] changes to Ms. [Brendi] Ploof's evaluation report because [Hoff] had not yet disclosed the report. **Ex. 27** at 3; **Ex. 29** at 1.

32. On 2 February 2018, Hoff emailed Dr. Thal and expressed her lay opinion on Jessica's ability to parent. *Id*. at 1. Hoff stated, "[w]hile Jessica has completed most of the services, she is so low functioning, I don't know that she could parent a child with special needs. Her mother…something was off there.  I couldn't exactly put my finger on it." *Id*. She further stated that the home was clean and safe. *Id*. She also indicated that she would shred Dr. Thal's original report. *Id***.**

33. Dr. Thal responded to Hoff's email stating that, "I didn't realize that the report had not been distributed as yet. That being the case, I will re-work the recommendations to include the bonding assessment." *Id***.**

34. On 7 February 2018, after Dr. Thal radically changed his report and instructed Hoff to "shred the other report." **Ex. 30**. Unfortunately for Dr. Thal and DCS, Szymkowski had disclosed the original report. **Ex. 29** at 1.

35. On 28 February 2018, Jessica successfully completed parent-aide services. The provider specifically found that Jessica "has demonstrated that she is able to meet his

6

[H.P.'s] basic needs" and recommended that a family reunification team be provided to reunify H.P. with his mother. **Ex. 31** at 2.

36. Hoff and her supervisor, Defendant Breeding, did not assign the recommended family reunification team and instead requested a bonding assessment based on the changed conclusions and procured recommendation in Dr. Thal's altered report on Brendi as justification. Hoff requested a bonding assessment in furtherance of her aim to sever Jessica's parental rights with H.P. **Ex. 32** at 180:11-183:2. Hoff referenced her track record of ensuring the termination of parental rights and boasted in her deposition about the many terminations of parental rights she as a caseworker had facilitated, proudly noting she had only lost one case. *Id.* at 6:1-8; 18:4-19:4.

37. On 6 March 2018, Hoff called Dr. Thal's office to let him know that contrary to the plan to shred his original report on Brendi, Szymkowski had, in fact, disclosed it to all parties. Hoff went on to explain that "Paige [Szymkowski] asked you [Thal] to consider additional information and that you revised your report." **Ex. 33**. The juvenile court inquired as to why Dr. Thal recommended a bonding/best interest evaluation in the altered report. *Id*.

38. In response to the court's inquiry, Dr. Thal authored a 14 March 2018 letter, in which he explained to Hoff that he had issued an altered report for his 4 January 2018 evaluation of Brendi because of the 30 January 2018 ex parte telephone call with Szymkowski. **Ex. 27** at 1.

39. In the 14 March 2018 letter, Dr. Thal stated that during the call with Szymkowski, she "expressed" "her concerns" over the alleged "substandard condition of grandmother's residence," and about H.P.'s alleged "very poor overall condition when he came into care." *Id*.

40. Szymkowski also expressed her personal view to Dr. Thal that H.P. was "bonded" with his foster family, and that H.P.'s bond with his foster family was a "critically important relationship." *Id.* Dr. Thal reported to Hoff that Szymkowski was "clearly concerned about the traumatic impact of removing [H.P.]" from foster care. *Id*. Szymkowski

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

7

made no reference to Dr. Thal about the inevitable trauma H.P. experienced when removed from the care of Jessica and Brendi on 12 January 2017.

41. Szymkowski's personal opinions had no factual basis and were contrary to the findings of the initial DCS investigators. **Ex. 4** at 2, 4. Her statements to Dr. Thal were demonstrably false. *Id*. Szymkowski violated her Oath of Loyalty by injecting her personal opinions to Dr. Thal. **Ex. 34**; **Ex. 15** at 81:13-82:13.

42. Dr. Thal materially altered his "Conclusions" and "Recommendations" for Brendi in her and Jessica's disfavor, based solely on the unsolicited, misleading, false information provided by Szymkowski in the unsolicited ex parte telephone call. *Compare* **Ex. 23** at 7-9 *with* **Ex. 28** at 7-10; *see also* **Ex. 27**; *see also* First Am. Compl. ¶ 222.

43. The section entitled "The following records reviewed for the evaluation" is identical in both reports. *Compare* **Ex. 23** at 3 *with* **Ex. 28** at 3. Notably, however, the Comprehensive Child and Safety Risk Assessment was among the records that Dr. Thal reviewed when preparing his evaluation report for Jessica; thus, he knew Szymkowski was not providing him any new factual information and that the allegations of substandard conditions in the home were unsubstantiated. *See* **PSOF ¶ 24; Ex. 22 at 3;** *see also* **PSOF ¶¶ 5-8**. Dr. Thal reviewed and relied upon documentation that directly refuted the false statements made by Szymkowski during their call. He also replaced Hoff's name for Szymkowski's name as the "Referral Agent." *Compare* **Ex. 23** at 1 *with* **Ex. 28** at 1.

44. On 7 March 2018, Hoff referred H.P. and his foster parents to S. Bryce Bennett, PsyD. for a bonding/best interest assessment. **Ex. 35**. Hoff provided Dr. Bennett with Dr. Thal's altered report on Brendi as collateral information. *Id*. at 1. Partially based on the records provided, Dr. Bennett's 18 June 2018 report recommended against returning H.P. to Brendi and Jessica's care. *Id*. at 15. Dr. Thal's profoundly altered report improperly influenced Dr. Bennett into believing that Brendi was not a viable co-parent. *Id*.

