# EXHIBIT 5

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jessica Ploof, an individual, | ) Case No. |
| | ) 2:21-cv-00853-JJT-PHX |
|    Plaintiff, | ) |
| | ) |
|  vs. | ) |
| | ) |
| State of Arizona, et al., | ) |
| | ) |
|    Defendants. | ) |
| _____ | ) |

DEPOSITION OF MEAGAN TAFOYA

May 30, 2025
10:12 a.m.
Phoenix, Arizona

Prepared by:                       CARRIE REPORTING, LLC
JENNIFER HONN, RPR                 Certified Reporters
Arizona CR No. 50885               2415 East Camelback Road
Carrie@carriereporting.com         Phoenix, Arizona 85016
                                   (408) 429-7573

(CERTIFIED COPY)

```
                                                                         2
 1                            I N D E X

 2   WITNESS                                                        PAGE

 3   MEAGAN TAFOYA

 4        By Mr. Connelly                                              4
          By Mr. Hunter                                              151
 5        By Ms. Rhodes                                              152
          By Mr. Connelly                                            162
 6

 7

 8

 9

10

11                        INDEX TO EXHIBITS

12   Description                                                    PAGE

13   Exhibit 44    ADOA: Student Transcript - MEAGAN                  13
                   TAFOYA (151428)
14                 ST-PLOOF-005494-513

15   Exhibit 45    Personnel file                                     37
                   ST-PLOOF-006717-6849
16
     Exhibit 46    TASC Toxicology                                   156
17                 12/21/16
                   ST-PLOOF-002607
18

19

20

21

22

23

24

25
```

25

1   said; right?
2       A.   Yes.
3       Q.   And you have to document when and where any
4   interviews of collateral sources took place; right?
5       A.   Yes.
6       Q.   You also learned that you have to document any
7   visits that you made to the home if that's part of what
8   you needed to do in the investigation; right?
9       A.   Yes.
10      Q.   And you learned that you have to document any
11  conversations you had with the parent or whoever the
12  caretaker is that's the subject of a hotline allegation;
13  right?
14      A.   Yes.
15      Q.   And all that is documented in -- at the time
16  documented in the CHILDS system; right?
17      A.   Correct.
18      Q.   And part of what you're documenting -- let's
19  step back for a second.
20           You learned that what you need to document are
21  observations that you made of the home or of the people
22  you're talking to; right?
23      A.   Yes.
24      Q.   You have to document any information that you
25  discovered that tends to refute or support the

26

1  allegations made in the hotline call; right?
2      A.   Yes.
3      Q.   And did you also learn as part of your core
4  training that if it's not documented, it's as if it
5  didn't occur?
6           MS. RHODES:  Form.  Foundation.
7           MR. HUNTER:  Join.
8           THE WITNESS:  Yes.
9  BY MR. CONNELLY:
10     Q.   And what that means, in other words, is that if
11 you -- let's say you interviewed a collateral source but
12 you didn't document that interview, it's as if that
13 interview never occurred; right?
14          MS. RHODES:  Form.  Foundation.
15          THE WITNESS:  Yes.
16 BY MR. CONNELLY:
17     Q.   And you learned that if you observed a condition
18 in a home but didn't document it, it's as if that
19 condition didn't exist; right?
20     A.   Yes.
21          MS. RHODES:  Form.  Foundation.  Sorry.
22 BY MR. CONNELLY:
23     Q.   And those things that you were taught in your
24 core training were reinforced to you during the time that
25 you were doing your shadowing of the investigator you

1  went back the second time?
2       A.   I don't recall.
3       Q.   You agree that in this second entry you don't
4  make any observations about Hunter as far as the way he
5  was dressed or the way he appeared other than he was
6  observed without any injuries except for a scratch on his
7  cheek; right?
8       A.   Correct.
9       Q.   So then we get down to Section F where you
10 interviewed both Jessica and Brendi during the course of
11 your two visits to the home; is that correct?
12      A.   Correct.
13      Q.   And when you're observing Hunter in the home and
14 when you're interviewing Jessica and Brendi in the home,
15 both times that you're out there, you're also observing
16 the condition of the home; is that fair?
17      A.   Yes.
18      Q.   And if you had noted anything about the
19 condition of the home that you felt was unsafe or
20 unsanitary, you would have noted it in your report;
21 right?
22      A.   Correct.
23      Q.   And if you had observed that the home was dirty,
24 you would have noted that in your report; right?
25      A.   Correct.

