# EXHIBIT FJ

Deposition of: James Steven Thal, Ph.D.                              April 2, 2025

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Jessica Ploof, an individual,    )
                                 )
              Plaintiff,          )
                                 )
vs.                              )Case No.
                                 )2:21-cv-00853-JJT-PHX
State of Arizona, et al.,         )
                                 )
              Defendants.         )
                                 )

DEPOSITION OF JAMES STEVEN THAL, PH.D.

Phoenix, Arizona
April 2, 2025
10:19 a.m.

REPORTED BY:                CARRIE REPORTING, LLC
Kristy A. Ceton, RPR, CRR   Certified Reporters
AZ CR No. 50200             17505 N. 79th Avenue
                            Suite 301-C
PREPARED FOR:               Glendale, AZ 85308
Certified Copy              (480) 429-7573

2

1          DEPOSITION OF JAMES THAL, PH.D.,

2     commenced at 10:19 a.m., on April 2, 2025, at

3     Gillespie, Shields & Taylor, 7319 North 16th Street,

4     Phoenix, Arizona, before Kristy A. Ceton, RPR, CRR,

5     Arizona Certified Court Reporter No. 50200.

6

7                          * * *

8

9     APPEARANCES:

10        For the Plaintiff:

11            MILLS & WOODS LAW, PLLC
              By:  Thomas A. Connelly, Esq.
12            5055 North 12th Street
              Suite 101
13            Phoenix, Arizona 85014

14        For the Defendant Thal:

15            WEINBERG WHEELER HUDGINS GUNN & DIAL
              By:  Jeff Hunter, Esq.
16            One North Central Avenue
              Suite 900
17            Phoenix, Arizona 85004
              jhunter@wwhgd.com
18
          For the Defendant State of Arizona:
19
              OFFICE OF THE ARIZONA ATTORNEY GENERAL
20            By:  Julie Rhodes, Esq.
                   Deborah Garner, Esq.
21            P.O. Box 6123-040A
              Phoenix, Arizona 85005
22            julie.rhodes@azag.gov

23        Also Present:

24            Natalie Newell

25

Deposition of: James Steven Thal, Ph.D.                                April 2, 2025

6

                                                    Phoenix, Arizona
1                                                   April 2, 2025
2                                                   10:19 a.m.

3

4                    JAMES STEVEN THAL, PH.D.,

5       called as a witness herein, having been first duly

6       sworn, was examined and testified as follows:

7

8                         EXAMINATION

9       BY MR. CONNELLY:

10          Q.   Good morning, Doctor.  Sorry for the

11      slight delay in getting started this morning.

12          A.   Good morning.

13          Q.   I know you had a long journey here,

14      didn't you?

15          A.   Yeah.  It was exhausting.

16          Q.   Across that lot.  That's a long way to

17      go.

18               Well, let me just have you start by

19      stating your name for the record and spelling it,

20      please.

21          A.   My name is James Steven Thal.  Last name

22      is spelled T-h-a-l.

23               THE COURT REPORTER:  And Steven?

24               THE WITNESS:  Steven with a "v."

25               THE COURT REPORTER:  Thank you.

Deposition of: James Steven Thal, Ph.D.                    April 2, 2025

33

```
 1          Q.   So since 1980 or 1985, somewhere in the

 2    early to mid-'80s, DCS has provided 90 to 95 percent

 3    of the referrals to your office; is that right?

 4          A.   To the --  Yes, that's correct.

 5          Q.   Okay.  Do you know what your overall

 6    annual revenue was in 2018?

 7               MR. HUNTER:  He's not going to answer

 8    that question.  You're getting into assets, which is

 9    not discoverable at this stage.  You want to ask him

10    a percentage of his total income derived from work

11    for DCS, that's fair.  But figures.  There's case law

12    against it.

13               MR. CONNELLY:  You know what, Jeff, I'm

14    going to believe you, even though I think you're

15    probably wrong.  But I'll give you the benefit of the

16    doubt.

17          Q.   BY MR. CONNELLY:  And so, Dr. Thal, what

18    percentage of your income in 2018 was derived from

19    DCS referrals?

20          A.   In 2018?

21          Q.   Well, yeah.  2018, 2019, 2020.

22          A.   Well, that's -- that's changed.  But in

23    2018, my total income you're asking?

24          Q.   Well, that's what I'm asking, but your

25    lawyer is saying I can't ask you to give me a number.
```

Carrie Reporting, LLC - Certified Reporters
480.429.7573

Deposition of: James Steven Thal, Ph.D.                                    April 2, 2025

1   So I'm asking you for the percentage of your income

2   in 2018.

