# EXHIBIT 41
# UNDER SEAL

**JAMES S. THAL, Ph.D.**
*Licensed Psychologist*
7315 N. 16th Street, Suite 202
Phoenix, AZ 85020
Tel (602) 263-8756
Fax (602) 263-8772

## PSYCHOLOGICAL RE-EVALUATION REPORT

### CONFIDENTIAL

| | |
|---|---|
| Name: | ***Jessica L. Ploof*** |
| Sex: | Female |
| Date of Birth: | 3/13/94 |
| Chronological Age: | 24 years |
| Ethnicity/Race: | Caucasian |
| Primary Language: | English |
| Referral Agent: | Claudia Hoff |
| Referral Agency: | DCS/DES |
| Date of Re-Evaluation: | 10/10/18 |
| Examiner: | James S. Thal, Ph.D. |
| ID # | 3467827 |

### REASON FOR REFERRAL

Ms. Ploof was referred for a psychological re-evaluation. The following referral questions were provided by DCS:

1. What is the prognosis that Ms. Ploof will be able to demonstrate minimally adequate parenting skills in the foreseeable future? With existing/proposed interventions, do you feel that she will be able to discharge parental responsibilities in the foreseeable future?
2. What stress factors are evident in the parent-child relationship that would make parenting particularly difficult for this parent?
3. Is a child in the care of this parent likely to be at risk in any way? If so, explain?
4. Given the reasons for removal, history of substance abuse and the client's current level of participation in services, can the child return safely to the home?
5. Does the parent have the ability to meet the special needs of the child?
6. Has anything changed since Ms. Ploof's 7/18/17 psychological evaluation that would safely allow her to parent her son, Hunter Ploof?

PSYCHOLOGICAL RE-EVALUATION REPORT
RE: *Jessica L. Ploof*
Date of RE-Evaluation: 10/10/18
Page 2

## BACKGROUND INFORMATION

Ms. Ploof is the mother of Hunter Ploof, now four-years of age. Hunter is in foster care. This case is well-known to the referral source and will not be extensively summarized in this report. Additionally, interested readers are referred to Summaries of Supervised Visitation and the most recent court report (dated 9/10/18). Furthermore, the Assessment of Bonding with Ms. Ploof, her mother, Brendi Ploof, and Hunter (see report by Dr. Bennett dated 6/18/18). Dr. Bennett concluded that Ms. Ploof, "does not have the ability to meet the special needs of Hunter." Dr. Bennett seemed to conclude that the grandmother, "has the ability to parent Hunter…" But added, "…there is concern she may not be able to effectively parent Hunter and continue to support (her daughter)." Dr. Bennett ultimately concluded, "…it is not in Hunter's best interest to return to his mother's and maternal grandmother's care." In the alternative, Dr. Bennett indicated that the child's foster placement, "provided a safe and stable environment with caregivers that understand his medical needs and the level of service he will likely require to be successful."

Ms. Ploof was involved in individual counseling at Buwalda and Associates which has now been concluded. The client has reportedly been employed helping to care for a special needs adult. Hunter is reportedly functioning well in his current placement. At the time of his initial placement, Hunter was described as "severely speech delayed with no social interests and no knowledge of how to interact with other people or children." He continues to receive physical therapy and occupational therapy along with speech and language services at a developmental preschool. An evaluation on 3/12/18 revealed that Hunter has a seizure disorder. According to the recent court report, "It is strongly suspected that Hunter is autistic, but to what degree, is unknown at this time." Contacts between the mother and her son are supervised by a parent aide. Hunter has been in care, initially a kinship placement, since 1/12/17. The youngster has been in his current foster home since 1/26/17.

