# EXHIBIT I

# Andrew Clark, M.D.

Telephone: 801-960-2138
Fax: 617-830-7281
Email: Andrewclark@andrewclarkmd.com

Board Certified, Adult, Child and Forensic Psychiatry    10 Concord Ave
*American Board of Psychiatry and Neurology*              Cambridge, MA 02138

**Psychiatric Expert Report**
**June 23, 2025**

Re: Jessica Ploof v State of Arizona, et al.
Case No 2:21-cv-00853-JJT-PHX

## Introduction:

Jessica Ploof is a 31-year-old woman who is the mother of a boy H▮▮▮▮ (DOB 4/▮▮/2014). Jessica and her mother Brendi Ploof raised H▮▮▮▮ together until he was removed by DCS in January 2017. Both Jessica and Brendi underwent psychological evaluations by Dr. James Thal in 2017 and 2018 while the child protection case was ongoing; Jessica's parental rights were eventually terminated.

I was asked by Attorney Thomas Connelly to review records and offer an opinion as to the standard of care employed by Dr. Thal in the course of his various evaluations in this matter.

I am a licensed physician in the Commonwealth of Massachusetts, and am Board Certified in Psychiatry as well as Child and Adolescent Psychiatry and Forensic Psychiatry. My CV is attached. I have conducted over 50 evaluations in the context of child welfare cases, working for both the Child Protective Services in Massachusetts and on behalf of parents' attorneys. The opinions presented here are offered within a reasonable degree of medical certainty. The opinions in this report are based on the information available at the time of the evaluation and are subject to modification in the event that new information is received.

## Source of Information:

The following records were reviewed as part of this evaluation:

1) Psychological Evaluation of Jessica Ploof by James S. Thal, Ph.D., undated (date of evaluation given as 7/18/17).
2) Psychological Evaluation of Brendi Ploof (marked as original), subject redacted, undated (Date of Evaluation given as 1/4/18).
3) Psychological Evaluation of Brendi Ploof (marked as revised), subject redacted, undated (Date of Evaluation given as 1/4/18).
4) Emails with handwritten notes from Dr. Thal's file, 1/18/18 through 1/30/18.
5) Letter from James S. Thal, Ph.D., to Claudia Hoff, unsigned, 1/29/2018 (characterized as "not sent").
6) Letter from James S. Thal, Ph.D. to Claudia Hoff, 3/14/2018.
7) Assessment of Bonding of Jessica Ploof, by Dr. S. Bryce Bennett, Psy.D. 6/18/18.
8) Psychological Re-Evaluation Report of Jessica L. Ploof by Dr. James Thal, undated (Date of Re-evaluation given as 10/10/18).
9) Psychological Re-Evaluation Report of Brendi Ploof by Dr. James Thal, undated (Date of Re-evaluation given as 1/14/19).
10) Psychological Evaluation of Jessica Ploof by D. J. Gaughan, Ph.D., 3/25/2025.
11) Deposition transcript of Dr. James Thal, 4/2/2025 and 5/8/2025.
12) Emails between Dr. James Thal and Claudia Hoff, 2/1/18 and 2/2/18.
13) DCS Request for Services, 11/8/17 regarding Brendi Ploof.
14) Banner pediatric records for H▬ Ploof

**Review of Records:**

Psychological Evaluation of Jessica Ploof by James S. Thal, Ph.D., undated (date of evaluation given as 7/18/17):

   Dr. Thal noted the hotline allegation that Ms. Ploof had been using meth and marijuana. He noted urine and hair follicle tests positive for methamphetamines, and a urine test positive for alcohol. He noted that Ms. Ploof had at some unspecified time smelled of alcohol at a meeting with DCS personnel.

He noted that Ms. Ploof had been prescribed psychotropic medications for depression and anxiety, and at one point had made a comment about killing herself.  He noted that Ms. Ploof received Social Security benefits for mild intellectual disability. He reported that the mother had "exhibited significant parenting deficits" during the supervised visits with the child. He described Hunter as exhibiting "no social interest" and being "severely speech delayed" at the time that he came into care.

