# EXHIBIT 45

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Jessica Ploof, an individual,      ) Case No.
                                    ) 2:21-cv-00853-JJT-PHX
        Plaintiff,                  )
                                    )
    vs.                             )
                                    )
State of Arizona, et al.,           )
                                    )
        Defendants.                 )
_____   )

DEPOSITION OF ANDREW CLARK, M.D.

November 5, 2025

2:10 p.m.

Phoenix, Arizona

Prepared by:                    Magna Legal Services
JENNIFER HONN, RPR                   866-624-6221
Arizona CR No. 50885            www.magnals.com
(Original)



EXHIBIT 45

Page 4

1                    ANDREW CLARK, M.D.,

2    called as a witness herein, having been first duly sworn

3    by the Certified Reporter to speak the whole truth and

4    nothing but the truth, was examined and testified as

5    follows:

6

7                    EXAMINATION

8    BY MR. HUNTER:

9        Q.    Will you please state your full name for the

10   record, Doctor.

11       A.    Andrew Clark, C-l-a-r-k.

12       Q.    And Dr. Clark, I'm Jeff Hunter.  We've met

13   before on another case.

14             I'm going to ask you a number of questions today

15   concerning the Ploof matter.

16             A couple instructions.  If you don't understand

17   my question, please let me know.

18       A.    Yes.

19       Q.    And if you answer it, we're going to assume you

20   understood it; fair?

21       A.    Fair.

22       Q.    Always need a verbal response, yes, no,

23   explanation.  Okay?

24       A.    Understood.

25       Q.    And if I cut you off, please let me know.


EXHIBIT 45

Page 9

```
 1      A.   I reviewed them before I authored my reports.  I
 2  did not rely on them for my reports, and so I did not
 3  list them.
 4      Q.   You anticipated my question.
 5           (Reporter clarification.)
 6  BY MR. HUNTER:
 7      Q.   Is it fair that the documents that you relied on
 8  are the 14 documents listed in your original report plus
 9  the deposition transcripts of Dr. Thal?
10      A.   Yes.  Plus the expert report from Dr. Tomasino.
11  Yes.  And I will try to speak up.
12      Q.   And you stated in your report from July 15,
13  2025, which is titled Response To Defendant's Expert
14  Report, that on page 4 you write, "It's clear, however,
15  that the revision of Dr. Thal's assessment changed the
16  trajectory of the case."
17           Do you remember writing that?
18      A.   I do.
19      Q.   Okay.  First of all, when you say "revision of
20  Dr. Thal's assessment," which assessment are you
21  referring to in that statement?
22      A.   So the January 2018 assessment of the
23  grandmother, and then the revision that came in it would
24  be late January 2018.
25      Q.   Of Brendi Ploof?
```


EXHIBIT 45
MAGNA

Page 10

```
 1      A.   Of Brendi Ploof.
 2      Q.   Okay.  And, in your opinion, under that
 3   assessment, quote, "Changed the trajectory of the case,"
 4   close quote?
 5      A.   So my understanding was that Dr. Thal's initial
 6   report was one in which he really gave approval for
 7   Brendi Ploof to assume the primary parenting role of
 8   H█████ with Jessica serving in some sort of helping
 9   fashion but without having any primary sustained
10   parenting responsibilities.
11           And that upon the subsequent revision of
12   Dr. Thal's report, there were other evaluations that were
13   then put in place, and H█████'s return to the grandmother
14   and the mother was contingent upon their successful
15   completion of those evaluations.  Those did not happen.
16   H█████ was eventually -- well, the mother's rights were
17   then eventually severed.
18      Q.   You said those did not happen.  What -- what did
19   not happen?
20      A.   I'm sorry.  The -- the results of the subsequent
21   evaluations were not favorable to the mother and
22   grandmother.  And with the eventual result that the
23   mother's rights were severed and that the grandmother was
24   not considered as the primary provider.
25      Q.   And by the "other evaluations," what other
```



Page 11

1  evaluations are you referring to?

