# EXHIBIT 46

## Andrew Clark, M.D.

Telephone: 801-960-2138
Fax: 617-830-7281
Email: Andrewclark@andrewclarkmd.com

Board Certified, Adult, Child and Forensic Psychiatry      10 Concord Ave
*American Board of Psychiatry and Neurology*                Cambridge, MA 02138

### Response to Defendant's Expert Report
July 15, 2025

Re: Jessica Ploof v State of Arizona, et al.
Case No 2:21-cv-00853-JJT-PHX

### Introduction:

   I have previously written a Psychiatric Expert Report in this matter dated June 23, 2025, at the behest of the plaintiff's attorney, Thomas Connelly.

   I am now in receipt of a 25-page Expert Report in this matter, authored by Michael DiTomasso, Ph.D., undated. I was asked by Attorney Thomas Connelly to write a brief response.

### Review of Dr. DiTomasso's Report:

   On page 7 of his report, in regard to Dr. Thal's first evaluation of Jessica Ploof on 7/8/2017, Dr. DiTomasso opines that Dr. Thal had "correctly diagnosed Methamphetamine Use Disorder" in Jessica Ploof, reasoning that even though Jessica "did not yet have a long-term addiction to it, but that is where methamphetamine use leads. Realistically, any use of that poison is a disorder." I would suggest that it is not the role of the forensic psychologist to make diagnoses based on their suspicions as to what might happen in the future, that not everyone who uses methamphetamine develops an addiction to it, and that the DSM-V TR criteria for Methamphetamine Use Disorder does not apply to just any who has ever used "that poison". In this instance, Dr. DiTomasso appears to endorse Dr. Thal's casual use of psychiatric diagnoses unmoored from any actual diagnostic criteria.

   Dr. DiTomasso does not address Dr. Thal's use of the Alcohol Use Disorder diagnosis for Ms. Ploof in that same report, aside from noting it.

   In regard to the question of the bipolar disorder diagnosis, Dr. DiTomasso notes on page 8 that "it had been mentioned in the case paperwork," and he endorsed Dr. Thal's use of that diagnosis in this regard. However, that mention is not noted anywhere in Dr. Thal's various reports, and so presumably did not constitute a part of the foundation for his opinions. And,

of course, a mention of a possible psychiatric diagnosis somewhere in the voluminous records is hardly grounds for a forensic evaluator to raise such a diagnosis without some clinical evidence to do so. As noted in my previous report, the fact that Jessica Ploof had at one point been prescribed the medication Abilify sheds no light on her mental health diagnoses. It is generally expected that before a forensic mental health evaluator offers a diagnosis on a client, even a 'rule out', they make some effort to establish the clinical grounds to do so.

Dr. DiTomasso opines on page 13 that it was a mistake for Dr. Thal to have changed his report on Brendi Ploof in January 2018, rather than issuing a letter or addendum. Dr. DiTomasso goes on to suggest that this mistake was not a critical one, however, as the original report eventually came to light. It seems reasonable to infer, then, that Dr. DiTomasso believes the mistake would indeed have been critical had the original report never been disclosed. Given that the disclosure of the original report came about in spite of Dr. Thal's efforts to keep it hidden, Dr. DiTomasso appears to be suggesting that Dr. Thal's critical mistake was neutralized somehow by the inadvertent disclosure of the first report. Although Dr. DiTomasso and I may agree that Dr. Thal's failure to issue an addendum or letter was a critical mistake at the time, we disagree around the question as to whether his subsequent steps effectively shielded him from blame.

Dr. DiTomasso does not address the question of Dr. Thal's basing his revised evaluation of Brendi Ploof on the DCS's worker's assessment of H████'s bonding with his foster family, or her opinion as to the placement that would be in H████'s best interest. As I noted in my original report, it is my opinion that these considerations should have no bearing on the psychological evaluation of Brendi Ploof, and the fact that Dr. Thal centered them so explicitly in his letter of March 14 raises grave questions as to his impartiality as well as his understanding of his role. By extension, the fact that Dr. DiTomasso does not mention this issue in his report would suggest that he either did not perceive it to be a problem, or overlooked that aspect of the situation.

