# EXHIBIT HG

```
 1                  UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ARIZONA
 3
 4   Jessica Ploof, an individual,   )
                                     )
 5          Plaintiff,                )
                                     )
 6       vs.                          )   Case No.
                                     )   2:21-cv-00853-JJT-PHX
 7    State of Arizona, et al.,       )
                                     )
 8          Defendants.               )
                                     )
 9   _____  )
10
11
12
                       DEPOSITION OF CLAUDIA HOFF
13
14
                           Phoenix, Arizona
15                         October 10, 2025
                              10:09 a.m.
16
17
18
19
     CERTIFIED COPY
20
21
     Reported by:
22                                        CARRIE REPORTING, LLC
     CARRIE A. CARIATI                    Certified Reporters
23   AZ CR No. 50355                      12725 W.Indian School Rd.
     NM Certified CR No. 613              Suite F-100
24   Certified Realtime Reporter          Avondale, Arizona 85392
     Registered Professional Reporter     (480)429-7573
25   carrie@carriereporting.com
```

```
 1          DEPOSITION OF CLAUDIA HOFF was taken on
 2   October 10, 2025, commencing at 10:09 a.m. at the law
 3   offices of GILLESPIE, SHIELDS, GOLDFARB, & TAYLOR,
 4   7319 North 16th Street, Phoenix, Arizona, before
 5   CARRIE CARIATI, a Certified Reporter, Certificate 50355,
 6   for the State of Arizona.
 7
 8   COUNSEL APPEARING:
 9    For Plaintiff:
10         MILLS + WOODS LAW PLLC
           Thomas A. Connelly, Esq.
11         5055 North 12th Street
           Suite 101
12         Phoenix, Arizona  85014
           tconnelly@millsandwoods.com
13
      For the Defendant Thal:
14
           WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
15         Jeffrey S. Hunter, Esq.
           One North Central Avenue
16         Suite 900
           Phoenix, Arizona  85004
17         jhunter@wwhgd.com

18    For the Defendant State of Arizona:

19         OFFICE OF THE ARIZONA ATTORNEY GENERAL
           Julie Rhodes, Esq.
20         Deborah Garner, Esq.
           P.O. Box 6123-040A
21         Phoenix, Arizona  85005
           julie.rhodes@azag.gov
22
      Also present:  Natalie Newell, Esq.
23
24
25
```

|    |    |
|----|----|
| 1  | CLAUDIA HOFF, |
| 2  | a witness herein, having been first duly sworn by the |
| 3  | Certified Court Reporter to speak the truth and nothing |
| 4  | but the truth, was examined and testified as follows: |
| 5  | |
| 6  | EXAMINATION |
| 7  | BY MR. CONNELLY: |
| 8  | *Q.* So, Ms. Hoff, why don't you just state your name |
| 9  | again for the record, spelling your last name so we make |
| 10 | sure we have it right. |
| 11 | *A.* Sure. My name is Claudia. My last name is |
| 12 | Hoff, H-o-f-f. |
| 13 | *Q.* And you understand you are here for a deposition |
| 14 | in the matter of Jessica Ploof versus the State of |
| 15 | Arizona -- |
| 16 | *A.* Yes. |
| 17 | *Q.* -- yourself and Paige and Dr. Thal, right? |
| 18 | *A.* Correct. |
| 19 | *Q.* Have you seen the complaint in this case? |
| 20 | *A.* I have. |
| 21 | *Q.* And when was that? When was the last time you |
| 22 | looked at it? |
| 23 | *A.* Last night. |
| 24 | *Q.* I see you have got some documents in front of |
| 25 | you. Are those documents you reviewed in preparation for |

