# EXHIBIT 1

## DECLARATION OF TIMOTHY TURNER

I, Timothy Turner, declare as follows:

I have been retained by DeeAn Gillespie-Strub and Thomas Connelly, attorneys for the Plaintiffs, to analyze the records related to this claim in the case known as Ploof v. Arizona, et al, Case No.: 2:21-CV-008533-JJT-PHX.

I am an expert in the field of social work and specifically the appropriate standards for child protective services and best practices during investigations of alleged child abuse and neglect. I have a Bachelor of Science Degree in Criminal Justice and Social Work; as well as over 200 hours of specialized training in all aspects of child protective services. I retired in 2017 following a 20-year career as a social worker and social worker supervisor for at risk families. My abilities include advanced assessment skills and the practice of solutions-based efforts in which clients are encouraged to participate. I possess strong leadership skills within my area of expertise.

Since 2017, I have owned and operated Turner Consultant Services, LLC, in which I have participated in 58 cases in 8 different states, 24 in Arizona alone. My Curriculum Vitae is attached as Exhibit A. A list of my previous cases is attached as Exhibit B. My Fee Schedule is attached as Exhibit C. The materials I reviewed to form my opinions will be listed individually following each category discussed in this report. In order to be succinct, I will not discuss the background details of the lawsuit. These can be accessed in detail within the First Amended Complaint which was one of the documents I reviewed for this report.

## I.  Records Reviewed:

It should be noted that many of the documents submitted by DCS have been heavily redacted. I reserve the right to amend or supplement my opinions if supplemental information is received. The following documents have been provided to me for review:

1. 1st Amended Complaint
2. Due Process Clause of the 14th Amendment
3. 45 CFR 1356.21(d) U.S. Code of Federal Regulations
4. Arizona Administrative Code (A.A.C.)
5. Wallis v. Spencer
6. DCS Policies & Procedures Manual
7. DCS Disclosed Case File
8. DCS CSRA & Case Plan
9. DCS Dependency Petition
10. DCS Severance Petition
11. Dr. Thal's Psychological Report on Jessica Ploof, 2017
12. Dr. Thal's Psychological Report on Jessica Ploof, 2018
13. Exhibits 15 thru 43 to Dr. Thal's reports
14. Dr. Bennett's Bonding Assessment of Jessica Ploof
15. Dr. Gaughan's Psychological Report on Jessica Ploof

1

16. DDD Records on H.P.
17. DCS E-mails from Christi Hoff
18. TERROS Progress Notes on Jessica Ploof
19. Parent Aide Discharge Summary
20. "Trauma Caused by Separation of Children from Parents" American Bar Association, (2019)


## I.    Background

The background section of this report is used merely as a quick synopsis of the participants, their roles, as well as, the DCS employee assignments:

A.    Jessica Ploof, Mother of H.P., **("Jessica"),** (diagnosed as mentally disabled). (IQ 65), **(Plaintiff).**

B.    **H.P.**, (initials used for privacy), DOB 04/29/2014, **(Plaintiff).**

C.    Brendi Ploof, Mother of Jessica, MGM to H.P., **("Brendi").**

D.    Dr. James Thal, DCS Contracted Psychological Evaluator for Jessica, **("Thal").**

E.    Sherri Walford, Brendi's Twin Sister and Maternal Aunt to H.P., **("Ms. Walford").**

F.    Meagan Tafoya, DCS Investigator assigned in 2016, (removed H.P. using a TCN). **("Tafoya").**

G.    Sarah Greenway, DCS Supervisor, **("Greenway").**

H.    Paige Szymkowski, DCS worker during 2017, **("Szymkowski").**

I.    Caludia Hoff, DCS **("Hoff").**

J.    Nick Breeding, DCS Supervisor, **("Breeding").**

K.    Heather Walker, Jessica's cousin and foster mom for H.P.


## II.    Applicable Law & Policy

### A.    Title 42 United States Code § 1983 (Fourteenth Amendment – Due Process Clause)

The Fourteenth Amendment to the United States Constitution, ratified in 1868 uses the same eleven words, called the Due Process Clause, to describe a legal obligation of all states.  These words have as

2

PLOOF000786

their central promise an assurance that all levels of American government must operate within the law and provide fair procedures. Due process deals with the administration of justice and acts as a safeguard from arbitrary denial of life, liberty or property by the government outside the sanction of law.

Whether it is federal, state or local jurisprudence, there are minimum guidelines that must be followed in order to guarantee fairness for everyone. An even greater burden is placed upon authorities when dealing with individuals who have an intellectual disability so they fully understand the proceedings being taken either on their behalf or contrary to their wishes. In the present lawsuit, the government agency is the Arizona Department of Child Safety (DCS) who is designated by the State of Arizona, to keep children safe, in such a manner as to also protect the legal rights of the children, and the parents, for each case in which they become involved.

DCS is responsible for selecting, training and supervising the personnel they put in the field to have direct contact with clients. Some of the qualifications that DCS must address are ethical ones. The agency must hire people of good moral character who are capable of absorbing the requisite training and effectively applying it in the field. One of the true tests of a successful DCS worker is the ability to complete their tasks while not interfering with the legal rights of the parent or child. The DCS supervisor for any worker is responsible for making sure that the case is properly documented because of a long held principle in DCS training, "If it isn't written down, it didn't happen."

DCS is similar to many other state and county agencies nationwide that provide child welfare services to families at risk. In order to receive federal funding these agencies are required to maintain a minimum standard otherwise referred to as, best practice. One of the fundamental best practices required of DCS workers is the ability to maintain clearly marked lines between their responsibilities and those of others involved in the process. Doctors of Psychiatry as well as other psychological professionals contract out to DCS and are not agency employees for a reason. The purpose is to allow the mental health professional to maintain their ethics while providing effective treatment for his or her patients.

When a DCS agent goes beyond this relationship and speaks directly to a doctor, in order to get them to change an evaluation, the DCS worker and the mental health professional have violated their individual codes of ethics. In this case, DCS worker Szymkowski took it upon herself to reach out to the contracted mental health provider, Dr. Thal, for the purpose of influencing his upcoming

PLOOF000787

psychological evaluation in order to convince the Juvenile Court that the Plaintiff, Jessica Ploof, was unfit to care for her three year old son, known by his initials, H.P..

While the DCS worker was trained by the agency, the fact remained that the requirement to be a DCS entry level worker was merely a Bachelor's Degree with no background in mental health. Dr. Thal, on the other hand, was a licensed professional who took an oath to refrain from unethical behaviors that might harm his patients or their families. He should have refused to engage in *ex parte* conversations with Szymkowski, much less allow her comments to change his psychological evaluation. For her part, the DCS worker was no longer even assigned to H.P.'s case when she engaged in the conversations with Dr. Thal. These were ethical violations by DCS Szymkowski that unfairly swayed the Juvenile Court's opinion and eventually led to the severance of Jessica Ploof's parental rights.

## B.    45 CFR 1356.21(d) United States Code of Federal Regulations

This code provides that the case plan be a discrete part of the case record which is available to the parents or guardian of the foster child and include a discussion with the foster parents of how the plan is designed to achieve a placement in the least restrictive manner or most family like setting. There was no evidence provided to this writer to indicate that DCS workers made any attempts to discuss H.P.'s case plan with Ms. Ploof or her mother, "Brendi" Ploof, the maternal grandmother to H.P. Brendi was being considered as a kinship placement for the child until Szymkowski interfered with Dr. Thal. In fact, the DCS staff apparently went out of their way to conceal what was in the case plan. After 1983, this statute was required to include a description of the services offered, and the services provided, to prevent the removal of the child from the home and reunify the family. There was no record reviewed of the DCS worker's contact notes with Ms. Ploof to verify that any discussions were held regarding H.P.'s future.

The standard of care for all child welfare investigations is to involve as little intrusion into the parent-child relationship as possible. The least restrictive option is always preferable unless the circumstances involve immediate risk of serious harm. Safety Plans are designed to mitigate these risks while more permanent solutions are found. They are not mandates to change legal court orders. A child and family team meeting (CFT) is unusual for a general neglect referral that is about to be

4

PLOOF000788

closed.   Somehow, DCS was convinced to keep this investigation open twice as long as policy required.

### C.    Wallis v. Spencer

Wallis v. Spencer is the federal precedent case that speaks effectively to child welfare functions. One of the most remarkable provisions of the law states:  "It is important to emphasize that in the area of child abuse, as with the investigation and prosecution of all crimes, the state is constrained by the substantive and procedural guarantees of the Constitution."  **Wallis v. Spencer, (9th Cir. 2000) 202 F. 3d 1126, 1137-1138 ("Wallis")**.  Indeed, the federal courts have defined the freedom to live with and raise children as one of a person's basic liberties to be protected.  Consequently, absent due process, a governmental agency cannot violate this right and seize a child from a parent's custody.  The Ninth Circuit Court in Wallis ruled that a state or county government may not remove a child from its parent's custody without a court order unless there is specific, articulable evidence that a child is in imminent danger of serious harm from abuse or neglect. Wallis at 1138.

### D.    Arizona Department of Child Safety Policies and Procedures Manual

The Policies and Procedures Manual is developed by the State of Arizona based on the principles set out in the Arizona Revised Statutes (A.R.S.)  which is state law governing DCS.  Among the requirements are a pre-established set of guidelines for the substantiation of a parent for child abuse or neglect.  The manual spells out in detail how the process is supposed to work.  For example, an investigation by DCS always results in a Finding.  These findings are as follows:

proposed substantiated pending dependency adjudication.

proposed substantiated.

proposed substantiated perpetrator deceased.

proposed substantiated perpetrator unknown.

unable to locate.

unsubstantiated.

