Thomas A. Connelly (AZ Bar #019430)
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
Jenny D. Jansch (AZ Bar #024431)
**GILLESPIE, SHIELDS & TAYLOR**
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Jesscia Ploof, an individual,<br><br>           Plaintiff,<br><br>v.<br><br>State of Arizona, *et al.*,<br><br>           Defendants. | Case No.: 2:21-cv-00853-JJT-PHX<br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO DCS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>(Hon. John J. Tuchi) |

Plaintiff, by and through undersigned counsel, hereby respond in opposition to DCS Defendants' Motion for Summary Judgment (Doc. 106), for the above refence matter.[1]

---

[1] To the fullest extent possible, this response is comprised of Plaintiff's Controverting Statement of Facts in Support of her Response in Opposition to DCS Defendants' Motion for Summary Judgment ("PCSOF"), Plaintiff's Motion for Summary Judgment (Doc. 121) and Plaintiff's Statement of Facts in Support of her Motion for Summary Judgment ("PSOF") (Doc. 122), Plaintiff's Response in Opposition to Defendant Thal's Motion for Summary Judgment and Controverting Statement of Facts in Support of Response in Opposition to Defendant Thal's Motion for Summary Judgment (CSOF) and the exhibits attached thereto.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014-2555
480.999.4556

Plaintiff provides the following Memorandum of Points and Authority and Controverting Statement of Facts in Support of her Response in Opposition to DSC Defendants' Motion for Summary Judgment ("PCSOF"). Because the record supports a reasonable inference of deliberate, material court-facing misconduct and a service trajectory that shifted from reunification to severance and adoption, DCS Defendants' motion should be denied.

## MEMORANDUM OF POINTS AND AUTHORITY

### I.     OVERVIEW

This case concerns **court-facing misconduct** that a reasonable jury could find **altered the evidentiary record** presented in the dependency proceedings and shifted the case trajectory from a reunification path to severance. Plaintiff's evidence supports that DCS personnel **coordinated off the record** with the Department's contracted evaluator, Dr. James Thal, to change his written recommendations and to suppress the original report—conduct that Plaintiff contends was then used to justify additional evaluative steps and to support severance of Plaintiff's parental rights.

Plaintiff is **not** asking this Court to relitigate the juvenile court's best-interest determinations or to overturn the severance order. This action seeks damages for **independent constitutional injuries**—including judicial deception, conspiracy, and denial of reasonable reunification efforts—based on conduct that was not presented to the juvenile court because the key coordination occurred **behind the scenes** and only became known through civil discovery in this matter. The central fact questions are whether Defendants knowingly altered / suppressed forensic evaluator opinions and advanced materially false or misleading factual narratives, and whether those acts foreseeably drove the case away from reunification services and toward severance of parental rights.

The record supports a triable issue that DCS Defendants and Dr. Thal each played a pivotal role in the shift toward severance by anchoring the severance petition and subsequent assessments on **Thal's altered evaluation** of Plaintiff's mother, Brendi Ploof—an altered evaluation that was then heavily relied upon by another psychologist, Dr. S. Bryce Bennett, in performing a bonding/best-interests assessment. On Plaintiff's

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

evidence, the result was a **tilted and incomplete court-facing record** that deprived Plaintiff of constitutionally required process and materially impacted the reunification analysis.

Procedurally, DCS Defendants previously moved to dismiss on statute-of-limitations grounds. This Court dismissed Claims One through Nine and Fourteen and remanded Claims Ten through Thirteen. Plaintiff appealed, and on April 13, 2023, the Ninth Circuit reversed the dismissal of Claims Four, Five, Six, Seven, Eight, and Nine and remanded. The remaining claims against DCS Defendants now before this Court are: **judicial deception (Claim Four), conspiracy (Claim Five), and denial of reasonable efforts (Claim Six).**

DCS Defendants move for summary judgment arguing, inter alia, that Claim Six is barred by claim preclusion; that Plaintiff cannot establish judicial deception (Claim Four); that the conspiracy claim (Claim Five) fails as derivative; that issue preclusion bars Claim Four; and that Defendants are entitled to qualified immunity. Summary judgment should be denied because Plaintiff's evidence creates genuine disputes of material fact on the court-facing misrepresentations/alterations, the existence of coordinated conduct, materiality, causation, and the adequacy of reunification efforts.

A severance order entered on a record allegedly shaped by concealed coordination and materially false narratives does not immunize the conduct that shaped that record.

## II.    BACKGROUND

### A.    Summary Background

A robust chronology follows, but stated summarily, the most pertinent events are these:

- December 20-21, 2016: anonymous hotline tips from a former boyfriend; unannounced investigative visits by DCS; home hazards not observed; and, "unsubstantiated" allegations of substandard home conditions

- January 2018: favorable Thal report re: grandmother Brendi Ploof

- January -February 2018: ex parte call between DCS and Thal; "re-work" report; "shred the other report" instruction

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

- February 2018: parent-aide recommends family reunification team; DCS does not provide it
- August 2018: termination of parental rights motion anchored in altered narrative
- Severance trial: testimony on home conditions / child condition
- Civil discovery: new contradictions / lack of firsthand knowledge / discovery of ex parte communications / discovery of "unsubstantiated" re home conditions.

