# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jessica Ploof, an individual, | ) Case No. |
| | ) 2:21-cv-00853-JJT-PHX |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| State of Arizona, et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

DEPOSITION OF MEAGAN TAFOYA

May 30, 2025
10:12 a.m.
Phoenix, Arizona

Prepared by:                       CARRIE REPORTING, LLC
JENNIFER HONN, RPR                 Certified Reporters
Arizona CR No. 50885               2415 East Camelback Road
Carrie@carriereporting.com         Phoenix, Arizona 85016
                                   (408) 429-7573

(CERTIFIED COPY)

I N D E X

| WITNESS | PAGE |
|---|---|
| MEAGAN TAFOYA | |
| By Mr. Connelly | 4 |
| By Mr. Hunter | 151 |
| By Ms. Rhodes | 152 |
| By Mr. Connelly | 162 |

INDEX TO EXHIBITS

| Description | PAGE |
|---|---|
| Exhibit 44   ADOA: Student Transcript - MEAGAN TAFOYA (151428) ST-PLOOF-005494-513 | 13 |
| Exhibit 45   Personnel file ST-PLOOF-006717-6849 | 37 |
| Exhibit 46   TASC Toxicology 12/21/16 ST-PLOOF-002607 | 156 |

3

1                DEPOSITION OF MEAGAN TAFOYA

2

3            The deposition of MEAGAN TAFOYA, was taken on

4   May 30, 2025, commencing at 10:12 a.m., at the law

5   offices of GILLESPIE, SHIELDS, GOLDFARB, & TAYLOR, 7319

6   North 16th Street, Phoenix, Arizona, before JENNIFER

7   HONN, a Certified Reporter, Certificate No. 50885, for

8   the State of Arizona.

9                        * * * * *

10  APPEARANCES:

11  For Plaintiff:

12       MILLS + WOODS LAW PLLC
         Thomas A. Connelly, Esq.
13       5055 North 12th Street
         Suite 101
14       Phoenix, Arizona  85014
         Tconnelly@millsandwoods.com
15
    For the Defendant Thal:
16
         WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
17       Jeffrey S. Hunter, Esq.
         One North Central Avenue
18       Suite 900
         Phoenix, Arizona  85004
19       Jhunter@wwhgd.com

20  For the Defendant State of Arizona:

21       OFFICE OF THE ARIZONA ATTORNEY GENERAL
         Julie Rhodes, Esq.
22       Deborah Garner, Esq.
         P.O. Box 6123-040A
23       Phoenix, Arizona  85005
         Julie.rhodes@azag.gov
24
    Also present:  Taylor Ross, Natalie Newell
25

4

1                    MEAGAN TAFOYA,
2  called as a witness herein, having been first duly sworn
3  by the Certified Reporter to speak the whole truth and
4  nothing but the truth, was examined and testified as
5  follows:
6
7                      EXAMINATION
8  BY MR. CONNELLY:
9      Q.   I know the court reporter already knows your
10 name, but it's sort of a convention we lawyers always
11 start with.
12           Will you please state your name and spell it for
13 the record.
14      A.   Meagan, M-e-a-g-a-n, Tafoya, T-a-f as in Frank,
15 -o-y-a.
16      Q.   Thank you.
17           And you're here today for a deposition in the
18 matter of Jessica Ploof.
19           You're familiar with that case --
20      A.   Yes.
21      Q.   -- you investigated a few years ago, that's
22 what -- mainly what we'll be talking about.
23           I don't intend to keep you here very long today.
24 Hopefully we can get through what little bit we -- what
25 little bit I want to get through with you today.  So I

1  went back the second time?
2      A.   I don't recall.
3      Q.   You agree that in this second entry you don't
4  make any observations about ▮▮▮▮ as far as the way he
5  was dressed or the way he appeared other than he was
6  observed without any injuries except for a scratch on his
7  cheek; right?
8      A.   Correct.
9      Q.   So then we get down to Section F where you
10 interviewed both Jessica and Brendi during the course of
11 your two visits to the home; is that correct?
12     A.   Correct.
13     Q.   And when you're observing ▮▮▮▮ in the home and
14 when you're interviewing Jessica and Brendi in the home,
15 both times that you're out there, you're also observing
16 the condition of the home; is that fair?
17     A.   Yes.
18     Q.   And if you had noted anything about the
19 condition of the home that you felt was unsafe or
20 unsanitary, you would have noted it in your report;
21 right?
22     A.   Correct.
23     Q.   And if you had observed that the home was dirty,
24 you would have noted that in your report; right?
25     A.   Correct.