45. On 12 June 2018, Hoff emailed Dr. Bennett ex parte offering her personal, lay opinion that both Jessica and Brendi were barely minimal parents. **Ex. 36** at 2. Hoff continued to email Dr. Bennett on 21 June 2018 thanking him for the detailed report,

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

8

informing him he may be called to testify at a severance trial as her intent was to terminate parental rights between Jessica and H.P. **Ex. 37 at 1**. Then on 20 September 2018 she interacted with Dr. Bennett again regarding the questions for the best interest assessment the next day for Ploof. **Ex. 38** at 2. She also informed Dr. Bennett that they "need the evaluation back quickly, as Dr. Thal does not want to see Brendi for another psych eval, until he sees your evaluation." *Id*. at 1. The next response indicated, "We are terminating on mother." *Id*. Hoff improperly orchestrated the change of trajectory from family reunification to termination in violation of due process. *Id*.

46. On 14 August 2018, Hoff facilitated filing a Motion for Termination of Parent-Child Relationship on time-in-care grounds, alleging that Jessica was unable to cure her intellectual disability and was unable to parent as a result. **Ex. 40** at 2:25-27; 3:26-28. DCS anchored its position for termination of parental rights on Dr. Thal's altered assessment of Brendi. "As Dr. Thal stated in his report, Jessica is unable 'to be relied upon to independently learn, retain, and implement safe and effective parenting practices.'" *Id*. at 4:20-23. DCS also alleged that foster care was the least-restrictive placement falsely claiming "[t]he child is not placed with a grandparent…*because DCS is unaware of any such person who is willing, able and appropriate to care for the child.*" *Id*. at 5:23-28 (emphasis added).

47. Dr. Thal conducted a second psychological evaluation of Jessica, as shown in his report dated 18 October 2018. **Ex. 41**. Relying partly on Dr. Bennet's report, he opined that "[p]lacing [H.P.] in Ms. Ploof's sole and independent care would likely place the child at risk for inadvertent neglect, impaired decision-making, and significant under-stimulation of the child's already reportedly compromised learning abilities." *Id.* at 7. He also opined that the prognosis is poor that Jessica can demonstrate minimally adequate parenting skills in the future. *Id*. at 8. Dr. Thal's recommendation now changed from reunification to adoption by the foster parents. *Id*. at 9.

48. For many months before the severance trial, Jessica lived independently and worked as a caregiver for a disabled child. **Ex. 19** at 180:23-181:20; **Ex. 32** at 87:23-89:25, 91:16-92:17.

9

49. Lee A. Underwood, Psy.D., conducted a psychological evaluation of Jessica as set forth in his report dated 19 April 2019. **Ex. 43**. Dr. Underwood opined that DCS reinitiate the plan for Jessica to have custody of her son with a co-parenting model; H.P. to receive individual behavioral health counseling to deal with the issues of being displaced; DCS to revive the Safety Plan; individual counseling for Jessica as she continues to work through multiple emotions related to displacement of her son; behavioral health counseling to assist her addressing concerns around substance use; family interventions, vocation training for Jessica; and random alcohol/drug screening to ensure ongoing compliance. *Id.* at 28-29.

50. Plaintiff's expert psychiatrist, Dr. Andrew Clark, M.D., opined that:

- Dr. Thal's revisions to his report of his 4 January 2018 evaluation of Brendi evidence "collu[sion]" between himself and DCS, and "changed the trajectory of the case," **Ex. 44** at 12, **Ex. 45** at 9:12-18, 10:2-11:5, **Ex. 46** at 4;
- DCS "unduly influenced" Dr. Thal's changes, **Ex. 44** at 9-12, **Ex. 45** at 21:8-11;
- "Dr. Thal's methodology was substantially below the standard of care" and "quite deficient" for one acting in the role of a forensic evaluator, as Dr. Thal was doing, **Ex. 45** at 31:24-25, 32:3-14, Ex. 44 at 9-12;
- It was below the standard of care for a forensic evaluator to engage in ex parte communications with a DCS worker that resulted in substantial, unexplained modifications to his report, **Ex. 45** at 32:16-33:1, Ex. 44 at 9-12;
- It was below the standard of care to "attempt to engage in subterfuge around the initial report" and "agreeing with the DCS worker that the first report should be shredded is highly deficient," **Ex. 45** at 33:2-5, Ex. 44 at 11-12;
- The record he reviewed contains indications that there was "collusion" between DCS and Dr. Thal regarding the changes that were made to his initial report on Brendi, **Ex. 45** at 33:23-34:20, **Ex. 44** at 11-12;

10

- It was outside the standard of care for forensic evaluators for Dr. Thal to change his report in the ways that he did based solely on the unsolicited, ex parte lay opinions of Szymkowski, **Ex. 45** at 38:23-39:14, Ex. 44 at 9-12;
- It was inappropriate for Dr. Thal to consider the question of H.P.'s bonding with the foster parents when reporting on his evaluation of the fitness of Brendi to parent the child, **Ex. 45** at 40:5-17, 44:6-8, Ex. 44 at 10, which was another indication of collusion between DCS and Dr. Thal, *id*. at 40:10-41:2.

51. Dr. Clark also opines that Dr. Thal's Report of his evaluation of Jessica in July 2017 also fell below that applicable standard of care in numerous ways. *See* Ex. 44 at 7-9.

**DATED** this 28th day of January 2026.

**MILLS + WOODS LAW PLLC**

By  */s/ Thomas A. Connelly*
　　Thomas A. Connelly
　　Robert T. Mills
　　Sean A. Woods
　　5055 North 12th Street, Suite 101
　　Phoenix, AZ 85014

**GILLESPIE, SHIELDS & TAYLOR**
　　DeeAn Gillespie Strub
　　Jenny D. Jansch
　　7319 North 16th Street
　　Phoenix, AZ 85020

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2026, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel of record

　　*/s/ Thomas A. Connelly*

11