1      Q.   If you observed that there was food all over the
2  floor, you would have noted that in this section of the
3  CSRA; right?
4      A.   Correct.
5      Q.   If you noted that there were dirty clothes all
6  over the floor, you would have noted that in this section
7  of the report; right?
8      A.   Correct.
9      Q.   If you observed that there were tampons all over
10 the floor, you would have noted that in this section of
11 the report; right?
12     A.   Correct.
13     Q.   If you noted that there were spiders or any
14 other kind of insects all over the floor or just in the
15 home, you would have noted that in your report; right?
16     A.   Correct.
17     Q.   And so since none of that appears in your
18 description in your entries in Section B or Section F of
19 the CSRA, we can conclude that the condition -- the
20 allegations made by the caller on February 20 about the
21 conditions of the home were not confirmed when you were
22 out at the home investigating the allegations; right?
23              MS. RHODES:  Clarification.  I think you
24 just said "February."  I think you meant to say
25 "December."

```
 1            MR. CONNELLY:  I did mean to say
 2   "December."
 3            THE WITNESS:  Correct.
 4   BY MR. CONNELLY:
 5      Q.   So this allegation about the home is
 6   unsubstantiated based on your investigation; right?
 7      A.   Correct.
 8      Q.   And, in fact, there was nothing at all that was
 9   unsafe about the home when you were out there; right?
10      A.   Not that I recall.
11      Q.   There was nothing about the condition of the
12   home that you would describe it as substandard; right?
13      A.   Correct.
14      Q.   There was nothing about the condition of the
15   home that you would describe as deplorable; fair?
16      A.   Correct.
17      Q.   And I may have already asked it this way, but
18   there was nothing about the condition of the home that
19   you would describe as unsafe; right?
20      A.   Correct.
21      Q.   When you were out there investigating both
22   times, particularly, I guess, in relation to the first
23   hotline call, you were not able to substantiate that
24   Jessica had left Hunter home alone ever; is that right?
25      A.   Correct.
```

1   plan in place, then, you knew that Jessica had a learning
2   disability; right?
3        A.   After the second report, yes.
4        Q.   Yeah.  What's the next thing you remember --
5   well, let's not move away yet.  Let's look at page 6
6   of 9.  You see Section G, "Collateral Contacts"?
7        A.   Yes.
8        Q.   And it looks to me like the only collateral
9   contact that was interviewed was Brendi Ploof; is that
10  right?
11       A.   Correct.
12       Q.   Okay.  So -- and there were no attempts made to
13  interview any other collateral contacts; right?
14       A.   Not that I recall.  They're also not documented,
15  so --
16       Q.   Right, they're not documented.
17            So if you had tried to reach a collateral
18  contact and were unsuccessful in doing so, that would be
19  reflected in here; right?
20       A.   Correct.
21       Q.   So based on what we see here, we can conclude
22  that the only collateral contact that you spoke to and
23  the only collateral contact you attempted to speak to was
24  Brendi Ploof; right?
25       A.   Correct.

1        THE WITNESS:  Not until we had to do a
2   removal where I gathered information for the cousin for a
3   possible placement.
4   BY MR. CONNELLY:
5       Q.   Okay.  But that comes in January when you
6   decided to do the removal.
7            But between the time that you started your
8   investigation and the time you did the removal, is it
9   fair to say that your investigation ended at the time you
10  did the removal?
11      A.   Yes.
12      Q.   So between the time that you started your
13  investigation and the time you did the removal, there was
14  no attempt made to contact any other collateral sources
15  besides Brendi Ploof; right?
16      A.   And Heather, but, correct, because I did speak
17  to Heather within that time frame.
18      Q.   Did you speak to Heather before January 12,
19  2017, when you placed Hunter with her?
20      A.   No.
21      Q.   You didn't speak to her until January 12, 2017,
22  right before you going to place Hunter with her; right?
23      A.   Correct.
24      Q.   So between December 21, 2016, when you first
25  started doing an investigation and January 12, 2017, when

1   you placed H        with Heather, you didn't attempt to
2   speak with any other collateral sources about the
3   allegations made in either hotline call; correct?
4        A.   Correct.
5        Q.   Then we get to Section 3 of the CSRA, which is
6   an "Analysis and Conclusions" section, and the first
7   subsection here is A, "Assessment of Present Danger."
8             And this is where you're supposed to document
9   any safety or risk factors that you observed during your
10  investigation; right?
11       A.   Correct.
12       Q.   And what you say here about your first -- the
13  first time you were out at the home on the 21st at
14  10:15 a.m., that "H      was observed at the home, that
15  he was free of any visible injuries, he was dressed
16  appropriately, and that the home was free from any safety
17  hazards;" right?
18       A.   Correct.
19       Q.   And although you don't go through all the
20  allegations about the condition of the home that we went
21  through earlier, you didn't observe any of those things.
22  That's why nothing of that sort is reported here in this
23  section; right?
24       A.   Correct.
25       Q.   And that's why you say that the home was free