3            MR. HUNTER:  He's not allowed to know

4   your total income at this stage of the litigation,

5   so -- but he can ask you percentage derived from DCS.

6            THE WITNESS:  Percentage --

7            MR. HUNTER:  Of your total revenue that

8   came from DCS.

9            THE WITNESS:  Probably, I suppose about

10  -- of my total income for a year, probably on the

11  range of perhaps, I don't know, 75 percent.

12  Something like that.

13       Q.   BY MR. CONNELLY:  And I asked about 2018,

14  but are you talking, in general, over the past few

15  years, or are you talking in 2018?

16       A.   No.  I was -- I was using your date.

17       Q.   Okay.

18       A.   And then that amount has declined over

19  the years.  Currently, I would say that income

20  derived from DCS is probably -- probably no more than

21  50 percent at this point.

22       Q.   So although 90 to 95 percent of your

23  business is coming from DCS, your testimony is that

24  right now, only about 50 percent of your annual

25  revenue is derived from DCS?

Deposition of: James Steven Thal, Ph.D.                                    April 2, 2025

35

1          A.    My annual income is -- because it's not

2    all practice-related.  I have other sources of

3    income.  Pension, investments.

4          Q.    Okay.

5          A.    So, I'm trying to piece out what that

6    part is.

7          Q.    Well, I said revenue.  I didn't say

8    income.

9                So revenue refers to monies you receive

10   from your professional efforts, not from pensions or

11   retirement or dividends or investments or anything

12   else.

13         A.    Okay.

14         Q.    So going back to the question of revenue.

15   How much of your revenue -- annual revenue of --

16                Do you operate your business under an

17   LLC?

18         A.    A PC.

19         Q.    A PC.  Okay.

20                So how much of the annual revenue of the

21   PC is derived from DCS?

22         A.    Almost all.

23         Q.    Okay.  And it's been that way for how

24   long?

25         A.    Probably --  It's hard to give you a time

Deposition of: James Steven Thal, Ph.D.                                    April 2, 2025

169

1   unsupervised visit, to my knowledge, with H████ in

2   all that time.

3                And that happens in cases where parents

4   are demonstrating their capacity to parent.  And I

5   don't think that happened with Jessica.  And I think

6   I know why.  She does not have the capacity to

7   function independently as a parent.  And other

8   examiners have concluded the same thing.  So I think

9   I was right.

10          Q.   BY MR. CONNELLY:  Well, you concluded

11  that she could parent in the capacity of a coparent,

12  right?

13          A.   Yeah.  Yes.

14          Q.   And you -- and you identified Brendi

15  Ploof as an acceptable coparent, right?

16          A.   That's correct.

17          Q.   And you did that in January of 2018,

18  right?

19          A.   Correct.

20          Q.   So let me ask you --

21          A.   Hang on.  Hang on a second.  This --

22  you're talking about Jessica's evaluation, right?

23          Q.   I'm talking about Jessica's evaluation,

24  and then Brendi's evaluation -- which we'll get to in

25  a minute -- that you performed in January of 2018.

Deposition of: James Steven Thal, Ph.D.                    April 2, 2025

180

1          Q.   Live independently.  Would that be

2     pertinent to her demonstrating minimally adequate

3     parenting capacity?

4          A.   It could be in the sense of, again, being

5     able to demonstrate sufficient autonomy.  That's what

6     that recommendation would be about.

7          Q.   And if -- if you're saying that --  I

8     don't see that you say that anywhere in here?

9          A.   No, I don't think I did.

10          Q.   No.  But at some point, it's alleged that

11     the Department wanted her to live independently?

12          A.   Okay.

13          Q.   If you're recommending that she could

14     best serve in the capacity of a coparent and, more

15     accurately, as an assistant caregiver, would there be

16     any reason to ask that she live independently?

17              MS. RHODES:  Form.  Foundation.

18              MR. HUNTER:  Join.

19              THE WITNESS:  In the context of this

20     evaluation, 2017?

21          Q.   BY MR. CONNELLY:  Just in the context of

22     -- of --

23          A.   Or right now?

24          Q.   Just in the context of DCS asking her for

25     -- you know, as part of the process of regaining

Deposition of: James Steven Thal, Ph.D.                                    April 2, 2025

181

1     custody, suggesting that she needs to live

2     independently, would that make sense in light of your

3     -- your recommendations?

4           A.   No, I can't -- I can't fully understand

5     or know what DCS' intention was.  I could speculate

6     what it is.  It's possible they have their reasons.

7     I can think of at least one reason why they would

8     want to go that route.