The following records were reviewed for this evaluation:

- Assessment of Bonding by S. Bryce Bennett, Psy.D. (date of report 6/18/18)
- Progress Report to the Juvenile Court (dated 7/31/18)
- Summary of Supervised Visitations (8/4/18, 8/11/18, 8/18/18, and 8/25/18)
- Comprehensive Child Safety and Risk Assessment (printed 8/24/18)
- Arizona Department of Child Safety – Case Plan (printed 9/5/18)
- Progress Report to the Juvenile Court (dated 9/10/18)
- Email from American Pony Express to Claudia Hoff, DCS (dated 9/10/18)
- Monthly Counseling Progress Report by Kathy Mohr-Almeida, Ph.D. (reporting period August 2018)

THAL(PLOOF) 000220

PSYCHOLOGICAL RE-EVALUATION REPORT
RE: *Jessica L. Ploof*
Date of RE-Evaluation: 10/10/18
Page 3

## ASSESSMENT PROCEDURES

Clinical Interview
Record Review
Personal History Questionnaire Update
Parent Assessment of Child's Competence
Symptom Checklist (SCL-90-R)

## PSYCHOLOGICAL FINDINGS

**Clinical Interview and Behavioral Observations.** At the outset of her assessment, Ms. Ploof was advised that the examiner had been retained again to conduct an updated assessment of her, the results of which would be forwarded directly to her DCS case manager. Ms. Ploof consented to the assessment but also stated that she was confused about being asked to submit to a second psychological evaluation. The client was advised that DCS was seeking additional information about improvements or progress by her in the 15 months since her last assessment. Ms. Ploof agreed to proceed. She was encouraged to ask questions at any time and also advised that she did not need to respond to any questions if she elected not to do so. Furthermore, Ms. Ploof was advised that she could provide any documents of her choosing for the examiner to review as part of the assessment process.

For the last two weeks, Ms. Ploof has been living independently in a two-bedroom apartment. She was at her previous residence for about three months. The client is now living in Apache Junction. The client said she is not in a relationship at the present time. Her mother is currently living in Chandler, but hopes to relocate close to Ms. Ploof, according to her, so that she can assist her with Hunter. This young mother continues to see her child regularly for supervised visits. Hunter is in a licensed foster home. The client was asked why she remained involved with DCS and responded, "Cuz it's taking a long time. I don't know cuz manager told me to." When reviewing the reasons why Hunter came into care, Ms. Ploof denied neglecting her child and denied the house was in poor or unsafe condition. She depicted her mother's small trailer as simply cluttered at the time DCS intervened. Ms. Ploof continues to maintain that her positive for meth was a result of a thwarted male suitor spiking her drink. She denied any issues with respect to alcohol. When asked about the report that she smelled of alcohol and disclosed drinking alcohol in the morning when she was interviewed by a DCS caseworker, Ms. Ploof maintains she had no recollection of making an admission of drinking.

Repeatedly, Ms. Ploof said, "I don't understand," why her son was removed from her care. She said her son receives speech therapy and "repetitive learning." When asked to define the term, Ms. Ploof responded, "consistent learning," adding that she was "not sure." The parent did not know if her son was receiving physical therapy or occupational therapy. Ms. Ploof is aware that Hunter has been diagnosed with seizures. Alarmingly, Ms. Ploof suspects that Hunter's conditions were caused by a

PSYCHOLOGICAL RE-EVALUATION REPORT
RE: *Jessica L. Ploof*
Date of RE-Evaluation: 10/10/18
Page 4

"certain shot." Ms. Ploof believes childhood inoculations cause autism. The client also disclosed that she delayed providing Hunter with his childhood vaccinations for one year in order to lessen the possibility of a negative effect.

Ms. Ploof was questioned at length about her parenting skills and knowledge. She described Hunter as the product of a full-term and unremarkable pregnancy, which was not planned. The client stated that the father, whom she chose not to identify, has not ever been involved in Hunter's life. Ms. Ploof said she obtained prenatal care and her son weighed seven pounds, eight ounces at birth. She denied using drugs or alcohol while pregnant. Ms. Ploof said she was not able to breastfeed Hunter. This client said Hunter was a healthy newborn, though he did not have adequate "muscle tone." This mother denied suffering from postpartum depression after delivering Hunter. Ms. Ploof believes Hunter is bonded to her, to his maternal grandmother, and to his foster parents. However, Ms. Ploof said she regards the foster parents as "not good people," because she believes they want to adopt her son. Nonetheless, she indicated the foster mother has told her she would allow Ms. Ploof to have continuing contact with her son if severance and adoption occurred. Ms. Ploof expressed her opinion that DCS is "trying to get me to fail." She expressed some mildly paranoid thoughts that Hunter has been kept in foster care because the agency receives substantial money for him, particularly since he is a disabled child.