 Ms. Ploof scored a Full Scale IQ of 65, placing her in the intellectually disabled range.

Dr. Thal concluded that Ms. Ploof had "engaged in some reckless abuse of dangerous drugs."

 Dr. Thal concluded that Ms. Ploof had inadequate parenting skills by virtue of her mental deficiency and that a child could not safely be returned to her sole custody.

2

Dr. Thal gave Ms. Ploof the following diagnoses:
1) Mild Intellectual Disability
2) Alcohol use disorder, in early remission.
3) Methamphetamine Use Disorder, in early remission
4) R/0 [a medical term meaning rule out] Bipolar I Disorder, unspecified.

DCS Request for Services, 11/8/17 regarding Brendi Ploof:

The DCS requested a psychological evaluation of Brendi Ploof by Dr. Thal. The referral noted some of the allegations contained in the hotline report, as well as the response of Jessica and Brendi. It noted that H▮▮▮▮ appeared to be severely delayed at the time he came into care, and that although he had made "great strides" while in foster care, he continued to require services. The referral referenced the Department's concerns about Brendi's ability to understand information.

Psychological Evaluation (marked as original) of maternal grandmother, subject redacted, undated (Date of Evaluation given as 1/4/18):

Dr. Thal's conclusions in this report highlighted the advantages of placing the child with the grandmother. He did not raise any concerns regarding the grandmother's mental health or capacity to care for the child. He concluded "Placement of H.P. in this grandmother's care and custody with the proper conditions appears to be appropriate", and that "Ms. Ploof likely possesses the ability to meet the special needs of her grandson."

Dr. Thal recommended that the grandmother seek permanent guardianship of the child, that she not leave the child unsupervised in the care of the mother for prolonged periods of time, and that some conjoint therapy sessions with mother and grandmother would be useful for the purposes of helping the mother to understand the primary caretaking role of the grandmother.

Letter from James S. Thal, Ph.D., to DCS Worker Claudia Hoff, unsigned, 1/29/2018:

Dr. Thal wrote, "In discussing this case further with your predecessor, Paige Szymkowski, I would recommend further assessment regarding what is the best placement for Hunter given his special needs and his relationships with adults who've been primarily involved in his life. Therefore, I would recommend that you seek a bonding/best interest evaluation of the child and the parties involved…. I appreciate the opportunity to supplement my recent report with this correspondence…"

Emails with handwritten notes from Dr. Thal's file, 1/18/18 through 1/30/18:

On 1/18/18, Dr. Thal sent his psychological evaluation report to DCS Worker Paige Syzmkowski. On 1/24/18 Ms. Syzmkowski scheduled a telephone call with Dr. Thal. Handwritten notes dated 1/30/18 reflect Ms. Syzmkowski's concerns regarding the grandmother, the state of the child, and the status of the child in the current foster home.

Emails between Dr. James Thal and Claudia Hoff, 2/1/18 and 2/2/18:

  On 2/1/18 Claudia Hoff wrote to Dr. Thal to indicate that she was the new CM [presumably Case Manager] for this case, that she was aware he had spoken with previous CM Paige, that she had not yet disclosed his report, and therefore that if he had any changes he wished to make he could update the report and send it to her.

  On 2/2/18, Dr. Thal wrote to Ms. Hoff that he had not been aware that the report had not yet been disclosed, that he would therefore rework the recommendations, and he requested that any copies of the report he had sent a few days previously should be shredded.

  A short time later, Ms. Hoff wrote back to Dr. Thal that she had been holding off [presumably in regard to disclosing the report] as she knew that Paige had concerns; she indicated that she would shred the original report.

Psychological Evaluation (marked as revised), subject redacted, undated (Date of Evaluation given as 1/4/18):

  Dr. Thal's revised Psychological Evaluation of the grandmother differed from the original evaluation in the following ways:

  1) No changes in any of the psychological findings that made up the body of the report.
  2) No changes in the Background Information detailed at the beginning of the report.
  3) Additional concerns regarding the grandmother noted in regard to questions 1, 2, 4, and 9.
  4) A new diagnosis of Child Neglect by History, code 995.52.
  5) The addition of a recommendation for a bonding/best interest evaluation to include the mother, grandmother, and foster parents.
  6) The addition of a recommendation that if the grandmother were to adopt, she would need to ensure an appropriate living environment and access to necessary services.
  7) A revision of the recommendation of a home study to "ensure that her home constitutes a safe and appropriately stimulating environment for her grandson."