2      A.    Primarily the bonding evaluation by Dr. Bennett

3  I think in July of 2018.   There were also, of course,

4  reevaluations for the mother and grandmother that

5  Dr. Thal did after that.

6      Q.    Okay.  And you reviewed the bonding evaluation;

7  correct?

8      A.    I did.

9      Q.    And the bonding evaluation was performed by

10  Dr. Bennett; correct?

11      A.    Correct.

12      Q.    And you understand that Dr. Thal had no role in

13  the bonding assessment, evaluation or Dr. Bennett's

14  opinions; correct?

15      A.    Aside from having made that recommendation

16  initially, yes.

17      Q.    Okay.  And what was Dr. Bennett's conclusion?

18      A.    Dr. Bennett's conclusion was that the mother and

19  grandmother had significant deficits.

20      Q.    And I don't see in your original report or

21  subsequent report that you expressed any criticism of

22  Dr. Bennett's methodology, his report, or his

23  conclusions; am I correct?

24      A.    You are correct.

25      Q.    And I don't see anywhere in your first report or



EXHIBIT 45

Page 20

1  Dr. Thal are contained within those pages?

2      A.   Yes.

3      Q.   Okay.  Do you have any criticisms of Dr. Thal

4  that are not contained within those pages or referenced

5  in your response report dated July 15, 2025?

6      A.   No.

7      Q.   Okay.  So if this case goes to trial and I get

8  to talk to you when you're on the witness stand, all the

9  opinions and criticisms that you're going to tell the

10 jury are contained within these two documents?

11              MR. CONNELLY:  Form and foundation.

12              THE WITNESS:  I believe so, yes.

13 BY MR. HUNTER:

14     Q.   I won't hear anything new?

15     A.   I hope not.

16              MR. CONNELLY:  Form and foundation.

17 BY MR. HUNTER:

18     Q.   You were retained to provide opinions in

19 reference to Dr. Thal; correct?

20     A.   Correct.

21     Q.   You were not asked to provide opinions in

22 reference to the other defendants in this lawsuit or DCS;

23 correct?

24     A.   Correct.

25     Q.   Okay.  So if we get to trial and you're up on


EXHIBIT 45
MAGNA
LEGAL SERVICES

Page 21

1  the witness stand, these lawyers down here representing

2  DCS are not going to hear you now expressing opinions as

3  to DCS; correct?

4              MR. CONNELLY:  Form and foundation.

5              THE WITNESS:  Correct.  All my opinions

6  should be articulated in my two written reports.

7  BY MR. HUNTER:

8      Q.   Okay.  It's your opinion that Dr. Thal was

9  unduly influenced in modifying his report by a DCS

10  worker; correct?

11     A.   Correct.

12     Q.   You read nothing in all the documents that

13  indicated that Dr. Thal reached his conclusions out of

14  ill will or spite for Jessica Ploof; fair statement?

15             MR. CONNELLY:  Form and foundation.

16             THE WITNESS:  Yes.

17  BY MR. HUNTER:

18     Q.   Okay.  While you may believe, because you

19  reference in your report, that there's several aspects of

20  how he went about writing his report and certain

21  statements in his report were incorrect, your opinion is

22  is that those issues that were incorrect in modifying his

23  report were not the product of Dr. Thal attempting to

24  take away Ms. Ploof's child; correct?

25             MR. CONNELLY:  Form and foundation.



EXHIBIT 45

Page 23

1    Q.   And in many of those cases you don't opine that

2    the doctor intentionally severed an artery, it was a

3    mistake that you felt rose to the level of negligence;

4    correct?

5              MR. CONNELLY:  Form and foundation.

6              THE WITNESS:  Correct.

7    BY MR. HUNTER:

8    Q.   You didn't read anything in all the documents we

9    provided where you concluded that Dr. Thal just decided

10   to ignore facts, ignore evidence with the purpose of

11   ensuring that Jessica Ploof had her parental rights

12   severed; true?

13             MR. CONNELLY:  Form and foundation.

14             THE WITNESS:  I actually read nothing that

15   would indicate he was acting out of ill will or animus

16   toward Jessica.