Dr. DiTomasso does not address the question of Dr. Thal incorporating new information without documenting it in his second report, and so fails to explain how a forensic clinician can write two reports with the exact same foundation but with dramatically different impressions and recommendations.

As noted in my report of June 23, it appears that the only information offered by Ms. Szymkoski in the telephone conversation of January 30 was her opinions on various aspects of the case, as well as her preferred outcome. Dr. DiTomasso seems to assume that Ms. Szymkoski provided Dr. Thal with important new information in that conversation, but does not address the fact that Dr. Thal had already been in possession of information about the state of the house and the child at the time of removal, and that Dr. Thal did not document any new information in his revised report. In this, Dr. DiTomasso seems to tacitly endorse a forensic evaluator changing their opinions and recommendations on the basis of information that is not documented in the body of the report, and then kept secret from the court and the parties in the matter.

Dr. DiTomasso suggests on page 13 that it was appropriate for Dr. Thal to treat the DCS worker as a "trustworthy source" and as someone who gave "reliable information." In doing so, he is suggesting that a forensic evaluator take as veridical the opinions of a former DCS worker without any further exploration of the basis of those opinions. There are multiple parties involved in cases such as these, each of whom has a perspective, a knowledge base, and a set of opinions. For a forensic evaluator to privilege the reporting and opinions of the DCS worker above all others is to abandon all claims to neutrality in the process.

Dr. DiTomasso does not address the question of Dr. Thal giving Brendi Ploof the inappropriate diagnosis of Child Neglect by History.

On page 25 of his report, Dr. DiTomasso asserts that Ms. Szymkowski had access to investigative information that was not available to Dr. Thal. It is not clear what Dr. DiTomasso is alluding to here - Dr. Thal's first report on Jessica Ploof lists a number of DCS records that he had reviewed, and both that report and the first Brendi Ploof report note the substandard condition of the house and the child being under-stimulated as concerns. It would appear that the only new information Ms. Szymkowksi provided to Dr. Thal on 1/30/17 was her impression of H█████'s bond with the foster parents, and her opinion as to the preferred outcome of the case.

Of note, Dr. Thal failed to list the sources of information that he relied upon in preparing the initial reports of Brendi Ploof, although he does offer a section of Background Information. He also, of course, failed to document the information he got from Ms. Szymkowski for his second report. This failure complicates any effort to interrogate his process, reduces the transparency of his report, and is a clear deviation from accepted practice. Dr. DiTomasso took note of none of these issues.

On page 25 of his report, Dr. DiTomasso addresses the allegation (#215) of ex-parte communication between Dr. Thal and Ms. Szymkowski, and notes that person-to-person communication between case workers and psychologists is the norm in dependency work. Dr. DiTomasso, however, does not address, and perhaps does not appreciate, the issue here: It is not that Dr. Thal spoke with Ms. Szymkowski, it is that he dramatically altered his conclusions after having done so without informing the parties and the court of the reasons for his change of mind. It is one thing for a DCS worker to communicate information to an evaluator (which presumably has corroboration in the case notes, and which as a matter of course is detailed in the expert's report), and quite another for a DCS worker to exert their influence to alter the outcome of a report.

On page 25 of his report, Dr. DiTomasso addresses the allegation (#255) that Dr. Thal and the DCS workers conspired to deceive the court and to conceal the report from Jessica. Dr. DiTomasso simply notes that he sees no reason to suspect a conspiracy, without addressing the substance of the allegation- that subsequent to the conversation with the DCS worker Dr. Thal wrote a second report that did not acknowledge what had transpired in the interim since his first report, and made efforts to insure that the first report was never disclosed. Dr. DiTomasso goes on to argue for the reasonableness of Dr. Thal's

recommendations; it is clear, however, that the revision of Dr. Thal's assessment changed the trajectory of the case. More to the point, the question as to whether Dr. Thal's final recommendations were or were not reasonable is irrelevant for the purposes of the present case.

**Conclusion:**

In all, it is my impression that Dr. DiTomasso's report endorses a number of behaviors on the part of Dr. Thal that I believe to be highly problematic and fails to address the important issues that I believe to be at the heart of the case.

Respectfully,

*Andrew Clark*

Andrew Clark, M. D.

4