1   Q.   How many severance trials did you do there?
2   A.   I would imagine 40.
3   Q.   40 in two years?
4   A.   Yeah.
5   Q.   And how many did you do at DCS over your
6   31 years?
7   A.   Probably 350.
8   Q.   350?
9   A.   Yeah.
10  Q.   Seems like a lot.
11  A.   I was there a long time.
12  Q.   How many did you do a year?
13  A.   I did probably -- I had a baby caseload, so I
14  did probably maybe six to seven.
15  Q.   Six to seven a year?
16       You say you had a "baby caseload." What
17  does that mean?
18  A.   I usually worked with the younger children.
19  Q.   Like children who were born --
20  A.   5 and below.
21  Q.   Pardon me?
22  A.   5 and below.
23  Q.   So 5 years old and below?
24  A.   Yeah.
25  Q.   Well, you must have done a few more than 6 or

1  till the permanency goal was reached, and in this case it
2  was adoption, right?
3      A.   Correct.
4      Q.   Now, you testified earlier that you estimate
5  about 350 severance trials that you handled in Arizona,
6  which -- let's just get the calculator out.
7      A.   That is many too many, as I am thinking back.
8  It seems like that many.
9      Q.   Over 28 years, that's about 12, 12 and a half a
10 year.
11          Does that sound about right?
12     A.   Could be.
13     Q.   And is it the case in Arizona that every time
14 you sought to sever or terminate parental rights, that you
15 were successful in doing that?
16     A.   Yes.
17     Q.   So if you sought to terminate parents' rights
18 350 times during your 28 years, then you successfully
19 terminated parental rights 350 times over those 28 years;
20 is that right?
21     A.   No.  I lost one case.
22     Q.   One.  So you did lose one case?
23     A.   Yes.
24     Q.   And you consider that a loss, right?
25     A.   No.  Actually, we decided that because the child

1  was not adoptable and the mother had a safe husband that
2  she had recently gotten married to, that he could be the
3  safety plan and we could return that older child back home
4  again.
5       Q.   How old was the child?
6       A.   He was about 12.
7       Q.   How long ago was that case?
8       A.   20 years ago.
9       Q.   And how did you end up with a 12-year-old child
10 if you were on the -- if you normally get the baby cases?
11      A.   Because I was in a different unit.
12      Q.   What unit?
13      A.   Well, it was -- it wasn't -- it was -- I was
14 probably in South Phoenix.  I worked in that unit for a
15 lot of time.
16      Q.   Are you aware that the severance rate in
17 Arizona, the success rate we will call it, although I
18 think that is a terrible word to use, but that
19 99.4 percent of the time that the State seeks to terminate
20 parental rights they are successful in doing so?  Did you
21 know that?
22           MS. RHODES:  Objection. Form. Foundation.
23           THE WITNESS:  No.
24 BY MR. CONNELLY:
25      Q.   It might be 99.6 percent of the time.  I might

1  protector."
2          Do you see that?
3     A.   I do.
4     Q.   And then if you go a little further down, it
5  says: "If she continues to seek out and accept services
6  from the department, community mental health, and
7  disability support services, we feel that Jessica and
8  Hunter will be great."
9          Do you see that?
10    A.   Yeah.
11    Q.   "A program such as the family reunification team
12 to assist with in-home supportive services would be a
13 great program, provide the entire family with support,
14 including grandmother."
15         Do you see that?
16    A.   I do.
17    Q.   Did you take any action after receiving this to
18 implement family reunification services in-home?
19    A.   Well, I think this is when Paige had the case.
20 So --
21    Q.   No. This is a report after you were on the
22 case. This is a report dated February 28, 2018.
23         Do you see that on the third page in the
24 signature block?
25    A.   Well, these were dates of services 9/18/17 to