PLOOF000789

A "proposed substantiated pending dependency adjudication" finding means that a dependency petition has been filed alleging dependency based on an allegation of abuse or neglect.  The Protective Services Review Team (PSRT) will enter the substantiated finding when the court adjudicates the child dependent based on an allegation of abuse or neglect contained in the dependency petition.  The Child Safety Specialist may need to fax, email or interoffice the order adjudicating the child a ward.

A "proposed substantiated" finding means that DCS has concluded that the evidence supports that an incident of abuse or neglect occurred based upon a probable cause standard.

Probable Cause means that the information gathered during the investigation would lead a reasonable person to believe that an incident of abuse or neglect occurred, and that the abuse or neglect was committed by the parent, guardian or custodian.  The Child Welfare Worker does not need to prove that abuse or neglect definitely occurred, but should have some credible evidence to support that finding.

When the worker completes an investigation and prepares a "proposed substantiated" finding, the information must include the following:

Who committed the abuse or neglect (alleged perpetrator-parent, guardian or custodian).

The child victim (child or children).

Details of how the child was abused or neglected.

When the abuse or neglect occurred.

What evidence supports the finding.

In order for there to be a "proposed substantiated" finding of abuse or neglect, the event must be the result of behavior by a parent, guardian or custodian.  A "custodian" is a person, other than the parent or guardian, with whom the child resides AND/OR who assumes responsibility for the child.  A custodian includes friends, boyfriends, girlfriends, relatives, and foster parents, but does not include a babysitter. The exception is when the perpetrator is unknown.  A substantiated finding of abuse or neglect requires that the parent, guardian or custodian committed at least one of the following acts of child maltreatment:

Physical Abuse

Physical Neglect

Medical Neglect

6

Sexual Abuse

Exploitation

Emotional Abuse

The Child Safety Specialist should apply the definition to the allegation under investigation by applying a series of questions as follows:

What is the minimal level of supervision, food, clothing, shelter or medical care needed for this child based on the child's age, cultural expectations and developmental status?

Is this minimal level being met by the parent, guardian or custodian?

If this minimal level is not being met, how is it not being met?

If this minimal level is not being met, what is the unreasonable risk of harm that has resulted or could result if the need is not met?

Is the parent, guardian or custodian using substances known to create an unreasonable risk of harm to a child? These substances include but are not limited to cocaine (crack), heroin, PCP, methamphetamine and alcohol.

### E.    DCS Policy on Substantiation of Maltreatment

In order to establish an overall assessment of the parent, guardian or custodian, the DCS worker must determine whether to substantiate the allegation(s). In determining whether to propose to substantiate neglect, consideration must be given to an overall assessment of the parent, guardian or custodian, including substance abuse. Propose to substantiate when a thorough assessment of safety and risk factors associated with the home environment and parental capacity indicates that the parent, guardian or custodian is unable or unwilling to meet the child's needs and that this failure creates an unreasonable risk of harm to the child's health or welfare. A thorough assessment of the safety and risk factors is key to determining whether the child is at an unreasonable risk of harm, and in determining the appropriate level of intervention and services needed to improve the parenting capacity. The current practice tool to assist in completing this assessment is the Child Safety Risk Assessment (CSRA). Jessica's child was taken from her on a suspicion of drug use that was reported by an anonymous source. She was not substantiated for anything which is why the detention of H.P. was so egregious from the beginning.

PLOOF000791

It is not an act of neglect if the child suffers from a disability or chronic illness and services are unavailable to treat the child's disability or chronic illness, or the child, in good faith, is being furnished Christian Science treatment by a duly accredited practitioner for that reason alone, or the parent, guardian or custodian refuses to put the child on a psychiatric medication or questions the use of such medication for that reason alone. Despite having a disability, Jessica Ploof was a good mother when DCS intervened and managed to terminate her parental rights without due process. The plaintiff began reaching out for help with H.P. shortly after he was born. She was already successfully working with the Arizona Department of Developmental Disabilities (DDD) based on her own requests. Her mother, Brendi, was employed by DDD to care for special needs children for thirteen years.

Documentation should include evidence that the parent, guardian or custodian knew or should have known that his or her actions were placing the child at an unreasonable risk of harm. This is supposed to be assessed by the DCS worker during the investigation and approved by her supervisor. The worker should not speculate or try to predict what will happen but merely evaluate the evidence as it is presented. This did not occur in the Ploof matter.

Instead, DCS assumed that the mother had a serious drug problem because she tested positive one time for marijuana, which she told the worker she would test positive for before the test was administered. Subsequent to this one test, Jessica Ploof continued taking random drug tests for the agency and tested positive one other time when hair follicle and urine testing were done simultaneously. Ms. Ploof was apologetic about her behavior and continued to cooperate with DCS. She completed services ordered by DCS to prove that she did not have a chronic drug problem. It was also overkill, in my opinion, for DCS to mandate that the maternal grandmother, Brendi Ploof, submit to random drug testing when they had no evidence to support that she had a drug problem.

DCS did not even have circumstantial evidence of the parent, guardian or custodian's knowledge or use of drugs. A standard drug test is often plagued with false positives and trace evidence at best. Typically, it has been best practice to consider whether the occasional use of marijuana was having a significant impact on the well being of the child. This was true in 2017 when this DCS investigation occurred. Since then, marijuana has been recreationally legalized in many states, including Arizona. This places a burden on authorities to prove that a legal substance was harming a child inside the home. There must be evidence and not mere supposition. In this case, DCS used the mother's alleged chronic marijuana use as an excuse to justify to the Juvenile Court that H.P. was unsafe in her home. Normally, parental use of marijuana is not enough unless it is negatively

8

impacting the child.  During twenty years as a CPS/DCS investigator and supervisor, I cannot recall a single time in which children were removed from the custody of a parent solely due to the parent's marijuana use, especially when the parent cooperates with services and stops using when responsible for the child.

**F.    The Decision to Take a Report of Child Abuse/Neglect**

In fact, questions come to mind about the DCS Hotline decision to open an investigation into the Ploof family based solely on reports that came from an anonymous source.  While these type of calls are permissible to the hotline they should be evaluated as reports that do not allow the agency to contact the caller for further information.  There is no opportunity to assess whether the reporter has an ax to grind or an ulterior motive for calling, other than the safety of the child.  Anonymous calls are normally evaluated with a lessor priority unless some independent evidence, such as a lengthy DCS history, exists to lend credence to the allegations in the report. In the Ploof matter, all of the allegations made against the mother were unsubstantiated other than the one time she tested positive for marijuana.

Mrs. Ploof assisted her daughter, Jessica, in providing as many services for H.P. as possible.  In fact, there were professionals from DDD, speech therapy as well as H.P.'s preschool teachers around the child on a daily basis.  The child was even seeing a pediatrician who recorded positive comments on Jessica in his notes for a Well Child Check in 2016.  Yet,  none of these mandated reporters expressed any concerns for the child's safety in the care of his mother and grandmother.

Despite this fact, DCS used anonymous reports to guide their decision to remove H.P. from his mother's care.  There was reason to believe that these calls to the DCS Hotline were made by a former boyfriend of Jessica's who was calling as retaliation for her ending their relationship.  There was no way to rule this out as a possibility.  DCS had already determined that Jessica Ploof had no previous history with the agency.  There had never been a police report or other evidence that Ms. Ploof was even smoking marijuana.  Due to her disability, Jessica was not even aware of what a "UA" was used for and admitted that she would test positive for "weed."  She made no attempt to conceal anything from DCS worker Tafoya or her supervisor Greenway.

Jessica was forced to undergo an invasive drug test on an anonymous call to the hotline.  H.P.'s mother was not even aware of what her due process rights were at this stage and DCS certainly made no attempts, according to their own documentation, to inform the mom what was in her best interests. The maternal grandmother arrived at home during DCS Tafoya's investigation and was able to protect

9

her daughter from further intrusions into her constitutional rights by DCS. At the conclusion of the home visit, DCS Tafoya determined that there were no safety hazards present in the home and the child should remain with his mother and grandmother. DCS policy required the worker to consider all evidence that would tend to support or refute the allegations that the child is a victim of abuse or neglect.

However, in December, 2017, Jessica submitted to hair follicle and urine drug screens. Her urine test, was positive for alcohol and marijuana while her hair test was positive for methamphetamine and marijuana. This was a mistake on Jessica's part and she readily admitted it and agreed to substance abuse services with the department. Nevertheless, DCS Tafoya used these results as justification to schedule a Team Decision Making (TDM) meeting during January of 2017. This was after the worker had left H.P. in the care of his mother for twenty-two days after she visited the home. During the TDM, the notes from the meeting do not indicate that Jessica was required to submit to the drug screen but she volunteered to take the test the next day. This was done as evidence of the mother's desire to cooperate with DCS in order to protect her son.

### G.    Removing a Child Using a Temporary Custody Notice (TCN)

The same home environment that was safe for H.P. for three weeks following the initial DCS contact was now deemed by Tafoya to mean that the child was in "imminent danger." According to the CSRA, DCS Tafoya, with her supervisor's approval, removed H.P. from his mother's custody using a Temporary Custody Notice (TCN). DCS's own records indicated that this action was completed at 3:30 PM on January 12, 2017, when the court was open. This was yet another DCS policy violation that contributed to the unlawful removal of the child from his mother.

A TCN is an internal DCS document that requires no court oversight. It is only allowed to be used by a DCS worker during times in which the Juvenile Court is closed, such as at night, weekends or holidays. DCS policy as well as best practice requires DCS to seek a Court Authorized Removal (CAR) which would have allowed the court to determine whether the removal was warranted. The court also wants to know what efforts the agency has undertaken to prevent the removal which is the most restrictive option. There must be no opportunity for mitigating the "imminent risk of harm due to Jessica's substance abuse." This opinion was based solely on two drug tests, that the mother

10

volunteered for instead of seeing the mother's cooperation as proof that she loved her son.  Something should have been done which would have prevented the need to immediately remove the child.