**B.**   **Robust Background**

Jessica is the mother of H.P. born in 2014, she struggled with an intellectual disability her entire life so she resided with her mother, Brendi Ploof, to help her co-parent H.P. and make sure his special and medical needs were met. **PCSOF ¶¶ 2,4-5; PSOF ¶¶ 1-3**. Because H.P. was a medically challenged child, Jessica and Brendi arranged services for H.P. through the Arizona Department of Developmental Disabilities (DDD), including physical therapy, speech therapy, and attendance at a Head Start preschool. **PCSOF ¶ 4; PSOF ¶ 2**. None of the DDD service providers and other professionals who regularly interacted with H.P. and Jessica, including doctors and teachers, as well as family members, saw anything amiss with H.P., Jessica, or the way Jessica cared for H.P. **PCSOF ¶ 2; PSOF ¶ 2-3**. None of these mandated reporters ever saw neglect or abuse by Jessica that warranted a report to DCS or the police.

In December 2016, Jessica's ex-boyfriend threatened to call the Department of Child Safety ("DCS") and make allegations against her. **PSOF ¶ 4.** Soon, thereafter, DCS received two anonymous tips regarding Jessica and H.P. **PCSOF ¶ 3; PSOF ¶ 5**. The first was received on 20 December 2016, alleging that Jessica was neglecting H.P. and that her home was unsafe. **PSOF ¶ 5; DSOF ¶ 1.** The second was received on 21 December 2016 for neglect, substance abuse, domestic violence, and that the home was "dirty" and there was "food, dirty clothes, tampons [unused] and spiders all over the floor." *Id*. **PCSOF ¶ 3**.

Following those calls, DCS investigators Defendant Megan Tafoya and Ms. Baggen visited Jessica's home unannounced twice. **PCSOF ¶¶ 2, 6**. As a result of their investigation, they allowed H.P. to remain in the home with Jessica and Brendi as a safety

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

4

monitor. **PCSOF ¶¶ 6-9**. The substandard home conditions were not observed either time and were recorded by DCS as "unsubstantiated." **PCSOF ¶¶ 3, 7-8**.

At Tafoya's request, Jessica voluntarily submitted to drug testing. **PSOF ¶ 10**. She tested positive for alcohol, marijuana, and methamphetamine. *Id*. **PCSOF ¶ 8**.  In response to the positive drug test, Tafoya scheduled a Team Decision Meeting (TDM)—a meeting between DCS and the family to discuss the safety plan—on 11 January 2017. **PSOF ¶ 11**. It was reported during the TDM that H.P. was healthy with stable housing. **PSOF ¶ 12**. Tafoya appointed Brendi as a "safety monitor for an in-home dependency." *Id*. Jessica was required to participate in TERROS and parenting classes. *Id*. Brendi agreed that she would submit to drug testing, as well. *Id*. Unfortunately, on 12 January 2017, Brendi was unexpectedly called into work and could not undergo the drug and alcohol screening that day. **PCSOF ¶¶ 11, 13**. Brendi offered to complete the screening on another day when she was not working. *Id*. That same day, despite there being no significant change in circumstances and no imminent danger to H.P., Tafoya removed H.P. from Jessica's care using a Temporary Custody Notice (TCN) without court authorization for the seizure. **PCSOF ¶¶ 11, 14**. On 17 January 2017, DCS caused a Dependency Petition and Petition for Paternity and/or Child Support to be filed. **PCSOF ¶¶ 14, 16, 21**.   The Petition alleged that Jessica was unable to parent due to substance abuse, mental health issues, being unable to make sound decisions, and was in constant need of instruction from the maternal grandparent. *Id*. There were no allegations within the Petition that the home was in substandard condition or that it was dirty or otherwise in an unsafe condition or that H.P. was being neglected. *Id*.  Based solely on DCS Petition, Court made H.P. a temporary ward of the Court.  **PCSOF ¶¶ 15, 18, 21; DSOF ¶ 15**. H.P. was initially placed with Jessica's aunt, Heather Walker. On 15 January 2017, a Rapid Response Assessment was initiated. **PCSOF ¶¶ 19, 20; DSOF ¶¶ 19, 20**. Heather Walker was unable to continue as placement due to H.P.'s distress H.P. and having her own two small children.  *Id*.

On 18 January 2017, Tafoya and Greenway submitted a Report to the Juvenile Court for Preliminary Protective Hearing and/or Initial Dependency. **DSOF ¶ 16, Ex. 2**.  In the

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

report, Tafoya claims that Jessica agreed to services but then later states she refused services. *Id*. There are no allegations of Jessica neglecting H.P.'s needs. *Id*. DCS Defendants claimed that since Brendi did not test and Jessica refused services, which was not true, the Safety Plan was no longer viable and H.P. was taken into DCS custody. (Doc. 106 at 3:25-28). On 25 January 2017, DCS filed a Motion for Change of Physical Custody of H.P. to DCS Foster Placement. **PCSOF ¶ 23; DSOF ¶¶ 20, 23, Exs. 16, 18**. Attached to the Report was an Addendum Report to the Juvenile Court prepared by Tafoya and Greenway. *Id*. That Addendum inaccurately states that Heather Walker was unable to care for H.P. due to his developmental needs. *Id*. However, Heather reported that H.P.'s distress and crying had escalated and, with two small children of her own and a new job where she was unable to take time off work, she could not meet H.P.'s needs. *Id*. On 26 January 2017, Tafoya transitioned the case to Paige Szymkowski, the DCS ongoing case manager. **PSOF ¶ 15**.

Szymkowski submitted a referral for Jessica's psychological evaluation with Dr. James Thal, a long-time contracted provider for DCS. **PSOF ¶¶ 20-21**. Ninety to ninety-five percent (90-95%) of Dr. Thal's practice are referrals from DCS. **PSOF ¶ 21**. Almost all his practice revenue is derived from DCS. *Id*. Szymkowski's referral states that Jessica refused services, grandmother refused services, severe domestic violence within the home, H.P. severely speech delayed and having DDD services, and H.P. was not having his needs met prior to placement. **PSOF ¶ 20, Ex. 17**.