1    Q.    If you observed that there was food all over the
2    floor, you would have noted that in this section of the
3    CSRA; right?
4    A.    Correct.
5    Q.    If you noted that there were dirty clothes all
6    over the floor, you would have noted that in this section
7    of the report; right?
8    A.    Correct.
9    Q.    If you observed that there were tampons all over
10   the floor, you would have noted that in this section of
11   the report; right?
12   A.    Correct.
13   Q.    If you noted that there were spiders or any
14   other kind of insects all over the floor or just in the
15   home, you would have noted that in your report; right?
16   A.    Correct.
17   Q.    And so since none of that appears in your
18   description in your entries in Section B or Section F of
19   the CSRA, we can conclude that the condition -- the
20   allegations made by the caller on February 20 about the
21   conditions of the home were not confirmed when you were
22   out at the home investigating the allegations; right?
23            MS. RHODES:  Clarification.  I think you
24   just said "February."  I think you meant to say
25   "December."

1           MR. CONNELLY:  I did mean to say
2    "December."
3           THE WITNESS:  Correct.
4    BY MR. CONNELLY:
5       Q.   So this allegation about the home is
6    unsubstantiated based on your investigation; right?
7       A.   Correct.
8       Q.   And, in fact, there was nothing at all that was
9    unsafe about the home when you were out there; right?
10      A.   Not that I recall.
11      Q.   There was nothing about the condition of the
12   home that you would describe it as substandard; right?
13      A.   Correct.
14      Q.   There was nothing about the condition of the
15   home that you would describe as deplorable; fair?
16      A.   Correct.
17      Q.   And I may have already asked it this way, but
18   there was nothing about the condition of the home that
19   you would describe as unsafe; right?
20      A.   Correct.
21      Q.   When you were out there investigating both
22   times, particularly, I guess, in relation to the first
23   hotline call, you were not able to substantiate that
24   Jessica had left ▮▮▮▮▮ home alone ever; is that right?
25      A.   Correct.

```
                                                                 104
 1   that is put into this assessment.
 2       Q.   Okay.  So in and of itself it's really not a
 3   risk factor, it's just an observation of yours?
 4       A.   Not per se, yeah.
 5       Q.   It's just an observation of yours that went into
 6   your calculus and determination to put a safety plan in
 7   place?
 8       A.   I put the safety plan in place due to the
 9   concerns for substance use.
10       Q.   Regarding Jessica?
11       A.   Correct.
12       Q.   So what's the purpose of saying here that there
13   is a concern that the maternal grandmother is parenting
14   ▓▓▓▓▓ and not Jessica?
15       A.   It just would have been my observation, which is
16   normally what goes in that section.
17       Q.   You say in here that "▓▓▓▓▓ is receiving speech
18   therapy at FPC church."
19            And that's something that Brendi had told you
20   on -- when you investigated on the 21st of December;
21   right?
22       A.   Yes.  That she told the worker Baggin.
23       Q.   Okay.  And but you didn't follow up -- as part
24   of your investigation you didn't follow up with FPC
25   church to talk to them about that or get any records that
```