1   from any safety hazards; right?
2       A.  Correct.
3       Q.  And you say that Hunter was free from any
4   visible injuries.
5           And during the time that you observed Hunter in
6   the home when both Jessica and Brendi were there, you
7   didn't see him reacting fearfully or hesitatingly towards
8   Jessica or Brendi, did you?
9       A.  Not that I recall.
10      Q.  And in your experience as an investigator, when
11  you go out to a home and a child has been abused by a
12  parent, you've seen where the parent -- the child kind of
13  shies away from the parent, right, or maybe looks a
14  little fearful in the presence of the parent; right?
15      A.  Not always.
16      Q.  Not always, but it happens; right?
17      A.  Correct.
18      Q.  And you can see that sometimes in a child;
19  right?
20      A.  Sometimes.
21      Q.  And you didn't observe anything like that with
22  H       though; right?
23      A.  No.
24      Q.  And there were no allegations of physical abuse
25  made about Hunter being physically abused; right?

```
 1   and protect H       if he were put at risk if she's not
 2   able to kind of work with Jessica within the home.
 3        Q.   Well, Jessica did go and do the test -- the drug
 4   test that you asked her to do; right?
 5        A.   Correct.
 6        Q.   And there was -- wasn't there a point in time
 7   during your investigation where Jessica said she didn't
 8   want to participate in services, but then Brendi talked
 9   to her, and she said, okay, I'll participate in services?
10        A.   At one point, yes.
11        Q.   Yeah, so -- there was no reason that you had to
12   remove H        from the home while you either filed a
13   petition with the court for an order to remove him;
14   right?
15             Let me rephrase that question.
16             You could have accomplished the same goal of
17   ensuring that H       remained safe while in the home by
18   filing a petition with the court for an order of removal
19   as opposed to serving a temporary custody order and
20   taking him that next day; right?
21               MS. RHODES:  Form.  Foundation.
22               THE WITNESS:  The concern of a responsible
23   adult not willing to cooperate and provide a UA to
24   suggest that she's clean and willing and able to be a
25   responsible adult was a concern.
```

113

```
 1  BY MR. CONNELLY:
 2      Q.   Okay.
 3      A.   And when staffing with the supervisor, the
 4  decision was made to send -- to do a temporary custody
 5  notice.
 6      Q.   Okay.  I can understand why you would be
 7  concerned that Brendi called off on the drug testing the
 8  next day, but I don't understand when she gave a
 9  reasonable explanation for why she did that you didn't
10  follow up by contacting the employer to verify whether or
11  not what she told you was true?
12               MS. RHODES:  Form.  Foundation.
13               THE WITNESS:  If I recall, she also stated
14  she was not going to provide the drug test, so it wasn't
15  just that she called out that she had to go to work but
16  that she also would not be providing that drug test in
17  the future, so I could not set up a future date.
18  BY MR. CONNELLY:
19      Q.   Okay.  Can you tell -- can you show me in
20  your -- can you show me in Exhibit 17, the CSRA, where
21  you have documented that Brendi said that she not only
22  that she couldn't make it that day but that she didn't
23  intend to make it at all for a drug test?
24      A.   It was when she was unable to do this.  So I
25  guess poor word choice.
```

115

1  Argumentative.
2              THE WITNESS:  Based that it's not in the
3  documentation, one may believe that she may not have said
4  that.
5  BY MR. CONNELLY:
6      Q.   Let's look at the TCN that you then served,
7  which is Exhibit 19.
8              MR. CONNELLY:  Anybody need a break?  We're
9  almost at the three-hour mark.
10             MR. HUNTER:  Can I have five minutes?
11             MR. CONNELLY:  Yeah, go ahead.  Let's go
12  ahead and take a stretching break then.
13             (Recess from 1:14 p.m. to 1:23 p.m.)
14  BY MR. CONNELLY:
15     Q.   Before we get to Exhibit 19, let me ask you,
16  both of your visits to the home on February -- excuse me,
17  December 21, 2016, were unannounced; right?
18     A.   Correct.
19     Q.   So neither Jessica nor Brendi knew you were
20  coming; right?
21     A.   Correct.
22     Q.   Did you visit that -- the home at any other
23  time?
24     A.   No.
25     Q.   Looking at Exhibit 19, this is the TCN that you

_____

MEAGAN TAFOYA

STATE OF ARIZONA    ) SS.
                    )
COUNTY OF MARICOPA  )

      BE IT KNOWN that the foregoing proceedings were taken by me, JENNIFER HONN, a Certified Reporter, in and for the County of Maricopa, State of Arizona; that the witness before testifying was duly sworn to testify to the whole truth; that the question propounded to the witness and the answers of the witness thereto were taken down by me in shorthand and thereafter reduced to typewriting under my direction; that the witness will read and sign said deposition; that the foregoing pages are a true and correct transcript of all proceedings had, all done to the best of my skill and ability.

      I FURTHER CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

      I FURTHER CERTIFY than I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 J(1)(g)(1) and (2).

Jennifer Honn                                    50885
_____                  _____
Certified Reporter                               AZ CR Number

*[signature: Jennifer Honn]*                     06/11/2025
_____                  _____
Certified Reporter                               Date
(Signature)

               * * *

      I CERTIFY that this Registered Reporting Firm has complied with the ethical obligations set forth in ACJA 7-206 (J)(1)(g)(1) through (6).

Carrie Reporting, LLC                            R1064
_____                  _____
Registered Reporting Firm                        RRF Number

*[signature: Michele Durrer]*                    __6/12/25_____
_____                  _____
Registered Reporting Firm                        Date
(Signature)