9           Q.   And what would be that reason?

10          A.   Well --

11               MR. HUNTER:  Form.  Foundation.

12               THE WITNESS:  They wanted her to

13    demonstrate independence and self-sufficiency.

14    Because I'm pretty sure the Department had to prove

15    to the Court that this young woman could parent

16    independently and autonomously.  And Jessica had to

17    demonstrate that.

18               And, of course, reading my report, you

19    know that my opinion is Jessica couldn't do that.

20    That's why I didn't recommend it.

21          Q.   BY MR. CONNELLY:  And so if -- so if the

22    recommendation is that she could parent in a

23    coparenting situation, what would be the -- what

24    would be the benefit of making her demonstrate that

25    she could live independently?

227

1   true?

2          A.   Oh, sure.

3          Q.   What did you do?

4          A.   I talked to Brendi about that, and I

5   talked to Jessica about that.  And then I believe as

6   I -- as I said earlier, that I -- I saw the notation

7   -- I think you pointed it out to me -- where that was

8   corrected, in effect, that the home was -- was not in

9   substandard condition.

10             So at that point, I'm just trying to do a

11  psychological evaluation.  You know, you see things

12  in a DCS reports and other sources that may or may

13  not be true.  I'm not necessarily trying to

14  establish, you know, the veracity of a report or

15  their credibility or what have you.

16         Q.   And when I showed you that it was an

17  allegation that you unsubstantiated, you didn't know

18  that until today; is that right?

19         A.   I'm not sure about that.

20         Q.   Because we'll get to it.

21             But when Paige called you later, one of

22  the things she said was that the home was in

23  substandard condition, right?

24         A.   That is my recollection.  In fairness, I

25  didn't tape-record that or anything of the sort.  I

Deposition of: James Steven Thal, Ph.D.                    April 2, 2025

228

1    don't know for certain if Paige said that or I made
2    an assumption about that.
3              The other statements by Paige, yeah,
4    she's pretty clear about those things.  The child's
5    lack of development.
6         Q.   And when -- when -- and you don't
7    identify Paige as a collateral source in either
8    version of your January 4th, 2018, report, right?
9         A.   Correct.
10        Q.   But, yet, you made changes to your report
11   based on what she said to you in that phone
12   conversation, right?
13        A.   Yes.
14        Q.   And in -- the second version --
15        A.   Let me -- let me be precise about that.
16             I made changes -- when you say based on
17   what she told me.  A better way for me to respond to
18   that is I began to look at those early reports and
19   findings again.  So it wasn't something that was
20   persuasive about that case manager's sell job or
21   anything of the sort.
22        Q.   Well, when we get to your conclusions and
23   recommendations in this -- in this version of the
24   report, you say that, No. 1, responding to referral
25   question No. 1 --

Deposition of: James Steven Thal, Ph.D.                              April 2, 2025

246

1    are suspending Dr. Thal's deposition today.  It's

2    after 6 p.m., and we're going to agree to a date to

3    continue and conclude the deposition.  Right?

4              MS. RHODES:  Yep.

5              MR. CONNELLY:  Jeff?

6              MR. HUNTER:  Yes.

7          (The proceedings adjourned at 6:07 p.m.)

8

9

10

11              _____

                JAMES STEVEN THAL, PH.D.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

247

```
1   STATE OF ARIZONA        )
                            ) ss.
2   COUNTY OF MARICOPA      )

3

4            BE IT KNOWN that the foregoing
    proceedings were taken by me, KRISTY A. CETON, a
5   Certified Reporter, in and for the County of
    Maricopa, State of Arizona; that the witness before
6   testifying was duly sworn to testify to the whole
    truth; that the questions propounded to the witness
7   and the answers of the witness thereto were taken
    down by me in shorthand and thereafter reduced to
8   typewriting under my direction; that the witness
    requested reading and signing said deposition; that
9   the foregoing pages are a true and correct transcript
    of all proceedings had, all done to the best of my
10  skill and ability.
             I FURTHER CERTIFY that I am in no way
11  related to any of the parties hereto, nor am I in any
    way interested in the outcome hereof.
12           I FURTHER CERTIFY that I have complied
    with the ethical obligations set forth in ACJA
13  7-206(J)(1)(g)(1) and (2).

14
    Kristy A. Ceton                    50200_____
15  Certified Reporter                 CR Number

16
    _____          4.14.25
17  Certified Reporter Signature       Date

18
             I CERTIFY that this Registered Reporting
19  Firm has complied with the ethical obligations set
    forth in ACJA 7-206(J)(1)(g)(1) and (2).
20
21  Carrie Reporting, LLC              R1064
    Registered Reporting Firm          RRF No.
22
23                                     4.14.25
    Registered Reporting Firm          Date
24  Signature

25
```