This parent said her son began to crawl before one-year of age and walked at one-year of age. Ms. Ploof said her son began to talk at a year-and-a-half. She reports he is toilet trained and she believes his development is on track. Ms. Ploof said Hunter has received regular pediatric care. The mother said her son has been diagnosed with a "mild" type of epilepsy and has been prescribed medication which she could not identify. Ms. Ploof said her son has episodes in which he "zones out," but denied he has convulsions. Ms. Ploof said her son participates in preschool, though she seemed to know little about his program. The mother described her son as a happy youngster who does not exhibit emotional or behavioral problems.

When asked about the effect on her son of their approximately 18-month separation, Ms. Ploof said that Hunter previously was "crying all the time." More recently he separates after visits without any issues. When asked about important necessities which a parent must provide to a child, Ms. Ploof responded, "love, affection, support, (and a) stable place to live." Ms. Ploof suggested a child should see a doctor every four months and a dentist every year. When asked about problems which could develop which would require immediate medical attention, Ms. Ploof did not understand the question. When the question was rephrased an additional two times, Ms. Ploof said seizures, "not breathing," or "acting weirdly," would prompt such action. This young mother did not know what would constitute a normal or an elevated temperature for a child. She suggested a child would require only eight hours of sleep. When prompted further about a child requiring more sleep, the client responded that a young child would need to nap as well. With prompting, Ms. Ploof was able to identify

PSYCHOLOGICAL RE-EVALUATION REPORT
RE: *Jessica L. Ploof*
Date of RE-Evaluation: 10/10/18
Page 5

basic food groups which included "grains and veggies." When prompted further she was also able to identify "chicken and pot roast," as well as fruit. This mother was asked why protein was important in a child's diet and responded, that a child needs protein for "energy and strong bones."

With respect to her approach to discipline, Ms. Ploof indicated she "talks to him" and reprimands Hunter mildly. The client did not indicate any intention to use harsh measures. She specifically denies any intention to use spankings. This parent seemed to indicate that she would precede timeout by talking to her child, typically an ineffective intervention. Ms. Ploof then seemed to indicate it would be more effective talking to her child after a timeout of four to five minutes. The client expects her mother to provide substantial assistance to her, both financially and in terms of helping her to parent Hunter. Ms. Ploof believes she and her mother have compatible childrearing approaches. The client said she praises her son for things like listening and cleaning up his toys. When asked to provide solutions to hypothetical childhood behaviors, Ms. Ploof seemed to indicate that she would not use aversive measures and prefers to talk in a gentle fashion with her child. When asked to assess Hunter's current functioning, Ms. Ploof described her son as "creative, funny, loves activities, and playing with mommy. (He) loves Ninja Turtles and painting." When Ms. Ploof was asked to identify her son's deficits, weaknesses, areas of concern, disabilities, and handicaps, the client responded that her son has a "slight form of epilepsy, learning delay, low muscle tone, speech, and repetitive learning." When asked about major changes in Hunter's functioning, this parent responded, "better communication (and) describing his feeling better."

For a "few months," Ms. Ploof said she has obtained part-time employment by caring for a disabled person. Ms. Ploof said she is helping care for an 18-year-old young woman by feeding and dressing her. Apparently, another individual assists in the young woman's care as well. This is, essentially, the client's first job. Ms. Ploof seemed to indicate something on the order of six or seven hours a day. Nevertheless, the client then said she is paid only "$50 per week." Ms. Ploof was asked about the accuracy of her report and stated she was unsure how much she was paid. She then estimated she was paid $500 per week. Ms. Ploof also receives SSI benefits, though she was not entirely sure of the amount, estimating she receives about $400 a month. Ms. Ploof said her mother manages her money. Her comments seemed to suggest that her mother may be her SSI payee. With respect to her income or living expenses, Ms. Ploof responded, "I don't know exact prices."

When asked about health related topics, Ms. Ploof said she does not take any medication and she denies suffering from chronic pain. Overall, she denies any medical conditions. Ms. Ploof said she has never had surgery or ever been seriously ill. This young woman does not know her weight but reported that she has a good appetite. Ms. Ploof obtains eight hours of rest per night and feels that she has sufficient energy throughout the day. She engages in regular exercise.