Letter from James S. Thal, Ph.D. to Claudia Hoff, 3/14/2018:

  Dr. Thal wrote that he had sent his original report on 1/18/18. He then spoke on the telephone with Paige Szymkowski on January 30 of that year. Ms. Szymkowski expressed

4

her concerns regarding the substandard condition of the grandmother's residence and the child's poor overall condition when he came into care. Paige also raised a major point regarding the relationship that she believed H▇ had established with his foster parents. Dr. Thal wrote that he advised Ms. Szymkowski that he would review his findings and consider drafting a follow-up letter suggesting ways to address her concerns. Subsequently Dr. Thal revised his report and re-issued it on February 7, 2018, while suggesting that the original report be shredded.

Assessment of Bonding of Jessica Ploof, by Dr. S. Bryce Bennett, Psy.D. 6/18/18:

   Dr. Bennet noted that the child H.P. had been diagnosed with FAS (Fetal Alcohol Syndrome). He noted that at the time the child had come into care he had significant behavioral and developmental concerns, but "has made significant progress during his time in foster care."

   In regard to Jessica Ploof, Dr. Bennet concluded that "she has not yet learned enough to effectively parent H.P.....it is unknown what improvements, if any, Ms. Jessica could continue to make."

   In regard to the grandmother, Ms. Brendi Ploof, Dr. Bennet raised concerns that "she seemed to lack an understanding of H.P.'s medical needs beyond developmental delays." And did not recognize the support her daughter would need. Dr. Bennet quoted a DCS Case Manager as indicating that the mother and grandmother's involvement in the case was "barely minimal" and noted that they had missed a CFT. Dr. Bennet then concluded that "their current level of involvement in the case suggests that neither of them comprehends the scope of his needs."

   Dr. Bennet concluded that Jessica did not have the ability to meet the special needs of H.P. In regard to the grandmother, he opined that she did have the ability to parent H.P., although then noted that she would need to invest in order to become an effective parent, "and the case manager already expressed concerns that they have been minimally involved in the case lately."

Psychological Evaluation of Jessica Ploof, Dr. James Thal, undated, Date of Re-evaluation 10/10/2018:

   The report noted that H▇ had been diagnosed with a seizure disorder and that he was "strongly suspected" to have autism.

   The report noted that Jessica had concluded a course of individual counseling, had completed drug treatment through the Terros program, and had been employed helping to care for a special needs adult. She was seeing H▇ regularly on supervised visits. Dr. Thal expressed alarm that Jessica believed H▇'s autism may have been caused by a

5

childhood immunization.[1]  Ms. Ploof reported that she had not drunk alcohol in about 2 years, and she denied any abuse of drugs such as methamphetamine.

Dr. Thal noted his alarm at Jessica's lack of understanding as to why H▮▮▮▮ had come into care in the first place, which included alleged "deplorable living conditions and reports that H▮▮▮▮ was alarmingly under-developed."  In his interviews with Jessica, she denied that she had neglected H▮▮▮▮ and denied that the house had been in a poor or unsafe condition.

Dr. Thal concluded that there had been no significant changes in Ms. Ploof's parenting profile. He opined that she would be best suited to assist a fully capable and competent caregiver.

Dr. Thal recommended "alternative long-term placement planning" for H▮▮▮▮. He did not address the possibility of Hunter being in his mother's primary care.

Psychological Re-Evaluation Report of Brendi Ploof by Dr. James Thal, undated (Date of Re-evaluation given as 1/14/19):

Dr. Thal noted that Ms. Brendi Ploof had recently moved to a six-bedroom home with her twin sister in the hopes of adopting her grandson, and also indicated that her sister could help care for H▮▮▮▮.