17   BY MR. HUNTER:

18   Q.   That was my question.

19   A.   Okay.

20   Q.   Thank you.

21        You have your medical degree?

22   A.   I do.

23   Q.   I forget what university?

24   A.   University of Michigan.

25   Q.   Michigan.  I should have known that.  I went to



EXHIBIT 45
MAGNA ▶
LEGAL SERVICES

Page 24

1    Michigan.

2         And then you're licensed in Massachusetts?

3    A.    Yes.

4    Q.    Any other state?

5    A.    No.

6    Q.    And board certified in psychiatry?

7    A.    Yes.  And child psychiatry and forensic

8    psychiatry.

9    Q.    Okay.  And you're not licensed in any other

10   state?

11   A.    That's correct.

12   Q.    Okay.  That's all the questions I have for you.

13   A.    I'm sorry?

14   Q.    That's all the questions I have for you.

15        They may have some.

16             MS. RHODES:  I have a few for you, sir.

17

18                     EXAMINATION

19   BY MS. RHODES:

20   Q.    Nice to meet you.  My name is Julie Rhodes.  And

21   this is Deb Garner.  We both represent the state

22   defendants on this case.

23        You were asked some questions in regards to any

24   other evaluations that you reviewed that recommended

25   Jessica had the ability to parent.


EXHIBIT 45

Page 30

                              EXAMINATION

2   BY MR. CONNELLY:

3       Q.   Hold on one second.

4       A.   I forgot you were still on.

5       Q.   All right.  You were not asked --

6       A.   Before we start, would you mind passing me a

7   water?  Thank you so much.

8       Q.   You were not asked to opine on Dr. Bennett's

9   methodology or his opinions; right?

10      A.   I was not.

11      Q.   You were not asked to opine on the parenting

12  skills of Jessica or Brendi?

13      A.   I was not.

14      Q.   And you don't have -- you were not asked to

15  opine on the efficacy of any juvenile court rulings in

16  this case; right?

17      A.   Correct.

18      Q.   And you said you don't have any opinions

19  regarding Dr. Thal's recommendations.

20           And would it be true that you don't have such

21  opinions on those recommendations because, first of all,

22  you weren't asked to opine on those recommendations, were

23  you?

24      A.   I was not.

25      Q.   And you couldn't form any opinions or any



EXHIBIT 45

Page 31

1    recommendations of your own in regards to Jessica or

2    Brendi because you did not interview -- evaluate either

3    Jessica or Brendi; is that true?

4         A.    I think it's true, yes.

5         Q.    And you said today that you didn't think -- you

6    didn't see anything to indicate Dr. Thal was acting out

7    of ill will or animus?

8         A.    Correct.

9         Q.    How would you characterize Dr. Thal's

10   methodology as, you know, as you observed it in what you

11   reviewed?

12        A.    In terms of his potential motivation?

13        Q.    In term of his potential motivation, in terms of

14   his methodology.  Go ahead and give me a robust response.

15             MR. HUNTER:  Form and foundation.

16             THE WITNESS:  So I'll say two things.  One

17   thing is I think Dr. Thal's letter of February --

18   March --

19             MR. CONNELLY:  March.

20             THE WITNESS:  -- March of 2018 indicates

21   that he seemed to believe that Hunter's best interests

22   were served by his actions.

23             And I think that -- as I said in my report,

24   I think Dr. Thal's methodology was substantially below

25   the standard of care.  I think it was quite deficient.  I



EXHIBIT 45
MAGNA

Page 32

1    think it was very unfortunate.

2    BY MR. CONNELLY:

3        Q.    Did his methodology -- do you understand

4    Dr. Thal to have been engaged in the role of a clinical

5    psychologist or in the role of a forensic psychologist?

6        A.    In the role of a forensic psychologist in that

7    he was doing an evaluation for purposes of the court

8    in -- in the role of an independent professional

9    evaluator as opposed to a treater.

10       Q.    And from what you saw in the records, did

11   Dr. Thal in performing his role as a forensic evaluator

12   fall below the standard of care applicable to forensic

13   psychology?