1   12/15/17.
2   *Q.*   Right, but the report is coming to you.
3   *A.*   Well, the report is going to Paige, but I still
4   would have reviewed it.
5   *Q.*   The report did not go to Paige because she
6   wasn't -- I am not going to quibble with you about that.
7           You were the case manager on the case at
8   the time, right?
9   *A.*   No, I don't know that that's accurate.
10  *Q.*   You were not on the case manager -- on the case
11  of February 28, 2018?
12  *A.*   I think -- midpoint.  I probably was.  I don't
13  recall.  I mean, this is, you know, a lot of dates.
14  *Q.*   You testified earlier that you came onto the
15  case either at the end of 2017 or in January of 2018.
16  *A.*   Beginning.  Okay.
17  *Q.*   You testified earlier about being on a telephone
18  call with Paige and Dr. Thal in relation to his
19  January 18, 2018, report on Brendi.
20  *A.*   Yes.
21  *Q.*   Do you remember all that?
22  *A.*   Yes.
23  *Q.*   This is after all of that.
24  *A.*   Okay.  Yeah, I gotcha.
25  *Q.*   You were on the case for about a year, right?

1        A.    And a half.
2        Q.    So you were the one who received this report
3  even though it says that the ADCS specialist is Paige,
4  right?
5        A.    Right.
6        Q.    She is named there because she made the original
7  referral, right?
8        A.    Probably.
9        Q.    So, again, this provider is indicating that
10 Jessica has enhanced all her protective capacities and
11 that she is able to learn and that she does learn and that
12 she implements what she has learned and that she is bonded
13 and that she would continue to benefit from services from
14 the department and that she would be okay to parent
15 Hunter.
16             Isn't that what she is saying?
17       A.    Yeah.
18             MS. RHODES:  Form.  Foundation.
19 BY MR. CONNELLY:
20       Q.    And they are recommending that a family
21 reunification team can assist with in-home services,
22 right?
23       A.    Right.
24       Q.    But you didn't do anything to put family
25 reunification services in place in the home.  You didn't

1  attempt that at all, right?
2     A.   No.
3     Q.   And then on the next page, she -- Natalie -- or
4  Natalia states, in regards to current parenting abilities
5  and family dynamics, that Jessica has demonstrated that
6  she is able to meet his basic needs.  She says:  "She is
7  now demonstrating learned skills from the skills sessions
8  and outside support."
9          Do you see that?
10    A.   I do.
11    Q.   And Natalia notes in the recommendations that
12 their organization can provide transition services to
13 facilitate unmonitored or supervised visits, again when
14 deemed appropriate.
15         Do you see that?
16    A.   Yeah.
17    Q.   And you never took any steps towards moving to
18 unmonitored or unsupervised visits, right?
19    A.   Right.
20    Q.   And the parenting aide people were observing
21 Jessica with Hunter at least two times a week two hours
22 each time, right?
23    A.   Right.
24    Q.   So they had a lot of eyes on the situation,
25 right?

1    MR. CONNELLY:  Read and sign?
2    MS. RHODES:  We will read and sign.
3    (Proceedings adjourned at 5:02 p.m.)

_____
CLAUDIA HOFF

**CERTIFICATE**

I HEREBY CERTIFY that the foregoing deposition was taken by me pursuant to notice; that I was then and there a Certified Court Reporter for the State of Arizona, and by virtue thereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth and nothing but the truth; pursuant to request, notification was provided that the deposition is available for review and signature; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed through computer-aided transcription under my direction, and that the foregoing typewritten pages contain a full, true, and accurate transcript of all proceedings had upon the taking of said deposition, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any of the parties hereto, nor am I in any way interested in the outcome hereof.

I FURTHER CERTIFY that I have complied with the ethical obligations set forth in ACJA Sections (J)(1)(g)(1) and (2).

DATED at Phoenix, Arizona, this 13th day of November, 2025.

_____
CARRIE A. CARIATI
Registered Professional Reporter
Certified Realtime Reporter
Certificate No. 50355

I CERTIFY that this Registered Reporting Firm has complied with the ethical obligations set forth in ACJA Sections (J)(1)(g)(1) and (2).

DATED at Phoenix, Arizona, this 13th day of November, 2025.

_____
Registered Reporting Firm R1064
CARRIE A. CARIATI, Owner