### Chapter 2: Section 4:  Assessment of Child Safety and Risk (CSRA) Policy & Procedure

The department **shall**:

promote the safety and protection of children;

assess whether any child in the home is in present or impending danger of serious harm;

prevent, intervene in and treat abuse and neglect of children;

promote the well-being of the child in a permanent home; and

coordinate services to strengthen the family.

An assessment of child safety and risk (CSRA) shall be completed on all cases where a field investigation is finished.  A Continuous Child Safety and Risk Assessment (reassessment) is required at specific intervals during the life of a case.  A case cannot be closed when a child has been assessed as unsafe or an active protective action or safety plan is in place.

### Child Safety and Risk Assessment (CSRA)

The assessment of child safety and risk is initiated during initial contact with the family and is continued throughout the investigation. The purpose of the child safety and risk assessment is to gather sufficient and relevant information to make an informed decision about whether the child is safe or unsafe. A child is unsafe when present danger or impending danger exists.

### Present Danger/Protective Action

Upon initial contact with the child and family, the DCS worker will determine whether any child in the home is in present danger. A child is in present danger when there is an immediate, significant and clearly observable family condition, **occurring in the present** that has resulted in or is likely to result in **serious or severe harm** or threat of harm to a child. If any child in the home is in

11

PLOOF000795

present danger, the Child Safety Specialist must take an immediate protective action that controls the present danger. This must be done to ensure child safety before any further interviews or assessment can take place. A protective action is an instantaneous, short term, sufficient action that provides a child with responsible adult supervision, and controls the safety threat(s) to allow completion of the Child Safety and Risk Assessment (CSRA). **Its purpose is to immediately control present danger.**

Examples of present danger may include but are not limited to:

a child who is abandoned or alone now, and not capable of caring for self or others;

caregiver is incapacitated due to substance abuse, mental illness, physical impairment, and/or cognitive functioning right now;

living environment that is hazardous and immediately threatens a child's safety such as exposed live wiring, manufacturing of drugs (i.e. Meth lab), exposure to extreme weather;

child presents as malnourished, dehydrated or failure to thrive, requiring immediate medical attention;

child is actively endangering self or others and caregiver cannot or will not control the child's behavior;

evidence of recent sexual abuse, perpetrator currently has access to identified victim, and no protective action by non-offending caregiver;

injuries such as facial bruises, injuries to the head, or multiple plane injuries, bruising or injuries to a non-ambulatory child, or immersion burns and child is not in a protective environment, such as a hospital;

domestic violence is actively occurring in the home at the time of initial contact and the child is present;

at the time of initial contact, the caregiver is subjecting the child to brutal or bizarre punishment such as confined to a cage, tied to an object, locked in a closet, forced feeding, scalding with hot water, burning with cigarettes, etc.;

evidence of abuse or neglect and the caregiver denies access to or flees with child to avoid DCS contact.

## H.    DCS Indifference to Jessica's Due Process

The actions of DCS following H.P.'s removal and placement in foster care clearly demonstrated the agency's indifference to violation of the constitutional rights of Jessica Ploof and H.P. Two of the due process claims alleged in this lawsuit concerned the mother's rights under the *Wallis* decision to make any and all medical decisions for her son and be present during medical procedures. This was in

PLOOF000796

place as part of a parent's inalienable right to raise their child free of government interference absent compelling evidence that the parent has abused or is about to abuse or neglect the child. The same can be said of the mother's right to make any educational decisions for her son while he is in the temporary custody of the state.

Prior to filing the dependency in this case, DCS Tafoya and her supervisor, Greenway, failed to conduct a diligent search for the absent parent or speak to any of the mother's relatives who were involved in the care of the child. They failed to secure any of the ample records on services provided to H.P. by DDD and the Head Start program in which Jessica Ploof volunteered to participate. In fact, the DCS case records indicated that the only actions done on the investigation were the initial home visit and the request that the mother drug test. This was by no means a "thorough" investigation as called for in DCS policy.

The fact that supervisor Greenway and her superiors allowed the Ploof case to progress to termination on the basis of such flimsy information demonstrated a wanton disregard for the due process rights of Jessica Ploof as well as H.P. This was the same environment that eventually led DCS worker Szymkowski to drastically overstep her boundaries by having ex parte communication with Dr. Thal. It can be assumed at this point that Szymkowski's supervisor, Breeding, approved of her actions which made this a training and supervision issue for DCS. Due Process requires layered supervision in an agency like DCS so that different levels of staff can evaluate the situation and possibly make more informed decisions.

Szymkowski was so emboldened, by the free reign she was given, to falsify testimony during a court hearing when she stated that the agency had concerns about the grandmother's failure to drug test and the revelation that when she did try to UA, she used an unapproved device to alter the results. Brendi Ploof admitted her mistake but it was irrelevant because this did not occur until after H.P. was removed by Tafoya. This was a lie by Szymkowski told under oath. Additionally, this writer has questions as to exactly whose parental rights were affected when H.P. was detained. Since Brendi Ploof did not possess parental rights to H.P., how was it that DCS could require her to drug test at all? If the maternal grandmother's drug use was indeed an issue, Jessica could have easily taken H.P. with her and moved in with another relative such as her aunt, Sherri Walford, who was already involved in the child's care.

For example, page 13 of the Case Plan, (Bates ST-PLOOF-001156) detailed the so called, "desired behaviors," that the agency expected Jessica Ploof to demonstrate before regaining custody of

13

her son.  This document serves as a litany of complex concepts that many adults would find daunting leading them to believe that they were set up to fail by DCS.  A person with developmental challenges like Ms. Ploof would almost certainly feel this way since it appeared as though DCS was throwing up road blocks to her succeeding.  While working with CPS/DCS for twenty years, I never prepared a case plan that from the onset was written in a manner that virtually guaranteed failure.

## I.        Removal as the Most Restrictive Option

The DCS Policy and Procedures Manual requires that the DCS worker evaluate whether a less restrictive option to removal is available to mitigate risk, if any, that may exist in the child's home. The following alternatives must be explored as part of best practice in social work:  "As the evaluation continues the DCS worker should ask themselves whether the following options protect the child short of a detention."

**1. In home solution**

Can the specific safety threats identified in the safety planning be successfully removed or modified by making specific, immediate changes in the living environment?   For example: Identifying an individual such as a grandparent, another member of the child's extended family including a person who has a significant relationship with the child or neighbor who can come into the home to support the family and maintain the child's safety;

Ensuring that the family receives emergency food, clothing, shelter, utilities or other necessities;

Removing the alleged abusive person from the home; or

Connecting the caregiver to services that have been helpful in the past and to individuals who are supportive of the caregiver.

Are immediate services available to the caregiver that prevent or eliminate the need for removal?

If so, can the parent get to the services? Confirm that the caregiver has made a connection with someone who can assist in the delivery of these services.  What makes you believe that these interventions will make the child safe?

**2. Leaving Home and Going to a Safe Place**

14

Sometimes the only solution is for the caregiver who is trying to protect the child to leave and go to a safe situation.

Can the parent, guardian or custodian and the child leave home and go to a safe place for at least a short period of time such as a relative's or friend's home?

Is there a shelter available that can provide temporary housing if no friend or relative can be identified?

If this is an option, the Child Safety Specialist needs to help the caregiver determine how employment or school issues will be managed?

**3. Voluntary Placement Agreement**

If there are no other voluntary alternatives, you may need to consider a voluntary placement. Based on your assessment of the parent, guardian or custodian, do you think:

- that the parent, guardian or custodian would place the child voluntarily until such time as the parent, guardian or custodian can create a safe living environment?
- Based on your assessment, is it likely that the parent, guardian or custodian will be able to resolve the identified safety factors within the 90 days of the voluntary placement period?

If no voluntary emergency intervention can ensure the child's safety, consult with your supervisor and with the Attorney General's Office when possible before removing the child from the home.

**4.  Temporary Custody with Caregiver's Knowledge**

Consider the following questions:

Is temporary custody the only option to ensure the child's safety?

Based on your assessment, is it necessary to remove the child immediately and that no other available Emergency Intervention option is appropriate and/or acceptable to the caregiver?

Provide to the parent or guardian:

the Temporary Custody Notice, CSO-1000A; and
A Guide to the Department of Child Safety, CSO-1010.

15

If the child was removed from a setting other than the home of a parent, guardian or custodian, complete the Notice of Removal, CSO-1039. Give one copy to an appropriate individual at the place of removal.

**5. Emergency Custody without the Caregiver's Knowledge**

In emergency situations, a child may have to be removed without prior consultation if failure to do so would be a danger to the child.

If emergency removal of a child is necessary and prior consultation with a supervisor is not possible, notify the supervisor within two hours if the removal occurred during regular working hours or by 8:30 am. the next morning if removal occurred after regular hours.

The following reasons may require removal of a child without caregiver knowledge:

Immediate need for medical or psychological examination;

Provision of emergency out-of-home placement due to present danger to the child; or

Identity or whereabouts of caregiver are unknown.

If the child was removed from a setting other than the home of a parent, guardian or custodian, complete the Notice of Removal. Give one copy to an appropriate individual at the place of removal. Proceed with verbal and written notice of parents, guardians or custodians.