In Szymkowski's Assessment and Plan dated 2 October 2017, she falsely alleged that "[t]here are no known protective behaviors present with Jessica." **PCSOF ¶ 40**; **PSOF ¶ 22**. "There is also a lack of ability to recognize safety threats, as the home was observed to be dirty, with food, dirty clothing, unused tampons as well as spiders all over the ground." *Id*. At the end of December 2017, Szymkowski was removed as the case manager and Defendant Claudia Hoff was assigned as the new case manager on 3 January 2018. **PSOF ¶ 23**. At that point, Szymkowski's involvement should have ended. *Id*.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

6

On 18 July 2017, Dr. Thal conducted his first psychological evaluation of Jessica. He opined that Jessica could be an effective co-parent to H.P. and suggested that the maternal grandmother, Brendi, take the role as the primary parent. **CSOF ¶¶12-20**; **PSOF ¶ 24**.

Dr. Thal's first psychological evaluation of Brendi took place on 4 January 2018. **PCSOF ¶ 30**; **PSOF ¶ 25**. He opined that Brendi was an appropriate caregiver for H.P, could meet his special needs, could provide at least minimally adequate care, and that H.P. would not be in danger if placed in her care. *Id*. He recommended that Brendi seek permanent guardianship of H.P. *Id*. That same day, Dr. Thal emailed Brendi's evaluation to Szymkowski, who was no longer on the case. *Id.*; **PSOF ¶ 23**. After reviewing the favorable report, on 24 January 2018, Szymkowski scheduled a call with Dr. Thal to discuss that report, as she, Hoff, and Breeding agreed should be done. **PSOF ¶ 26**. By January 2018, after one year of DCS involvement, Jessica had successfully completed required services and was on track for H.P.'s return until Szymkowski and Dr. Thal had their conversation that produced a distorted court-facing evidentiary record. **PSOF ¶¶ 27, 50**.

On 29 January 2018, Dr. Thal sent a letter to Hoff explaining that "[i]n discussing this case with your predecessor, Paige Szymkowski, I would recommend further assessment regarding what is the best placement for H.P….Therefore, I would recommend that you seek a bonding/best interest evaluation of the child and the parties involved." **PSOF ¶ 27**. Despite being off the case for a month, Szymkowski had an ex-parte telephone call with Dr. Thal on 30 January 2018 during which she expressed her personal, lay opinion that H.P. was bonded with his foster parents and Dr. Thal should take that into consideration. **PSOF ¶ 28**. Szymkowski also stressed the allegedly substandard condition of the home, knowing that these issues were unsubstantiated. *Id*. After this call, Dr. Thal altered his previous professional findings and recommendations. **PSOF ¶ 29**. He now opined that Brendi would not be able to provide minimally adequate parenting and added the recommendation, at Szymkowski's request, for a bonding assessment. *Id*. Dr. Thal's

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

7

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

was not a one-time event but a mechanism that continued to operate in the court-facing evidentiary record and led to the permanent termination of the parent-child relationship. Neither Szymkowski nor Hoff provided any new or additional information to Dr. Thal to support his changes. **PSOF ¶ 30**.

On 1 February 2018, Hoff emailed Thal and "suggested in lieu of a follow-up letter, that [Thal] could simply make [his] changes to [Brendi's] evaluation report because [Hoff] had not yet disclosed the report." **PSOF ¶ 31**. The very next day, on 2 February 2018, Hoff emailed Dr. Thal and expressed her personal, lay opinion on Jessica's ability to parent. **PSOF ¶ 32**. Hoff stated "[w]hile Jessica has completed most of the services, she is so low functioning, I don't know that she could parent a child with special needs. Her mother...something was off there. I couldn't exactly put my finger on it." *Id*. She further stated that the home was clean and safe. *Id*. She told Thal that she would shred his original report. *Id*. In response, Thal stated "I didn't realize that the report had not been distributed as yet. That being the case, I will re-work the recommendations to include the bonding assessment." **PSOF ¶ 33**. Then, on 7 February 2018, contrary to the applicable professional standards, Thal instructed Hoff to "shred the other report." **PSOF ¶¶ 34, 50**.

Jessica dutifully and successfully continued with recommended services and on 28 February 2018, she successfully completed parent-aide services. **PSOF ¶ 35**. The provider specifically found that Jessica "has demonstrated that she is able to meet his [H.P.'s] basic needs" and recommended that a "family reunification team" be provided to reunify H.P. with his mother. *Id*. Hoff, Breeding, and others at DCS did not arrange for or set up reunification services. Instead, they requested a bonding assessment using Thal's substantively altered report as justification. **PSOF ¶ 36**.

On 6 March 2018, Hoff called Dr. Thal's office to inform him that, unfortunately, his original Brendi report, the unaltered version, was disclosed to all parties. **PSOF ¶ 37**. Hoff explained that "Paige [Szymkowski] asked you [Thal] to consider additional information and that you revised your report." *Id*. She also expressed that the court wanted to know why Thal recommended a bonding/best interest evaluation in the altered report.