1  they might have or anything like that; right?
2       A.   No.
3       Q.   And you also say that he gets therapy for low
4  muscle tone.
5            Again, that was something that Brendi told you;
6  right?
7       A.   Correct.
8       Q.   And you didn't do anything to follow up on that
9  statement; right?
10      A.   Correct.
11      Q.   In the "Assessment of Impending Dangers" section
12 there, you talk about Jessica -- you say here, "▓▓▓▓ is
13 unable to protect himself or seek protection from others.
14 Jessica is under the influence of alcohol when she is
15 caring for ▓▓▓▓."
16           You put that in there because you smelled
17 alcohol on her breath that day, and she told you that she
18 had drank some alcohol that was in the refrigerator;
19 right?
20      A.   Correct.  And she had a positive UA for alcohol
21 as well.
22      Q.   Well, the fact that she had a positive UA
23 doesn't tell you anything about when she was imbibing in
24 the alcohol; right?
25      A.   Well, based off of drug testing, it's very rare

```
                                                                    147
 1    Let me show you Exhibit 15.  If you'll look at the second
 2    page of Exhibit 15, there's background information.
 3             Do you see that?
 4        A.   Uh-huh.
 5        Q.   That's a "yes;" right?
 6        A.   Yes.  Sorry.
 7        Q.   The second paragraph the first sentence says,
 8    "The condition of the home where ▇▇▇ was residing was
 9    depicted as substandard."
10             Do you see that?
11        A.   Yes.
12        Q.   You never observed the condition of the home to
13    be substandard; right?
14        A.   No.
15        Q.   And you never documented anywhere that the
16    condition of the home was substandard; right?
17        A.   Just other than regurgitating what's in the
18    report, no.
19        Q.   And when you say regurgitating what's in your
20    report, you're talking about --
21        A.   The initial hotline call.
22        Q.   -- the allegations of the anonymous caller;
23    right?
24        A.   Correct.
25        Q.   And based on your investigation, those
```

```
 1   allegations were unsubstantiated; right?
 2        A.   Correct.
 3        Q.   And are you aware of anyplace else in the DCS
 4   records where the condition of the home is based on any
 5   kind of DCS investigation identified as being
 6   substandard?
 7        A.   I wouldn't know after my end date, so no.
 8        Q.   Let me show you Exhibit 30.  And I'll ask you to
 9   look at, again, the second page.
10             And, again, it's the second paragraph, couple
11   sentences in, it says, "The mother's residence was
12   described as substandard."
13             Do you see that?
14        A.   Yes.
15        Q.   And just, again, your investigation of the
16   allegations about the condition of the home determined
17   that those allegations were not substantiated; right?
18        A.   Correct.
19        Q.   In your three visits to the home, you never
20   observed the condition of the home to be one that was
21   unsafe for ▮▮▮▮▮; right?
22                  MS. RHODES:  Form.  Foundation.
23                  THE WITNESS:  Correct.
24                  MR. HUNTER:  Join.
25   //
```

1   BY MR. CONNELLY:
2       Q.   It was never a condition that you would describe
3   as substandard; right?
4               MS. RHODES:  Form.  Foundation.
5               THE WITNESS:  It's -- it wouldn't have
6   caused a safety concern for me to remove ▬▬▬ from the
7   home.
8   BY MR. CONNELLY:
9       Q.   Okay.  And so what happened in this case -- what
10  I've given you there, Exhibit 30, that's the second
11  version of a report prepared by Dr. Thal who's a
12  psychologist engaged to perform a psychological
13  evaluation of Brendi Ploof in this case in the case of
14  this report.
15              This is the version that he submitted to Claudia
16  Hoff after he had already submitted a first version, the
17  signed version of the report, to Paige Szymkowski.
18              Ms. Szymkowski then called Dr. Thal after
19  receiving the report and had a conversation with him
20  about his report.  He then changed his report.  Okay?
21              He then wrote a letter about what Ms. Szymkowski
22  told him when they had a telephone conversation and why
23  he -- what information he received from her that caused
24  him to change his report.  Okay?
25              That's Exhibit 35.  And in the first paragraph

167

STATE OF ARIZONA  ) SS.
                  )
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing proceedings were taken by me, JENNIFER HONN, a Certified Reporter, in and for the County of Maricopa, State of Arizona; that the witness before testifying was duly sworn to testify to the whole truth; that the question propounded to the witness and the answers of the witness thereto were taken down by me in shorthand and thereafter reduced to typewriting under my direction; that the witness will read and sign said deposition; that the foregoing pages are a true and correct transcript of all proceedings had, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

I FURTHER CERTIFY than I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 J(1)(g)(1) and (2).

Jennifer Honn                                    50885
_____        _____
Certified Reporter                              AZ CR Number

*[signature: Jennifer Honn]*                    06/11/2025
_____        _____
Certified Reporter                              Date
(Signature)

                        * * *

I CERTIFY that this Registered Reporting Firm has complied with the ethical obligations set forth in ACJA 7-206 (J)(1)(g)(1) through (6).

Carrie Reporting, LLC                           R1064
_____        _____
Registered Reporting Firm                       RRF Number

*[signature: Michele Durrer]*                   6/12/25
_____        _____
Registered Reporting Firm                       Date
(Signature)