Carrie Reporting, LLC - Certified Reporters
480.429.7573

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


Jessica Ploof, an individual,        )Case No.
                                     )2:21-cv-00853-JJT-PHX
        Plaintiff,                   )
                                     )
     vs.                             )
                                     )
State of Arizona, et al.,            )
                                     )
        Defendants.                  )
_____      )




DEPOSITION OF JAMES STEVEN THAL, PH.D.
VOLUME 2

May 8, 2025
1:06 p.m.
Phoenix, Arizona






Prepared by:                 CARRIE REPORTING, LLC
JENNIFER HONN, RPR           Certified Reporters
Arizona CR No. 50885         2415 East Camelback Road
Carrie@carriereporting.com   Phoenix, Arizona 85016
                             (408) 429-7573

(CERTIFIED COPY)

251

```
 1              DEPOSITION OF JAMES STEVEN THAL, PH.D.
                            Volume 2
 2

 3              The deposition of JAMES STEVEN THAL, PH.D.,

 4    Volume 2, was taken on May 8, 2025, commencing at

 5    1:06 p.m., at the law offices of GILLESPIE, SHIELDS &

 6    TAYLOR, 7319 North 16th Street, Phoenix, Arizona, before

 7    JENNIFER HONN, a Certified Reporter, Certificate No.

 8    50885, for the State of Arizona.

 9
                            * * * * *
10

11    APPEARANCES:

12    For Plaintiff:

13          MILLS + WOODS LAW PLLC
            Thomas A. Connelly, Esq.
14          5055 North 12th Street
            Suite 101
15          Phoenix, Arizona  85014
            Tconnelly@millsandwoods.com
16

      For the Defendant Thal:
17
            WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
18          Jeffrey S. Hunter, Esq.
            One North Central Avenue
19          Suite 900
            Phoenix, Arizona  85004
20          Jhunter@wwhgd.com

21    For the Defendant State of Arizona:

22          OFFICE OF THE ARIZONA ATTORNEY GENERAL
            Julie Rhodes, Esq.
23          Deborah Garner, Esq.
            P.O. Box 6123-040A
24          Phoenix, Arizona  85005
            Julie.rhodes@azag.gov

25
```

Deposition of: James Steven Thal, Ph.D. Vol. II                    May 8, 2025

252

1              JAMES STEVEN THAL, PH.D.,

2    called as a witness herein, having been first duly sworn

3    by the Certified Reporter to speak the whole truth and

4    nothing but the truth, was examined and testified as

5    follows:

6

7                         EXAMINATION

8    BY MR. CONNELLY:

9         Q.    Okay.  The last time we were here, we were in

10   the midst of talking about the evaluation of Brendi, the

11   first one.  And so before we get into all that again,

12   have you done anything -- have you looked at any

13   materials since we departed last time as far as materials

14   related to this case?

15        A.    Sure.

16        Q.    What did you look at?

17        A.    I looked at my file in preparation for today.

18        Q.    Okay.  Any particular aspects of your file?

19        A.    The reports.

20        Q.    Did you look for a copy of the initial

21   evaluation of Brendi that you signed and delivered on

22   January 18, 2019?

23        A.    Yes.

24        Q.    Did you find it?

25        A.    Yes.

Deposition of: James Steven Thal, Ph.D. Vol. II                    May 8, 2025

283

 1    was a significant mistake or error or misstatement of

 2    somebody's name or age.  That happens.  It probably

 3    happens a couple times a year.

 4        Q.   And did anything significant happen in the case

 5    between the time that you sent it to Ms. Szymkowski and

 6    the time that she called you on January 30?

 7        A.   No.  There was no -- there were no new events in

 8    that sense.  There was nothing new that had happened.

 9        Q.   And did you make a significant error in the

10    report you sent to her on January 18?

11        A.   No.

12        Q.   So the reasons that you've identified for

13    reports being kicked back didn't occur in this case in

14    relation to this version of the report; right?

15        A.   You said did I make any significant mistakes,

16    and I don't believe so.

17        Q.   Okay.  And as far as forensic reports go, do you

18    agree that once a report is signed and delivered that

19    it's -- it's a report -- it exists on its own as a --

20    well, you used the word "delivered" in the severance

21    trial, so I'll stick with that word.

22             When it's delivered, it's an entity of its own

23    that exists in the world; right?