PSYCHOLOGICAL RE-EVALUATION REPORT
RE: *Jessica L. Ploof*
Date of RE-Evaluation:  10/10/18
Page 6

This client said she has never been in trouble with the law. Ms. Ploof said she has not consumed alcohol for about two years. She denied any abuse of drugs such as methamphetamine and contends she unknowingly ingested meth early in her DCS case. Ms. Ploof denies that she has any substance abuse issues.

**Intellectual/Academic Assessment**. Further intellectual and academic testing was not conducted with Ms. Ploof. The client's results from her 7/18/17 evaluation continue to be valid and reliable measures of Ms. Ploof's functioning and interested readers are referred to her prior results. Those results suggested Ms. Ploof functions in the extremely low range of intellectual ability.

When asked about her own career goals, Ms. Ploof said she would like to continue her education and go to college, though she is not sure of an area of study or a specific career field.

**Social/Emotional Assessment**. Ms. Ploof presented promptly for her evaluation appointment. She was well-groomed, alert, and cooperative. Ms. Ploof was very hesitant about completing a written personality test, suggesting that her results would reflect poorly upon her because she had "failed" her previous psychological evaluation. Ms. Ploof was encouraged to do her best and she agreed to proceed. This client was sometimes avoidant with respect to eye contact. Ms. Ploof seemed somewhat socially uncomfortable, but she did not display any agitation or hostility. Her introspective abilities seemed to be limited. Ms. Ploof seemed anxious. She denies any self-destructive thoughts. This client did not exhibit any signs of psychosis. Her self-knowledge is limited by her intellectual disability. Overall, however, her reality testing is intact. Ms. Ploof is clearly distressed about losing custody of Hunter permanently.

This client seemed to give a good effort during most of her evaluation. Her motor activity was unremarkable. Her stream of thought seemed appropriate. Her concentration was adequate. She frequently asked questions which suggested confusion about the evaluation process and about the nature of a number of questions posed to her. Ms. Ploof's listening comprehension is poor. At all points, explanations and encouragement were provided to this apprehensive young woman.

When asked about improvements in her life since her last evaluation, Ms. Ploof responded, "(I) make better choices." When asked how she had improved as a parent, the client again responded, "(I) made better choices in life." The client provided the same response again when asked about any major changes in her life since her July 2017 evaluation. When asked to rate her life satisfaction, Ms. Ploof responded that her life was, essentially, perfect by stating that she would rate herself at "100" on a scale of 0 to 100 where 100 is the highest and best possible score. Ms. Ploof reports that she "never" feels lonely, hopeless, discouraged, tense, nervous, or angry. Specifically, Ms.

PSYCHOLOGICAL RE-EVALUATION REPORT
RE: *Jessica L. Ploof*
Date of RE-Evaluation: 10/10/18
Page 7

Ploof said she does not experience depression, anxiety, fears, or mood swings. She does not believe that she is in need of any mental health services. The client did not identify any particular negative thoughts, worries, or concerns. Ms. Ploof said she has "never" been suicidal or had any urges to harm others. The client said she is not in counseling at the present time.

On the Symptom Checklist (SCL-90-R), an inventory of distressing experiences during the preceding week, this client did not endorse any single item. Since the SCL is a self-report inventory composed of many symptoms which are experienced by normally functioning adults, Ms. Ploof's responses seemed to be superficial and likely reflect a lack of self-awareness.

The client reported completing drug treatment at TERROS and commented, "I honestly didn't need those classes." Ms. Ploof also reported she no longer is required to drug test. The client said she participated in individual counseling for "a few months," but commented again about an absence of issues, stating, "I don't have problems with my emotions." However, during her evaluation, Ms. Ploof clearly appeared distressed at times. At one point she admonished herself, saying, "I promised I wouldn't get frustrated!" Ms. Ploof explained she was up quite late the preceding evening and could not sleep because she was worried about her performance during this psychological evaluation. She repeatedly returned to her confusion about why she was being asked to submit to another psychological evaluation. The client expressed a number of times, "There's no reason I can't parent."

An attempt was made to administer the MMPI-2-RF to Ms. Ploof. A lack of understanding of item content became apparent, along with an overly cautious and obsessive response to item content. The attempt at administering the instrument was eventually discontinued as the client became increasingly frustrated and perturbed about responding to questions which she, evidently, believed would portray her in a negative light. Extending even to very neutral questions on the MMPI-2-RF such as questions about her career interests.