Ms. Ploof asserted that the reasons given by DCS for H▮▮▮▮'s removal from the mother's care were completely baseless. Ms. Ploof noted that she remained puzzled by the bonding examiner's recommendation against the placement of the H▮▮▮▮ with her. Ms. Ploof reported that she had changed jobs so that she would soon be working 20 hours a week rather than 40 hours a week in order to be more available for H▮▮▮▮. Ms. Ploof also noted her experience working with special needs children in the past. Ms. Ploof described H▮▮▮▮ as having absence seizures, which are now controlled by anti-seizure medication. She reported that H▮▮▮▮ was in a developmental preschool where he receives occupational and speech therapy. She reported that although H▮▮▮▮ has not been formally diagnosed with autism, attempts are being made to arrange for a diagnostic evaluation.  She described H▮▮▮▮ as exhibiting a range of OCD like behaviors. She indicated an expectation that H▮▮▮▮ would have learning problems in the future. Ms. Ploof took issue with the DCS statement that Hunter had fetal alcohol syndrome.

In conclusion, Dr. Thal noted that Ms. Ploof pledged that she would supervise any contacts between H▮▮▮▮ and his mother. She asserted that she thought it would be unjust to sever Jessica's rights.

Dr. Thal saw no signs of a mental illness or personality disorder.

---

[1] [1] The 2024 Annenberg Public Policy Center survey found that 24% of Americans believe that there is a link between the MMR vaccine and the development of autism.

Dr. Thal concluded," given Ms. Ploof's failure to recognize the original allegations of neglect questions about her ability to protect, and the results of the recent bonding assessment, placement of H▇ with his maternal grandmother is not recommended."

Banner Children's Pediatric Records for H▇:

   Records indicated that the mother and grandmother had brought H▇ into the office for a number of routine concerns, including an ear infection, vomiting and fever

   Records indicated that H▇ had been identified as having low muscle tone as an infant, and received Early Intervention services as a result. He was receiving physical therapy and speech therapy through Early Head Start. The records noted that there had been no history of intrauterine drug or alcohol exposure.

   H▇ was seen for a two year old well child check on 5/25/2016 (he was just two years old at this time)- this was the last visit noted before the child was removed. At that time he was noted to have a speech delay (could speak single words, and knew about 10 words) as well as a history of delayed walking. He was noted to be a picky eater. A developmental screening was performed. H▇ was said to have normal physical growth. He was getting physical therapy and speech therapy. No further concerns were noted.

H▇ was seen as a new foster child on 1/13/2017. His problems at that time included delayed immunizations (the mother and grandmother had consistently declined immunization for H▇), Hypotonia [low muscle tone], Speech delay, delayed walking as an infant, and Transient alteration of awareness [concerns with staring episodes and possibly a seizure disorder]. The doctor noted that the mother had not followed through on the EEG or MRI recommended by Dr. Timothy [presumably the Neurologist], and that the mother had declined to have a full developmental evaluation done when H▇ was younger.

**Impressions and Conclusions:**

Impressions Regarding Dr. Thal's Report of Jessical Ploof of July 2017:

   There are, in my opinion, several ways in which this report is substantially deficient. They include:
   1) Although the date of the interview with the mother is provided, there is no indication of the date when the report was actually written. Evaluations such as this are often written months after the actual interview, and information is often collected both before and after interviews, so that the absence of a date interferes with the reader's ability to establish the timing and context of the product[2].

---

[2] This deficiency becomes especially problematic in regard to Dr. Thal's subsequent reports on the mother.

2) On several occasions in the Background Information portion of the report, Dr. Thal reports opinions without attribution, suggesting that they are accurate. For example, on page 3 of the report, he states, "Ms. Ploof reportedly has exhibited significant parenting deficits" without noting the document from which he drew the information, who reported this, or what specific deficits were noted. This impedes the reader's ability to critically evaluate his selection of information. Laying out a transparent and thorough recording of the information that forms the basis of a report is a core aspect of forensic report writing.