14       A.    Yes.

15       Q.    How so?

16       A.    I think, as I said in my report, there were a

17   number of different ways.  I'm certainly critical of

18   Dr. Thal for having given Jessica diagnoses, two explicit

19   diagnoses and one rule-out diagnosis without her having

20   met any of the diagnostic criteria.  I think that's

21   highly deficient.

22            And primarily I'm just -- I'm highly critical of

23   Dr. Thal for having had ex-parte communication with a DCS

24   worker that resulted in a substantial modification of his

25   report with no explanation in the report as to what



EXHIBIT 45
MAGNA

Page 33

1    happened or the basis upon which it happened and about

2    his attempt to engage in subterfuge around the initial

3    report.  I think -- I think -- I think agreeing with the

4    DCS worker that the first report should be shredded is

5    highly deficient.

6        Q.    And does it change your opinion that Dr. Thal

7    fell below the standard of care for a forensic

8    psychologist in relation to Brendi Ploof's first

9    evaluation -- is your opinion in that regard changed at

10   all by the fact that the juvenile court was made aware

11   that there were changes to his report and then decided to

12   go ahead and accept the second report?

13       A.    No.

14              MR. HUNTER:  Form and foundation.

15   BY MR. CONNELLY:

16       Q.    You said that -- again, you said that Dr. Thal

17   was not acting -- you didn't see anything to indicate

18   that Dr. Thal was acting out of ill will or animus,

19   however we're using those terms here, and that the DCS

20   caseworkers, Ms. Szymkowski and Ms. Hoff, you did not see

21   anything that indicated that they were acting out of ill

22   will or animus.

23              Do you have opinion on whether or not the

24   documents you reviewed in this case indicate that there

25   may have been some collusion on the part of Dr. Thal and



EXHIBIT 45
MAGNA

Page 34

1    the State in revising his report to reach the

2    recommendations and conclusions that he did in the

3    revised version?

4              MR. CONNELLY:  Form and foundation.

5              MS. RHODES:  Form.  Foundation.

6              THE WITNESS:  Yes.  I think -- I think I

7    remember your question.

8    BY MR. CONNELLY:

9        Q.   Do you want me to rephrase it?

10       A.   No.  It was a fine question.  Just the form --

11   the unison form and foundations got me rattled for a

12   moment.

13       Q.   Okay.  So for what you reviewed, you believe

14   that there's indication in the record that the -- that

15   Dr. Thal and the State were acting in collusion or -- to

16   change the report the way it was changed?

17             MR. CONNELLY:  Form and foundation.

18             MS. RHODES:  Form and foundation.

19             THE WITNESS:  I think "collusion" was the

20   word that I used in my report.

21   BY MR. CONNELLY:

22       Q.   Okay.  And in your experience -- in your

23   experience, is the -- what's the -- what's the issue at a

24   dependency hearing -- and let me -- let me step back for

25   a second.



EXHIBIT 45

MAGNA
LEGAL SERVICES

Page 35

```
 1              Did we give you -- did you review the -- you

 2    didn't review the dependency petition in this case, did

 3    you?

 4        A.   I don't believe so, no.

 5        Q.   Let me see if we marked the dependency petition

 6    as an exhibit.

 7              MR. HUNTER:  While looking for that, I'm

 8    going to object to giving your own expert documents in

 9    the middle of a deposition he has never reviewed.

10              MR. CONNELLY:  I don't know that we have it

11    marked as an exhibit.

12              Sorry for the delay here.  It's taking some

13    time to -- I might have it in my car.

14              While this is trying to do what I'm asking

15    it to do, let me ask you a different question.

16    BY MR. CONNELLY:

17        Q.   You testified about Dr. Thal's letter dated

18    March 14, 2018, and that's a document you reviewed;

19    right?

20        A.   Correct.

21        Q.   And in that letter, Dr. Thal explains about the

22    conversation he had with Paige Szymkowski; right?

23        A.   Yes.

24        Q.   And in the first paragraph of that letter, he

25    says that Ms. Szymkowski has significant concerns about
```



EXHIBIT 45

Page 36

1    the mental -- the maternal grandmother's ability to meet

2    Hunter's needs.  That she expressed her concerns about

3    the substandard condition of the grandmother's residence

4    and the child's very poor overall condition when he came

5    into care.