**J.      Trauma for children removed from their homes**

In the 2019 publication, *"Trauma Caused by Separation of Children from Parents A Tool to Help Lawyers,* reviewed by this writer, the subject matter, as the title belies, deals with several types of emotional trauma suffered by children removed from their parent's homes by CPS (DCS in this case). This is the primary reason why keeping the child with the parent, along with services, is number one on the list of interventions available to DCS when a child is in present danger.  Placement in kinship care is another form of protection that was available in the Ploof investigation.  However, DCS Tafoya and Greenway chose to forego these less restrictive options and proceed directly with H.P.'s detention and placement into foster care.  According to this publication, there is a direct correlation between removal

16

of a child by the state and traumatic behaviors later manifested by the child.  Clinical research shows that:

- Children who are removed are "overwhelmed with feelings of abandonment, rejection, worthlessness, guilt, and helplessness."  (Folman, 1998).

- Separation floods stress hormones throughout the child's brain and body, leading to difficulty sleeping, developmental regression, heart disease, hypertension, obesity, diabetes, and decreased longevity. (Goydarzi 2018; Eck 2018; Carnes 2018).

- Permanent architectural changes in the brain, including lower IQs.  (Wan 2018).

- Depression, more suicide attempts, and more problems with alcohol abuse and gambling.  (Wan 2018; Goydarzi 2018; Eck 2018; Carnes 2018).

- Children generally suffer worse outcomes when removed than if they had been allowed to remain in marginal homes.  In studies of similarly situated children (those with social services involvement facing possible removal), children who were, in fact, removed (compared to those remaining at home).

- Removed children have two to three times higher delinquency rates. (Ryan & Testa 2005; Doyle 2007; Doyle 2008; Lowenstein 2018).

- Removed children have higher teen birth rates. (Doyle 2007).

- Removed children have lower earnings as adults. (Doyle 2007).

- Removed children are two to three times more likely to enter the criminal justice system as adults. (Doyle 2008).

- Removed children are twice as likely to have learning disabilities and developmental delays. (Lowenstein 2018).

DCS Tafoya documented some of the behavioral changes that H.P. went through once he was separated from his mother and taken from his home.  Some of these behaviors included H.P. hitting his head until he bled when he could not be soothed; showing no interests or emotions as well as becoming very clingy and crying often.  The child was not manifesting any of these behaviors when he was with his mother and grandmother.  DCS, in my opinion, rushed to judgment when they bypassed other less restrictive options to proceed directly to a detention when they knew that it was not in the best interests of this child.   The same DCS worker, Tafoya, who found the conditions in the mother's home adequate suddenly changed her opinion and reported to the court that H.P. was in imminent danger from Jessica's

PLOOF000801

drug use.  Since Ms. Tafoya failed to complete a thorough investigation she was unable to develop any evidence against Jessica Ploof other than a couple of drug tests the mother volunteered to take.


**K.      Concealment and other Due Process violations by DCS**


During the life of the Ploof case, it became increasingly apparent that DCS was deliberately trying to conceal their actions from Ms. Ploof knowing full well that the mother was intellectually disabled and naive about how a DCS case actually worked.  DCS Tafoya reported during her initial contact with Jessica Ploof that the worker was aware that the mother was not able to fully understand the proceedings.  Nevertheless, there was none of the disclosed DCS records that indicated that the agency planned to treat Ms. Ploof in any other manner than typical parents involved in a DCS case. This was a violation of Jessica's due process rights to have all government proceedings explained to her in a manner she was able to understand.


**L.      Jessica's Contacts with Dr. James Thal & DCS Szymkowski**


Jessica Ploof's inability to understand what was happening to her was documented for the first time during her initial psychological assessment by Dr. Thal, who was contracted to DCS.  Dr. Thal testified in Juvenile Court that Jessica, "did not have an understanding of what is going on."  He went on to state that, "Jessica was fundamentally confused about why her child was taken from her."  Even when Dr. Thal produced his initial report for the court and stated that it was difficult for Jessica to understand things and to retain things in memory, DCS Tafoya and later DCS Szymkowski failed to accommodate the mother's learning deficits and alter her case plan to better suit her needs.

During a second psychological on Jessica, by Dr. Thal, he indicated that the DCS services provided had been ineffectual because they were not suited for an adult with a serious learning disability.  By this time, the caseworker for H.P. had changed from the DCS Investigator, Tafoya, and moved to the DCS Ongoing worker, Szymkowski as was standard protocol.  She was the worker who wanted a second psychological because she apparently did not like the results of the first one.

Once again, following the 2018 evaluation, Szymkowski refused to follow Dr. Thal's recommendations even though he was hired by DCS.  In fact, Dr. Thal reported that his practice was

PLOOF000802

90-95% dependent on referrals from DCS. These actions were part of an ongoing pattern of behavior by DCS Szymkowski that constituted ethical lapses in judgment that were condoned by her supervisor. Dr. Thal actually recommended that Jessica and H.P. be allowed to live with Brendi Ploof, the maternal grandmother. DCS resisted this advice due to some supposition over whether Brendi was listening in on Jessica's calls to the worker and influencing what Jessica was saying. There was no proof to this allegation and neither the mother or grandmother were ever substantiated for any abuse or neglect of H.P. The agency did not even prove that either of the ladies failed to take proper care of H.P. because of substance abuse. This should have been a pre-requisite to a finding that the child was at imminent risk of serious abuse or neglect at the hands of his caregivers.

By the time of his 2018 report, the DCS caseworker had changed again, this time from Szymkowski to Claudi Hoff. This event was pivotal as a result of what happened next to violate the due process rights of the mother and child. Despite having no further connection with the Ploof case, and not having been assigned when the child first came into care, Szymkowski took it upon herself to contact Dr. Thal prior to the issuance of his second report on Jessica Ploof. With absolutely no evidence to prove her allegations, she told Dr. Thal that Brendi Ploof's residence was in a substandard condition and that H.P. was in very poor condition when he first came into care. Dr. Thal testified that Szymkowski tried to convince him that Brendi Ploof's residence was not a suitable placement for H.P.

When confronted with the lack of evidence to prove gross neglect, DCS Szymkowski engaged in false testimony that is laid out in detail in the 1st Amended Complaint on page 23. This was after she convinced Dr. Thal, with one telephone call, to change his second report from recommendations favoring H.P. remaining in Brendi Ploof's home with his mother, Jessica, to a report expressing "grave concerns," over the safety of the child in this environment. This was a stark turnaround since the doctor testified that he did not review any additional documentation since he wrote his first report. Dr. Thal had yet to file his second report when he was contacted by Szymkowski.

As previously discussed, Szymkowski was merely a caseworker for DCS who possessed no background in mental health, yet she was able to convince a licensed therapist to change a report that was crucial to the mother's ability to maintain custody of her son. This was an ethical lapse on the part of the doctor who should not have allowed a laymen to influence his professional opinions. This appeared to be a capitulation to DCS since the majority of his practice relied on the agency. Even Dr. Thal himself testified that the *ex parte* communication with Szymkowski was inappropriate. This is

19

one of the reasons he is a defendant in this lawsuit.  Please refer to pages $24-25$ of the 1ˢᵗ Amended Complaint to view in detail the changes made by Dr. Thal before releasing his second report.

### M.     Jessica's Completion of Services

On September 19ᵗʰ, 2017, Jessica completed the TERROS program in which she was enrolled by DCS due to her alleged drug problems.  Once this issue was addressed, DCS should have returned H.P. to his mother's custody.  The agency did not comply and kept Jessica completing services for five more months.  On February 28, 2018, Jessica successfully completed the Parent-Aide Program.  The discharge paperwork specifically stated that Jessica was capable of taking care of H.P.'s basic needs and a reunification team should be put together.  The person working with Jessica for Parent-Aide even offered her own company as a possible provider.

This occurred shortly after Dr. Thal issued his report on Brendi.  H.P. should have been returned by DCS at that time as well.  However, the agency chose to continue on with the deprivation of H.P. from his mother.  DCS Hoff pushed ahead with a Bonding Assessment.  This was despite the fact that she was already in possession of the TERROS records and the Parent Aide records on Jessica.  The worker's own providers had already opined that Jessica was drug free and able to meet H.P.'s basic needs.  This is the standard for a fit parent not the best parent possible.

### N.     Termination of Parental Rights

By using the mother's intellectual disability against her DCS managed to present a case to the Juvenile Court to terminate Jessica's parental rights to H.P. in 2018.  The court ruled that the services that DCS offered Ms. Ploof had not been successful in assisting her in discharging her parental duties. It is incredulous to me that DCS deliberately failed to provide services that would have been effective for someone with Jessica's intellectual needs and then parlayed that into a court ruling that the services were not helping which led to the termination of Jessica's parental rights.  This was truly a leap as wide as the Grand Canyon.

DCS Szymkowski violated Jessica Ploof's due process when she chose to provide false testimony under oath.  This action alone canceled her claims of absolute immunity and opened her to liability and constituted a reckless disregard for the truth.  Szymkowski, Hoff and Thal actually

PLOOF000804

engaged in a conspiracy to violate the due process rights of Jessica Ploof under the Fourth and Fourteenth Amendments which is an action involved in this suit. The specifics of the conspiracy are also laid out in detail on pages 28-29 of the 1st Amended Complaint. There were no reasonable efforts made by the defendants to preserve the relationship between Jessica and H.P.

### O.    Conclusions

Following my review of the disclosed records from the Jessica Ploof file, I've come to the following professional conclusions:

- The Arizona Department of Child Safety violated the Due Process Clause of the 14th Amendment in several ways that were fundamentally unfair to Jessica Ploof and H.P.

- DCS conducted an ill-advised investigation of Jessica Ploof based solely on a Hotline report from an anonymous source. This placed undue influence on a report that could not be verified. This was below the standard of care.