*Id*. In response, Thal sent a letter dated 14 March 2018, explaining that he issued an altered report based on his 30 January 2018 phone call with Szymkowski. **PSOF ¶ 38**. Dr. Thal explained that Szymkowski "expressed her concerns" over the alleged "substandard condition of grandmother's residence," and about H.P.'s alleged "very poor overall condition when he came into care." **PSOF ¶ 39**. He further explained that Szymkowski also expressed her personal view that H.P. was "bonded" with his foster family and that this bond was a "critically important relationship." **PSOF ¶ 40**. Thal reported that Szymkowski was "clearly concerned about the traumatic impact of removing [H.P.] from foster care." *Id*. No mention was made of the inevitable trauma H.P. experienced being removed from the loving care of his mother and grandmother at age two and a half. Szymkowski's personal views had no factual basis and were contrary to the written reports of the initial DCS investigators. **PSOF ¶ 41**. Injecting her personal opinions into the case this way was a violation of the DCS Oath of Loyalty. *Id*. After this ex parte phone call, Thal changed his report and added a new recommendation for bonding assessments. **PSOF ¶¶ 25, 27-29.**

The records reviewed by Thal are identical in both reports; that is, he did not receive any new, objective, factual information to justify his changes. **PSOF ¶¶ 43, 50.** Notably, the Comprehensive Child and Safety Risk Assessment (CSRA) was among the list of records reviewed, and it documents that the home was free of any safety risks and H.P. was safe with Brendi and Jessica in their home. *Id*. Thal also changed the "Referral Agent" from Szymkowski to Hoff, which was not technically correct. *Id*.

In reliance on Thal's recommendation, on 7 March 2018, Hoff referred H.P. and his foster parents to S. Bryce Bennett, PsyD. for the bonding/best interest assessment. **PSOF ¶ 44.** Thal's altered report was included in the collateral information provided to Dr. Bennett. *Id*. Dr. Bennett's 18 June 2018 report did not recommend returning H.P. to Brendi and Jessica's care. *Id*. Thal's altered report improperly influenced Dr. Bennett into believing that Brendi was not a viable co-parent. *Id*. This position was a 180-degree shift

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

from Thal's original report that was supportive of H.P. being in the care of his mother with grandmother's assistance, as had been the case for the first two and half years of his life.

Hoff communicated ex-parte with Dr. Bennett through email on 12 June 2018, 21 June 2018, and again on 20 September 2018. **PSOF ¶ 45.** During these communications she expressed her personal opinion that Jessica and Brendi were barely minimal parents, and that he may be called to testify as she forecasted the intent to terminate Jessica's parental rights, and needed the evaluation back quickly as Thal did not want to see Brendi for a second psychological evaluation before reviewing Dr. Bennett's evaluation. *Id*. Hoff informed Dr. Bennett of her intent to terminate Jessica's rights with her son. *Id*.

Based on Thal's altered report, on 14 August 2018, Hoff facilitated DCS's Motion for Termination of Parent-Child Relationship on time-in-care grounds coupled with the claim that Jessica was unable to cure her intellectual disability and was unable to parent as a result. **PSOF ¶ 46.** In their Motion, DCS anchored its position on Thal's altered report and assessment, "as Dr. Thal stated in his report, the mother is unable 'to be relied upon to independently learn, retain, and implement safe and effective parenting practices." *Id*. DCS also alleged that foster care is the least-restrictive placement, falsely claiming "[t]he child is not placed with a grandparent…*because DCS is unaware of any such person who is willing, able and appropriate to care for the child*." (emphases added). *Id*.

Hoff then ensured Thal conducted a second psychological evaluation of Jessica on 18 October 2018 using the compounded error of Dr. Bennet's assessment, which itself was improperly influenced by Dr. Thal's altered report on Brendi. **PSOF ¶ 47**. In this second report, Dr. Thal now opined, "[p]lacing [H.P.] in Ms. Ploof's sole and independent care would likely place the child at risk for inadvertent neglect, impaired decision-making, and significant under-stimulation of the child's already reportedly compromised learning abilities." *Id*. Thal went even further stating that the prognosis is poor that Jessica is able to demonstrate minimally adequate parenting in the future. *Id*. He also changed his recommendation from reunification to adoption by the foster parents. *Id*.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Dr. Underwood was retained by Jessica to conduct a psychological evaluation. **PSOF ¶ 48.** Dr. Underwood opined that DCS should reinitiate the plan for Jessica to be the physical guardian of her son with a co-parenting model along with reviving the Safety plan and other recommendations. *Id*.

At the severance trial on 14 January 2019, Szymkowski testified about the allegedly "substandard" conditions of the home that did not exist, that H.P. was severely neglected when he came into care; and her firsthand knowledge of the device used by Brendi during drug testing. **PCSOF ¶ 31**. When asked if she provided pre-placement data to Thal, she testified "[s]o when I had the phone conversation with him [Thal], I wasn't overseeing the case anymore. So I didn't have the file, so wouldn't have been able to send him those files to him anymore if they were in there." **PCSOF ¶ 31**. She was also asked if her intent was for Thal to write a new report and she responded, "[i]n the conversation that I had with him, *I know I had mentioned that*. . ." **PCSOF ¶ 31** (emphasis added). Realizing she just admitted to collusion to write a new report, she then stated, "you know, he could probably just do an updated addendum." *Id*. Szymkowski also admitted that she did not provide H.P.'s DDD records or his medical records to Thal. *Id*.