24        A.   I'm not sure --

25                  MR. HUNTER:  Form.  Foundation.

Deposition of: James Steven Thal, Ph.D. Vol. II                    May 8, 2025

322

```
 1                THE WITNESS:  Yeah.  But doesn't -- doesn't
 2   Brendi bear responsibility for that?  I'm pointing out
 3   something that she seemed to be remiss in doing.  It
 4   wasn't a deliberate attempt to sabotage her.  It's an
 5   observation that she's not very open about her emotions
 6   and maybe she needs to be.
 7   BY MR. CONNELLY:
 8      Q.   Okay.  Doctor, and this is recognizing the fact
 9   that persons who are being evaluated with those
10   standardized tests in the context of a -- a child welfare
11   investigation often underreport their -- their
12   psychological issues; right?
13                MS. RHODES:  Form.  Foundation.
14                MR. HUNTER:  Join.
15                THE WITNESS:  Sure.  Is that your
16   observation?  You're asking it as a question?
17   BY MR. CONNELLY:
18      Q.   Yeah, it's a question.
19      A.   Yeah I don't know if I'd agree often, but, yeah,
20   that's a factor.
21      Q.   In relation to your second -- the response to
22   the second prompt about Brendi's ability to demonstrate
23   minimally adequate parenting skills, in the first report
24   you say, "The prognosis that this grandmother will be
25   able to demonstrate minimally adequate caregiving skills
```

Deposition of: James Steven Thal, Ph.D. Vol. II                    May 8, 2025

323

1    to her grandson Hunter in the foreseeable future is seen

2    as favorable."

3            And that's where you stop in the first version.

4            In the second version, you add, "Favorable

5    provided that she can maintain a clean and hygenic home

6    environment."

7            You added that only after your call with

8    Ms. Szymkowski; right?

9                    MS. RHODES:   Form.   Foundation.

10                   THE WITNESS:   As I am needing to remind

11   you, I added that after I reviewed those records and

12   thought it made good sense to include that.   I didn't

13   think that would be particularly challenging for Brendi

14   to maintain a clean and safe home environment.   But I

15   added that because that's rather standard wording and

16   just kind of amplified the nature of that recommendation.

17   BY MR. CONNELLY:

18       Q.   If it's standard wording, why wasn't it included

19   the first time around?

20       A.   I think it was oversight.   I included the first

21   part of that but not the second clause of statement, so I

22   thought I'd clarify it.

23       Q.   And what did you see in the record that supports

24   that the -- that the home was not clean and hygenic?

25       A.   You reviewed those at some length and you

Deposition of: James Steven Thal, Ph.D. Vol. II                    May 8, 2025

324

1    advised me that was all baseless.  But I think it's a

2    fair and important recommendation that a home ought to be

3    clean and hygenic for a little boy in the context of --

4    of this situation and what had transpired in the past,

5    the meth in the home and drugs and alcohol and so on,

6    just to as a reminder that Brendi has a special

7    obligation to keep the home clean and hygenic as well as

8    consistent and stable and those other things that I

9    mentioned.

10       Q.   And one of the things that Ms. Szymkowski

11   pointed out to you was her belief that the home was in

12   substandard condition; right?

13                   MR. HUNTER:  Form.  Foundation.

14                   THE WITNESS:  Well, in my conversation with

15   her, I think as I've already testified to this, that her

16   concern was about the condition that Hunter was when --

17   was in when he came into care.  I don't know if she said

18   the home was in substandard condition.  I honestly don't

19   remember that.

20                   I may have made that statement, but I think

21   when I testified at the severance trial, I think I

22   pointed out that Ms. Szymkowski may not have said that to

23   me, that particular statement about the home being

24   trashed or cluttered or whatever.

25   //

Deposition of: James Steven Thal, Ph.D. Vol. II                    May 8, 2025

325

```
 1   BY MR. CONNELLY:
 2       Q.   And then you go on with a second and third
 3   sentence in your response to prompt number 2 in the
 4   revised version that you didn't include in the original
 5   version; right?
 6       A.   Okay.
 7       Q.   Is that correct?
 8       A.   Well, I don't know.  I don't know what you're
 9   referencing to.
10       Q.   Take a look at it.
11       A.   Do you want to just read it?
12               MR. HUNTER:  Right here.
13               THE WITNESS:  Okay.
14   BY MR. CONNELLY:
15       Q.   In Exhibit 23, you stop at the word "favorable,"
16   period, one sentence.
17       A.   Okay.
18       Q.   And then in Exhibit 30, you add that clause
19   which we just talked about, and then you have two more
20   sentences that you added; right?
21       A.   Okay.  I'm trying to keep up with you.
22            Are you talking about conclusion number 2?
23       Q.   Referral question number 2 you then add after
24   the first sentence, "It is alarming that Ms. Ploof did
25   not intercede in the past."  And then go on for two
```

326

1   sentences; right --

2       A.    Yes.

3       Q.    -- that were not included in the original

4   version; right?