### **CONCLUSIONS**

Jessica L. Ploof was referred for a re-evaluation. This young mother's now four-year-old son has remained in foster care. Hunter has not had any unsupervised visits with his mother. Ms. Ploof has participated in a wide range of services but, not surprising given the nature of her mental deficiency, there are not significant changes in her parenting profile. This is an intellectually disabled young woman who has substantial difficulty with concepts, timeframes, and retaining factual information. She is more than willing to follow directives and she clearly loves her toddler. However, placing Hunter in Ms. Ploof's sole and independent care would likely place the child at risk for inadvertent neglect, impaired decision-making, and significant under-stimulation of the child's already reportedly compromised learning abilities.

PSYCHOLOGICAL RE-EVALUATION REPORT
RE: *Jessica L. Ploof*
Date of RE-Evaluation: 10/10/18
Page 8

It is troubling to note that Hunter has developed an epileptic seizure disorder and learning issues which require proactive parenting and diligent supervision. It is also alarming that this young parent continues to deny or misunderstand why her child came into care in the first place. Those reasons included deplorable living conditions and reports that Hunter was alarmingly under-developed. Ms. Ploof, despite her best intentions, is not capable of providing adequate care reliably and consistently over time. As was the case during her previous evaluation, Ms. Ploof appears to be best suited to assist a fully capable and competent caregiver.

In response to the presenting referral concerns, the following opinions and conclusions are submitted:

1. *What is the prognosis that Ms. Ploof will be able to demonstrate minimally adequate parenting skills in the foreseeable future? With existing/proposed interventions, do you feel that she will be able to discharge parental responsibilities in the foreseeable future?* **The prognosis that Ms. Ploof will be able to demonstrate minimally adequate parenting skills in the foreseeable future is poor.**
2. *What stress factors are evident in the parent-child relationship that would make parenting particularly difficult for this parent?* **Ms. Ploof was not observed with her child. For an extensive examination of this referral question, readers are referred to Dr. Bennett's bonding assessment of Ms. Ploof and her son.**
3. *Is a child in the care of this parent likely to be at risk in any way? If so, explain?* **A child in the care of this parent would likely be at risk for inadequate intellectual stimulation and a lack of adequate routine care and attention. In particular, Ms. Ploof's medical decision-making abilities are significantly limited.**
4. *Given the reasons for removal, history of substance abuse and the client's current level of participation in services, can the child return safely to the home?* **Given the data reviewed for this evaluation, it is not in Hunter's best interest to be returned to the care of his mother.**
5. *Does the parent have the ability to meet the special needs of the child?* **It does not appear that Ms. Ploof, by virtue of her intellectual disability and the accompanying impact on her judgment and decision making, is able to meet the special needs of her child.**
6. *Has anything changed since Ms. Ploof's 7/18/17 psychological evaluation that would safely allow her to parent her son, Hunter Ploof?* **Ms. Ploof does not yet comprehend why her child was taken into care. While she has obtained part-time employment and her own apartment, it does not appear that significant change has occurred since Ms. Ploof was evaluated 15 months ago, which would suggest that she can safely parent Hunter.**

PSYCHOLOGICAL RE-EVALUATION REPORT
RE: *Jessica L. Ploof*
Date of RE-Evaluation: 10/10/18
Page 9

## DIAGNOSTIC STATEMENT

| | |
|---|---|
| 319 | Mild Intellectual Disability |
| 995.52 | Child Neglect, by history |

## RECOMMENDATIONS

1. Given that the recent bonding/best interest assessment ruled out Ms. Ploof as a competent caregiver for Hunter, it is not recommended that he be placed in the mother's care and custody.
2. It appears that alternative long-term placement planning is necessary to ensure Hunter's health, safety, and wellbeing. If his current foster parents are appropriate, they should be considered as an adoptive placement.
3. Ms. Ploof is encouraged to continue working in order enhance her self-sufficiency.
4. Ms. Ploof is encouraged to continue her education in order to maximize her abilities. Vocational training would be most appropriate.

*James S. Thal, Ph.D.*

JST:tsk