3) Similarly, Dr. Thal wrote in that same paragraph that when the child came into care he "appeared to have been understimulated." On this occasion Dr. Thal appears to be repeating someone else's presumption that the cause of the child's developmental delay was a lack of social interaction. In fact, there are a host of possible causes for a child's delayed development, spanning almost all of pediatric medicine, so that assuming emotional neglect on the part of the mother without any further information is both groundless and highly prejudicial. It is the job of the forensic evaluator to determine how much weight to give particular pieces of information, and to use their expertise in doing so. In this instance, Dr. Thal appears to have uncritically accepted a presumption that is detrimental to the mother and that forms a central aspect of the allegations against her. Any well-trained mental health clinician should be aware that there are multiple causes for developmental delay, and that having a child with a delay does not necessarily implicate the parents as deficient.

4) On page 9 of the report Dr. Thal concludes that Ms. Ploof "engaged in some reckless abuse of dangerous drugs." In fact, all Dr. Thal knew at the time was that Ms. Ploof had at one point tested positive for marijuana, alcohol and methamphetamine, and that a DCS worker had at one point reportedly smelled alcohol on her. Given that, I take his use of the phrase "reckless abuse" to be inflammatory, unnecessary, and unsupported, raising concerns around the degree of impartiality he brings to the evaluation.

5) Dr. Thal obtained information from Ms. Ploof that she had recently been prescribed medication for depression and anxiety, and that she had been prescribed "mood stabilizers and Abilify". In addition, he noted that she had reportedly made a comment at one point about killing herself. On page 10 of the report, he gives Ms. Ploof the diagnosis of R/O 296.40 Bipolar I Disorder, Unspecified. Bipolar I Disorder is a severe psychiatric illness characterized by episodes of mania. However, the information contained in this report does not support a single DSM-V diagnostic criterion for Bipolar I Disorder. The fact that someone at some point had prescribed her a medication that is sometimes used in the treatment of Bipolar Disorder (along with a myriad of other uses) does not, in itself, contribute anything to the diagnosis. As such, this diagnostic conclusion is both ungrounded and inflammatory. In addition, Dr. Thal either knew or should have known that placing the letters "R/O" in front of this diagnosis is meaningless to non-medical readers.[3]

---

[3] R/O is a medical term meaning "rule out", indicating a diagnosis that is suspected but not yet confirmed.

6) Dr. Thal gave Jessica Ploof the diagnoses of Alcohol Use Disorder in early remission, and Methamphetamine Use Disorder in early remission. According to the DSM-5, each of these diagnoses requires at least 2 of 11 possible criteria; the information available in this report regarding Ms. Ploof's drug and alcohol use does not support any of those criteria. By giving her the diagnoses of drug and alcohol use disorders, rather than simply noting her drug and alcohol use, he makes her usage appear more problematic and entrenched than is supported by the information.

7) For Dr. Thal to have given Ms. Ploof three highly significant and potentially damaging psychiatric diagnoses without being able to support even a single one of the various diagnostic criteria necessary raises serious questions, in my opinion, in regard to either his clinical acumen or his impartiality. Dr. Thal testified at his deposition that the DSM-V is meant to be aspirational, and is not a cookbook. Indeed, the DSM-V notes that the diagnostic criteria should be informed by clinical judgment. However, Dr. Thal does not seem to appreciate the fact that forensic evaluations are different in kind from clinical assessments, and that psychiatric diagnoses in forensic evaluations carry a great deal of weight, and need to be offered with precision and care. If he believed that Ms. Ploof had aspects of these disorders that were important to note he could have either simply discussed them in his conclusion or have given the diagnosis while making clear the ways in which all of the diagnostic criteria were not satisfied. It falls below the standard of care to offer a formal psychiatric diagnosis in a forensic evaluation based simply on some unexplained clinical intuition.

Impressions in Regard to Dr. Thal's Two Evaluation Reports of Brendi Ploof in January 2018:

Dr. Thal wrote an initial Psychological Evaluation Report of the maternal grandmother, Brendi Ploof. Although the report was undated, it was reportedly sent to DCS on 1/18/2018. The report supported the grandmother as an appropriate placement for Hunter, and supported the grandmother seeking permanent guardianship. Dr. Thal had previously evaluated Jesscia Ploof, for which he had reviewed background information, and for this evaluation he additionally reviewed a recent progress report and a case plan.