6              Do you remember reading that in that letter?

7        A.    I do.

8        Q.    And the substandard condition of the

9    grandmother's residence and the child's very poor overall

10   condition when he came into care were information that

11   was included on the initial referral that Dr. Thal

12   received from the Department in relation to Brendi

13   Ploof's first evaluation; is that your recollection?

14       A.    It is, yes.

15       Q.    And those were things that he noted in the first

16   version of his report; is that your recollection?

17       A.    Of the Brendi --

18       Q.    Of the Brendi evaluation.

19       A.    Yes.

20              MS. RHODES:  Form.

21   BY MR. CONNELLY:

22       Q.    So neither of those things were new information

23   that may have developed between the time that Dr. Thal

24   was first sent the referral and the time that he authored

25   his report; correct?



EXHIBIT 45

Page 37

```
 1                    MS. RHODES:  Form and foundation.

 2                    MR. HUNTER:  Form and foundation.

 3               THE WITNESS:   Correct.

 4   BY MR. CONNELLY:

 5       Q.   And the revision to his report -- to his

 6   January 2018 report of Brendi doesn't make any changes in

 7   regard to those assertions; is that correct?

 8       A.   Correct.  As far as I understand, as far as I

 9   could tell, there was not a word changed in the body of

10   the report where he describes the foundation of his

11   opinions.

12       Q.   And in the revision, he doesn't note that he had

13   a conversation with Ms. Szymkowski.  That's one of the

14   things you're critical of; right?

15       A.   Yes.

16                    MR. HUNTER:  Form and foundation.

17   BY MR. CONNELLY:

18       Q.   And then in the second paragraph of this

19   March 14, 2018, report Dr. Thal says that the second

20   major point raised by Ms. Szymkowski in the telephone

21   conversation on January 30, 2018, had to do with, quote,

22   "The critically important relationship she believed

23   H███ had established with his foster parents," close

24   quote.

25               And is an expression of the caseworker's opinion
```


EXHIBIT 45
MAGNA
LEGAL SERVICES

Page 38

1  about such a matter something that is properly considered

2  by the forensic psychologist?

3              MR. HUNTER:  Form and foundation.

4              MS. RHODES:  Form and foundation.

5              THE WITNESS:  So I'd say it's something

6  that could be considered.  It's not necessarily out of

7  bounds.  But he would want to see it listed among the

8  information that he considered and he'd certainly want to

9  see some more information of that than simply the opinion

10  of the DCS caseworker.

11  BY MR. CONNELLY:

12     Q.   And would it be within the standard of care for

13  the forensic psychologist to rely on the opinion of a

14  caseworker regarding her view of the relationship between

15  the child and the foster parents --

16              MS. RHODES:  Form.  Foundation.

17              MR. HUNTER:  Join.

18  BY MR. CONNELLY:

19     Q.   -- in a dependency setting?

20     A.   So I'm not sure I could say that.  I can say it

21  would raise questions as to the sort of the foundation of

22  his information.

23     Q.   Would it be forensically sound for him to change

24  his report in the manner that he did based on

25  Ms. Szymkowski's opinions alone?



EXHIBIT 45
MAGNA

Page 39

```
 1                    MS. RHODES:  Form and foundation.

 2                    MR. HUNTER:  Join.

 3                    THE WITNESS:  No.

 4    BY MR. CONNELLY:

 5        Q.   And you didn't see anything in the record

 6    regarding the relationship between H███████ and his foster

 7    parents that was provided to Dr. Thal between January --

 8    January 18, 2018, and the time that he made the revisions

 9    to his report that supported Ms. Szymkowski's opinions

10    regarding that relationship between Hunter and the foster

11    parents; is that right?

12                    MS. RHODES:  Form.  Foundation.

13                    MR. HUNTER:  Join.

14                    THE WITNESS:  That is correct, yes.

15    BY MR. CONNELLY:

16        Q.   And in your experience, is it true that the

17    issue at a dependency hearing -- not a severance hearing

18    but a dependency hearing -- is whether the parent is able

19    to safely parent the child that's the subject of the

20    petition?

21                    MR. HUNTER:  Form and foundation.

22                    MS. RHODES:  Form and foundation.

23                    THE WITNESS:  I'd say safely and

24    adequately.  But it's the parent's capacity, it's the

25    parental fitness that's the issue in the dependency
```