- DCS failed to hire, train and supervise appropriate personnel and this led to numerous violations of the civil rights of Jessica Ploof and H.P..
- While the DCS workers on this case documented many of their actions in the CSRA, the notes did not reflect conscious efforts on the part of workers to work with Jessica towards reunification which was the original goal of the case plan.

- Mental Health treatment providers and others who work with DCS are contractors for a reason. The purpose is to shield the professional from undue influence by any agency representatives.

- This principle was violated when DCS Szymkowski engaged in an ex parte telephone call with Dr. Thal that caused him to alter the conclusions of his report to the court. Szymkowski was not trained in mental health treatment and was not even assigned to the Ploof case when she made the call.

PLOOF000805

- Dr. Thal allowed DCS Szymkowski to influence his decisions over the reunification of Jessica with her son H.P. as capitulation to DCS where his testimony indicated that he received up to 95% of his business.

- DCS deliberately bypassed less restrictive options that were available to prevent H.P. from being taken from his home. They immediately proceeded to the most restrictive option which was removing the child from his mother's custody over alleged use of marijuana.

- Since 2017, when this case occurred, there have been several states, including Arizona, who have legalized the recreational use of marijuana. DCS had to show that the alleged use by the mother was causing serious harm to come to her child. They did not prove that in any way. The use of marijuana alone has never been sufficient grounds to remove a child from the home as long as the caregiver is not using while caring for the child.

- Wallis v. Spencer required all child welfare organizations nationwide to recognize that a parent has an inalienable right to raise their children free from government interference absent credible evidence of maltreatment. DCS did not have evidence of maltreatment since all of their information was based on an anonymous source.

- Both the Arizona Revised Statutes and the DCS Policies and Procedures Manual spell out the proper protocol for conducting an investigation as well as managing the ongoing case. This case was, in my opinion, a textbook example of compounded due process violations that led to the tragedy of Jessica Ploof forever losing contact with her son.

- Since DCS failed to conduct a thorough investigation as required by policy, they were unable to substantiate Jessica for any type of abuse or neglect. They apparently used one positive test for marijuana as justification to remove the child based on risk, which they never proved.

- The DCS Hotline chose to inappropriately open an investigation against Jessica based on an anonymous report that the mother insisted was called in by her former boyfriend as retaliation for Jessica ending their relationship. DCS was never able to prove otherwise which made this a

PLOOF000806

flimsy case from the beginning. Jessica did not have any previous contacts with DCS which was one way the agency can verify allegations made anonymously.

- DCS Tafoya removed H.P. from his mother's custody by using a Temporary Custody Notice which was an internal DCS document that required no court oversight before being served on a parent. This form is designed to be used only in an emergency situation that occurs when the court is closed, such as nights, weekends and holidays. Tafoya recorded on the TCN that it was served at 3:30 PM which was when the court was open and available. This was a violation of DCS policy and fell well below the standard of care.

- In order for the removal of H.P. to be within policy, DCS was required to prove that the child was in present danger or was likely to sustain serious or severe harm if left in the home right now. This was certainly not the case for the Ploof family and none of it was ever proven by DCS yet they managed to convince the Juvenile Court that the child was unsafe.

- DCS continued to consciously violate the due process rights of both mother and child by making medical and educational decisions for H.P. without including Jessica in the decision making process. The mother had the right to be present for medical procedures and approve of any education decisions made while her son is in foster care.
- DCS Szymkowski compounded her inappropriate behaviors during the ex parte call with Dr. Thal by giving false testimony against the mother and grandmother in Juvenile Court. She accused the grandmother of using a device to fake drug test results before the child was removed. In reality, the grandmother did not make this attempt until after the child was in foster care.

- Many of the professionals that worked on the Ploof case reported that Jessica was unable to understand much of what DCS was trying to instill upon her because of her intellectual disability. They recommended that DCS alter the services provided so that the mother was more likely to succeed in reunification with her son. Nevertheless, DCS failed to change any of the plaintiff's services to appropriately provide reunification services.

23

PLOOF000807

- Despite failing to provide effective services to the mother, that she could understand, DCS managed to convince the Juvenile Court to terminate Jessica's parental rights to H.P. on the basis of the services being provided not being effective in helping the mother achieve reunification. They changed the case plan to severance and adoption without proper justification and were never made to prove their case before depriving Ms. Ploof of her son.

- National clinical research involving children taken from their homes by child welfare authorities, like DCS, suffer serious traumatic symptoms that could have been prevented if the child was kept in the home with even a marginal parent as long as services were being provided and the child's safety could be assured. H.P. suffered from serious behavioral deficits that he did not have before he was removed. The suffering this child endured was entirely preventable in this writer's opinion.

24

All of my opinions were reached and are made within a reasonable degree of certainty and probability within the field of children's social services.  The right to amend this report is reserved if further relevant documentation is revealed.


Respectfully submitted,


Date:  June 23, 2025

*Timothy Turner*
Timothy Turner (Jun 23, 2025 20:30 MDT)
_____
Timothy Turner, CPS Consultant

PLOOF000809

P.O. Box 4086 • Kingman, AZ 86402 • (928) 278-7108 • CPStrn@icloud.com or CS1930@outlook.com

# *Timothy Scott Turner*

**QUALIFICATIONS:**

My educational qualifications include a Bachelor of Science Degree in Criminology with a minor in Social Work; as well as over 200 hours of specialized training in all aspects of child protective services. I worked for 20 years as a senior social worker and social work supervisor for at risk families. My abilities include advanced assessment skills and the practice of solutions-based efforts in addition to strong leadership skills.
I have now retired from the field as my consultant business has expanded.  For the past 9 years, I have also served as a legal consultant and expert witness in legal matters related to the proper standard of care required by CPS procedures, training, and personnel.

**EXPERIENCE AS A CHILD WELFARE CONSULTANT & EXPERT WITNESS:**

After serving as a professional consultant/Expert Witness in the field of child welfare for the past decade, I have participated in 56 lawsuits since 2011.  I've completed assignments, written reports and provided deposition testimony for cases filed in Federal Court in Arizona, California, Nevada, North Carolina, Washington; State Courts in New York and Wisconsin, as well as state lawsuits in the California counties of Contra Costa, Placer, San Bernardino, Sonoma, Santa Clara, Mendocino, and Los Angeles Counties.

I can be accessed as a child welfare consultant on the website, Expert Pages.com, or by accessing my "Linked In" page.  My website is, turnerconsultantservices.com.  A list of cases I've participated in will be provided upon request.

**EXPERIENCE IN CHILD PROTECTIVE SERVICES:**

**2015 – 2017:  Mendocino County Health and Human Services Department, Ukiah, CA.  ER Investigations Supervisor/ Social Worker V.**

Responsibilities:  As a supervisor, I was responsible for the supervision of 6 experienced CPS investigators in the field as well as the training of new employees assigned to my unit.  The Red Team was a new statewide initiative that focuses on the most serious of the referrals to strategize the most appropriate response. This was also my responsibility. This is a fast-paced environment that requires the ability to think outside the box in order to ensure the safety of the most vulnerable citizens among us.

As a social worker, I was responsible for training and supervision of new workers in the field while carrying an average of 25-30 new investigations per month. This included the exigent removals of children and their initial placements and court appearances.  This required working closely with law enforcement with a client base that included large amounts of illegal substance abuse and mental illness, both leading causes of child maltreatment.

26

Accomplishments:  I have received certification as an expert witness in risk assessment in the Mendocino County Courts.  I've provided court testimony frequently and I have received specialized training to conduct recorded forensic interviews of children for court.  I completed all of the required supervisor's CORE training and attended supplemental trainings by the agency.

**2014 – 2015:  Fairfax County Department of Family Services, CPS Division, Fairfax, VA.  CPS Specialist III.**

Responsibilities:  I was assigned to a CPS unit covering a large urban area near Washington, D.C.  This involved a differential response system in which less serious cases were assessment only while more serious cases were investigations.  I worked largely with an immigrant population and used translators frequently in order to provide services to the clients. I prepared court reports and testified in court as required for the job.  I was there for a short time due mainly to a lack of acclimation to the East Coast and my departure was not job related.

Accomplishments:  shortly after arriving on this investigative unit, I was given the responsibility by the supervisor for going into the field and working with new investigators and evaluating their performance.  This was a training role that I was comfortable with from other positions I've held in the past.  While in this position, I completed at least 100 separate investigations and worked over 24 hours at a time on call over two different holiday weekends.

**2012 - 2014:  Mendocino County Health and Human Services Department, Ukiah, CA. Social Worker III.**

Responsibilities: This was my first assignment with Mendocino County.  I was assigned to an emergency response CPS unit with an average of 25-30 new investigations per month.  My duties included personally supervising male clients with Court ordered urine testing and both sexes for oral swab drug testing, the preparation of detailed case plans and court reports, and the maintenance of multiple case records using the CMS/CWS computer system.

Accomplishments:  I was successful in closing 35 separate child abuse/neglect referrals during the month of February 2014. The statewide average of referrals closed, per social worker, in California, is 15. My supervisor relied on me to train and supervise the new staff in the field when she was unavailable.

**2009 – 2011:  San Bernardino County Department of Children and Families, Victorville, CA. Social Services Practitioner.**

Responsibilities:  My duties included the investigation of allegations of child abuse and neglect to a diverse ethnic population. This included the provision of solution based and family centered services largely to an immigrant client base.  Training of new workers in the field was also something that I often volunteered to do.  My duties included working with families on a limited, "intake" basis; as well as families within the Court system for months.  Each type of case required different skills.

Accomplishments:  I completed over 500 separate investigations and prepared at least 30 detailed Jurisdictional/Dispositional Court reports.  I testified in Family and Criminal Court hearings several times.  Since I was frequently assigned to a reunification case for months, I became adept at writing and monitoring case plans. I maintained computerized records using the CMS/CWS computer system.