Hoff testified on 16 January 2019 that she was the one who called Thal and said "I think that the previous worker doesn't necessarily agree and can you look at your report again, have some more contact with Paige [Szymkowski] because she doesn't believe it is accurate." **PCSOF ¶ 31**. Hoff also testified "H.P. was being medically neglected and his needs were not being met. . . no one was taking him to his medical appointments." *Id*. No one at the department requested H.P.'s records. *Id*. She was asked why the Department did not allow visits with her mother [Brendi] as a safety monitor, Hoff testified "when we came into the case we took custody of [H.P.], [Brendi] was living there. She didn't follow through with [H.P.'s] medical needs either. So I don't think the Department would ever be approving of a person who didn't follow through with the medical needs of placement." *Id*. Clearly indicating the intent to sever the parental rights early on with no plans for reunification. The juvenile court served Jessica's parental rights on July 30, 2019, which

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

11

was appealed. *Jessica P. v. Dep't of Child Safety, H.P.*, 249 Ariz. 461, 467–68, ¶¶ 17-22 (App. 2020), opinion vacated in part *Jessica P. v. DCS/H.P.*, CV-20-0241-PR, 2020 WL 8766053 (Ariz. Dec. 15, 2020).

## III.    **STANDARD FOR REVIEW**

Rule 56 provides that a moving party is entitled to summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor." *Puentes v. City of San Mateo*, No. C 11-02511 SI, 2011 WL 4005383, at *2 (N.D. Cal. Sept 8, 2011), aff'd, 481 F. App'x 348 (9th Cir. 2012) (internal citations omitted). "Summary judgment will not lie if the dispute about a fact is 'genuine,' *i.e.*, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The trial court must inquire if "the evidence…is so one-sided that one party must prevail as a matter of law" and "should not act other than with caution in granting summary judgment." *Id.* at 242-43. In addition, the "[p]arty seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admission on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrette*, 477 U.S. 317, 106 (1986); Fed. R. Civ. P. 56(a).

## IV.    **ARGUMENT**

A severance order entered on a record allegedly shaped by concealed coordination and materially false narratives does not immunize the conduct that shaped that record. In short, DCS Defendants' motion should be denied because of genuine factual disputes on the remaining claims:

- **Claim Four (Judicial deception)**: genuine disputes on falsity/recklessness + materiality + causation;

- **Claim Five (Conspiracy)**: agreement inferred from unlikely acts (ex parte communications, "shred to other report," a revised report) + overt acts + shared objective;

- **Count Six (Reasonable efforts)**: triable issues that DCS withheld the recommended reunification pathway (family reunification team/co-parent model) after shifting to severance.

### A.    There are Genuine Issues of Material Fact of Due Process Violations

Defendants first attempt to argue substantive due process and then ironically shift to procedural due process violations forcing Plaintiff to address both.  (Doc. 106 at 6).

Parents' rights are fundamental liberty interest, and the heightened protection of substantive dure process applies.  *See Troxel v. Granvill*, 530 U.S. 57, 65-66 (2000).  "Courts have characterized the right to familial association as having both a substantive and procedural component.  *Keates v. Koile,* 883 F.3d 1228, 1236 (9th Cir. 2018) (quotation omitted).  Substantive due process can be violated "regardless of the procedures used."  *See Siefert v. Hamilton Cnty*., 951 F.3d 753, 765-66 (6th Cir. 2020).

### 1.    Procedural due process violations

"While the right is a fundamental liberty interest, officials may interfere with the right if they provide with the parents fundamentally fair procedures."  *Id*. (quotation and citations omitted).  "An official 'cannot size child suspected of being abused or neglected unless reasonable avenues of investigation are first pursued.'"  *Keates* 883 F. 3d at 1237 (*quoting Wallis v. Spencer*, 202 F.3d 1126, 1138).  Furthermore, "[a] liberty interest may arise from either of two sources:  the due process clause itself or state law."  *Carver v. Lehman*, 558 F.3d 869, 872 (9th Cir. 2009)(quotation omitted).  "[D]eliberately fabricating evidence in child abuse proceedings violates the Due Process clause of the Fourteenth Amendment when a liberty or property interest is at stake."  *Costanich v. Dep't of Soc. & Health Servs.*, 627 F. 3d 1101, 1108 (9th Cir. 2010). These fundamentally fair procedures

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

13

are guaranteed by Arizona law. Arizona requires DCS to train its personnel on protecting families' due process rights from initial contact through case closure. A.R.S. § 8-456.

All that matters here because Plaintiff's theory is not that she merely "lost" in juvenile court; it is that DCS personnel violated those process-protection duties by steering the forensic evaluator record off the books and then using the altered narrative to justify termination of parental rights; they also ignored the "family reunification team" recommendation of their own contracted provider to pursue the termination with an altered and misleading court-facing record developed through hidden ex parte communications and a "shred" the original report instruction; and Szymkowski's severance trial testimony about firsthand observations that she lacked and were contrary to later-discovered evidence.

### 2. Substantive due process violations

A "shock of conscience" test is used to determine if substantive due process is violated by acts of a governmental official. *See Gunter v. N. Wasco Cnty. Sch. Dist. Bd of Educ.*, 577 F.3d Supp. 1141, 1153 (D. Or. 2021); *see also Cnty of Sacromento v. Lewis*, 523 U.S. 833, 845-846 (1998) (substantive due process protects against the arbitrary or oppressive exercise of government power). When determining if an act "shocks the conscience," courts consider if a legitimate government interest motivated the government official, if the act was intentional, and if they knew there was substantial risk of serious harm. *Siefert*, 951 F.3d at 766-67.

DCS Defendants acts were arbitrary, motivated by the case workers' personal lay opinions, and their willingness to coordinate and participate in joint action with Thal to produce an altered court-facing record to support the outcome they personally felt was better for H.P.—severance and adoption, even in the face of the "family reunification team" recommendation of their own chosen parent-aide provider—rather than for the legitimate state interest in protecting H.P. The state court hearings did not cure the procedural due process violations because DCS Defendants continued their path of severance based on the secretly manufactured court-facing record indisputably material to juvenile court's

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

decision. DCS Defendants' conduct shocks the conscience and violated Plaintiff's substantive dure process rights. *See Gunter*, 577 F. Supp.3d at 1153; *Cnty of Sacramento*, 523 U.S. at 845-46; *Siefert*, 951 F.3d at 766-767.