5       A.    That's correct.

6       Q.    And those are significant additions that you're

7   making to your responses to these referral questions in

8   your revised version; do you agree?

9       A.    Yes.

10      Q.    And they're only added after you had a call with

11  Ms. Szymkowski; correct?

12              MS. RHODES:  Form.  Foundation.

13              MR. HUNTER:  Join.

14              THE WITNESS:  It was added when I revised

15  the report.

16  BY MR. CONNELLY:

17      Q.    After having a call with Ms. Szymkowski; right?

18              MR. HUNTER:  Form.

19              THE WITNESS:  After Valentine's day when

20  lots of events transpired.

21  BY MR. CONNELLY:

22      Q.    Well, it wasn't after Valentine's day, if we're

23  going to flip about things.

24              MR. HUNTER:  He's just asking a temporal

25  question.  Did you make that change after the date of the

1    conversation that you had with Ms. Szymkowski?

2                    THE WITNESS:  Yeah, I went back and

3    reviewed it and made a change based on my review.

4    BY MR. CONNELLY:

5        Q.   And do you agree with me that the inclusion of

6    these two sentences here were not favorable to Brendi or

7    Jessica?

8        A.   Do I agree?

9        Q.   Do you agree that the inclusion --

10       A.   Do I agree.

11       Q.   -- of those two sentences in the revised report

12   was not favorable to Brendi or Jessica?

13       A.   It clearly was not favorable to Jessica.  Again,

14   I don't think I ruled out Brendi, the grandmother, as a

15   placement.

16       Q.   Do you agree that including these statements

17   here the second time around when you didn't include them

18   the first time was not helpful to the goal of family

19   reunification with Brendi as the primary caregiver and

20   Jessica as the assisting caregiver?

21                   MR. HUNTER:  Form.  Foundation.

22                   THE WITNESS:  Not helpful to the goal of

23   reunification.  I don't know.  It wasn't necessarily my

24   objective to further the goal of family reunification.

25   It was my objective to do a psychological evaluation and

Deposition of: James Steven Thal, Ph.D. Vol. II                    May 8, 2025

328

1   to answer fully and completely.  Again, I did not rule

2   out Ms. Ploof -- grandmother Ploof as a potential

3   placement.

4   BY MR. CONNELLY:

5        Q.    I agree that you don't explicitly rule that out,

6   but don't you agree that the report as revised makes that

7   a very unlikely result?

8        A.    I would agree to the extent it's critical.

9   Unlikely, I guess I don't see it that way.  I don't see

10  it as making it unlikely.

11       Q.    And I'm intrigued by the word "alarming," that

12  you find it alarming in the past that Brendi did not

13  intercede.

14             What occurred between the first time that you

15  signed and delivered your report on January 18 to the

16  time of signing and delivering the second version on

17  February 7, 2018, that now caused alarm but didn't cause

18  alarm the first time?

19       A.    Yeah, good question and I think the basis of the

20  response to that is I'm not sure that I fully realized

21  that all that time in question that the mother Jessica

22  was living with the grandmother Brendi.  As I reviewed

23  that, I began to realize, yeah, that was exactly the

24  situation, and hence my conclusion that grandmother had

25  to bear some responsibility for what occurred.

```
 1        Q.    And when you say "for what occurred," what do
 2   you mean?
 3        A.    Well, the reason DCS intervened.  The mother's
 4   misuse of drugs and alcohol, questions about her
 5   treatment of the child, the events that triggered DCS
 6   intervention.
 7        Q.    And when you say that Hunter was in poor
 8   condition and grossly underdeveloped, what are you
 9   referring to?
10            Was he developmentally delayed, physically
11   underdeveloped?  Dirty?
12            What are you referring to?
13        A.    I don't know if he was underweight.  I don't
14   know that.  But in other respects I think -- my
15   understanding.  Again, I never saw Hunter.  My
16   understanding was he underdeveloped with respect to
17   language, cognitive development, and those types of
18   things.
19        Q.    And those were things that Ms. Szymkowski made a
20   point of talking to you about on January 30; right?
21        A.    She did.  She did.
22        Q.    So it was only after you had a conversation with
23   Ms. Szymkowski that you're suddenly alarmed about those
24   things as well; right?
25            MS. RHODES:  Form.  Foundation.
```

 1                    THE WITNESS:  No.  That's wrong.

 2                    MR. HUNTER:  Join.

 3       BY MR. CONNELLY:

 4            Q.   You say it's wrong, but you didn't include those

 5       concerns in your first set of responses; right?