Subsequently, DCS did not release the report, but rather arranged for the former case manager Paige Szymkowski to have a telephone call with Dr. Thal on 1/30/2018, during which she expressed her concerns about the maternal grandmother. Dr. Thal subsequently drafted a revised report and sent it to DCS on 2/7/18, while requesting DCS to shred their copy of his original report.

I have a number of concerns about the process employed here. They are as follows:

If Ms. Szymkowski had communicated new information to Dr. Thal during the 1/30/18 telephone call, he should have noted that in his report, which he did not. As a result, the foundation for the conclusions provided in the original report is exactly the same as the

9

foundation of the revised report, and yet the recommendations are dramatically different. The conclusions of forensic evaluations are supposed to be built upon a foundation of information, flowing logically, coherently and transparently from information to conclusion. That the same foundation of information could lead to two very different sets of conclusions would suggest that either Dr. Thal's forensic process is fundamentally incoherent and unreliable, or that something happened between 1/18/18 and 2/7/18 that is not articulated in his report that caused him to change his conclusions.

We have reason to believe that the latter explanation is the correct one, as Dr. Thal wrote in his letter of 3/14/18 that he reviewed his original report and subsequently made revisions in response to the concerns expressed by Ms. Szymkowski. This letter is, I believe, highly revealing as to what happened in this instance.

Dr. Thal noted in his letter of 3/14/18 that the DCS worker had expressed concerns about the home and about H▬'s condition at the time. However, he had already had the opportunity to review DCS records on this case for his first report as well as for his evaluation of Jessica, and he did not detail any new information in the body of his second report, and so the assertion that he had received important new (but undisclosed) information about the case is not, in my opinion, credible. While it is possible that Dr. Thal's first report was so deficient in its information gathering that he failed to appreciate indications of possible neglect at the time of removal, the fact that he did not change a single word of the information section of his second report would seem to belie that.

Dr. Thal wrote in his letter of 3/14/2018 that a "major point" he had discussed with Ms. Szymkowski was the "critically important relationship" that she believed had developed between H▬ and the foster parents, and the related "question of H▬'s best interest." In this regard, I believe Dr. Thal was deeply confused about his role and the scope of his evaluation. He had not been asked to assess H▬'s attachment to the foster parents, and he knew nothing about it aside from the verbal report of the prior case worker. Furthermore, to the extent that he took that into account, he did not document it in his report. In doing so, he allowed the former caseworker to exert a substantial influence on his report, based solely on her personal opinion, using information that fell outside the scope of his work, and he did so without acknowledging the new information in his revised report.

More importantly, Dr. Thal had not been asked to opine on what sort of placement would be in H▬'s best interest. Not only is that not the relevant legal standard for the case (as I understand Arizona law), but it was outside the bounds of his charge, which was to do a psychological evaluation of the grandmother. It seems clear, therefore, that in the conversation of 1/30/18 Ms. Szymkowski managed to convince Dr. Thal that H▬'s best interests were to remain with the foster family, and that Dr. Thal then reverse-engineered his report to support that outcome. Rather than being an impartial expert assessment of the maternal grandmother, the revised report appears to have been simply an effort to support the ultimate outcome preferred by the former DCS case worker. A process such as this, in my opinion, makes a mockery of the very idea of independent expert assessment intended to aid the Court, and of the due process rights of the parties involved.

10

   Although Dr. Thal had been commissioned by DCS to conduct this evaluation, he was not acting in the role of a partisan consultant, but rather as an impartial, independent evaluator. An attorney who hires a partisan expert is free to dismiss the expert if the expert's conclusions do not support the attorney's litigation strategy, and that attorney may discuss the evaluation with their hired expert prior to the report's admission to court, making suggestions and proposed modifications. An independent evaluator however, must take pains to remain in a position of equipoise between the two sides, and avoid even the appearance of partisanship. For Dr. Thal to allow himself to engage in a substantive, ex parte discussion with one side of the case, and to allow that undisclosed discussion to dramatically influence a report that had already been completed, demonstrates a significant degree of partisanship and falls below the standard of care.