EXHIBIT 45

Page 40

1    hearing, and that's my understanding of what Dr. Thal was

2    supposed to be addressing with both Jessica and with

3    Brendi.

4  BY MR. CONNELLY:

5        Q.    So I think you expressed this in your reports

6    that Dr. Thal's engaged to not opine on the best interest

7    of the child but to opine on the adequacy of Jessica and

8    Brendi to serve as parents to Hunter?

9              MS. RHODES:   Form.   Foundation.

10             MR. HUNTER:   Join.

11             THE WITNESS:   I expressed it with some

12   vehemence in my report that Dr. Thal had no business

13   paying any attention to the question of H██████'s bonding

14   with the foster parents and certainly not with the DCF

15   worker's opinion about H████'s bonding with the foster

16   parents.  His job was to address the capacity of the

17   mother and the grandmother.

18  BY MR. CONNELLY:

19       Q.    And is it the changing of his report to include

20   a recommendation for a bonding and best interest

21   assessment after he has this conversation with Paige one

22   of the indicators to you that there was some collusion

23   between the State and Dr. Thal?

24             MR. HUNTER:   Form.   Foundation.

25             MS. RHODES:   Form.   Foundation.



Page 41

```
 1                    THE WITNESS:  Yes.  And I think that his

 2   letter of March 16 spells it out quite clearly.

 3   BY MR. CONNELLY:

 4        Q.   March 14, for the record.

 5        A.   March 14.

 6        Q.   And in the -- you testified earlier it was 15 or

 7   20 years ago that you last did work as a forensic

 8   psychologist in relation to dependency and severance

 9   proceedings in Massachusetts; is that right?

10        A.   Psychiatrist.

11        Q.   Psychiatrist?

12        A.   That is correct, yes.

13        Q.   And during the time that you were working as a

14   forensic psychiatrist, you were engaged to perform

15   evaluations to determine the adequacy of a parent; is

16   that right?

17        A.   Yes.  So I worked -- I worked in juvenile court

18   clinics, so I did court-ordered evaluations in care and

19   protection cases.  I worked for DCS -- DCF in

20   Massachusetts on a number of occasions.  I worked for

21   parents' attorneys on a number of occasions doing

22   parenting evaluations.

23        Q.   And in any of those evaluations, did you ever --

24   did the State child welfare workers contact you after you

25   had issued a report on an ex parte basis to discuss with
```



EXHIBIT 45

MAGNA

Page 42

1  you any concerns about anything you had to say in your

2  report?

3                    MS. RHODES:  Form.  Foundation.

4                    MR. HUNTER:  Join.

5                    THE WITNESS:  No.

6  BY MR. CONNELLY:

7       Q.    Were there situations where you had issued a

8  report and then you were given additional information by

9  way of documentation or conversation from any of the

10 parties involved?

11      A.    Yes.

12      Q.    And in that instance, were all the parties

13 included on whatever communication you received

14 transmitting that initial information to you?

15                   MR. HUNTER:  Form.  Foundation.

16                   MS. RHODES:  Form and foundation.

17                   THE WITNESS:  So if they were not included

18 in the transition to me directly, I would make sure that

19 they would be including with the understanding then that

20 everybody gets the same information.

21 BY MR. CONNELLY:

22      Q.    Paige Szymkowski testified that the reason

23 they -- "they" being the Department -- she testified it

24 was a collective decision made by the Department made

25 amongst herself, Claudia Hoff, and their supervisor, and



EXHIBIT 45

1  that the reason that they did that was because they

2  wanted to make sure Dr. Thal was aware of their concerns

3  about H█████'s developmental delay coming into care and

4  the potential substance use in the home.