PLOOF000811

**2007 – 2008:  Clark County Children and Families Division, Las Vegas, NV.  Specialized Investigations, Sex Abuse Investigator.**

Responsibilities:  My duties included the exclusive investigations and court actions required for sexual abuse victims and their families. This included the production of recorded forensic interviews of child victims, to be used as evidence in court.  I testified and prepared detailed case plans and court reports to assist the court in determining what services were in the children's best interests.  I consulted with law enforcement and district attorneys to prepare for both criminal and civil hearings.  I was responsible for being well versed in policy and procedure in order to complete my tasks.
Accomplishments:  I worked frequently with children of all ages who have been victims of the most horrible abuse and neglect imaginable.  I have been successful at developing rapport with the children, I have worked to provide services for them to recover and thrive in the future.  I became adept at completing recorded forensic interviews.

EXPERIENCE BEYOND 10 YEARS IN CPS

**2004 - 2007:  Arizona Department of Economic Security, CPS Division, Prescott Valley & Kingman, AZ.  Investigative Specialist III.**

Responsibilities:  I was assigned to an average of 30 new reports of child abuse and neglect per month; the placement of children into foster care arrangements; the preparation of court documents and testimony over 30 times; computerized case records using the CHILDS windows-based program. Approximately 500 assessments into all types of maltreatment were completed. My job included family-based services and case planning on an individual basis.

Accomplishments:  I received a promotion and raise in less than one year for exceeding in my performance review.  I was assigned to several high-profile investigations at the request of District office.  I received specialized training in Forensic Interviewing in order to conduct video interviews with children.  I performed over 35 such recorded interviews for Court.  I was able to train and supervise several new employees to assist my supervisor in the field.  I volunteered to testify in front of the Arizona Legislature on impending changes to the agency.

**2002 - 2004:  New Mexico Children, Youth and Families Dept. CPS Division, Farmington, NM. CPS Senior Investigator.**

Responsibilities:  I was responsible for the training and supervision of new case managers in the field; the investigation of reports of child abuse and neglect in a multi-county collection of small cities.  My duties included the provision of family centered services to prevent removals when possible.  I was charged with using the Windows based FACTS system to maintain case records and prepare case plans. These duties were completed hundreds of times. Court testimony was also required on several occasions.

Accomplishments:  this CPS position was unique because the office was located near the Navajo Reservation, the largest Native American tribe in America.  After receiving specialized ICWA training, I was successful at working with the tribe on numerous cases.  An understanding of ethnic diversity was essential and I received compliments from supervisors for my skills in this area.

PLOOF000812

**1988 – 1990 & 1993-1996: Texas Department of Protective and Regulatory Services, San Angelo (1988-90) & Austin, TX (1993-96).  CPS Specialist II and III.**

Responsibilities:  From early, 1988 until late 1989, my assignment was to conduct child abuse and neglect investigations in San Angelo, TX.  Assessments of safety and risk to children were conducted and appropriate placement actions taken when necessary.  This was in a pre-computerized environment, yet documentation was maintained, and court reports filed.  Case planning and family preservation services were also practiced routinely.

From early 1993, until late 1995, I was a caseworker in Burnet, TX with the same responsibilities.  During 1995-1996, my final year with the agency, I transferred to the statewide child abuse hotline where I served as a screener for reports and transported these reports to the field and to emergency response teams.

Accomplishments:  During this employment, I conducted hundreds of assessments as an intake caseworker.  My reputation developed as a worker that wanted to be case sensitive and not cookie cutter in structure.  I was responsible for a large number of case plans, service plans and safety plans.  I was trained at the Child Sexual Abuse Conference in Huntsville, AL for advanced service to the agency.

As a hotline screener, I was able to delay suicidal clients who called in while emergency help arrived.  I developed telephone interviewing skills which are a completely different skill set than face to face interviews.  This position also required the ability to respond during multiple and often stressful situations.

PLOOF000813

### Prior Consultant/Expert Witness Cases for Timothy Turner

1). **Morris v. Arizona,** (2011), Case No. CV2011-001887, Kevin Tucker, Atty., Tucker & Miller, Attorneys at Law, 1440 E. Missouri Ave., Suite C150, Phoenix, AZ 85014, Phone: (602) 714-9864. This was a foster care case in which a teenage boy died from a methadone overdose while in a foster placement approved by CPS.

2). **Lopez v. Arizona,** (2012), Case No. Never Filed, Lincoln Combs, Atty., Gallagher & Kennedy, P.A., 2575 E. Camelback Rd., Suite 1100, Phoenix, AZ, 85016, Phone: (602) 530-8000. This was a proposed foster care case in which undocumented children, born in America, were placed by CPS with relatives in Mexico, where they were sexually abused.

3). **Van Horn v. Arizona,** (2013), Case No. CV2013-005449, Jorge Franco, Atty., Jennings, Haug & Cunningham, L.L.P., 2800 N. Central Ave., Suite 1800, Phoenix, AZ 85004-1049, Phone: (602) 234-7800. This was a case in which CPS failed to protect two teen girls from neglect which led to sexual abuse of one daughter by her stepfather. **(I completed a deposition in this case in 2015).**

4). **Raggio v. Arizona,** (2013), Case No. CV2013-015102, Jorge Franco, Atty., Jennings, Haug & Cunningham, L.L.P., 2800 N. Central Ave., Suite 1800, Phoenix, AZ 85004-1049, Phone: (602) 234-7800. This was a case in which CPS failed to protect a female toddler from severe injuries through a proper investigation. **(I completed a deposition in this case in 2015).**

5). **Laster v. Arizona,** (2016), Case No. JD-16089-S, Raymond Norris, Atty., Gallagher & Kennedy, P.A., 2575 E. Camelback Rd., Suite 1100, Phoenix, AZ 85016, Phone: (602) 530-8000. This was a case involving failure to protect a toddler by CPS, which led to the child suffering severe and permanent brain damage.

6). **Birair v. Kolychek,** (2016), Case No. CV-15-01807-PHX-DJH, Dennis Blackhurst, Atty., Gillette Phelps, P.L.C., 3850 E. Baseline Rd., Suite 125, Mesa, AZ 85296, Phone: (480) 467-7000. This was a case in which CPS removed five children from the parents without exigency or a warrant. This went on for over one year. **( I completed a deposition in this case in 2017). ($900,000 verdict for plaintiff).**
https://www.phoenixnewtimes.com/news/arizona-dcs-social-workers-tore-a-mesa-family-apart-then-the-parents-beat-them-in-court-11489246

7). **Leon v. Rosas,** (2017), Case No. 16-CP-023139, Christopher Dull, Atty., Christopher Dull, Esq., 1999 S. Bascom Ave., Suite 700, Campbell, CA 95008-2205, Phone: (408) 879-2625. This was a custody case in Family Law Court, in which CPS was involved, and I was hired by the father to review his documents with his counsel.

8). **Dyer v. Arizona,** (2017), Case No. CV2016-005118, Jeffrey Imig, Atty., Miller, Pitt, Feldman & McAnally, P.C., 2800 N. Central Ave., Suite 840, Phoenix, AZ 85004, Phone: (602) 266-5557. This was a kinship foster care case involving two young children who were placed with relatives by DCS where they were sexually abused by a resident of the home.

9). **Aksu v. Contra Costa County,** (2017), Case No. CV-12-4268, Tanya Leydiker, Atty., Meadows, Schwartz & Cook, 2121 N. California Ave., Walnut Creek, CA 94596-7333, Phone: (925) 947-1147. This was a case in which CPS falsified documentation to manipulate the custody decisions away from the plaintiff father.

10). **Acosta v. Gap Ministries,** (2017), Case No. C-20145162, Andrea Watters, Atty., Watters & Watters, P.L.L.C., 4729 E. Sunrise Dr., Tucson, AZ 85718, Phone: (520) 323-5910. This was a foster care case in which DCS placed a teen boy into a group home where he was attacked by another resident and lost an eye. DCS was aware of the violent history of the offending resident but failed to protect.

PLOOF000814

11). ***Akey v. Placer County,*** (2017), Case No. 2:14-CV-2402, Patrick Dwyer, Atty., Dwyer & Associates, P.O. Box 1705, Penn Valley, CA 95946, Phone: (530) 432-5407.  This was a case in which CPS removed a child without exigency or a warrant and claimed that a verbal safety plan was sufficient to protect the child.  This was a Federal lawsuit**.  (I completed a deposition in 2017 and testified in Federal Court in 2019). ($1 Million verdict for plaintiffs).**

12). ***Fakoya v. Clark County, Nevada,*** (2017), Case No. Unavailable, Peter Angulo, Atty., Angulo & Stoberski, Attorneys at Law, 9950 W. Cheyenne Ave., Las Vegas, NV 89129, Phone:  (702) 384-4012.  This was a case that eventually settled where CPS made false allegations of physical abuse against the father as retaliation.

13). ***Heideman v. State of Washington,*** (2017), Case No. 10-2-02649-2, Jeffrey Caffee, Atty., Van Siclan, Stocks & Firkins, P.L.C., 721 45th Street, Auburn, WA 98002-1381, Phone: (253) 859-8899.  This was a case that eventually settled in which CPS conducted multiple investigations but failed to find obvious red flags leading the children to be abused by their father.

14). ***Suzuki v. Contra Costa County,*** (2017), Ref. No. 1161-2286-0145-9012710, Tanya Leydiker, Atty., 1350 Treat Blvd., Suite 420, Walnut Creek, CA 94597, Phone: (925) 934-6200.  This was a case in which CPS failed to protect a 15-year-old special needs boy from emotional abuse committed against him by his father.