## B. <u>Claim Preclusion Dose Not Bar Count Six (Reasonable Efforts)</u>

DCS Defendants claim that since this court already found claim preclusion on the ADA accommodations and reunification services had been litigated and affirmed on appeal that Plaintiff's reasonable efforts claim (Count Six) should be precluded under claim preclusion (Doc. 106 at 7).

To determine the preclusive, or res judicata, effect of the state juvenile court litigation, this Court must look to the law of the State of Arizona. *Sunkist Gowers, Inc. v. Fisher*, 104 F.3d 280, 283 (9th Cir. 1997). In civil litigation, claim preclusion "means that 'a final judgment on the merits in a prior suit involving the same parties or their privies bars a second suit based on the same claim'" *Lawrence T. v. Dept' of Child Safety*, 246 Ariz. 260, 261, 438 P.3d 259, 262 ¶ 8 (App. 2019) (quotations omitted). Under Arizona law, for an action to be barred, it must be based on the same cause of action asserted in the prior proceeding. *Phoenix Newspapers, Inc. v. Dep't of Corr.*, 188 Ariz. 237, 934 P.2d 801, 804 (App. 1997) (citations omitted); *Niensted v Witzel*, 133 Ariz. 348, 355, 651 P.2d 876, 883 (App. 1982). "If no additional evidence is needed to prevail in the second action than that needed in the first, then the second actions is barred." *Id*. "Two causes of action which arise out of the same transaction or occurrence are not the same for purposes of res judicata if proof of different or additional facts will be required to establish them." *E.C. Garcia and Co., Inc. v. Ariz. Dep't of Revenue*, 178 Ariz. 510, 875 P.2d 169, 179 (App. 1993). "The 'same evidence' test is quite liberal, and permits a plaintiff to avoid preclusion 'merely by posturing the same claim as a new legal theory,' even if both theories rely on the same underlying occurrence." *Power Rd.-Williams Field LLC v. Gilbert*, 14 F. Supp. 3d 1304, 1309 (D. Ariz. 2014) (citation omitted).

Simply put, claim preclusion does not apply here because Plaintiff's civil rights claims are not the same "cause of action" tried in the juvenile court. Moreover, the court-

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

facing record in the juvenile court did not include the concealed behind-the-scenes coordination discovered in this matter; thus, it could not have been litigated in the juvenile court in any meaningful way. The juvenile court's resolution of the dependency/severance actions did not resolve the constitutional claims at issue in this action. Defendants' preclusion theory also fails because the gravamen here is concealed misconduct—ex parte coordination and suppression of a forensic evaluation—that was not disclosed to the juvenile court and was not discoverable to Plaintiff during the dependency proceedings. Preclusion cannot be used as a shield for conduct that, by design, was kept out of the tribunal's view.

## C.    There are Sufficient Facts to Support a Judicial Deception Claim Against Szymkowski (Count Four)

Plaintiff's judicial deception claim against Defendant Szymkowski presents a classic triable issue. The record supports that Szymkowski's alleged misconduct was not a one-time event but a mechanism that continued to operate in the court-facing evidentiary record: she arranged and participated in an ex parte call after she was removed from the case, pressed "substandard home" and "bonded foster family" themes despite knowing the home allegations were unsubstantiated, and provided no new factual information to support Thal's altered report—actions which produced the altered evaluation and caused downstream reliance (i.e., bonding assessment, later filings, and later evaluations) taking the case from reunification to severance, and are the continuing injury-producing effects that make summary judgment inappropriate.

As a fundamental right to familial relationship, this Court has recognized "a constitutional right under the Due Process Clause of the Fourteenth Amendment to be free from judicial deception and fabrication of evidence in the context of civil child custody cases." *Benavidez v. Cnty of San Diego*, 993 F.3d 1134, 1146 (9th Cir. 2021). "[D]eliberately fabricating evidence in civil child abuse proceedings violates the Due Process clause of the Fourteenth Amendment when a liberty or property interest is at stake...." *Costanich v. Dep't of Soc. and Health Servs.*, 627 F.3d 1101,1108 (9th Cir. 2010).

16

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

To successfully allege a violation of the constitutional right to be free from judicial deception, the plaintiff must allege, (1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision. *Benavidez*, 993 F.3d at 1147. Materiality exists if the judicial decision would have been affected by the absence of the false information or the inclusion of the omitted truth. *Benavidez*, 993 F.3d at 1145. "[T]the court must determine the materiality of the allegedly false statements or omissions by purging those statements and determining whether what remains would have provided a substantial basis for issuing the [order]." *Wright v S. Ariz. Child's Advoc. Ctr.*, No. CV-21-00257-TUC-JGZ, 2024 WL 427787 *2 (D. Ariz. Sept. 24, 2024).