 6                    MR. HUNTER:  Form.  Foundation.

 7                    THE WITNESS:  I think I would disagree.  I

 8       think I indicated in that report that if Brendi were to

 9       be the parent, she would need to take, you know, proper

10       steps and so on, that clearly we're dealing with a child

11       with a handicapping condition.

12       BY MR. CONNELLY:

13            Q.   Well, you didn't include those comments in your

14       response to prompt number 2 in the first version of the

15       report; right?

16            A.   Correct.

17            Q.   In response to number 4 in the first version of

18       the report, you say that, "A child in the sole care and

19       custody of this grandparent would not appear to be at

20       risk in any identifiable way provided she sets clear

21       boundaries and expectations with the mother Jessica

22       Ploof;" right?

23            A.   Yes.

24            Q.   Then after you have a conversation with

25       Ms. Szymkowski, you change that in a significant and

 1  material way, don't you?

 2      A.    No.

 3      Q.    You change to it say you agree with me that it

 4  now says, "Hunter would be at risk for neglect and

 5  regression in his development if Ms. Ploof" -- meaning

 6  Brendi -- "is not adequately attentive to her grandson's

 7  health and well-being;" right?

 8      A.    Yes.

 9      Q.    That's a significant change from that he would

10  not appear to be at risk in any identifiable way in her

11  care; right?

12      A.    Not right.  I think it's a clarification --

13      Q.    Okay.

14      A.    -- that was important.

15      Q.    And what made you realize that this

16  clarification was necessary between January 18 and

17  February 7?

18      A.    Again, reviewing the information I had and

19  looking at how I worded that particular response to the

20  referral question, I thought it needed to be clearer, and

21  I think that's -- that's all that was about was

22  specifying what was going to be needed here.

23      Q.    And was that a referral question that you

24  discussed with Ms. Szymkowski?

25      A.    I didn't discuss any referral questions with

340

1              MR. CONNELLY:  Can you read that back.

2              (The reporter read back the requested

3     portion of the record.)

4              MR. HUNTER:  Renew my objection.

5              THE WITNESS:  I think I've answered that.

6     BY MR. CONNELLY:

7        Q.   I don't think you have because I don't think I

8     asked that question.

9        A.   Well, let me respond to it, although I still

10    answered that about five different versions of it.

11             I think it is appropriate and ethical and I

12    would say mandatory to change a report in view of other

13    information and if that report has not been sent out.  If

14    that report had been sent out, it would have dictated

15    other -- if I'd known it had been sent out, it would have

16    dictated other -- another approach to that.

17       Q.   The key for me in that response, Doctor, is you

18    said "in view of other information," and you've testified

19    that you didn't receive any information that you didn't

20    already know.

21       A.   That's the other information.

22       Q.   The other information is that you didn't receive

23    any information you didn't already know?

24       A.   No, no, no.  No.  I reviewed the information I

25    have -- I had at that time.  And that, I think, compelled

Deposition of: James Steven Thal, Ph.D. Vol. II                    May 8, 2025

341

 1   me on further review and to look at those things very

 2   closely to make some changes in that report.

 3       Q.   So --

 4       A.   I thought that was entirely appropriate.

 5       Q.   And the only reason you took a second look at

 6   that report and made changes was because you were

 7   prompted to do that after receiving a call from Paige

 8   Szymkowski?

 9       A.   I don't know what you mean by that.

10               MR. HUNTER:  Form.  Hold on.

11               MS. RHODES:  Form.  Foundation.

12               MR. HUNTER:  Form and foundation.  Asked

13   and answered.  Go ahead.  But we're getting late in the

14   day and we're starting to rehash the same thing over and

15   over.