   On 3/6/18 Dr. Thal received an email informing him that his first report had in fact been released, and so "the attorneys caught that there were two different reports." It was only after this that he wrote a letter on 3/14/18 to offer an explanation. It is likely, in my opinion, that Dr. Thal and the DCS worker had not intended to disclose the existence of the first report, the fact of the telephone call of 1/30/18, or the reasons for the revisions that were made. Their plan to shred the original report would be consistent with this. One of the cornerstones of forensic evaluations is transparency- the process of an evaluation, the information obtained, and the reasoning toward conclusions is clearly spelled out to all parties and to the court, allowing for scrutiny by all sides. It is below the standard of care to not disclose information that was relied upon by the evaluator in formulating their opinions, particularly in this case, information that had such a substantial impact.

   There is typically an agreed upon process by which the forensic evaluator transmits a completed forensic report to the parties. In this case, it appears that the process was one in which Dr. Thal would send the completed report to the DCS worker, who would then distribute it to the other parties. Once his first report had been signed and sent, it was out of his hands, and the responsibility for managing it ethically fell to DCS. While Dr. Thal's suggestion that DCS shred his first report may place him in an unfavorable light, in my opinion, it was up to DCS at that point to push back on any such suggestion. Where Dr. Thal's behavior did fall below the standard of care, I believe, was in producing a second report that made no mention of the first, perpetuating a deceit around what had occurred.

   If in fact DCS made efforts to hide the existence of the first report, and to attempt to sway the conclusions of an expert through ex-parte communication, that in my opinion, raises serious questions about the ethics and appropriateness of their behavior here.

   The most likely explanation for what occurred in this instance, I believe, is that the DCS worker disagreed with Dr. Thal's original set of recommendations around the grandmother, and so rather than release the reports she instead spoke with Dr. Thal and convinced him to change his conclusions, with the expectation by both of them that their

agreement could be kept secret. In effect, they colluded to produce a report that would support a predetermined outcome that the former DCS worker preferred.

In his revised report of Brendi Ploof, Dr. Thal added the diagnosis of Child Neglect by History, denoted by the diagnostic code of 995.52. He appears to have made an error here, as this diagnosis refers to the medical condition of children who have suffered malnutrition as a result of neglect. Given that Dr. Thal went to the trouble to look up a formal diagnostic code, one would expect that he would bother to learn what it actually represented before putting it into his report. It appears that Dr. Thal was using this "diagnosis" as a way to give the imprimatur of psychological expertise to the assertion that the grandmother had neglected the child. Again, it appears that he added this "diagnosis" after his conversation with the DCS worker in an effort to justify his altered recommendations. And, again, it appears that he presumed that Hunter's developmental delays were the result of neglect, rather than any number of other possible causes. It falls below the standard of care, in my opinion, for a forensic evaluator such as Dr. Thal to give a highly prejudicial diagnosis to a subject without an understanding of what that diagnosis actually means.

Whether the information that Dr. Thal obtained adequately supported the conclusions that he drew is a matter that has already been litigated and is beyond the scope of my expert opinion here.

**Conclusions:**

In sum, it is my opinion that Dr. Thal's initial evaluation of Jessical Ploof was problematic in several ways, and that it fell below the standard of care in that he gave her three psychiatric diagnoses with minimal justification.

It is my opinion that Dr. Thal's two evaluation reports of Brendi Ploof in January and February of 2018 were also problematic in several ways, and that his actions fell below the standard of care in his agreeing to dramatically revise his initial report solely at the behest of the former DCS case manager, and his then issuing a second report without acknowledging the existence of the first, the fact of the ex-parte communication, the substance of the new information obtained, or the reasons for his reversals. It also fell below the standard of care when Dr. Thal gave her a diagnosis that he apparently did not understand.

Respectfully Submitted,

*Andrew Clark*

Andrew B. Clark, M.D.