5         According to your review of the documents, did

6  Dr. Thal have that information before this conversation

7  and before he wrote his first version of Brendi's report?

8              MS. RHODES:  Form.  Foundation.

9              MR. HUNTER:  Form.  Foundation.

10             THE WITNESS:  Yes.  It was my understanding

11  that he had that information, and it was also my

12  conclusion that given that he did not change the body of

13  his report in any way, he had not received any new

14  information that was at all meaningful.

15             MR. CONNELLY:  Well, I don't think I have

16  any other questions.

17             MS. RHODES:  I have one follow-up if I --

18  oh, I'm sorry.

19             MR. HUNTER:  Do you want to go first?

20             MS. RHODES:  Sure.  I've just got one more

21  question.

22

23                    EXAMINATION

24  BY MS. RHODES:

25    Q.   Just so I'm clear, it's your opinion that


EXHIBIT 45

Page 44

1    Dr. Thal was not able to consider the needs of H████ in

2    any manner when conducting an evaluation of either

3    Jessica or Brendi?

4            Do I have that correct?

5        A.    No, no, that's not correct.

6            It's my opinion that he should not have attended

7    to the question of Hunter's attachment to the foster

8    family.

9        Q.    Isn't that a need of the child, however?

10   Wouldn't the child's current status, how he was doing,

11   whether he was receiving services, whether he was

12   operating well and healthy in the home, isn't that the

13   needs of the child as an overall --

14           MR. CONNELLY:    Form -- form and foundation.

15           THE WITNESS:    I think, yes, the needs of

16   the child absolutely in terms of trying to assess the

17   potential capacity of Brendi or Jessica.    But the

18   attachment with the foster family I think is a different

19   question.

20   BY MS. RHODES :

21       Q.    Okay.  Thank you.

22

23                        EXAMINATION

24   BY MR. HUNTER:

25       Q.    Just to make sure we're on the same page, in



EXHIBIT 45
MAGNA

Page 47

1              When you say "collusion," what's your definition
2    of that word?
3        A.    I think my definition in this case is the two of
4    them having a conversation that was ex parte, right, not
5    privy -- the other people were not privy to it that they
6    then attempted to keep secret --
7        Q.    Okay.
8        A.    -- with the result being that Dr. Thal wrote a
9    modified report.
10       Q.    Okay.  That's your definition in this case?
11       A.    Yes.
12       Q.    That's all the questions I have for you.
13   Thanks.
14             MR. CONNELLY:  I'm going to just have a
15   follow-up.
16
17                      EXAMINATION
18   BY MR. CONNELLY:
19       Q.    Is it your understanding that the juvenile court
20   was asked to consider the question of whether or not
21   there were violations of civil rights in this case?
22             MS. RHODES:  Form.  Foundation.
23             MR. HUNTER:  Form.  Foundation.
24             THE WITNESS:  I have no knowledge one way
25   or the other on that question of that -- on that



EXHIBIT 45
MAGNA
LEGAL SERVICES

Page 50

```
 1   STATE OF ARIZONA   )

                        )

 2   COUNTY OF MARICOPA )

 3

 4            I, JENNIFER HONN, a Certified Reporter,

 5   Certificate No. 50885, in the State of Arizona, do hereby

 6   certify that the foregoing witness was duly sworn to tell

 7   the whole truth; that the foregoing pages constitute a

 8   full, true, and accurate transcript of all proceedings

 9   had in the foregoing matter, all done to the best of my

10   skill and ability.  Pursuant to request, notification

11   was provided that the deposition is available for review

12   and signature.

13

14            I FURTHER CERTIFY that I am not related to

15   nor employed by any of the parties hereto, and have no

16   interest in the outcome.

17

18            WITNESS my hand this November 13, 2025.

19

20                    Jennifer Honn

21                    /s/Jennifer Honn

                      Jennifer Honn, RPR

22                    Arizona Certified Reporter

                      No. 50885

23

24

25
```



EXHIBIT 45

MAGNA