15). ***Schlindler v. Contra Costa County,*** (2017), Case No. DSS-0643956, Jennifer Ani, Atty., Jennifer Ani, Attorney at Law, 4040 Civic Center Dr., Suite 200, San Rafael, CA 94903-4187, Phone: (415) 259-6626.  This was a custody case that CPS intervened but failed to protect the 8-year-old daughter from her father who was known to have a violent past.

16). ***Evans v. Mendocino County,*** (2017), Case No. DSS-0643883, Jennifer Ani, Atty., Jennifer Ani, Attorney at Law, 4040 Civic Center Dr., Suite 200, San Rafael, CA 94903-4187, Phone (415) 259-6626.  This was a custody case in which a father fought to regain custody of his children following an investigation by CPS with no follow thru.

17). ***Dixon v. Mendocino County,*** (2017), Case No. 17-17636-01, Jennifer Ani, Atty., Jennifer Ani, Attorney at Law, 4040 Civic Center Dr., Suite 200, San Rafael, CA 94903-4187, Phone: (415) 259-6626.  This was a case in which there was an unlawful detention by CPS to intervene in custody hearings because the deceased mother was an employee of CPS before her death.

18). ***Arizona v. Ashish,*** (2017), Case No. CR-2014-02223-001, Rennee DeSaye, Atty., for defendant, DeSaye P.L.L.C., 8618 N. Cardinal Dr., Phoenix, AZ 85028, Phone: (602) 373-2071.  This was a case in which CPS placed children with relatives in error, denying the defendant father of his rights to due process.

19). ***Magana v. Anderson,*** (2017), Case No. 16-FL-04616, Robert Pacuinas, Atty for defendant, Law Office of Robert Pacuinas, 2100 Northrop Ave., Suite 800, Sacramento, CA 95825, Phone: (916) 921-1859.  This was a case in which a flawed CPS investigation led to false custody issues for the defendant.

20). ***Pynn v. Pynn,*** (2018), Case No. 150065, Supreme Court, State of New York, Anna Marie Richmond, Atty for plaintiff, Law Offices of Anna Marie Richmond, 2500 Rand Bldg., 14 Lafayette Square, Buffalo, NY, 14203-1925, Phone: (716) 854-1100.  This was a case in which CPS conducted a flawed investigation and failed to protect the children from being abused by their father and led to a five-year custody battle.

21). ***Erie County, NY v. Susan B.,*** (2018), Appellate No. CAF-16-01277, Charles Greenberg, Atty for Appellant, Charles J. Greenberg, Attorneys, 3840 E. Robison Rd., Suite 318, Amherst, NY, 14228-2001, Phone: (716) 389-3553.  This was a federal case on appeal regarding the violation of the mother's due process rights following a flawed CPS investigation.

PLOOF000815

22). ***DeLaere v. Kushnir,*** (2018), Case No. Unknown, Caroline Phenix, Atty., for Respondent, Publicly Correct Firm, 2355 Westwood Blvd., Suite 617, Los Angeles, CA 90064, Phone: (213) 787-7144. This was a case in which the mother took the children out of state following a flawed CPS investigation that led to an illegal change in custody.

23). ***People v. Graves,*** (2018), Case No. FV-1120-3032, Robert Shamuilian, Atty., Tarman & Shamuilian, Attorneys, 9333 Baseline Rd., Suite 100, Rancho Cucamonga, CA 91730, Phone: (909) 658-7341. This is still an open criminal case in which CPS left a child in the care of a sex offender who abused her. **

24). ***Aufdenberg v. St. Rose Hospital,*** (2018), Case No. Unknown, Branden Jung, Atty., for plaintiff, Lewis Brisbois & Associates, 6385 S. Rainbow Blvd., Suite 600, Las Vegas, NV 89118, Phone: (702) 693-4355. This was a case in which CPS tried to remove a newborn from the mother who had been a foster child horribly abused while in foster care.

25). ***Ratliff v. Arizona,*** (2018), Case No. CV-185432, Jorge Franco, Atty., Jennings Haug & Cunningham, Attorneys at Law, 2800 N. Central Ave., Suite 1800, Phoenix, AZ 85004, Phone: (602) 234-7800. This was a case in which DCS conducted a flawed investigation and prematurely closed their case, which led to further abuse of the child.

26). ***Mueller v. San Bernardino County,*** (2019), Case No. 5:18-CV-00151-DSF-SP, Eric Rossman, Atty., Rossman Law Group, P.L.L.C., 350 N. 9th St., Suite 500, Boise, ID 83702, Phone: (208) 331-2030. This was a highly publicized foster care case in which CPS failed to disclose the predatory behaviors of one of the foster children placed in their home and he horribly abused his younger brother. This resulted in the largest foster care verdict in California history. I wrote the court report. **(I completed a Zoom Deposition in 2022). ($7.5 Million dollar settlement for the plaintiff).**
Behind San Bernardino County's $7.5M+ Foster Care Abuse Settlement: Part 1 - VOICE (theievoice.com)

27). ***Bentley v. DCS & City of Mesa,*** (2019), Case No. 2:17-CV-00966-PHX-DJH, Yusra Bokhari, Atty., Schern, Richardson, Finter, 1640 S. Stapley Dr., Suite 132, Mesa, AZ 85204, Phone: (480) 632-1929. This was a case in which DCS removed children without a warrant and without exigency. **(I completed a Deposition in 2019).**

28). ***Chatman v. Ferrell,*** (2019), Case No. 2:17-CV-08326-DLR, Martin Bihn, Atty., Bihn & McDaniel, 2600 N. Central Ave., Suite 1775, Phoenix, AZ 85004, Phone: (602) 248-9779. This was a case involving an interstate move of foster children by DCS in violation of the law. **(I completed a Deposition in 2019) (I testified in Federal Court in 2020).**

29). ***Dyer v. Arizona,*** (2019), Case No. CV-2018-008907, Robert Pastor, Atty., Montoya, Lucero & Pastor, 3200 N. Central Ave., Suite 2550, Phoenix, AZ 85012-2490, Phone: (602) 279-8969. This was a case in which a foster child left unprotected by DCS and was molested in a foster home. **(I completed a Zoom Deposition in 2020).**

30). ***Prince v. Mullins,*** (2019), Referral No. 0366-5007-2997-5091008, Carlos Martinez, Atty., Bay Area Law, 647 N. Santa Cruz Ave., Suite C, Los Gatos , CA 95030, Phone: (408) 286-3070. This was a case that involved a custody dispute following a CPS investigation.

31). ***Avitia v. Arizona,*** (2020), Case No. CV-2016-051180, Darius Bursh, Atty., McCain & Bursh, 901 W. McDowell Rd., Phoenix, AZ 85007, Phone: (602) 604-2138. This was a case in which DCS should have been contacted but wasn't. The mother ended up killing her infant twin sons. **(I completed a Deposition in 2021).**

32). ***ZM Doe v. Arizona,*** (2020), Case No. CV-2018-008907, Robert Pastor, Atty., Montoya, Lucero & Pastor, 3200 N. Central Ave., Suite 2550, Phoenix, AZ 85012-2490, Phone: (602) 279-8969.

PLOOF000816

This was a case in which DCS placed a child in a foster home where she was molested by her foster parent. DCS failed to follow the procedures necessary to protect the child.

33). ***Jane Doe v. Arizona,*** (2020), Case No. C-2018-2866, Scott Eldridge, Atty., Burg, Simpson, 8310 S. Valley Hwy., Suite 270, Englewood, CO 80112, Phone: (303) 792-5595. This was a case in which a four-year-old foster child was seriously abused in two different foster homes, once by a foster parent and later seriously burned by an adoptive parent approved by DCS. ( I completed a 90-page court report in 2020).

34). ***Frodsham v. Arizona,*** (2020), Case No. CV-2019-00073, Scott Eldridge, Atty., Burg, Simpson, 8310 S. Valley Hwy., Suite 270, Englewood, CO 80112, Phone: (303) 792-5595. This was a case in which a teenage child was abused in an adoptive placement approved by DCS. The adoptive father was later arrested for running a child pornography ring and filming the foster child being molested and placing the images online. The adoptive father was arrested by federal authorities. This occurred right under the noses of DCS who failed to respond. This case was highly publicized.

Horrific Arizona CPS Corruption Scandal - Saving Grace Advocates

35). ***Talia Williams v. Arizona,*** (2020), Case No. 2:18-CV-01234-DJH, Adam Anderson & Dennis Blackhurst, Attys., Anderson, Banta & Clarkson, 48 N. McDonald, Mesa, AZ 85201, Phone: (480) 272-5983. This was a case in which DCS removed a child from his mother using false information to secure the warrant.

36). ***Denice Williams v. Arizona,*** (2020), Case No., 2:18-CV-01293-GMS, Joshua Carden, Atty., The Joshua Carden Law Firm, 16427 N. Scottsdale Rd., Suite 410, Scottsdale, AZ 85254, Phone: (480) 454-1100. This was a related case in which DCS failed to reunify children in foster care with their parents for five years.

37). ***Otto v. Portage County, WI,*** (2020), Case No., CV-176C54, Peter Lloyd, Atty., Peter Lloyd & Associates, 232 W. Grand Ave., Wisconsin Rapids, WI 54495, Phone: (715) 424-3900. This was a case in which Wisconsin CPS removed two children without a court order and failed to reunify for five years due to bias against the mother.

38). ***Lipton v. Nevada County,*** (2020), Case No., CV-19-083938, Joyce Vega, Atty., Law Offices of Vincent W. Davis & Associates, 150 N. Santa Anita Ave., Suite 200, Arcadia, CA 91006, Phone: (626) 446-6442. This was a case in which a foster child was abused in the foster home and returned to the parent with severe mental illness.