Plaintiff has adequately alleged all three elements. The doctrine is applied broadly to government actors who deliberately distort evidence before a court. *Geene v. Camreta*, 588 F.3d 1011, 1033 (9th Cir. 2009) (fabrication and distortion of evidence presented to court actionable); *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (deliberate fabrication of evidence violates due process). "The term 'deliberate fabrication' encompasses both statements that the official knew were false and those the official would have known were false had he not recklessly disregarded the truth." *Schindler v. Contra Costa Cnty.*, No. 21-CV-02984-JSW, 2023 WL 2414864, at *2 (N.D. Cal. Mar. 8, 2023) (citing *Keates v. Koile*, 883 F.3d 1228, 1240 (9th Cir. 2018)). Regardless of the origination of the claims, Szymkowski and Hoff may be liable for repeating statements with "reckless disregard for the truth." *Keates*, 883 F.3d at 1240. Of course, "deliberateness" and "reckless disregard" are states of mind that can rarely be shown by direct evidence and may be shown by circumstantial evidence. *See, e.g.*, *Shoen v. Shoen*, 48 F.3d 412, 417 (9th Cir. 1995) (under defamation law, noting that "actual malice may be shown by circumstantial evidence"); *Sifredo Salguero v. Sullivan*, No. CV 19-07414-CJC (AS), 2020 WL 3087401, at *15 (C.D. Cal. May 5, 2020) (*quoting People v. Bloom*, 48 Cal. 3d 1194, 1208 (1989) ("Evidence of a defendant's state of mind is almost inevitably circumstantial, but

circumstantial evidence is as sufficient as direct evidence to support a conviction"), report adopted, 2020 WL 3086232 (C.D. Cal. June 10, 2020)).

DCS Defendants' misrepresentations and omissions are fully set forth above, including allegations that H.P.'s medical needs were not being met so they could pursue neglect claim, the home was in a substandard condition, that H.P. was not receiving services, *ex parte* communications between DCS Defendants and Thal that resulted in his altered report, the agreement to shred Thal's original report, another forensic expert relying on the altered report, and moving for severance based on the altered report. If you take out failure to act on the "family reunification team" recommendation, Szymkowski's ex parte phone call, Hoff's ex parte communications with Thal and Bennett, Thal's altered report, the false information and Bennet's reliance on Thal's altered report, severance was not guaranteed. All these actions culminated in a materially misleading court-facing evidentiary record before the juvenile court. A severance order does not immunize extra-record manipulation of the evidentiary stream that led to the order; it makes the integrity of that stream more, not less, central.

### D.    Plaintiff's Conspiracy Claim Does Not Fail

DCS Defendants argue that Plaintiff's conspiracy claim fails. However, the evidence is clear that Szymkowski was off the case when she orchestrated an ex parte contact with a forensic evaluator (Thal) that then rippled throughout the juvenile proceedings providing a secretly altered court-facing evidentiary record built on Thal's altered report, coordination between Hoff and Thal with instruction to "shred the other report," publication of the altered report used by Bennet to support his bonded assessment against reunification, as well as DCS's purposeful deviation from recommended family reunification team services.

Liability for conspiracy in a § 1983 action exists when there is an agreement to achieve the goal of violating a plaintiff's constitutional rights. *Crowe v. Cty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010). "[S]ubstantial cooperation" between the private actor and the State must be shown. *Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498, 503 (9th Cir.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

1996). Thal becomes a state actor "by conspiring with a state officer or by engaging in a joint activity with state officials" and "by becoming so closely related to the State that the person's actions can be said to be those of the State itself." *Price v. State of Hawaii*, 939 F.2d 702, 708-09 (9th Cir. 1991), cert denied, 503 U.S. 938 (1992). Thal's activity must be "inextricably intertwined" with those of the state. *Burnette v. Humane Soc'ty of Ventura Cnty*, 294 F.3d 1205, 1211 (9th Cir. 2020).

"Direct evidence of improper motive or an agreement by the parties to violate a plaintiff's constitutional rights will only be rarely available. Instead, it will almost always be necessary to infer such agreement from circumstantial evidence or the existence of joint action." *Mendocino Envtl. Ctr. v. Mendocino Cnty*, 192 F.3d 1283, 1302 (9th Cir. 1999). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir. 1989). To establish that the conspiracy was the cause of the plaintiff's injuries, "the requisite causal chain can occur through the 'setting in motion [of] a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.'" *Harris v. Roderick*, 126 F.3d 1189, 1196 (9th Cir.1997) (*citing Johnson v. Duffy*, 588 F.2d 740 (9th Cir.1978)).

Here, evidence of an agreement to conspire is reasonably inferred by DCS Defendants' and Thal's actions when their acts would have been unlikely to occur without the agreement. *Id.*; *Kunik v. Racine County*, 946 F.2dd 1574, 1580-81 (7th Cir. 1991). "The existence of a conspiracy may be inferred from the nature of the acts, the relationship of the parties, 'the interests of the conspirators, or other circumstances,' and 'express agreement or tacit concert will, if proven, suffice to create liability.'" *Vasquez v. City of Phx.*, 2006 WL 1147716, *4 (D. Ariz. May 1, 2006) (quoting omitted). Thus, not only can a conspiracy rest on circumstantial evidence, but the agreement need not be spoken or tacit, it can be inferred from conduct. The law provides that circumstantial evidence, such as the actions described here, can be used to show the requisite meeting of the minds for § 1983

conspiracy. *Crowe*, 608 F.3d at 440. Furthermore, under *Kunik*, evidence of the agreement can be inferred from DCS Defendants' and Thal's actions when their conduct would have been unlikely to occur without the agreement or understanding. *Kunik*, 946 F.2d at 1580-81.