16               MR. CONNELLY:  Well, no, no, he -- he --

17   I'm going to -- I'm going to rephrase.

18               MR. HUNTER:  Okay.

19   BY MR. CONNELLY:

20       Q.   You said that it's ethical and appropriate and

21   everything else to make changes to a report you've

22   already signed and delivered if there are new

23   circumstances.  And you've testified before that there

24   were no new circumstances, there were no new facts, you

25   didn't learn anything you didn't already know from

Deposition of: James Steven Thal, Ph.D. Vol. II                    May 8, 2025

343

```
 1   doing that?  You're rehashing --

 2              MR. CONNELLY:  Because I want to hear what

 3   he says again.

 4              MR. HUNTER:  Okay.  Well, it's almost

 5   four o'clock, so we're not going to go too much longer if

 6   we're going to rehash.  We're well over the seven hours

 7   at this point.  I've given you three hours today on top

 8   of the six you had last time.

 9              So we're going to -- if you've got

10   something new to ask, let's go on to it.  If not --

11              MR. CONNELLY:  Look, I want to ask about

12   his -- the qualification he's added.  So I want to hear

13   what he said so we can properly phrase the question.

14              (A discussion was held off the record.)

15              (The reporter read back the requested

16   portion of the record.)

17   BY MR. CONNELLY:

18     Q.   "In view of other information," that's the

19   phrase that caught my attention.  And so you made changes

20   in this report and you maintained that it was appropriate

21   to do so, maybe even mandatory for you to do so, in view

22   of other information.  So what was the other information?

23     A.   The other information was --

24              MR. HUNTER:  Hold on.  Hold on.

25              THE WITNESS:  Okay.
```

Deposition of: James Steven Thal, Ph.D. Vol. II                    May 8, 2025

344

1           MR. HUNTER:  Asked and answered.  This has
2    been gone over five times, so this is going to be the
3    last time.  Then we'll move on.
4    BY MR. CONNELLY:
5        Q.   In view of other information.  What was the
6    other information?
7        A.   Yeah, and I answered it already.  But when I
8    used that term, it was about the information I had in my
9    file.  I had the information that I had.  That's what I
10   reviewed.  I didn't say "new."
11       Q.   So there was no other information.  It was
12   information you already had?
13           MR. HUNTER:  That's argumentative.  You
14   don't need to answer that.
15           THE WITNESS:  I think it's a semantic
16   discussion, so --
17   BY MR. CONNELLY:
18       Q.   Semantic.  It's not semantics, sir, when loss of
19   a child is at issue.
20           MR. HUNTER:  It's argumentative at that
21   point.
22           MR. CONNELLY:  It's not argumentative.
23           MR. HUNTER:  Let's move on.  You got
24   something new?
25           If not, let's pass the witness and see if

Deposition of: James Steven Thal, Ph.D. Vol. II                    May 8, 2025

376

1          MR. CONNELLY:  Okay.  All right.  That's

2     all.  Thank you.

3          MR. HUNTER:  Read and sign.

4          THE COURT REPORTER:  Mr. Hunter, do you

5     want a copy of the transcript?

6          MR. HUNTER:  Oh, yes.

7          MS. RHODES:  Yes.  Thank you.

8          THE COURT REPORTER:  Thank you.

9          (Deposition concluded at 4:47 p.m.)

10               *  *  *  *  *

11

12

13          _____

14               JAMES STEVEN THAL, PH.D.

15

16

17

18

19

20

21

22

23

24

25

Deposition of: James Steven Thal, Ph.D. Vol. II                                    May 8, 2025

377

```
 1   STATE OF ARIZONA   ) SS.
                        )
 2   COUNTY OF MARICOPA )

 3           BE IT KNOWN that the foregoing proceedings were
     taken by me, JENNIFER HONN, a Certified Reporter, in and
 4   for the County of Maricopa, State of Arizona; that the
     witness before testifying was duly sworn to testify to
 5   the whole truth; that the question propounded to the
     witness and the answers of the witness thereto were taken
 6   down by me in shorthand and thereafter reduced to
     typewriting under my direction; that the witness will
 7   read and sign said deposition; that the foregoing pages
     are a true and correct transcript of all proceedings had,
 8   all done to the best of my skill and ability.
             I FURTHER CERTIFY that I am in no way related to
 9   any of the parties hereto nor am I in any way interested
     in the outcome hereof.
10           I FURTHER CERTIFY than I have complied with the
     ethical obligations set forth in ACJA 7-206(F)(3) and
11   ACJA 7-206 J(1)(g)(1) and (2).

12
     Jennifer Honn                        50885
13   _____          _____
     Certified Reporter                AZ CR Number
14

15
     [signature]                          05/20/2025
16   _____          _____
     Certified Reporter                Date
17   (Signature)

18                        * * *

19           I CERTIFY that this Registered Reporting Firm
     has complied with the ethical obligations set forth in
20   ACJA 7-206 (J)(1)(g)(1) through (6).

21   Carrie Reporting, LLC                R1064
     _____          _____
22   Registered Reporting Firm         RRF Number

23
     [signature]
24   _____          ___5.22.25_____
     Registered Reporting Firm         Date
25   (Signature)
```