39). ***Farr v. Sonoma County,*** (2020), Case No., SCV-264540, Scott Montgomery, Atty., Abby Law, 100 Stony Point Rd., Suite 200, Santa Rosa, CA 95401, Phone: (707) 542-5050. This was a case in which children removed by CPS and placed in a foster home were molested by the foster parent. **($15 Million Dollar Settlement for Plaintiff in 2023). (I was scheduled to participate in a deposition but the case was decided the day of my deposition so it was canceled).**

Northern California Siblings Receive Foster Care Abuse Trial Award | The Imprint (imprintnews.org)

40). ***King v. Wake County, NC,*** (2020), Case No., 16-CV-003262, Heather Snider, Atty., Patton & Ryan, LLC, 330 Wabash Ave., Chicago, IL, 60611, Phone: (312) 261-5168. This was a case in which I was consulted on behalf of CPS, who removed a severely injured child from an abusive parent.

41). ***Wood v. Contra Costa County,*** (2021), Case No., CV-19-07597-MMC, Marc Angelucci, Atty., Marc Angelucci, Attorney at Law, P.O. Box 6414, Crestline, CA 92325, Phone: (626) 319-3081. This was a case where CPS removed two children without a warrant or exigency. Mr. Angelucci was murdered by a deranged man in what became a nationally publicized case prior to completing the case.

PLOOF000817

[Suspect in Murder of Judge's Son Linked to Slaying of Calif. Lawyer (people.com)](people.com)

42). ***Ramirez v. Sacramento County,*** (2021), Case No., 165-L06316, Robert Pacuinas, Atty., Law Office of Robert Pacuinas, 2100 Northrop Ave., Suite 800, Sacramento, CA 95825, Phone: (916) 921-1859.  This was a case in which a child was sexually abused in a foster home but no adequate CPS investigation was ever conducted.

43). ***Robinette v. Arizona,*** (2021), Juvenile Case No. JD-201600142, DeeAn Gillespie, Atty., Gillespie, Shields, Goldfarb & Taylor, 7319 N. 16th St., Phoenix, AZ 85020, Phone: (602) 870-9700.  This is a current case in which a foster child was kept out of the home by DCS for over 26 months with no permanency plan. ** **(I completed a Zoom Deposition in 2024).**

44). ***Hooker v. Orange County,*** (2021), Case No. Unknown, William Light, Atty., Frank Barbaro & Associates, 1111 N. Broadway, Santa Ana, CA 92701, Phone: (714) 835-2122.  This was a case in which CPS removed two children with no court order and no exigency.

45). ***Grant v. Alameda County,*** (2021), Case No. Unknown, Tate Lounsbery, Atty., Tate Lounsbery, Attorney at Law, 270 E. Douglas Ave., El Cajon, CA 92020, Phone: (510) 610-1000.  This was a custody case in which CPS removed a child without a warrant or exigency and failed to follow thru with the parent in good faith.

46). ***Gonzales v. San Mateo County,*** (2021), Juvenile Case No. 19-CV-0736-UC, Karen Rosenthal, Atty., San Mateo County Counsel's Office, 400 County Center, 6th Floor, Redwood City, CA 94063, Phone: (650) 363-4250.  This was a case in which I was consulted by counsel for CPS to verify that the agency completed their functions according to policy and state law.

47). ***Wright v. Arizona,*** (2021), Case No., 4:21-CV-00257-JGZ, Michael Moore, Atty., Law Office of Michael Moore, 4931 N. Pontatac Ave., Tucson, AZ 85718, Phone: (520) 318-0075.  This is a current case the removal of a child by DCS without informing the parents of the subsequent forensic examination.**

48). ***Hartley v. Hughes & Garland,*** (2022), Case No., Never Filed, Martin Bihn, Atty., Bihn & McDaniel, PLC, 2600 N. Central Ave., Suite 1775, Phoenix, AZ 85004, Phone: (602) 248-9779.  This was a proposed case of severe neglect in which the mother failed to provide for her children and her home was alleged to be hazardous to the children.  DCS was aware of these conditions but failed to respond to protect the children.

49). ***Rudesill v. Streamwood Hospital,*** (2022), Case No. 15L-3146, Patrick Sullivan, Atty., Segal McCambridge, 233 Wacker Dr., Suite 5500, Chicago, IL 60606, Phone: (312) 645-7800.  This was a case involving a child murdered by a foster parent after being released from the hospital. I consulted for the hospital's attorneys.

50). ***Cooper v. Los Angeles County,*** (2022), Case No., Unknown, Edna Wenning, Atty., Law Offices of Vincent Davis & Associates, 440 E. Huntington Dr., Suite 100, Arcadia, CA 91006, Phone: (626) 446-6442.  This was a case in which children were removed by CPS in violation of the father's civil rights.

51). ***Poulet v. Los Angeles County,*** (2022), Case No., 2:20-CV-11188-FLA-AS, Edna Wenning, Atty., Law Offices of Vincent Davis & Associates, 440 E. Huntington Dr., Suite 100, Arcadia, CA 91006, Phone: (626) 446-6442. This is a current case which involved a foster child that was placed with a foster family who was not informed of the child's  serious mental health issues and violent behaviors.**

52). ***Geiler v. Clark,*** (2022), Case No., A-20-808331-C, Alissa Bestick, Atty., Lewis Brisbois & Associates, 6385 S. Rainbow Blvd., Suite 600, Las Vegas, NV 89118, Phone: (702) 693-4343.  This is a current case involving a gravely ill mother whose son was taken from her by CPS without due process.**

PLOOF000818

53). ***Davis v. Arizona,*** (2023), Case No., CV-2021-051341, Jim Abraham, Atty., Zachar Law Firm, P.O. Box 47640, Phoenix, AZ 85020, Phone: (602) 494-4800. This is a current case involving three young children in a foster placement when one child drowned in an unsupervised swimming pool. DCS failed to make proper inspections of the home prior to placing the children with a 70-year-old caregiver. **

54). ***Lutgen v. Arizona,*** (2023), Case No., Not filed as of yet, Dennis Blackhurst & Joshua Carden, Attys., Carden & Livesay, LTD, 419 E. Juanita Ave., Suite 103, Mesa, AZ 85204, Phone: (480) 345-9500. This is a proposed case in which a mother was convicted of the starvation death of her child. DCS was aware of the mother's psychotic behaviors but failed to act to protect the child.**

55). ***Kahraman v. Arizona,*** (2023), Case No., CV-22-00375-PHX-SRB, DeeAn Gillespie-Stroud, Atty., Gillespie Shields & Taylor, 7319 N. 16th St. Phoenix, AZ 85020, Phone: (602) 870-9700. This is a current case in which DCS accused the mother of Munchausen's Syndrome by Proxy. DCS removed her autistic twin boys with no evidence to sustain the allegations.**

56). ***Manns v. San Bernardino County,*** (2023), Case No. 5:21-CV-02065-JWH-SHK, Mark Skapik, Atty., Skapik Law Group, 5861 Pine Ave., Suite A-1, Chino Hills, CA 91709, Phone: (909) 398-4404. This is a current case in which CPS removed a baby for what were minor injuries and placed the baby with his drunken father in order to punish the mother who had legal custody.** **<span style="color:red">(I completed a Zoom Deposition in November 2023).</span>**

57). ***Groves v. DCS,*** (2023), Case No. Not Filed Yet, Matthew Boatman, Atty., Gallagher & Kennedy, 2575 E. Camelback Rd., Suite 1100, Phoenix, AZ 85016-9225, Phone: (602) 530-8000. This is a proposed case in which DCS removed two children from their parent's custody without a warrant or exigency. They kept the children out of the home for 18 months.**

58). ***Fuller v. Esteem Children's Services, Inc***., (2024), Case No. Pending, Gail A. Sater, Atty., Treon + Shook, PLLC 4600 North 12th Street, Phoenix, AZ 85014, Phone: (602) 265-7100. This is a pending lawsuit against a foster care agency when the staff was aware of resident drug use at the same time a 17 year old girl overdosed on Fentanyl.**

PLOOF000819

**TURNER CONSULTANT SERVICES, LLC**
**2025 Fee Schedule**
**(Effective January 1, 2025)**

**2025 Consultation/Expert Witness Fee Schedule for Timothy Turner:**

**(A).  Engagement Fee (Deposit) (First Six Hours)         $1,800.00**

**(B). Telephone Consultations, CPS File & Document Reviews, Written Statements and Detailed Report Preparations:**

                                        **$ 300.00 per hour**

**(B). Expert Witness Court Testimony and Depositions:**

                                        **$ 2,500.00 Flat Rate**

**(C). Travel/Wait Time                        $ 200.00 per hour**

36

PLOOF000820

# Ploof Declaration - Turner

**Final Audit Report**                                              2025-06-24

| | |
|---|---|
| Created: | 2025-06-24 |
| By: | DeeAn Gillespie (astrub@gillaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAHEpfHAfcZyVkYZ398DOxiZ709TqXAFqE |

## "Ploof Declaration - Turner" History

Document created by DeeAn Gillespie (astrub@gillaw.com)
2025-06-24 - 2:03:17 AM GMT

Document emailed to Timothy Turner (tt760@proton.me) for signature
2025-06-24 - 2:03:23 AM GMT

Email viewed by Timothy Turner (tt760@proton.me)
2025-06-24 - 2:30:07 AM GMT

Document e-signed by Timothy Turner (tt760@proton.me)
Signature Date: 2025-06-24 - 2:30:41 AM GMT - Time Source: server

Agreement completed.
2025-06-24 - 2:30:41 AM GMT

Adobe Acrobat Sign