Moreover, "[w]hether defendants were involved in ***an unlawful conspiracy is generally a factual issue and should be resolved by the jury***, so long as there is a possibility that the jury can 'infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding to achieve the conspiracy's objectives." *Mendocino Env't Ctr.*, 192 F.3d at 1301–02 (emphasis added). Finally, "[i]f sufficient allegations appear of the acts of one defendant among the conspirators, causing damage to plaintiff, and the act of the particular defendant was done pursuant to the conspiracy, during its course, in furtherance of the objects of the conspiracy, with the requisite purpose and intent and under color of state law, then all defendants are liable for the acts of the particular defendant under the general principle of agency on which conspiracy is based." *Hoffman v. Halden*, 268 F.2d 280, 295–96 (9th Cir. 1959), overruled on other grounds by *Cohen v. Norris*, 300 F.2d 24 (9th Cir. 1962). "In other words, a conspiracy under section 1983 permits a jury to hold co-conspirators liable for the damages flowing from a constitutional deprivation that all of the co-conspirators may not have personally carried out." *Sanchez v. Foley*, 972 F.3d 1, 11 (1st Cir. 2020).

### E.    Issue Preclusion Does Not Bar All Claims

DCS Defendants attempt to argue that issue preclusion bars any constitutional violation against them. (*See* Doc. 106 at 13). Issue Preclusion does not apply to issues presented in this lawsuit. As noted previously, preclusion does not apply because the federal civil rights claims here are not the same issues or causes of action as presented in the juvenile court. And, the behind-the-scenes coordination discussed herein was concealed, so it could not have been litigated in the juvenile court in any meaningful way.

For issue preclusion to apply, four conditions must be met: "(1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." *Janjua v. Neufeld*, 933 F. 3d 1061, 1065 (9ᵗʰ Cir. 2019).

The elements of issue preclusion are not satisfied by DCS Defendants. First, the issues at stake here are not the same as those in the dependency/severance proceedings. DCS Defendants rests on an overly generalized description of the issues raised in this case and those raised in the dependency/severance action. In that action, H.P.'s custody was at stake, and DCS Defendants' civil liability for judicial deception and conspiracy were not. DCS Defendants fail to show any of the judicial deception and conspiracy issues were decided by the juvenile court. The juvenile court adjudicated the statutory grounds for termination, best interest of H.P., and guardianship suitability. The issues at stake here are § 1983 claims for judicial deception and ongoing conspiracy to deprive Plaintiff of her constitutional rights which were not litigated and determined by the juvenile court. Judicial deception and conspiracy were not actually litigated in the juvenile court, nor necessary to determination of the issues in the severance action. Plaintiff did not have a full and fair opportunity to litigate DCS Defendants' actions nor the judicial deception that was ongoing through the severance trial. Therefore, issue preclusion does not apply.

Defendants' preclusion theory fails for an additional reason: the gravamen here is concealed misconduct—ex parte coordination and suppression of an evaluation—that was not disclosed to the juvenile court and was not discoverable to Plaintiff during the dependency proceedings. Preclusion cannot be used as a shield for conduct that, by design, was kept out of the tribunal's view.

### F.    DCS Defendants are Not Entitled to Qualified Immunity

DCS Defendant make the erroneous claim that they are entitled to qualified immunity for their alleged wrongful acts. (*See* Doc. 106 at 15). Qualified immunity precludes liability if the state actor's "conduct does not violate established statutory or constitutional rights of which a reasonable person would have known." *Harlow v Fitzgerald*, 457 U.S. 800, 818 (1982). As fundamental right to familial relationships, this

Court has recognized "a constitutional right under the Due Process Clause of the Fourteenth Amendment to be free from judicial deception and fabrication of evidence in the context of civil child custody cases." *Benavidez,* 993 F.3d at 1146. "[D]eliberately fabricating evidence in civil child abuse proceedings violates the Due Process clause of the Fourteenth Amendment when a liberty or property interest is at stake...." *Costanich v. Dep't of Soc. and Health Servs.*, 627 F.3d 1101,1108 (9th Cir. 2010).

To determine whether DCS Defendants are entitled to qualified immunity, the Court considers two independent questions: (1) whether their conduct violated a statutory or constitutional right, and (2) whether that right was "clearly established" at the time. *District of Columbia v. Wesby*, 583 U.S. 48, 62 (2018). For the purposes of qualified immunity, a right is clearly established if "a reasonable officer would recognize that his or her conduct violates the right under the circumstances faced, and in light of the law that existed at that time." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1056 (9th Cir. 2006). The court need not, however, find "a prior case with identical, or even materially similar facts;" it is enough that "the preexisting law provided the defendants with fair warning that their conduct is unlawful." *Id.* "If a state official 'submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarding the truth,…he cannot be said to have acted in a reasonable manner, and the shield of qualified immunity is lost. *Id*. at 1240. In this case, DCS Defendants deceived their own forensic expert and the juvenile court by presenting information they knew or reasonably should have known was false. DCS Defendants false narrative is fully set forth above and in Plaintiff's Controverting Statement of Facts. Their actions resulted in moving the case from reunification to severance. The claim for qualified immunity fails as a matter of law.

## V.    <u>CONCLUSION</u>

Summary judgment can be granted only if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

conclude that DCS Defendants violated Plaintiff's constitutional rights. For all the reasons stated above, the court should deny DCS Defendants Motion for Summary Judgment.

**RESPECTFULLY SUBMITTED** this 13th day of March 2026.

GILLESPIE, SHIELDS & TAYLOR

By */s/ DeeAn Gillespie Strub*
     DeeAn Gillespie Strub
     Jenny D. Jansch
     7319 North 16th Street
     Phoenix, AZ 85020

MILLS + WOODS LAW PLLC

     Thomas A. Connelly
     Robert T. Mills
     Sean A. Woods
     5055 North 12th Street, Suite 101
     Phoenix, AZ 85014

     *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 13, 2026, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel of record

     */s/ DeeAn Gillespie Strub*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556